**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| DATA MARKETING PARTNERSHIP, LP, | ) ) ) | |
| Plaintiff, | ) ) ) | Civil Action File No. |
| v. | ) ) | _____ |
| UNITED STATES DEPARTMENT OF LABOR, EUGENE SCALIA, *in his official capacity as Secretary of the United States Department of Labor*, and UNITED STATES OF AMERICA, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**COMES NOW** the Plaintiff Data Marketing Partnership, LP ("DMP") and file this, its

Complaint for Declaratory and Injunctive Relief against Defendants United States Department of

Labor ("DOL"), Eugene Scalia, solely in his official capacity as Secretary of the United States

Department of Labor, and the United States of America, and show the Court as follows:

**INTRODUCTION**

1.      This lawsuit seeks a declaratory judgment to settle an immediate and ongoing

controversy caused by DOL's refusal to act on the advisory opinion request filed by LP

Management Services, LLC ("LPMS") on November 8, 2018, revised as of January 15, 2019, and

further revised as of February 27, 2019 (the "Request").  A true and correct copy of the Request is

attached hereto as Exhibit A.

2.      The Request was submitted because LPMS, as plan administrator and named

fiduciary of the self-insured health plan that DMP maintains for its common law employees and

limited partners (the "Plan") as an adopting employer, seeks to confirm that DOL will not classify

01583737-6                                            1

the Plan as a multiple employer welfare arrangement ("MEWA") as that term is defined in 29 U.S.C. § 1002(40) of the Employee Retirement Income Security Act ("ERISA").   LPMS is the general partner of DMP.

3.      According to the Request, while neither DMP nor LPMS believes the Plan is a MEWA, because the applicable statutory terms set forth under ERISA are ambiguous and a limited partnership is a potentially novel sponsor of a health plan, LPMS has sought an advisory opinion pursuant to ERISA Procedure 76-1 in order to achieve finality on this issue and to assuage the concerns of DMP's current employee, limited partners and potential limited partners.

4.      Apart from the federal judiciary, DOL is solely responsible for interpreting ERISA – within statutory limitations – and has acknowledged this responsibility both in guidance it has provided concerning MEWAs and in its actions issuing approximately 140 advisory opinions and information letters on issues concerning MEWAs.

5.      As with private parties such as LPMS, States have also routinely filed advisory opinion requests with DOL, similar to the Request, seeking guidance on many issues presented by ERISA including issues concerning MEWAs. Indeed, States and others have no alternative but to engage in this process where, as here, the issue presented requires an interpretation of ERISA, as States are not authorized to assign their own meaning to terms set forth in a federal statute.

6.      While not filing their own advisory opinion request, several States have submitted a letter in support of the Request to DOL.  On February 21, 2019, the Attorneys General of Louisiana, Arkansas, Georgia, Indiana, Nebraska, South Carolina and Texas jointly signed a letter in support of the Request (the "State AG Letter").  A true and correct copy of the State AG Letter is attached hereto as Exhibit B.

7.      In the State AG Letter, the respective Attorneys General stated "[w]e are interested in this request and encourage the DOL to respond as soon as possible. The [Request] sought by [LPMS] provides an alternative for expanded access to ERISA plans. We support the intent behind the request and find its legal arguments well-reasoned and thorough, but *interpretation and enforcement of ERISA falls under the exclusive authority of the DOL*."  See Exhibit B, p. 1 (emphasis added).

8.      Guidance from DOL on the Request is critically important because its response informs DMP as to which regulatory authority controls the administration of the Plan.  A determination that the Plan is a MEWA immediately causes a cascading set of regulatory compliance hurdles mandated by statute in each State concerning MEWAs that conduct business within their borders. That regulatory enforcement obligation is a heightened concern here because the Plan is self-insured. The regulatory requirements and burden imposed on self-insured MEWAs are substantial and varied from State to State.  Should DOL determine that the Plan is not a MEWA, DMP would not be subject to such varied and burdensome MEWA regulations of the States.

9.      The delay from DOL and the subsequent confusion created in the several States where DMP currently seeks to do business as to the status of the Plan under ERISA actively undermines DMP's ability to do business throughout the United States. This harm to DMP occasioned by DOL's unreasonable inaction is further detailed below.

10.      DMP faces catastrophic regulatory penalties and enforcement actions as a sponsor of a Plan with limited partners and Texas employees due to the inaction of DOL.  Should DOL determine that the Plan is a MEWA, then DMP will have no choice but to dissolve the Plan.  In such event, the participants would lose their health insurance and access to health care.

01583737-6                                                       3

11.     Perhaps worse than the impending regulatory burden, the lack of clarity on this fundamental issue has resulted and will continue to result in many potential limited partners declining to join DMP for fear that their health coverage will be cancelled.  A major incentive for limited partner membership is the Plan offered by DMP.

12.     Each limited partner that refuses to join for the reason set forth in Paragraph 11 limits the scope of the data pool that DMP can offer to potential customers, thus undermining DMP's overall business purpose and directly siphoning off revenue and profits that would have been had but for DOL's inaction.

13.     Plaintiff accordingly asks that the Court to declare that the Plan is not a MEWA and award other relief as set forth below.

## JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a) and 29 U.S.C. §§ 1132(k). Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 702 and 704 and 29 U.S.C. §§ 1137(a).

15.     Venue is proper in this district pursuant to the express provisions of ERISA, 29 U.S.C. §§ 1132(k).  Venue is also proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (e)(1). Defendants are United States agencies or officers sued in their official capacities; Defendants reside in this District; and a substantial part of the events giving rise to this action occurred in this District.

## PARTIES

16.     Plaintiff is aggrieved by the unreasonable delay in agency action by the federal Defendants and have standing to bring this action.

17. Defendant DOL is an agency of the United States government and has responsibility for implementing and enforcing portions of ERISA. It is an "agency" under 5 U.S.C. § 551(1).

18. Defendant Eugene Scalia ("Secretary") is the Secretary of Labor and is sued solely in his official capacity.

19. Defendant the United States of America is sued as permitted under 5 U.S.C. § 702.

### FACTS

20. LPMS, a limited liability company that is duly formed under the laws of the State of Georgia and registered to do business in the State of Texas, submitted the Request to DOL. LPMS is the general partner of DMP. DMP, a limited partnership that is duly formed under the laws of the State of Texas and qualified to do business in the State of Texas, is directly impacted by the DOL's failure to respond to the Request. The stipulated facts presented in the Request are hereby incorporated by reference and are the stipulated facts on which the Plaintiff relies.

21. LPMS, as the general partner of DMP, is responsible for day-to-day business management decisions including, but not limited to, the execution of rental/office lease agreements, employment contracts, distribution of revenue producing agreements, and grantor decisions to form a group health plan.

22. The limited partners of DMP are individuals who have obtained a limited partnership interest through the execution of a joinder agreement with DMP which is approved by the general partner who in turn files a resolution adding the new limited partner and updates DMP's partnership information to include this information.

23. Limited partners participate in global management issues through periodic votes of all partners of DMP. Together, the general partner and the limited partners, wholly control and operate DMP.

24.     DMP's primary business purpose and main source of revenue is the capture, segregation, aggregation, and sale to third-party marketing firms of electronic data generated by limited partners who transmit such data with DMP.

25.     In addition to certain other management rights, limited partners have a say in how aggregated data will be sold or used by DMP.

26.     Each limited partner agrees to contribute more than five hundred (500) hours of work per year through the generation, transmitting, and sharing of their data.  Thus limited partners are active, committing time and service to the revenue-generating activity of DMP which, among other things, makes them "working owners."

27.     Income distributions by DMP to limited partners resulting from such revenue-generating activities will be reported as guaranteed payments and subject to employment taxes.

28.     DMP also employs at least one common law employee to assist DMP with administrative and/or revenue generating services.

29.     To attract, retain, and motivate talent in support of DMP's primary business purpose, DMP established the Plan.  The Plan Document of the Plan will state in its "Eligibility" section that only eligible plan participants of which DMP is an employer, as defined by ERISA § 1002(7), including certain employees and partners of DMP, are eligible to participate in the Plan.

30.     The Plan automatically covers all common law employees of DMP. The Plan is available to provide coverage to limited partners if they choose to participate. No other persons are eligible to participate in the Plan.

31.     DMP pays 100% of the premiums for coverage under the Plan for common law employees of DMP.  Limited partners are 100% responsible for paying their own premiums for coverage under the Plan.

32.     The Plan is intended to comply with ERISA, including, but not limited to, Parts 1, 4, 5, and 7 of Subtitle B of Subchapter I of ERISA.

33.     Since the Plan is formed and sponsored only by DMP – and not in concert with any other employer – the Plan is a single-employer self-insured group health plan.  LPMS, as the General Partner, serves as the named Fiduciary and Plan Administrator of the Plan. LPMS intends to appoint an independent fiduciary to assist with fiduciary obligations and administration matters associated with the Plan.

34.     DMP recognizes that there are many potential risks which could lead to plan failure(s), whether due to ill-conceived structure, inadequate (re)insurance reserves, or some combination of these and other factors.  DMP has established strong safeguards as a commitment to employees and partners – which are described in detail in Paragraphs 35 through 39 – to address each vulnerability both as to sponsorship and participation.  These safeguards are an integral component of fulfilling the purpose of ERISA to protect employees and their welfare benefits.

35.     The Plan has a number of third-party vendors LPMS engages on behalf of DMP to administer.  First, LPMS hires a consulting and benefits design firm for guidance and assistance with fulfilling plan requirements pursuant to ERISA and related statutes.  Second, LPMS appoints a licensed and bonded Third Party Administrator ("TPA") to collect funds and allocate funds, adjudicate claims, manage claims appeals, execute the payment of claims for benefits under the Plan, and perform other traditional services performed by a TPA.  Third, LPMS appoints a benefits administrator to assist its staff in managing eligibility data and plan participant customer service issues on an ongoing basis.  Fourth, LPMS creates a Trust to hold any plan assets related to the Plan.  Finally, LPMS obtains a reinsurance policy for the Plan.

36.     These third-party vendors service the Plan as their delegated duties require. For example, the TPA collects monthly premium payments from the Plan's participants.  The TPA allocates these funds appropriately, routing plan assets to the Trust (which is solely controlled by a Directed Trustee), paying vendors their fees, and ensuring premium payments are timely made to the reinsurance carrier underwriting the Plan's reinsurance policy.  The TPA withholds a certain amount of premium due to the reinsurance carrier covering the Plan in order to expedite payment of claims for benefits.  With respect to paying claims for benefits, in cases where the TPA has received and approved a claim, the TPA will access the plan assets held in Trust to pay such claim. Should a claim require a payment in excess of the funds available to the TPA on an immediate basis, the TPA coordinates with the reinsurance carrier covering the Plan for transmission of additional funds to the TPA's claims-paying account. Once received, the TPA will continue paying claims.

37.     The reinsurance policy is of a comprehensive and specific nature.  Coverage is obtained from first-dollar and to an unlimited degree per the terms of the reinsurance policy.  This policy is supported by multiple layers of retrocessionary coverage without a risk corridor by retrocessionaires.

38.     LPMS requires the following features of any policy it obtains to cover the Plan now or in the future.  First, any group health plan sponsored by LP, or by any other entity managed by LPMS and which offers ERISA plan participation to its eligible plan participants, including certain employees and partners, must first obtain Qualifying Reinsurance Coverage.  "Qualifying Reinsurance Coverage" means excess/stop loss insurance, indemnity insurance for a self-insured plan or employee benefit trust, insurance for a self-insured plan or trust, or reinsurance coverage

purchased from an excess/stop loss, indemnity, insurance, or reinsurance carrier that meets the key requirements.

39. These requirements for Qualifying Reinsurance Coverage are:

a. an agreement to (re)insure, without limitation, all benefits covered by the Plan which it (re)insures;

b. provided Plan and Reinsurance coverage must be identical as to benefits and limitations;

c. it may only be issued by a carrier which establishes and maintains retrocessionary coverage from one or more (re)insurer(s) with at least $100,000,000 in aggregate equity for any claims which the plan is unable to satisfy by reason of a solvency event affecting said carrier's ability to pay claims, to an unlimited degree;

d. it must note on any contract for coverage a definite starting or attachment point of such coverage which is conspicuous and clear to the plan member(s) prior to purchase of such coverage, and qualifying (re)insurance coverage issued on a non-stop loss (re)insurance basis must have a first-dollar starting point;

e. it must note on any contract for coverage an unlimited liability of the carrier issuing such coverage for benefits covered by such coverage which is conspicuous and clear to the plan member(s) prior to purchase of such coverage;

f. it must have been approved by one or more regulatory body or bodies duly authorized to license and regulate the business of insurance within the United States and/or a member of the National Association of Insurance Commissioners, for a minimum of twenty-four months, and been issued to at least one insured party for the direct and/or indirect coverage of health and/or medical benefits, and in force throughout said period;

g.      it may only be issued by a carrier which establishes and maintains reserves with respect to covered benefits, in an amount recommended (or the mid-point of multiple recommendations) by an actuary certified by the American Academy of Actuaries, consisting of reserves sufficient for:

i.      unearned contributions;

ii.      benefit liabilities which have been incurred, which have not been satisfied, and for which risk of loss has not yet been transferred, and for expected administrative costs with respect to such benefit liabilities;

iii.      any other obligations of the plan; and

iv.      a margin of error and other fluctuations, taking into account the specific circumstances of the plan.

h.      May only be issued by a carrier which establishes and maintains additional reserves of at least $500,000 above the reserves noted above.

i.      Carriers issuing Qualifying Reinsurance Coverage may demonstrate compliance with the reserve requirements described above with alternative reserves in the form of a contract of indemnification, lien, bonding, (re)insurance, letter of credit, or security.

j.      Any business of insurance, including but not limited to the obtaining of Qualified Reinsurance Coverage, conducted in any State must comply with the insurance laws of said State, and obtain all required State approvals.

40.      Congress enacted ERISA in 1974 principally to protect employees, pensioners, and their employee pension and welfare benefits. ERISA imposed fiduciary obligations on plan administrators, and implemented disclosure requirements, and other safeguards.

41.     Title I of ERISA, which governs employee benefit plans – including group health plans – "was adopted … [in part] to remedy the abuses that existed in the handling and management of welfare and pension plan assets … Workers in such traditional employer-employee relationships are more vulnerable than self-employed individuals to abuses because the workers usually lack the control and understanding required to manage pension funds created for their benefit" *Schwartz v. Gordon*, 761 F.2d 864, 868 (2d Cir. 1985). Therefore, ERISA is designed to protect "participants" who are "employees" that participate in employee benefit plans which are subject to its regulatory scope.

42.     Subchapter I of ERISA is comprised of Subtitle A – General Provisions and Subtitle B – Regulatory Provisions. For purposes of Subchapter I, 29 U.S.C. § 1002 sets forth all defined terms. The statute provides that an "employee welfare benefit plan" means "any plan, fund, or program . . . established or maintained by an employer or employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants and beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits." 29 U.S.C. § 1002(1). 1 A "participant" refers to an "employee or former employee of an employer…" *Id.* § 1002(7). "Employee" means "any individual employed by an employer." *Id.* § 1002(6).  ERISA defines "employer" in relevant part as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan…." *Id.* § 1002(5).

---

1 A type of "employee welfare benefit plan" is a "group health plan" defined in Part 7, Subtitle B of ERISA and is discussed *infra*. Also under ERISA, an "employee welfare benefit plan" can be formed to offer "benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services," 29 U.S.C. § 1002(1), or any benefit listed in 29 U.S.C. § 186(c). ERISA also establishes "employee pension benefit plans." *Id.* § 1002(2). All of these types of plans are interconnected with the definition of "employer" at § 1002(5).

43.    A MEWA means "an employee welfare benefit plan, or any other arrangement (other than an employee welfare benefit plan), which is established or maintained for the purpose of offering or providing any benefit described in paragraph (1) [referring to employee welfare benefits] to the employees of two or more employers (including one or more self-employed individuals), or to their beneficiaries…[2] *Id.* at § 1002(40).

44.    While ERISA § 1002(7), the definitional section of ERISA, is silent about the status of partners as participants in ERISA plans, other sections of ERISA, the initial regulations promulgated by DOL along with subsequent regulatory iterations, various Advisory Opinions, and informal guidance all compel the conclusion that limited partners in partnerships like DMP are "employees" within the meaning of ERISA § 1002(7).

45.    Importantly, the applicable regulations do not say that a partner cannot be an "employee" and state that a partner can be an ERISA governed participant.

46.    In 1999, DOL clarified in an exhaustive opinion the intended scope of 29 U.S.C. § 1002(3) of ERISA and its regulations set forth at 29 U.S.C. § 2510.3-3(b) making clear that self-employed individuals (including partnerships and partners which are specifically referenced therein) who are "working-owners" may have dual status as an "employer" and an "employee," and therefore, may be considered a "participant" in an ERISA-covered plan where such working owners participate along-side of their common law employees. DOL Op. No. 99-04A (Feb. 4, 1999).

47.    More specifically, DOL opined that 29 U.S.C. §§ 1101(a)(2), 1103(b)(3)(A), 1108, 1301(b)(1), 1321(b)(9), and 1322(b)(5)(A) all support this conclusion. *Id.*  Moreover, DOL noted

---

[2] The remainder of the definition sets forth exceptions to MEWA status none of which are applicable here.

that to treat such working owners different than employees would cause "intolerable conflicts" between the different Parts of ERISA and lead to "absurd results." *Id.* (referring to the warning issued by the Supreme Court in *Nationwide Mutual Insurance Co. v Darden*, 503 U.S. 318, 323 (1992), which held that the common law definition of employee must be graphed into ERISA to at least partially define the statutory meaning of "employee." ).

48.    Considering the circumstances of the limited partners participating in the Plan, DMP is a valid limited partnership and the limited partners will actively provide valuable services to DMP in support of and essential to its profit goals.

49.    DMP employs common law employees and those employees along with the limited partners are eligible to participate in the Plan. Consequently, and consistent with DOL Op. No. 99-04A, the limited partners should be treated as "working owners" and, therefore, employees who along with their common law employees of DMP are participants in an ERISA covered plan.

50.    With respect to DMP, limited partners will actively provide services on behalf of the partnership in support of its profit goals and income derived therefrom will be reported as guaranteed payments as that term is used in IRC §§ 707(c) and 1402(a)(13), which addresses the taxation of limited partner income. Therefore, the income received by the limited partners will be subject to employment taxes under IRC §1402(b) (self-employment income is subject to Social Security taxes and in other important ways is treated as *de facto* wages).

51.    This tax treatment, of course, is the hallmark of service performed by an employee on behalf of an employer as distinguished from partners earning distributive shares as

contemplated by IRC §1402(a)(13) who are merely passive equity owners. *Renkemeyer, Campbell & Weaver LLP v. Commissioner,* is instructive on this point. 136 T.C. 137 (2011).[3]

52.     Lastly, at the time 29 U.S.C. §2590.732(d) was finalized, the Treasury Department also finalized mirror regulations at Treas. Reg. §54.9831-1(d). It appears that this mirroring was supplemental to the amendment by Congress of IRC §5000(b)(2),  which clarified that self-employed persons could sponsor group health plans. While ERISA does not have a clear approach to classifying partners, the IRC does. In this regard, service by a partner on behalf of the partnership very clearly causes self-employment income tax treatment on distributed income. The relationship between the partner and the partnership is *de facto* employment. This closely aligns with ERISA's goals of regulating employment relationships and serves as a good bridge to achieve the policy objectives which expressly calls for harmonizing the Department and Treasury provisions that relate to the same subject matter. *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 13 (2004) ("…Congress' objective was to harmonize ERISA with long standing tax provision.").

### THE ADVISORY OPINION INACTION HARMS THE PLAINTIFFS

53.     As detailed in the preceding paragraphs, the failure by DOL to take any action on the Request harms the economic and proprietary interests of Plaintiff.

54.     The requested relief, if granted, will redress the injuries to the interests of Plaintiff caused by DOL's failure to issue an Advisory Opinion Ruling in a reasonable timeframe.

---

[3] The Tax Court also provides a thorough history of emerging hybrid corporate business forms like limited partnerships which as a point of reference provides relevant detail supporting the need for consistent regulation by the Department of Treasury and the DOL.

## CAUSES OF ACTION
### COUNT ONE
### DECLARATORY JUDGMENT

55.    Plaintiff incorporates each of the foregoing paragraphs by reference as if they were fully set forth herein.

56.    Under 29 U.S.C. §§ 1132(k), the "administrator, fiduciary, participant, or beneficiary of an employee benefit plan" may bring suit "to restrain the Secretary from taking any action contrary to the provisions of this Act…"

57.    Plaintiff brings this suit in its capacity as fiduciary of the Plan, and requests that this Court declare the limited partners of DMP are "employees" and "participants" in an ERISA covered employee welfare benefit plan, and prohibit the Secretary from ruling otherwise because such a ruling would be an "action contrary to the provisions of" ERISA.

58.    Plaintiff further request this Court declare and the Plan is not a MEWA as that term is defined from ERISA, and similarly prohibit the Secretary from ruling otherwise because such a ruling would be an "action contrary to the provisions of" ERISA.

### COUNT TWO
### INJUNCTIVE RELIEF

59.    Plaintiff incorporates each of the foregoing paragraphs by reference as if they were fully set forth herein.

60.    Under Rule 65 of the Federal Rules of Civil Procedure, this Court may issue a preliminary and subsequent permanent injunction enjoining the Secretary from taking any action with respect to the at-issue Advisory Opinion while this case is pending.

61.    The Plaintiff respectfully requests the Court issue such injunction at the earliest possible time in order to prevent continuing and irreparable harm to the Plaintiff.

62.     The Plaintiff further respectfully request the Court issue an injunction preventing the Secretary from taking action that is contrary to this Court's finding on the merits with respect to Count 1 of Plaintiff's Complaint.

63.     The Plaintiff further respectfully requests the injunction apply with equal force to the several States' respective departments of insurance or similarly charged administrative bodies. Broad federal preemption applies to single employer ERISA plans.  Because interpretation of ERISA is inherently a federal prerogative, permitting the states to engage in a patchwork interpretation landscape on a question that is purely federal in character and still pending before this Court would unduly burden Plaintiff is manifestly unjust.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a.      Declare the limited partners of DMP are "employees" and "participants" in an ERISA covered employee welfare benefit plan;

b.      Declare that the Plan is not a MEWA as that term is defined under ERISA;

c.      Declare that DOL failed to timely respond to the Advisory Opinion request and, therefore, in the interest of judicial economy, neither DOL nor any state agencies may opine on or take any action whatsoever on the substance of the Request but rather must await the final disposition of this action before taking any independent course of action with respect to the issue of whether the Plan is a MEWA;

d.      Enjoin DOL and all its officers, employees, and agents, and anyone acting in concert with them, from implementing, applying, or taking any action in any State that is contrary to the findings of this Court;

e.      Award Plaintiffs costs, expenses, and reasonable attorneys' fees; and,

f.     Award such other relief as the Court deems just and proper.

Respectfully submitted,

**TAYLOR ENGLISH DUMA LLP**


*/s/ Reginald Snyder*
Reginald Snyder
Texas Bar No. 24030138
Bryan Jacoutot (*Pro Hac Vice Pending*)
Georgia Bar No. 668272
1600 Parkwood Circle, Suite 200
Atlanta, Georgia 30339
Telephone: (770) 434-6868
Facsimile: (770) 434-7376
rsnyder@taylorenglish.com
bjacoutot@taylorenglish.com

*Counsel for Plaintiffs*

01583737-6                                    17