**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

**DATA MARKETING PARTNERSHIP, LP and**
**LP MANAGEMENT SERVICES, LLC,**

**Plaintiffs,**

**v.**

**UNITED STATES DEPARTMENT OF LABOR,**
**EUGENE SCALIA,** *in his official capacity as Secretary of the*
*United States Department of Labor,* **and**
**UNITED STATES OF AMERICA,**

**Defendants.**

**Case Number 4:19-cv-00800-O**

<u>**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**</u>

**Reginald Snyder**
**Texas Bar No. 24030138**
**Jonathan Crumly (Pro Hac Vice Pending)**
**Georgia Bar No. 199466**
**Bryan Jacoutot (Pro Hac Vice Pending)**
**Georgia Bar No. 668272**
**TAYLOR ENGLISH DUMA LLP**
**1600 Parkwood Circle, Suite 200**
**Atlanta, Georgia 30339**
**Telephone: (770) 434-6868**
**Facsimile: (770) 434-7376**
**rsnyder@taylorenglish.com**
**jcrumly@taylorenglish.com**
**bjacoutot@taylorenglish.com**
**Counsel for Plaintiffs**

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................... 1

II.    PROCEDURAL BACKGROUND ........................................................................ 3

III.   STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................ 5

   A.   OVERVIEW OF LPMS AND DMP RELATIONSHIP AND BUSINESS .................... 5

   B.   REAL HARM TO REAL PEOPLE CAUSED BY AO RESPONSE AND ACA ............ 7

   C.   DMP PLAN SUMMARY ............................................................................... 11

   D.   MEWAS AND DOL'S ADVISORY OPINION PROCEDURE ................................ 12

IV.   ARGUMENT AND CITATION TO AUTHORITY ................................................... 14

   A.   THIS COURT HAS AUTHORITY AND JURISDICTION OVER PLAINTIFFS' CLAIMS .......... 14

   B.   THE AO RESPONSE ISSUED BY DOL IS NOT ENTITLED TO ANY DEFERENCE .............. 15

   C.   AO RESPONSE VIOLATES SUPREME COURT PRECEDENT AND PRIOR DOL ADVISORY OPINIONS ............................................................................................ 22

   D.   AO RESPONSE VIOLATES APA BY FAILING TO ANALYZE AND CITE RELEVANT, APPLICABLE LAW ...................................................................................... 30

   E.   AO RESPONSE VIOLATES DOL PROCEDURES BY BASING CONCLUSIONS ON SPECULATIVE AND DISTORTED FACTUAL FINDINGS ........................................ 32

   F.   AO RESPONSE ARBITRARILY DENIGRATES ECONOMIC ACTIVITY OF DATA CONTRIBUTING PARTNERS ........................................................................ 35

   G.   EVEN WITH *AUER* AND/OR *CHEVRON* DEFERENCE, DOL'S AO RESPONSE REMAINS UNLAWFUL ................................................................................. 38

   H.   PERMANENT INJUNCTIVE RELIEF IS WARRANTED BY THE FACTS AND THE LAW ........ 40

V.    CONCLUSION ............................................................................................... 50

## Table of Authorities

5 U.S.C. § 551 ................................................................................................................. 15

5 U.S.C. § 704 ................................................................................................... 1, 15, 40, 41

5 U.S.C. § 706 ................................................................................................... 15, 38, 39

26 U.S.C. § 401 ........................................ 24, 28, 29, 31, 42, 43, 44, 46, 47, 48

26 U.S.C. § 469 ................................................................................ 31, 35, 36

26 U.S.C. § 911 ................................................................................................. 28

26 U.S.C. § 3508 ............................................................................................... 42

29 U.S.C. § 1002 ....................................................... 3, 13, 28, 43, 48, 49

29 U.S.C. § 1132 ................................................................... 1, 14, 15, 40, 41

29 U.S.C. § 1144 ............................................................................................... 49

29 U.S.C. § 1191a ......................................................................... 25, 43, 47, 48

26 C.F.R. § 1.469-5T ...................................................................................... 36

29 C.F.R. § 2510.3-3 .................................................................. 24, 29, 43, 47, 48

Fed. R. Civ. P. 56 ...................................................................................... 1, 14

ERISA Proc. 76-1 ............................................................... 13, 15, 29, 32

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937) ............................................. 41

*Alenco Communs, Inc. v. FCC*, 201 F.3d 608 (2000) ............................................ 39

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ................................ 19

*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945) ........................... 19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..................................... 14

*Chevron, U.S.A. v. National Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ................ 16

*Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012) ..................... 20, 29

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ................................... 16, 17, 20

*Clackamas v. Gastroenterology Associates, P.C. v. Wells*, 538 US 440 (2003) ............ 45

*Cutaiar v. Marshall*, 590 F. 2d 523 (3d Cir. 1979) ............................. 40

*Good Samaritan Hosp. v. Shalala*, 508 U.S. 402 (1993) ............................. 18

*House v. American United Life Insurance Company*, 499 F.3d 443 (5th Cir. 2007) ...... 26, 43, 48

*INS v. Cardoza-Fonseca*, 480 U.S. 421, n. 30 (1987) ............................. 18

*Kisor v. Wilkie*, 204 L. Ed. 2d 841 (2019) ................................... 19, 20, 21

*Lifecare Mgmt. Servs., LLC, v. Ins. Mgmt Adm'rs*, 761 F. Supp. 2d 426 (2011) ....................... 39

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (1994) ....................................................... 14

*Marbury v. Madison*, 5 U.S. 137 (1803) ............................................................... 41

*Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993) ....................................................... 45

*Motor Vehicle Mfrs v. State Farm*, 463 U.S. at 431(1983)................................................ 39

*Nationwide Mut. Ins. Co. v Darden*, 503 US 318 (1992) .......................................... 23, 24, 44, 45

*New York v. United States Dep't of Labor*, 363 F. Supp. 3d 109 (D.D.C. 2019) .................... 6, 49

*Patterson v Shumate*, 504 US 753 (1992) ............................................................. 44

*Pension Benefit Guaranty Corp., v. Wilson N. Jones Mem. Hosp.*, 374 F. 3d 362 (2004) ......... 39

*Permian Basin Petroleum Ass'n v. DOI*, 127 F. Supp. 3d 700 ......................................... 39

*Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*,
        541 U.S. 1 (2004) ..................................... 17, 23, 28, 32, 42, 43, 44, 45, 46, 47, 48, 49

*Steffel v. Thompson*, 415 U.S. 452 (1974) ........................................................... 40

*Transitional Learning Community at Galveston, Inc., v. US OPM*,
        220 F.3d 427 (5th Cir. 2000) ................................................................. 39

*Virginia Beach Policemen's Benevolent Ass'n v. Reich*, 881 F. Supp. 1059 (1995) .................. 15

Llewellyn, Karl N., "Chevron Step Zero," 92 Va. L. Rev. 188 (2006) ....................................... 17

<u>**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**</u>

Plaintiffs Data Marketing Partnership, LP ("DMP") and LP Management Services, LLC ("LPMS") (DMP and LPMS collectively referred to as "Plaintiffs"), file this Brief in Support of their Motion for Summary Judgment (the "Motion") pursuant to Fed. R. Civ. P. 56, 29 U.S.C. §§ 1132(a)(3) and 1132(k) and 5 U.S.C. § 704. In the Motion, Plaintiffs seek judgment as a matter of law against Defendants United States Department of Labor ("DOL"), Department of Labor Secretary Eugene Scalia, in his official capacity only (the "Secretary") and the United States of America ("USA") (DOL, the Secretary and USA collectively referred to as "Defendants"), respectfully showing the Court as follows:

## I.   INTRODUCTION

Plaintiffs seek judgment as a matter of law to correct the fatally-flawed, arbitrary and capricious actions of DOL, which actions would have the effect of depriving over 50,000 Americans access to affordable healthcare under an Employee Retirement Income Security Act ("ERISA") compliant single-employer group health plan. Without citation to binding legal authority and in contradiction of United States Supreme Court precedent and DOL's own prior interpretations, DOL issued a response ("AO Response") to Plaintiffs' Advisory Opinion request (the "AO Request") on January 24, 2020, erroneously concluding that limited partners in LPMS-managed limited partnerships, such as DMP, do not perform work for the partnership and "are not participants in a single-employer, group health plan or ERISA plan".[1] The undisputed facts in the record before DOL and this Court, however, paint a different picture: the limited partners are active participants creating DMP's primary commercial offering by committing time and service to the revenue-generating activity of DMP, as well as earning income in return for the time and service

---

[1] A true and correct copy of the AO Response is included in the Appendix at App. pp. 1 – 6.

committed. They are clearly "working owners" of the partnership. As such, they are entitled to be participants in the single-employer health plan established by their limited partnership.

The AO Response should be set aside because DOL exceeded its statutory authority, thereby violating the Administrative Procedure Act's ("APA") legal criteria governing agency action. Moreover, the AO Response is not entitled to deference from this Court because, at a minimum, the statutes and regulations relevant to this issue are unambiguous. As further outlined below, and as the parties have agreed, no genuine dispute exists as to any material fact in this case, and Plaintiffs are entitled to judgment as a matter of law in their favor on all claims asserted in their First Amended Complaint (ECF No. 9) ("FAC"). DOL's AO Response, on the other hand, attempts to prohibit Plaintiffs' legitimate and innovative business model from offering the benefit of a group health plan to tens of thousands of self-employed Americans. If DOL's unlawful decision were allowed to stand, its opinion would have the practical effect of depriving more than 50,000 participating Americans of their current health coverage, and potentially millions of others currently being unable to gain access to affordable healthcare due to the inequitable impacts of the Affordable Care Act a/k/a Obamacare ("ACA"). Given that the AO Response fails to analyze any relevant statutes or regulations, contradicts Supreme Court authority without explanation, and ignores DOL's own prior analysis of the relevant issues, it is the definition of an arbitrary and capricious final ruling which must fall at summary judgment.

Due to the irredeemable flaws in the AO Response, Plaintiffs are entitled to the following relief from this Court:

1.     A declaration that the AO Response is void and of no force or effect;

2.     A declaration that "working owners" can be participants for the purposes of ERISA group health plans;

3.      A declaration that DMP limited partners and similarly situated, LPMS-managed partnership limited partners are "working owners" under ERISA entitled to participate in ERISA group health plans;

4.      A declaration that the Plan (*see infra*) is a single-employer welfare plan and not a multiple employer welfare arrangement ("MEWA") under ERISA;

5.      An Order compelling Defendants' withdrawal of the AO Response as a violation of ERISA; and

6.      An injunction against DOL from taking any action that is contrary to this Court's Order including, but not limited to, this Court's explicit finding that DMP's limited partners and similarly situated LPMS-managed partnership limited partners are working owners under ERISA.

## II.     PROCEDURAL BACKGROUND

LPMS employs a novel and legitimate business model. In an effort at constructive engagement, transparency, and at the specific invitation of DOL, LPMS submitted its AO Request to DOL on November 8, 2018 regarding its business model and its proposed single-employer health plan. LPMS subsequently revised its AO Request on January 15, 2019 and again on February 28, 2019, (the "AO Request").[2] The AO Request thoroughly explained LPMS' business plan, the single-employer health plan to be offered by each of the limited partnerships it intended to manage, and how the proposed plan complied with well-established legal precedent and DOL's own prior advisory opinions. LPMS sought to confirm that DOL would not classify such partnership health plans as MEWAs as that term is defined in 29 U.S.C. § 1002 (40) of ERISA and more specifically confirm the following:

---

[2] A true and correct copy of the AO Request is included in the Appendix at App. pp. 7 – 20.

3

1.      The single-employer, self-insured, group health plans sponsored by LPMS-managed partnerships (including DMP) are "employer welfare benefit plans" within the meaning of ERISA section 3(1).

2.      The limited partners participating in LPMS-managed partnerships' single-employer, self-insured, group health plans are "participants" within the meaning of ERISA section 3(7).

3.      The single-employer, self-insured, group health plans sponsored by LPMS-managed partnerships are governed by Title I of ERISA.[3]

DOL's AO Response on January 24, 2020 was issued four hundred forty-two (442) days after submission of the AO Request and one hundred twelve (112) days after the filing of the original Complaint. DOL publicly posted the AO Response on DOL's website a mere four (4) days before Defendants' Answer to the original Complaint was due. On February 3, 2020, Plaintiffs filed their First Amended Complaint, seeking injunctive relief and arguing that the AO Response has no basis in law or in fact. As set forth below, summary judgment is appropriate in this case. The parties have agreed that the issues before this Honorable Court involve matters of law and that the facts relevant to this case are undisputed, making this case ripe for summary disposition.

---

[3] App. p. 7.

### III.    STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.    OVERVIEW OF LPMS AND DMP RELATIONSHIP AND BUSINESS[4]**

DMP is a partnership duly registered and formed in the State of Texas.[5] The primary business purpose of DMP is the production, capture, segregation, aggregation, anonymization, organization, and sale to third-parties of electronic data generated by its partners.[6] The generation and aggregation of electronic data transmitted by each partner represents the most significant, income-generating commodity which DMP seeks to sell to third parties.[7] To succeed, this business model requires large numbers of partners contributing data to the partnership.[8] The limited partners are compensated for, control and manage the production, capture, segregation, aggregation, and sale of, data they individually produce, empowering partners in a manner not otherwise available to them.[9] LPMS, the general partner of DMP, manages DMP's day-to-day operations. DMP is wholly controlled and operated by LPMS and its limited partners.[10]  DMP also employs common

---

[4] All of the facts concerning partnership governance, business activity and the self-insured single-employer group health plan of DMP are equally applicable to all other LPMS-managed limited partnerships. For sake of clarity and brevity, Plaintiffs will only include such information concerning DMP; however, all such facts apply to the other LPMS-managed limited partnerships.

[5] A true and correct copy of the FAC is included in the Appendix at App. pp. 21 – 52; *See also*, App, p. 55, ¶ 13.

[6] A true and correct copy of the Declaration of Randall W. Johnson is included in the Appendix at App. pp. 53 – 58. Plaintiffs acknowledge that this declaration was first submitted in this lawsuit in conjunction with Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction and was not part of the record before DOL when it issued its AO Response. The Declaration is offered to provide sworn testimony of the facts contained in the AO Request, App. p. 7, and to perfect the evidentiary record before this Court in compliance with the applicable rules pertaining to motions for summary judgment. *See* App. p. 54, ¶ 7.

[7] App. p. 28, ¶ 35.

[8] App. p. 54, ¶ 8.

[9] App. p. 56, ¶ 17.

[10] App. p. 55, ¶ 12.

law employees to administer day to day operations, engage prospective buyers of the partners' work product, and enhance the software developed and owned by DMP.[11]

After the submission of the AO Request and in reliance on various favorable representations made by DOL representatives, DMP established a single-employer, self-insured, group health plan (the "Plan") to attract, retain, and motivate talent in service of DMP's primary business purpose.[12] The Plan reflects the substantial commitment that DMP makes to its eligible plan participants, which are comprised solely of DMP's employees and limited partners (as well as their eligible spouses and dependents). Since this Plan is formed and sponsored only by DMP – and not in concert with any other employer – the Plan is a single-employer, self-insured group health plan. DMP serves as the Named Fiduciary and Plan Administrator of the Plan.[13] The Plan automatically covers all common law employees and is available to provide coverage for the limited partners if they choose to participate.[14] As of January 30, 2020, nearly 50,000 Americans have either been automatically enrolled as eligible common law employees, or elected to join a plan after signing a joinder agreement as a partner either of DMP or of one the other LPMS-managed partnerships sponsoring health plans.[15] These plans are designed to be "single-employer plans" covered by ERISA and are not MEWAs.[16]

---

[11] App. p. 56, ¶ 19.

[12] App. pp. 56 – 57, ¶¶ 20, 23 and 24.

[13] App. p. 29, ¶ 40.

[14] App. p. 57, ¶ 21.

[15] *Id.* at ¶ 23.

[16] Although establishing that the Plan is not a MEWA was a principal focus of the AO Request, DOL ignored the MEWA issue entirely in its AO Response, likely due to the fact that any arguments asserting that the Plan is a MEWA would conflict starkly with DOL's position regarding Association Health Plans, in its appeal of the DC Circuit Court's decision in *New York v. United States Dep't of Labor, 363 F. Supp. 3d 109 (D.D.C. 2019)*

The limited partners of DMP are individuals who have obtained an ownership interest through the execution of a joinder agreement with DMP.[17] Limited partners also participate in global management issues through periodic votes of all partners. Any payments made by DMP to limited partners for their revenue-generating activities are reported to the IRS as guaranteed payments, and are subject to employment taxes. To be eligible to participate in the Plan, each limited partner must contribute at least five hundred (500) hours of work per year through the generation, transmission, and sharing of their marketable electronic data.[18]

In order to generate the necessary electronic data to provide for the primary business purpose of the partnership, participating partners who are willing to generate data for resale by the partnership install proprietary software for computers and mobile applications on the computers and mobile devices they choose to use to generate data for the partnership.[19] This software captures the electronic data generated by the partners as they use the application on their computers and/or mobile devices and transmits it to a "data bank" maintained by the partnership. The aggregated electronic data collected from the limited partners of all of the member limited partnerships is then anonymized and organized for marketing to third-party purchasers.

B.    REAL HARM TO REAL PEOPLE CAUSED BY AO RESPONSE AND ACA

The success of the DMP's business model (as well as the other LPMS-managed limited partnerships) depends on its ability to attract enough partners in order to generate statistically meaningful user data.[20] As a result of the AO Response finding that DMP's partners are not working owners entitled to participate in DMP's single-employer plan, Plaintiffs have ceased

---

[17] App. p. 9; App. p. 55, ¶ 11.
[18] App. p. 8; App. p. 55, ¶¶ 12, 15; App. p. 56, ¶ 18.
[19] App. p. 56, ¶ 16.
[20] App. p. 57, ¶ 24.

enrolling partners in the partnership plans.[21] Should the AO Response survive summary judgment, the 50,000 plus partner enrollees in the partnership plans will have to be "de-enrolled," thereby losing their health coverage.[22]

DMP created the Plan as a key recruitment method to achieve this essential business goal of attracting a sufficient user base to create marketable electronic data.  Access to group health plans is an attraction and retention tool utilized by an overwhelming majority of US employers, and many companies (particularly in transient sectors, such as temporary staffing) publicly advertise access to their group health plans in order to attract new employees.  DMP's benefit plan model is therefore nothing new; only its ownership structure is in any way novel.  Contrary to the underlying assumptions of DOL, "novel" is not a synonym for illegitimate, or unlawful.  DMP fully conforms with state partnership law and the Plan fully conforms with ERISA, including its treatment of partners as employees for the purposes of establishing group health plan eligibility.

Despite having direct regulatory oversight of ERISA, DOL admits it could not muster the resources to evaluate the AO Request's treatment of long-standing authority interpreting ERISA. Instead of relying on internal resources, DOL "consulted with" the Departments of Health and Human Services and the Treasury. Despite this ad hoc interagency consultation, DOL still reached erroneous conclusions. Apparently, bureaucrats at three key agencies of the federal government

---

[21] App. p. 58, ¶ 25.

[22] That harm would be catastrophic to those limited partners.  Those partners and their dependents could well be without a health plan or health insurance until January 1, 2021 because the LPMS-managed group health plans would remain in place to service the common law employees of the partnerships.  As such, the removal of the partners from the group health plan may not constitute grounds for a Special Enrollment Period since the Plan would remain in effect for the common law employees.  Also, it appears the partners would not have access to health insurance coverage through COBRA given the retroactive re-characterization of the partners' coverage by DOL to individual policies.  Consequently, those partner plan participants would not be able to obtain other coverage until the open enrollment period late in 2020 effective January 1, 2021 or even continuation coverage through COBRA to bridge the gap.

(at least two of whom are unnamed and thus entirely unaccountable) believe that prospective partners who may be attracted to join DMP (and the other LPMS-managed partnerships) partly to gain access to the Plan should instead seek coverage from the only source they believe to be appropriate – the ACA individual market.  In order to consider the harm being done to Plaintiffs and their partners by the AO Response, it is therefore necessary to consider the alternative.

The individual market as it currently exists was created by passage of ACA.  Even its most ardent supporters must concede that ACA has had highly disparate impacts on Americans. Approximately 9,000,000 people are enrolled in ACA exchange plans, and 8,000,000 of these enrollees – nearly 90 percent – receive "free insurance" thanks to premium subsidies from the federal government.  In contrast, at least 24,000,000 hardworking Americans have no health coverage whatsoever.  The reason most frequently cited by those who lack health plans is inability to afford premiums for the individual plans available under ACA.[23]  As a rule, the uninsured are neither impoverished (because those who are receive ACA subsidies) nor wealthy (because wealthy people are able to pay whatever it costs to get coverage, and generally do). Overwhelmingly, the uninsured population is made up of the self-employed middle-class, which is the fastest-growing segment of the US population.[24]

While Americans were repeatedly promised that "if you like your plan, you can keep your plan," that has been far from the actual experience of tens of millions of Americans.  The news

---

[23]   https://www.kff.org/uninsured/issue-brief/key-facts-about-the-uninsured-population/   See Tolbert, Jennifer, et al., "Key Facts About the Uninsured Population".  Last accessed 18 February 2020.  A true and correct copy of this article is included in the Appendix at App. pp. 55 – 89.

[24]   https://dataspace.princeton.edu/jspui/bitstream/88435/dsp01zs25xb933/3/603.pdf   See Katz, Lawrence and Krueger, Alan, "The Rise and Nature of Alternative Work Arrangements in the United States, 1995-2015." Last accessed 18 February 2020. A true and correct copy of this article is included in the Appendix at App. pp. 90 – 136.

reports of pain, suffering, and rampant "medical bankruptcies" experienced by those unable to meet the high deductibles and out of pocket maximums of "affordable" plans on the ACA individual market cannot be overstated.  As one small but powerful example, Melanie Graham described how her sister became an unnecessary casualty of the devastating financial impacts of ACA on average citizens.[25]   Before full implementation of ACA, Ms. Graham's sister, her husband, and four children were "covered by a medical plan they liked."[26] Unfortunately, "like so many others in this country, her family's private health care policy was cancelled because of [ACA]."[27] After losing her preferred private sector health care policy, Ms. Graham's sister avoided seeing a doctor until her new ACA-approved, individual market policy commenced. Why did she avoid the doctor?  Because "she and her husband didn't have a lot of money, so she didn't want to incur what she thought were avoidable medical expenses."[28] Unfortunately, the examination that would have generated those "avoidable medical expenses" also would have detected a "badly blocked gall bladder that had become highly infected.  Her body went into septic shock just two days before her Obamacare policy would have kicked in."[29] The Plan offered by DMP, rejected by an arbitrary and capricious AO Response from DOL, would have given Ms. Graham's sister a third alternative to "your money or your life."

DOL (and according to the AO Response, its mostly anonymous, unaccountable, hastily assembled *ad hoc* interagency committee) apparently believes that this status quo of illusory health coverage is not only acceptable but desirable, and that it must be defended at the cost of performing

---

[25] See, Graham, Melanie, "Obamacare Killed My Sister" https://ricochet.com/129913/archives/obamacare-killed-my-sister/ Last accessed 18 February 2020.  A true and correct copy of this article is included in the Appendix at App. pp. 137 – 149.
[26] App. p. 137.
[27] *Id.*
[28] *Id.*
[29] *Id.*

a legally required, dispassionate analysis of Plaintiffs' model and any other alternatives to ACA. Currently, over 50,000 Americans in the Plan and comparable plans maintain access to health coverage and affordable health care. The eligibility for inclusion in the Plan (and similar group health plans) rests upon the "working owner" construct implicit in the participant's active contribution of work product to the business purposes of the partnership. Should the AO Response stand despite its fatal flaws, all of those hard-working Americans would suddenly be subject to the same tragic lack of options faced by Ms. Graham's late sister and her family.

## C.   DMP PLAN SUMMARY

In an effort to attract, retain, and motivate talent in service of DMP's primary business purpose, DMP established the Plan. The Plan reflects the substantial commitment that DMP is making to its eligible plan participants, who are comprised solely of DMP's employees and partners (as well as their eligible spouses and dependents).

The Plan has a number of third-party vendors which DMP engaged to administer the Plan. First, DMP hired a consulting and benefits design firm for guidance and assistance with fulfilling plan requirements pursuant to ERISA and related statutes. Second, DMP appointed a licensed and bonded Third Party Administrator ("TPA") to collect and allocate funds, adjudicate claims, manage claims' appeals, execute the payment of claims for benefits under the Plan, and perform other traditional services performed by a TPA. Third, DMP appointed a benefits administrator to assist its staff in managing eligibility data and plan participant customer service issues on an ongoing basis. Fourth, DMP created a Trust to hold any plan assets related to the Plan. Finally, DMP obtained a reinsurance policy for the Plan. This reinsurance policy is of a comprehensive and specific nature, as described more fully below.

The terms of the Plan are outlined in a Plan Document and are intended to comply with ERISA, including but not limited to, Parts 1, 4, 5, and 7. This Plan Document contains information

11

on the benefits provided by the Plan to Plan participants; eligibility information; instructions on claims for benefits; claims appeals information; coordination of benefits provisions; disclaimers concerning certain federal statutes; and other information. With respect to eligibility, the Plan Document notes that *both* employees *and* partners are eligible to participate in the Plan. At least one common law employee participates in the Plan, as well as a number of partners, although not all partners will necessarily participate in the Plan. DMP pays 100% of the premiums for coverage under the Plan for its employees. Partners are responsible for paying their own monthly program costs for coverage under the Plan. The enrollment procedures outlined in the Plan Document require annual Open Enrollment periods and Special Enrollment periods, consistent with applicable law, to permit eligible plan participants to join the Plan.

The aforementioned third-party vendors service the Plan as their delegated duties require. For example, the TPA collects monthly program cost payments from the Plan's participants. The TPA allocates these funds appropriately, routing plan assets to the Trust (which is solely controlled by a Directed Trustee), paying vendors their fees, and ensuring premium payments are timely made to the reinsurance carrier underwriting the Plan's reinsurance policy. The TPA withholds a certain amount of premium due to the reinsurance carrier covering the Plan in order to expedite payment of claims for benefits. With respect to paying claims for benefits, in cases where the TPA has received and approved a claim, the TPA will access the reinsurance withheld to pay said claim. Should a claim require a payment in excess of the funds available to the TPA on an immediate basis, the TPA coordinates with the reinsurance carrier covering the Plan for transmission of additional funds to the TPA's claims-paying account. The reinsurance is available to pay claims on a first dollar basis. Once received, the TPA will continue paying claims.

## D.    MEWAS AND DOL'S ADVISORY OPINION PROCEDURE

The Plan is designed to be a "single-employer plan" covered by ERISA. 29 U.S.C. §

1002(41). An ERISA plan that is not a multiple employer welfare arrangement ("MEWA") is a single-employer plan. 29 U.S.C. § 1002(40). Plans that are maintained by partnerships could be found to be MEWAs if partners of the partnership enrolled in a plan are found to be separate employers. With respect to MEWAs, in 2003, DOL first issued written guidance on addressing questions about MEWA status entitled *MEWAs: Multiple Employer Welfare Arrangements under the Employee Retirement Income Security Act (ERISA): Guide to Federal and State Regulation*, U.S. Dept. of Labor, Employee Benefits Administration (2013) (the "Guide").[30] As part of the *Guide*, DOL addressed when advisory opinion requests are "necessary." *See Guide*, pp. 35-36. This guidance made clear that "interpretive" determinations, as opposed to factual ones, meet the "necessary" standard and such determinations are conducted by DOL through the process set forth in ERISA Procedure 76-1 ("ERISA Proc. 76-1").[31]

Pursuant to ERISA Proc. 76-1, once an advisory opinion is requested, the procedure allows DOL to conclude its review in one of three ways: (i) a positive or negative response to the opinion requested, (ii) the issuance of an information letter instead of an advisory opinion, or (iii) a statement declining to respond. In this situation, and after more than a year's delay, DOL issued the AO Response that had been requested. As there is no administrative appeal available to Plaintiffs, it is within this Court's purview to resolve the issues presented in the FAC and Plaintiffs' Motion for Summary Judgment.

---

[30] A true and correct copy of the cover page and cited pages of the Guide are included in the Appendix at App. p. 150 – 152. A full copy of the Guide is available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/mewa-under-erisa-a-guide-to-federal-and-state-regulation.pdf. Last accessed 18 Feb. 2020.

[31] A true and correct copy of ERISA Procedure 76-1 is included in the Appendix at App. p. 153 – 160.

## IV.   ARGUMENT AND CITATION TO AUTHORITY

Summary judgment should be granted when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (1994). "Summary judgment is and should be 'an integral part of the Federal Rules as a whole, which are designed to secure the just speedy and inexpensive determination of every action.'" *Little*, 37 F3d at 1075, citing *Celotex*, 477 US 317.

In this case, the relevant facts are undisputed. DMP's limited partners have an individual ownership interest in the partnership, contribute to the performance of the work of the partnership's primary business, affect the direction of the partnership by participating in decision making, and receive guaranteed payments for the time and service committed in support of DMP's sale of electronic data to third parties.

### A.   THIS COURT HAS AUTHORITY AND JURISDICTION OVER PLAINTIFFS' CLAIMS

ERISA provides,

> Suits by an administrator, fiduciary, participant, or beneficiary of an employee benefit plan to review a final order of the Secretary, to restrain the Secretary from taking any action contrary to the provisions of this Act, or to compel him to take action required under this title, may be brought in the district court of the United States for the district where the plan has its principal office, or in the United States District Court for the District of Columbia.

29 U.S.C. § 1132(k). ERISA also provides,

> (a)     Persons empowered to bring a civil action — A civil action may be brought—
>
> > (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan…

14

29 U.S.C. § 1132(a)(3).

The claims available under § 1132(k) are broken up into three separate and distinct categories: "(1) actions to review a final order of the Secretary; (2) actions to 'restrain the Secretary from taking any action contrary to the provisions of this Act'; and (3) actions to compel the Secretary to take action 'required under this subchapter.'" *Id.* Plaintiffs seek relief under the first two prongs of this law.

The AO Response is an "order" qualifying as an "agency action" or "final agency action for which there is no other adequate remedy." *See* 5 U.S.C. § 704. For this purpose, "order" means the "whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making…" *See* 5 U.S.C. § 551(6). Pursuant to ERISA Proc. 76-1, once DOL issues a response, it may not be withdrawn and it is binding on the parties to the request. Moreover, ERISA Proc. 76-1 does not provide for an administrative appeal. *Cf. Virginia Beach Policemen's Benevolent Ass'n v. Reich,* 881 F. Supp. 1059, 1064 (1995). Under the APA "[o]nly after a party clears the 'final agency action' and 'committed to agency discretion' hurdles of judicial review, may a reviewing court 'compel agency action unlawfully withheld or unreasonably delayed.'" 5 U.S.C. § 706(1). Additionally, the reviewing court may "hold unlawful and set aside actions, findings and conclusions [of the agency] found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Prior to reviewing the AO Response to determine whether it violates ERISA or the APA, the Court must first determine whether and to what degree it should defer to DOL's discretion in implementing ERISA or its accompanying regulations. In this case, this Court should not defer at all to the position taken by DOL in the AO Response.

## B.   THE AO RESPONSE ISSUED BY DOL IS NOT ENTITLED TO ANY DEFERENCE

There are at least two reasons that the Court should not defer to DOL's AO Response. First,

the statute at issue is unambiguous as evidenced by controlling Supreme Court precedent and

DOL's own advocacy in the controlling case, thus defeating any claim Defendants might make for

*Chevron* deference. Second, regulations relevant to this issue are unambiguous, making it

inappropriate to grant the AO Response deference under the controlling *Auer* case. The AO

Response purports to utilize facts described in Plaintiffs' AO Request and the subsequent original

Complaint against DOL in the instant action. As further described below, DOL consulted very

little law – whether statutory, regulatory, or judicial – in formulating its AO Response, and often

misconstrued or misapplied basic facts in their analysis. Nevertheless, because this Court may

consider whether deference to DOL's statutory or regulatory interpretations is appropriate, the

limitations on such deference and its inapplicability in this case must be articulated.

1.   **To the extent DOL's AO Response is interpreting the statutory language of ERISA, DOL is not entitled to *Chevron* deference.**

When a court reviews an agency's construction of the statute it administers, that court must

address two questions: "First, applying the ordinary tools of statutory construction, the court must

determine 'whether Congress has directly spoken to the precise question at issue.' If the intent of

Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect

to the unambiguously expressed intent of Congress." *City of Arlington v. FCC*, 569 U.S. 290, 296

(2013). "But if the statute is silent or ambiguous with respect to the specific issue, the question for

the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

[Internal quotations omitted]. Put differently, where there is ambiguity in a statute or where

Congress has committed discretion to an agency in drafting implementing regulations, "such

legislative regulations are given controlling weight unless they are arbitrary, capricious, or

manifestly contrary to the statute." *Chevron, U.S.A. v. National Resources Defense Council, Inc.,*

467 U.S. 837, 844 (1984). Even where ambiguity is found, however, that ambiguity does not

automatically command deference under *Chevron.* While "ambiguity is a sign," it is "not always a conclusive sign… that Congress intends a reviewing court to pay particular attention to (i.e. to give a degree of deference to) the agency's interpretation."[32] *Arlington,* 569 U.S. at 308, (Breyer, J. concurring)*, citing Gonzales v. Oregon,* 546 U.S. 243, 258 – 269 (2006)*.

As an initial matter, there is no statutory ambiguity in the provisions at issue. The Supreme Court explained as much in *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1 (2004). As more fully explored in Section IV(C) below, the questions presented in *Yates* are the same questions put before DOL in Plaintiffs' AO Request. Yet, in this instance, DOL opted to conjure ambiguity where none exists in order to exercise authority that Congress did not delegate to the agency. But Supreme Court precedent is not so easily circumvented.

Even if this Court were to presume that *Yates* was somehow inapplicable, then the Court would need to look no further than the direct pronouncements of DOL in its amicus brief filed in the *Yates* case. In *Yates*, DOL strongly advocated including working owners as "participants" in benefits plans covered by ERISA, saying that such a categorization, "furthers ERISA's purposes of promoting employee benefit plans and protecting the interests of plan participants and their beneficiaries." App. p. 164. DOL further reasoned that, "allowing working owners to be plan participants encourages them to create plans that also provide benefits to other employees and promotes economics of scale in plan administration and investments." App. p. 165. In this case, DOL directly contradicts this position, stating that to "treat [Plaintiffs' limited partners] as employee participants in an ERISA-covered plan would effectively read the employment-based limitations on ERISA coverage out of the statute." App. p. 5. And, this hypocritical stance is not

---

[32] This step in the *Chevron* analysis has been colloquially termed "Step Zero," which is an "initial inquiry into whether *Chevron* applies at all." Llewellyn, Karl N., *Chevron Step Zero,* 92 Va. L. Rev. 188, 191 (2006).

DOL's only about-face on prior interpretations made by DOL in the AO Response.

In its *Yates* Amicus Brief, DOL was concerned with the potential consequences of excluding certain members of an employer from an ERISA plan, while including others. As DOL correctly noted in *Yates*: "[S]plitting a plan into ERISA and non-ERISA components would be administratively unworkable under both the Internal Revenue Code and Title I of ERISA." App. p. 165. In the AO Response, however, DOL is unconcerned with this prospect, advocates wading headlong into this "unworkable" arrangement, and offers no explanation as to why it has changed its position. DOL states:

> To the extent the limited partnership program covers common law employers of the partnership, the Department would consider the limited partnership to have established a separate welfare benefit plan of those employees. That plan would be subject to ERISA, and persons responsible for operating the plan would be subject to the reporting, disclosure, fiduciary, group health, and enforcement provisions in Parts 1, 4, 5, 6, and 7 of ERISA.

App. p. 6, FN 5.

DOL's unexplained and complete course reversal is entitled to no deference from this Court under *Chevron* or any other standard. "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *INS v. Cardoza-Fonseca,* 480 U.S. 421, 446, n. 30 (1987) (quoting *Watt v. Alaska,* 451 U.S. 259 (1981)). How much weight a court should accord such a change depends "on the facts of individual cases." *Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 417 (1993). Here, the facts are clear: DOL's change in position is unsupported by the law, is unexplained, and appears based entirely on establishing what DOL apparently views as a better litigation position. As the Supreme Court has noted, though, "[d]eference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."

*Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 213 (1988).

**2.    To the extent DOL's AO Response is interpreting its own regulations, the regulations at issue in the AO Request are not entitled to *Auer* deference.**

The Supreme Court "has often deferred to agencies' reasonable readings of genuinely ambiguous regulations. "We call that practice *Auer* deference, or sometimes *Seminole Rock* deference, after two cases in which we employed it." *Kisor v. Wilkie,* 204 L. Ed. 2d 841, 850 (2019), citing *Auer v. Robbins,* 519 U.S. 452 (1997); *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410 (1945). In *Kisor,* the Supreme Court undertook a vast limiting exercise in an effort to concretely identify the small set of situations in which *Auer* deference is proper.

Although *Kisor* opened with the unremarkable conclusion that *"Auer* deference is sometimes appropriate and sometimes not," *Id.* at 850, what followed in Justice Kagan's majority opinion was a machete to the body of *Auer,* leaving behind only scraps of the formerly robust deference doctrine. The majority so limited the applicability of *Auer* that Chief Justice Roberts filed a concurring opinion for the sole purpose of stating that the majority opinion and Justice Gorsuch's concurrence, which desired to completely overturn *Auer*, were in many ways on the same page. Justice Roberts observed:

> The majority catalogs the prerequisites for, and limitations on, *Auer* deference: The underlying regulation must be genuinely ambiguous; the agency's interpretation must be reasonable and reflect its authoritative, expertise-based judgment; and the agency must take account of reliance interests and avoid unfair surprise. Justice Gorsuch, meanwhile, lists the reasons that a court might be persuaded to adopt an agency's interpretation of its own regulation: The agency thoroughly considered the problem, offered a valid rationale, brought its expertise to bear, and interpreted the regulation in a manner consistent with earlier and later pronouncements. **Accounting for variations in verbal formulation, those lists have much in common.**

*Kisor*, 204 L. Ed. 2d at 869 (Roberts, J. *concurring*) (emphasis added).

Subject to these limitations, *Auer* deference is rooted in the presumption that "Congress

would generally want the agency to play the primary role in resolving regulatory ambiguities." *Id.* at 854. Put differently, the Court adheres to a rebuttable presumption that "the power authoritatively to interpret its own regulations is a component of the agency's delegated powers." *Id.* at 855; (quoting *Martin v. Occupational Safety and Health Review Comm'n.*, 499 U.S. 144, 151 (1991)). But, this justification has limits, and the *Kisor* court called attention to many of them.

First, a prerequisite to engaging in deference per *Auer,* a court must find initially that the regulatory term is genuinely ambiguous. "And when we use that term, we mean it – genuinely ambiguous, **even after a court has resorted to all the standard tools of interpretation."** *Id.* at 857 (emphasis added). Accordingly, much like the requirements of *Chevron,* a court is first required to utilize its traditional statutory toolkit before it may accord *Auer* deference. *Id.* at 858; *City of Arlington,* 569 U.S. 290, 296. But, exhaustion of the toolkit does not in and of itself mandate deference. To the contrary, "when reasons for that presumption [of deference] do not apply, or countervailing reasons outweigh them, courts should not give deference to an agency's reading, except to the extent it has the 'power to persuade.'" *Id.* at 857, citing *Christopher v. SmithKline Beecham Corp.,* 567 U.S. 142, 159 (2012). Similar to *Chevron,* then, a court should decline to accord *Auer* deference if it "concludes that an interpretation does not reflect an agency's authoritative, expertise-based, 'fair[, or] considered judgment." *Id.* citing *Christopher,* 567 U.S., at 155 (quoting *Auer,* 519 U.S., at 462).

Even if a court finds ambiguity, a court may not engage in *Auer* deference if the agency's interpretation is not reasonable. As the Supreme Court has noted, "The text, structure, history, and so forth at least establish the outer bounds of permissible interpretation." *Id.* at 859. The Supreme Court has cautioned against treating this "reasonableness inquiry" as a formulaic or academic recitation unworthy of serious consideration. "Let there be no mistake. [Reasonableness] is a

20

requirement an agency can fail." *Id.* And, as the Supreme Court has made clear, even a reasonable interpretation alone does not carry the day. "We have recognized in applying *Auer* that a court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Id.* Although the Court has declined to articulate a specific test for such an inquiry, it has laid out persuasive markers for determining whether *Auer* should apply. An interpretation must "be the agency's 'authoritative' or 'official position,' rather than any more *ad hoc* statement not reflecting the agency's views." *Id.* [Emphasis original]. The interpretation must "in some way implicate [the agency's] substantive expertise." *Id.* at 860. Finally, the interpretation must "reflect 'fair and considered judgment' to receive *Auer* deference." *Id.* Particularly important for this Court's analysis purposes is that a new interpretation will not receive deference, whether or not introduced in litigation, if it "creates 'unfair surprise' to regulated parties." *Id.* at 861.

To be sure, the regulations interpreted by DOL in the AO Response do not possess the requisite ambiguity to initiate *Auer* deference.[33] As with a *Chevron* deference analysis, the very fact that the Supreme Court and DOL both have spoken directly to the provisions at issue here shows the traditional statutory toolkit provides all that is needed to unravel any perceived textual mysteries. But, even if some ambiguity persisted, *Kisor* counsels against deference. As noted earlier, deference is given because of the agency's "power authoritatively to interpret **its own** regulations is a component of the agency's delegated lawmaking powers," and "in part… because the agency that promulgated a rule is in the better position to reconstruct its original meaning." *Id.* at 855 (emphasis added). Here, however, DOL looked outside its own expertise and solicited help from "the Department of Health and Human Services and the Department of the Treasury," App. p. 6.

---

[33] See, Section IV(C).

This suggests that DOL recognizes it does not, in fact, have any special insight as to the meaning of the regulations at issue. Moreover, DOL provides no explanation as to why the Treasury Department or the Department of Health and Human Services might be better positioned to reconstruct the original meaning of a DOL regulation. And, by failing to provide any specifics or documentary support for its assertion of concurrence by other federal agencies, DOL creates the appearance of highly consequential decisions being made by self-selected, anonymous, and unaccountable interagency *ad hoc* committees of like-minded individuals within the federal government, irrespective of whether their shared views are in line with those of their agencies or of the administration they purportedly serve.

In short, the permissible reasons for according DOL *Auer* deference are entirely absent here. Accordingly, the AO Response must rise or fall on its own merits. Because of the reasons that follow, the AO Response falls woefully short of meeting the relevant legal standards, and this Court should permanently set aside the AO Response.

**C.    AO RESPONSE VIOLATES SUPREME COURT PRECEDENT AND PRIOR DOL ADVISORY OPINIONS**

A central – perhaps *the* central – question in this case is whether DMP's limited partners are "working owners" for the purposes of ERISA. DOL's AO Response fails to articulate any legal basis for its conclusion that DMP's limited partners are not working owners. In fact, DOL's AO Response violates clearly established Supreme Court precedent as well as its own prior advisory opinions on this very question.

In *Yates,* the Supreme Court conclusively established that a "working owner," such as each DMP limited partner in this case, is eligible to participate as an "employee" in a single-employer plan governed by ERISA. The Supreme Court held:

22

> The answer, we hold, is yes: If the plan covers one or more employees other than the business owner and his or her spouse, the working owner may participate on equal terms with other plan participants. Such a working owner, in common with other employees, qualifies for the protections ERISA affords plan participants and is governed by the rights and remedies ERISA specifies. In so ruling, we reject the position, taken by the lower courts in this case, that a business owner may rank only as an "employer" and not also as an "employee" for purposes of ERISA-sheltered plan participation.

*Yates*, 541 U.S. at 6. In reaching its decision, the majority of the Court determined that the statutory terms set forth in ERISA mandated this result, and there was no reason to look to common-law employment factors like those set forth in *Nationwide Mut. Ins. Co. v Darden*, 503 US 318 (1992), which it had previously determined must occur to define the term "employee" for purposes of ERISA. *Id.* at 12.

Rather, the *Yates* majority very intentionally set aside a common law employment test by holding that ERISA provides "specific guidance" on which to rely, obviating the *Darden* common law analysis. *Id.* The Court stated: "In sum, because the statute's text is adequately informative, we need not look outside ERISA itself to conclude with security that Congress intended working owners to qualify as plan participants." *Id.* In further support of this point, in Footnote 5 of the majority opinion, the Court explained its position as follows:

> We do not suggest that each provision described supra, at 13-15 in isolation, would compel the Court's reading. But cf. *post*, at 25-26 (Thomas, J., *concurring in judgment*). In combination, however, the provisions supply 'specific guidance' adequate to obviate any need to expound on common law. See *Darden*, 503 US, at 323…

*Id*. at 16, FN 5. This position taken by the majority directly rebutted Justice Thomas' concurring opinion, wherein he advocated for a common law employment test to also be applied to working owners. In fact, Justice Thomas stated that the majority made all working owners employees for purposes of ERISA, without exception. ("The Court does not clearly define who exactly makes up

23

this class of 'working owners,' even though members of this class are now considered categorically to fall under ERISA's definition of "employee.") *Id. post*, at pp. 25-26, FN* (Thomas, J. concurring in judgement).

The majority looked to both ERISA and the Internal Revenue Code (the "Code"), pointing to 26 U.S.C. § 401(c)(1)(A) (which defines "employee" to include a "self-employed individual"), as well as 26 U.S.C. §§ 401(c)(1)(B) and 401(c)(2)(A)(i), (which define "'a self-employed individual' to cover an individual with 'earned income' from 'a trade or business in which personal services of the taxpayer are a material income-producing factor.'") *Id.*, at 14. The majority then offered up the following assessment: "This definition [of employee] no doubt encompasses working sole proprietors and <u>partners.</u>" *Id.* (emphasis added). The majority also relied heavily on DOL's analysis and conclusions in 99-04A which, in relevant part, the Court restated in its opinion:

> In its regulation at 29 C. F. R. 2510.3-3, the Department clarified that the term 'employee benefit plan' as defined in section 3(3) of Title I does not include a plan the only participants of which are '[a]n individual and his or her spouse . . . with respect to a trade or business, whether incorporated or unincorporated, which is wholly owned by the individual or by the individual and his or her spouse' or '[a] partner in a partnership and his or her spouse.' The regulation further specifies, however, that a plan that covers as participants 'one or more common law employees, <u>in addition to the self-employed individuals</u>' will be included in the definition of 'employee benefit plan' under section 3(3). The conclusion of this opinion, that such 'self-employed individuals' are themselves 'participants' in the covered plan, is fully consistent with that regulation." Advisory Opinion 99-04A, at 561, n 7." emphasis added.

*Id.* at 20.

In addition to this express reliance on self-employed status, an even closer look at 99-04A is also instructive to understand the *Yates* majority's willingness to collectively read ERISA and

24

Code provisions as dispositive. In Footnote 3 of 99-04A,[34] DOL expressly defines working owner for purposes of its opinion in 99-04A as follows:

> By the term "working owner," you apparently mean any individual who **has an equity ownership right of any nature in a business enterprise** and **who is actively engaged in providing services to that business**, as distinguished from a "passive owner," who may own shares in a corporation, for example, but is not otherwise involved in the activities in which the business engages for profit." (Emphasis added).

Albeit informally, less than a year after *Yates* was decided, DOL went even further in its support of 99-04A and the *Yates* holding when it cited this very precedence in a response it gave to the American Bar Association Standing Committee on Employee Benefits (the "ABA Committee").[35] The timing of DOL's interpretation is particularly relevant because it closely followed in time not only the *Yates* opinion but also the issuance of the final regulations it issued concerning 29 U.S.C. § 1191a(d) (discussed *infra*). The ABA Committee explicitly asked for DOL's opinion on the following hypothetical fact pattern: If partners, as self-employed individuals, participate in a partnership health plan alongside of employees of the partnership, does that cause the health plan to be a multi-employer welfare arrangement[36] ("MEWA"), because employees of two or more employers participated in the plan?[37]

---

[34] A true and correct copy of Advisory Opinion 99-04A is included in the Appendix at App. pp. 178 – 182.

[35] Periodic meeting between ABA Committee and representatives of the Department held on May 18, 2005, Q&A 16 (App. p. 195). A true and correct copy of this document is included in the Appendix at App. pp. 183-207.

[36] ERISA Section 3(40). *See also,* App. p. 6. The significance of MEWA status in the context of ABA Committee's question is that each partner would be considered to be a separate employers maintaining partnership health plan. Consequently, this status then throws the health care plan and the partners into an additional and complex set of statutory and regulatory requirements both at the Federal level and also the state level.

[37] It is fair to say that the question by the ABA was both an academic one and a practical one. Given that groups of lawyers commonly form together in partnerships and lawyers give advice to clients who are partnerships, getting clarification regarding the question of MEWA status of a partnership health plan was of paramount importance.

DOL's response to the ABA Committee's question was a definitive "No." ("A plan sponsored by a single partnership covering only partners of the partnership and common law employees of the partnership would not be a MEWA for purposes of section 3(40) of ERISA.") The Department explained that "a self-employed partner in a partnership should be treated as an 'employee' of the partnership." Citing *Yates*, the Department reasoned that its regulations did not preclude partners from being treated like employees for all purposes under ERISA. Significantly, like the Supreme Court holding in *Yates* and consistent with its conclusions in 99-04A, the Department did not establish in its response to the ABA Committee minimum requirements to be qualified as a "working owner" partner for these purposes. At least by implication, this silence leaves intact the "working owner" definition it set forth in 99-04A and adopted by the Supreme Court in *Yates*. Moreover, by expressly basing its opinion to the ABA Committee on the partners "self-employed" status, DOL embraced the Code's concept of self-employment as being dispositive.

The Fifth Circuit Court of Appeals, in *House v. American United Life Insurance Company*, 499 F.3d 443 (5th Cir. 2007), has also concluded that ERISA applied to a welfare benefit arrangement providing disability benefits coverage to a law firm's partners and its common law employees. In *House*, the law firm partnership established a welfare benefit plan that provided disability benefits to employees of the partnership, as well as to the partners. The partnership – as the employer of the employees – paid 100% of the premiums for disability coverage for its employees and automatically enrolled them in the plan. The partners, on the other hand, were responsible for 100% of their own premium payments. The Circuit Court found that despite the differences in the manner in which premiums were paid, the partnership established a comprehensive employee welfare benefit plan covering both partners and employees, thus creating

a single-employer ERISA-covered plan. *Id.* at 451-452. While the Circuit Court cited to *Yates* in its holding, it emphasized the common benefit available to all partners and employees under the plan and the plan's coverage of employees of the partnership. The latter fact otherwise made the disability plan subject to ERISA. Importantly, the Circuit Court also made no distinctions amongst the partners in the partner class, and therefore, like *Yates,* all of the law firm partners were treated as participants for purposes of ERISA without distinction among the partner classification.

In its AO Response, on the other hand, DOL re-writes other standards set forth in its regulations in a manner wholly inconsistent with *Yates* and 99-04A. In this regard, DOL conjures up the following standards for limited partners that if met creates a scenario in which "… it would be ***plausible*** to treat them as employed by the partnership in the relevant sense." App. p. 5. (Emphasis added.) DOL states in its AO Response that limited partners can only be true owners if "the limited partners worked for or through the partnership, had ***a material ownership interest*** in the partnership, and earned income for work that ***generated material income for the partnership***…" *Id*. (Emphasis added.)

There really is no other way to express it – DOL is simply wrong on this point. According to *Yates* and 99-04A, for a partner – any partner – to be a working owner he/she need only to have "an ***equity ownership right of any nature*** in a business enterprise and [to be] ***actively engaged in providing services*** to that business." App. p. 181. (Emphasis added.) This governing standard does not have a "materiality" standard, which in any event is undefined. On its face, DOL's requirement of a "material ownership interest" is inconsistent with law. The "ownership right of any nature" standard established by *Yates* and 99-04A neither dictates nor even implies a materiality requirement. Furthermore, the relevant law does not contemplate any sort of minimum income standard – much less a "material income" standard – to achieve "working owner" status. If such a

27

standard were to exist, then it would be impossible for the vast majority of start-up partnerships to have any sort of ERISA-covered plans, as start-up entities very seldom have income from the outset, but unquestionably can have ERISA-covered plans.

Drilling down further on the alleged "material income" standard, with respect to DOL's standard that "earned income" must derive from "work that generated material income for the partnership," again there is no legal basis. Under the IRC, "earned income" is defined in 26 U.S.C. § 911(d)(2)(A) as compensation for personal services, not distributive shares, evidenced by compensation or guaranteed payments for services rendered as opposed to mere equity ownership. Further, the actual test regarding self-employment status is set forth in 26 U.S.C. §§ 401(c)(1)(B) and 401(c)(2)(A)(i), which define "'a self-employed individual' to cover an individual with 'earned income' from 'a trade or business in which personal services of the taxpayer are a material income-producing factor." *Yates*, 541 U.S. at 14. Here, DOL seeks to require an economic threshold to be achieved even though the law requires none. In fact, 26 U.S.C. § 401(c)(1)(B)(i) makes clear that a self-employed individual retains that status even though the "trade or business ... did not have net profits for the taxable year." Therefore, in the AO Response, DOL plainly changes the standards articulated in *Yates* and 99-04A and thereby impermissibly abandons the Supreme Court's carefully considered analysis and its own prior guidance rendering its decision wholly without basis in law and in fact and therefore, arbitrary and capricious and impermissible under the APA.

In the AO Response, DOL also attempts to re-write its long-standing regulation defining the scope of the meaning of the "employee benefit plan" in 29 U.S.C. § 1002(3), and this too must be rejected. In relevant part, this regulation states:

> Plans without employees. For purposes of title I of the Act
> and this chapter, the term "employee benefit plan" shall not include

28

> any plan, fund or program, other than an apprenticeship or other training program, under which no employees are participants covered under the plan, as defined in paragraph (d) of this section. For example, a so called "Keogh" or "H.R. 10" plan under which only partners or only a sole proprietor are participants covered under the plan will not be covered under title I. However, a Keogh plan under which **one or more common law employees, in addition to the self-employed individuals, are participants covered under the plan, will be covered under title I.**

29 CFR § 2510.3-3(b). (Emphasis added.) In the AO Response, DOL indicates that a ratio percentage test must be met to satisfy the "one or more" requirement.

> You argue, by implication, that the limited partnership benefit program can be treated as a single ERISA-covered plan because it would cover at least one common law employee of the partnership itself, … **even if the single common law employee is outnumbered by thousands or tens of thousands of "limited partners"** who obtain health coverage through the arrangement.

App. p. 4. (Emphasis added.)

In the first instance, as already discussed *infra*, to the extent DOL attempts to require through its AO Response satisfaction of a *Darden* common law employment test, this must be rejected because the Supreme Court determined in *Yates* that the *Darden* test was not applicable to owner employee status. Secondly, DOL has no authority to establish requirements in a final order that must be obtained through rule making or, in this case, the reversal of *Yates* by the Supreme Court. By requiring compliance with a ratio percentage test, DOL is not merely interpreting 2510.3-3(b). DOL is changing the entire calculus. DOL would have the rule be "one or more" common law employees, plus some corresponding maximum ratio of partners. In fact, as a practical matter, DOL's newly articulated requirement begs the question of what ratio is compliant. This determination cannot be made through interpretation. Therefore, any such attempt to establish such a requirement through a final order is a violation of the APA. *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (*Auer* deference does not apply "when the agency's interpretation is plainly erroneous or inconsistent with the regulation."). Though

29

regulations promulgated to this effect by DOL would be equally fatally flawed, at a minimum, if DOL wants to introduce these completely new standards, to be compliant with the APA, it should do so through rule making and not through the issuance of final orders under ERISA Proc. 76-1.

**D.**     **AO Response Violates APA by Failing to Analyze and Cite Relevant, Applicable Law**

The omission of any citation to or analysis by DOL with respect to the advisory opinion requested by LPMS justifying its decision renders the decision arbitrary and capricious. For example, when DOL previously issued an advisory opinion addressing facts that also raised issues concerning the status of a working owner as an eligible participant for purposes of ERISA, DOL cited to 99-04A in order to makes its determination. *See* DOL Op. No. 2006-04A.[38] Moreover, DOL often cites to both *Yates* and *Darden* when it addresses an issue concerning "employee" status in an advisory opinion it issues. This procedure makes sense because the *Darden* test covers those instances where the common law employee issues are present, and *Yates* covers those instances where a working owner analysis is required. Therefore, together, the two cases address all circumstances concerning employee status, yet neither are considered by DOL in its AO Response. Said differently, DOL does not simply cite to *Darden* as the test for all determinations of "employee" status under ERISA, because the majority in *Yates* declined to adopt that approach with respect to working owners.

---

[38] In fact, if you conduct a search on DOL's website under the EBSA tab and then go to the sub-tab offering "Law & Regulations" and then go to sub-tab "Guidance," DOL provides access to all prior advisory opinions it has issued. Using DOL's search engine, if you seek advisory opinions designated by DOL as applicable to the term "working owner" and also "participant" which is defined in ERISA Section 3(7), the <u>only</u> hit you get is DOL Op. No. 2006-04A which in turn cites to and analyzes 99-04A. Yet DOL omitted that citation and accompanying analysis in the AO Response as well. A true and correct copy of Advisory Opinion 2006-04A is included in the Appendix at App. p. 208-213.

Unconstrained by established precedent in *Yates* and 99–04A, DOL fails to give a reasonable explanation for how it reached its decision. DOL takes the liberty to engage in a robust common law employment analysis to determine whether the partners described in the AO Request are eligible to participate as ERISA "employees" and "participants" in a health plan sponsored by the partnership. For example, DOL calls out and expressly relies on the following employment related factors in the AO Response:

> According to the representations you have provided in support of your request, limited partners do not appear to report to any assigned "work" location or otherwise notify the partnership that they are commencing their work; and they are not required to possess any particular work-related skills.[39] App. p. 2.

> These provisions, like the title of the law itself— the *Employee* Retirement Income Security Act (emphasis added) — are replete with references to the employment relationship, and ERISA's coverage expressly turns on the provision of benefits in the employment context, As the above quoted language demonstrates, ERISA covers employee welfare benefit plans sponsored by an employer or employee organization for the benefit of plan participants who are themselves employees or former employees. The arrangements proposed by LP Management meet none of these criteria, inasmuch as the partnership is not the limited partners' employer, and the partners are neither employees nor employers with respect to the partnership. App. p. 3.

> The fact that one common law employee participates in a purported partnership program does not mean that everyone covered by the arrangement is participating in an ERISA plan. Rather, the regulation must be read in light of the Department's authority under ERISA to regulate the provision of employee benefits offered in the context of a genuine employment relationship. App. p. 4.

---

[39] Pursuant to 26 U.S.C. § 469 discussed *infra*, the pertinent consideration is activity undertaken for a profit not a common law employment test. In this regard, what limited partners are doing is intentionally downloading software, using the device dedicated to partnership use, signing in, creating data through use of the device, transmitting that data to the online "data bank" for aggregation, and ultimately helping to manage the data's end use. Therefore, the creation of data is not happenstance, rather it is an intentional and dedicated activity intended to be used by the partnerships to generate revenues for the partnership.

DOL cannot rely on any of these employment related-factors, however, based on the Supreme Court's holding in *Yates* because this very test was specifically rejected. Instead, in relevant part, the Supreme Court directs us to 26 U.S.C. §§ 401(c)(1)(A), 401(c)(1)(B) and 401(c)(2)(A)(i) and 99-04A as the "specific guidance" that makes owner employees ERISA employees. By rejecting the application of *Darden*, the Supreme Court intentionally treats owner employees differently, recognizing that it is the Internal Revenue Code that actually defines the terms "self-employed individuals" and "owner employees," whereas ERISA does not. The majority very directly supports its position by pointing out that ERISA itself requires that it be harmonized with the Code. *Yates* at 13. Therefore, the Supreme Court comfortably concludes it is both appropriate and consistent with ERISA to recognize the different attributes of owner employees and relies on the Code to establish the relevant standards. Therefore, DOL's reliance on common law employment factors to make its determination in the AO Response is contrary to law. In short, DOL intentionally chose the wrong analysis in order to reach its desired conclusion, despite having previously (and properly) utilized the correct analysis without difficulty. This conduct amounts to the very definition of a decision-making process that is arbitrary and capricious.

**E.    AO RESPONSE VIOLATES DOL PROCEDURES BY BASING CONCLUSIONS ON SPECULATIVE AND DISTORTED FACTUAL FINDINGS**

DOL's approach is also fatally flawed by failing to take into consideration important and material information and facts asserted by Plaintiffs, and by inventing facts that were not before the DOL via the AO Request. DOL relied on speculative facts even though ERISA Procedure 76-1 bars such reliance. Specifically, ERISA Proc. 76-1 § 10 states, "The opinion assumes that all material facts and representations set forth in the request are accurate, and applies only to the situation described therein." App. p. 159.  In the AO Response, however, DOL does not accept as

accurate even the most basic facts presented by LPMS. As the table below demonstrates, these factual inaccuracies and mischaracterizations by DOL are rampant throughout DOL's response and render the decision wholly without support by the undisputed factual record.

| AO Response | AO Request |
|---|---|
| "the revenue that a limited partner could reasonably expect from the limited partnership will typically be zero" App. p.3. | "Income distributions by LP to LPartners resulting from such revenue-generating activities will be reported as guaranteed payments and will be subject to employment taxes" App. p. 8.<br><br>"partners earning guaranteed payments must be providing services directly to the partnership in the form of hours of service contributed by the partner to the partnership" App. p. 17. |
| Partners "do not work for or through the partnership" App. p. 1.<br><br>"they do not receive income for performing services for or as partners of the partnership" App. p. 1.<br><br>No facts on how "partners are meaningfully employed by the partnership" App. p. 2.<br><br>No information provided on partner's participation "in global management issues through periodic voting of all partners". App. p. 2. | LPartners:<br><br>"contribute time and energies/services to LP by sharing data and assisting in LP's primary business purpose and revenue generation activity." App. p.14.<br><br>"participate in global management issues through periodic votes of all Partners" App. p. 8.<br><br>"contribute time and service to revenue generating activities of the LP [partnership]" App. p. 8.<br><br>Receive "income distributions by LP to LPartners resulting from such revenue-generating activities" App. p. 8. |
| "The purported and sole 'service' that the limited partners would appear to perform for or through the partnership would be to install specific software on personal electronic devices that capture data as they browse the | Partners "vote on how aggregated data will be sold or used by LP as well as votes on partnership matters" App. p. 9. |

| | |
|---|---|
| Internet or use their devices for their own purposes." App. p. 2.<br><br>"no information on how that 'work' differs in any meaningful way from the personal activities individual limited partners would otherwise engage in while using their personal devices." App. p. 2. | Partners contribute time and service to revenue-generating activities on behalf of LP" App. p. 9.<br><br>Partners "control and manage the capture, segregation, aggregation, and sale of their own data, empowering LPartners in a manner not otherwise available to them when they utilize services over the Internet through their computers, phones, televisions, and other devices." App. p. 9. |
| Partners do not "perform any services on [the partnership's] behalf" App. p. 2. | Partners "contribute time and energies/ services to LP by sharing data and assisting in LP's primary business purpose and revenue generation activity." App. p. 14.<br><br>Partners "vote on how aggregated data will be sold or used by LP as well as votes on partnership matters" App. p. 9. |
| Software "captures the data tracking *of other companies* as individual partners use their devices and surf the internet. App. p. 2. | Software "tracks the capture of such data *by other companies*". App. p. 9. |
| No information on "meaningful equity interest in the limited partnership" or "that they can expect any appreciable financial benefit for their participation in the partnership except health coverage". App. p.2. | Partners will receive "[i]ncome distributions by LP to LPartners resulting from such revenue generating activities". App. p. 9.<br><br>"Lpartners wholly control and operate LP" together with LPMS. App. p. 8. |
| Partners do not have "any assigned 'work' location". App. p. 2.<br><br>Partners do not "notify partnership that they are commencing work. App. p. 2. | Partners can work remotely while their data is collected for use by the partnership - the software partners install on their devices "provide[s] access of such data to LP" enabling the partnership to keep track of the number of hours spent by each partner. App. p. 9. |

| | |
|---|---|
| Partners do not "depend on the limited partnership as a source of business revenue". App. p. 3. | "partners earning guaranteed payments" provide "services directly to the partnership in the form of hours of service contributed by the partner to the partnership" App. p. 17. |
| Primary reason for partners to participate "appears to be to acquire health coverage". App. p. 3. | Health coverage is provided as an incentive for participation, along with control over their data and a share in the revenue from the sale of the data.  App. p. 9. |

In no way did LPMS characterize the partners' services as mindless, unintentional and inconsequential to the partnerships' business. Rather, the work performed by the partners constitutes the primary income generating commodity sold to third parties. It is simply DOL's antiquated view of commerce and erroneous opinion that its mischaracterizations are the "real" facts, which it uses to reach a predetermined conclusion completely at odds with the facts presented to it.  While these personal views and erroneous opinions will prop up the ACA individual market, they do not derive from a rational application of the presented facts to Supreme Court precedence and unambiguous language in ERISA.

F. **AO RESPONSE ARBITRARILY DENIGRATES ECONOMIC ACTIVITY OF DATA CONTRIBUTING PARTNERS**

While DOL has not issued further guidance distinguishing working owners "actively engaged in providing services" from passive ownership as set forth in 99-04A, the Internal Revenue Code contains a long history of regulating the difference between these types of owners of a trade or business. For instance, 26 U.S.C. § 469 and subsequent regulations address the directly related issue of income and loss recognition (*i.e.*, is it passive or not), including the recognition of income and losses by limited partners, by analyzing whether the partners themselves are active or passive owners within their respective business.

Generally, to determine how income and losses are recognized, 26 U.S.C. § 469 sets forth a standard based on "material participation" in the conduct of a trade or business.[40] In turn, material participation is generally defined as an activity[41] (on behalf of a trade or business) that is regular, continuous, and substantial with respect to limited partners, and meets one of three threshold standards.[42] The relevant standard in this case is five hundred (500) or more hours of service in a year.[43] Therefore, under 26 U.S.C. § 469, a limited partner is not considered to be a passive owner when the limited partner is providing more than five hundred (500) hours of participation to the limited partnership. *See* 26 CFR § 1.469-5T(a)(1). Therefore, it must be that a limited partner who is not a passive owner is materially participating and "actively engaged in providing services" to the limited partnership. In the case of DMP, in order to qualify for participation the partnership's health plan, limited partners must contribute at least 500 hours of electronic data in a year – the very contribution of time and service that DMP requires and uses for income production.

The partners at issue in this case are "working owners" within the meaning of the relevant laws, regulations and Supreme Court precedent. There is also the basic application of common sense. Perhaps DOL does not recognize that there are different forms of work. DOL focuses on concepts such as having a physical place to go to work, and the notion that DMP partners are, in effect, doing what they would otherwise do in their daily lives regarding the collection of data.

---

[40] 26 U.S.C. § 469(c)(1) (For this purpose, "participation" is defined as work performed by an individual (not managed), irrespective of the individual's capacity when performing the work, in connection with an "activity" in which the individual owns an interest at the time the work is done.) 26 CFR § 1.469-5(f)(1). Importantly, work is not defined so a type or minimum amount is not required.

[41] An activity is one that is generally related to income production in the conduct of a trade or business. *Id.* at § 1.469-4T(c)(2)(iv). Note that no minimum amount of income is required to be a qualifying activity.

[42] *Id.* at § 1.469-5T(a)(1)(2) and (6).

[43] Id., at § 1.469-5T(a)(1).

Despite DOL's failure to recognize it, gone are the days when one necessarily had to have a defined physical workplace. Remote workers abound, unfettered by bricks and mortar, having been liberated by the very technologies at the heart of this case – mobile devices and the internet. Those partners who are covered by the Plan at issue download the application required to track their data, decide what data that they will provide to the partnership, upload that data that they choose, and ultimately will be compensated for those efforts. While that process differs from being a plumber, teacher, security guard, or career bureaucrat, it is no less a form of work in the modern "gig economy." For the DOL to be allowed to conclude otherwise would give authority to that agency that is not contemplated in the relevant laws, regulations, or cases – or the economic reality of today.

DOL also argues that the DMP partners are merely doing with their internet usage data that which they are already doing with that data, namely allowing someone to collect it and to use that data for their purposes. It is unquestionable that internet companies such as Google® and Facebook® take data about their users' usage and sell that data to third parties for massive profits.[44] In this case, LMPS, DMP and their respective partners are attempting to break that cycle. The partners are taking control of at least some portion of the data reflecting their internet usage and attempting to aggregate that data with others to create a product for which there is undeniably already a market.[45] This business model is innovative. It is novel. And, it functions in the same

---

[44] Curran, Dylan, "Are you ready?  Here is all the data Facebook and Google have on you," The Guardian, March 30, 2018.   https://www.theguardian.com/commentisfree/2018/mar/28/all-the-data-facebook-google-has-on-you-privacy. Last accessed 18 February 2020. A true and correct copy of this article is included in the Appendix at App. pp. 214-222.

[45] See "U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data & Data-Use Solutions in 2018, Up 17.5% From 2017," https://www.iab.com/news/2018-state-of-data-report/ (As of 2018 that the data buying business was closing in on $20 billion as an industry in the US alone). Last accessed 18 February 2020.  A true and correct copy of this article is included in the Appendix at App. pp. 223-227.

spirit of self-determination with which any entrepreneurial venture operates.  Perhaps this novelty and innovation is why DOL cannot comprehend that the partners are "working owners" who contribute time and service to the revenue-generating activity of DMP.

Finally, there remains the question of whether the DMP partners are "owners." Setting aside DOL's inaccurate characterization of what it means to be an "owner", DMP's partners (whether general or limited) are owners of DMP. A valid DMP limited partnership agreement exists. Each of the limited partners has entered into a valid joinder agreement relating to their limited partnership interests in DMP. DOL has neither challenged the validity of the joinder agreements nor the legitimacy of limited partnership itself, other than to dismissively reference them in the AO Response.  Unquestionably, the DMP limited partners have an equity interest in the partnership. The fact that the limited partnership interests currently are not generating what the DOL deems to be "*material* income" is of no moment, as that "standard" is found nowhere in any of the relevant statutes, regulations, or cases. Like limited partners in a limited partnership that owns timberland – in which timber sales might not generate income for the limited partners for decades, yet no one would argue that those limited partners are not "owners" in the timberland limited partnership – the DMP limited partners are unquestionably owners of their portions of the DMP limited partnership.

## G.    EVEN WITH *AUER* AND/OR *CHEVRON* DEFERENCE, DOL'S AO RESPONSE REMAINS UNLAWFUL

Even if the AO Response were accorded full deference under both *Auer* and *Chevron*, the decision violates the APA because it is arbitrary and capricious, an abuse of discretion, and is otherwise not in accordance with well-established law and should be set aside.

The APA, 5 U.S.C. § 706 (2) (A) specifically mandates that courts "hold unlawful and set aside [agency] actions, findings and conclusions found to be arbitrary and capricious, an abuse of

discretion, or otherwise not in accordance with law." The AO Response is the very definition of agency action that is contrary to established legal precedent, as well as to DOL's own pronouncements concerning working owners, and is not supported by the facts in the record. More particularly, in cases such as this, § 706 (2) (A) "empowers courts to reverse agency action that is arbitrary and capricious." *Alenco Communs., Inc. v. FCC,* 201 F.3d 608, 619 (2000). "Arbitrary and capricious review under the APA differs from Chevron two-step review because it focuses on the reasonableness of the agency's decision-making process rather than on the reasonableness of its interpretation." *Transitional Learning Community at Galveston, Inc., v. US OPM,* 220 F.3d 427 (5th Cir. 2000) FN 2. Like *Chevron* review, APA review is narrow and deferential, requiring only that the agency 'articulate a rational relationship between the facts found and the choice made." *Alenco Communs, supra.*

Yet, even under the highly deferential standard for arbitrary and capricious review, the court is required to "determine whether the agency action was based upon consideration of the appropriate factors." *Pension Benefit Guaranty Corp., v. Wilson N. Jones Mem. Hosp.,* 374 F. 3d 362, 366 (2004). The agency decision must be reasonably discerned, it must articulate "a rational connection between the facts found and the decision made", it must take into consideration important and material information as well as important aspects of the problem presented to the agency, and it must articulate a satisfactory explanation for its action. *See Alenco Communs*, 201 F. 3d at 619; *Pension Benefit Guaranty Corp.,* 374 F. 3d 362; *Lifecare Mgmt. Servs., LLC, v. Ins. Mgmt Adm'rs,* 761 F. Supp. 2d 426, 434 (2011) (USDC ND TX) (decision of plan administrator denying coverage is entitled to review for abuse of discretion); *Permian Basin Petroleum Ass'n v. DOI,* 127 F. Supp. 3d 700, 712 (USDC WD TX 2015), citing *Motor Vehicle Mfrs v. State Farm*, 463 U.S. at 431(1983). Importantly, "'[p]ost-hoc explanations … are simply an inadequate basis

for review of an administrative decision.'" *Pension Benefit Guaranty Corp.,* 374 F. 3d at 367. In light of the foregoing discussion, DOL failed even this threshold standard of review.  For more than a year, DOL simply ignored a properly-made AO Request, and only after a Complaint was filed against it in this Court, the answer to which was due in less than two weeks, did it cobble together and issue its Swiss cheese-like AO Response.  It is difficult to imagine a clearer example of an arbitrary and capricious abuse of discretion.

## H.    PERMANENT INJUNCTIVE RELIEF IS WARRANTED BY THE FACTS AND THE LAW

DOL has forfeited the right to rule on the issues presented by LPMS in the AO Request. In addition to this Court's authority to review the effectiveness of the AO Response as a final order pursuant to 29 U.S.C. § 1132(k) and the APA, this Court is also authorized to declare the rights of the parties  in order to restrain DOL from taking any actions contrary to the provisions of ERISA pursuant to 29 U.S.C. § 1132(k). *See Steffel v. Thompson*, 415 U.S. 452 (1974). To this end, Plaintiffs respectfully request that the Court declare what legal requirements are applicable, and in so doing undertake a review of the facts presented in the AO Request, to determine that the limited partners are "working owners" who are deemed to be statutory employees.  As such, those "working owners" are eligible to participate in the Plan.  Plaintiffs also ask that the Court determine that the Plan is a single-employer plan and not a MEWA because the partners participate alongside the partnership's common law employees. In addition, DOL should be permanently enjoined from taking any and all actions that are inconsistent with these determinations, so that Plaintiffs can confidently rely on the Court's determinations in the future.

ERISA provides this Court with jurisdiction to fully declare Plaintiffs' rights arising from this dispute. *Id*. *See, e.g*., *Cutaiar v. Marshall*, 590 F. 2d 523, 527 (3d Cir. 1979) (finding jurisdiction under both 29 U.S.C. § 1132(k) and 5 U.S.C. § 704 to issue a declaratory judgment.). First, 29 U.S.C. § 1132(k) provides, in relevant part, that Plaintiffs may file suit "to restrain the

Secretary from taking any action contrary to the provisions of this Act." This relief necessarily authorizes this Court to declare what legal standards must be applied to craft an appropriate injunction. *Cutaiar,* 590 F. 2d at 529 ("...the issues are resolved by a simple exercise of statutory construction.").  Second, pursuant to 29 U.S.C. § 1132(k) and 5 U.S.C. § 704, this Court may also declare the rights of parties like Plaintiffs and DOL where, as here, there is a case or controversy concerning both the legality of a final order issued by DOL and whether that final order was properly issued as determined under the requirements of the APA. *Id.*; s*ee also, Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-240 (1937).

Where, as here, federal statutes waive sovereign immunity, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Congress has set forth no requirement in either ERISA or the APA to remand this question back to the agency from which this dispute arises. The AO Response is a final order; there is no additional discovery to pursue or disputed facts to resolve where a matter is ripe for adjudication at the motion for summary judgment stage. *Haworth*, 300 U.S. 239-240. Moreover, applicable legal standards have been clearly articulated by the Supreme Court in its holding in *Yates*. Therefore, under these circumstances, this Court can resolve the issues presented as a matter of law.

Plaintiffs have demonstrated that the AO Response issued by DOL violated the APA and should be disregarded (discussed *supra*). In particular, DOL wholly failed to engage in a credible analysis of the true stipulated facts and did not cite to or even attempt to distinguish undisputed legal standards established by the Supreme Court to support its conclusions set forth in the AO Response. Since DOL engaged in arbitrary and capricious actions in response to the issues presented by Plaintiffs, this Court should now conduct a legal analysis of the issues presented by

Plaintiffs. The factual record is complete and this Court can discern for itself the true nature of the facts presented by Plaintiffs, notwithstanding DOL's arbitrary and capricious interpretation of these facts. Moreover, having a complete factual record, there is nothing more for the parties or this Court to do other than undertake the legal analysis mandated by the Supreme Court in Y*ates*. Had DOL correctly analyzed the issues presented, DOL would have concluded as a matter of law that the partners are "working owners" as defined by *Yates*, and as such are statutory employees who are eligible to participate alongside of common law employees of the partnership.

For the reasons previously set forth, the *Yates* holding exclusively sets forth the applicable legal standards to be used to analyze the issues presented by Plaintiffs. First and foremost, despite DOL's attempt to graft in a common law employment test, in *Yates* the Supreme Court determined that the statutory provisions of ERISA unambiguously establish the legal status of working owners as statutory employees.[46] As discussed in detail *supra*, the Supreme Court cited to numerous provisions of ERISA that provided "specific guidance" for its holding. Consistent with that guidance, the Supreme Court determined that it was equally clear that, although ERISA did not set forth a definition of working owner, the Code very plainly did. *Yates*, 541 U.S. at 6.

Moreover, ERISA and the Code were intended to be harmonized to achieve ERISA's purposes. *Id*. at 13. Specifically, the Supreme Court held that a "working owner" as defined in U.S.C. § 401(c)(1)(3) is an "employee" when such working owner is a "self-employed individual"

---

[46] The concept of statutory employment status is utilized by both Congress and the courts to override the common law employment test, like what was adopted by the Supreme Court in *Darden,* to accomplish a given result. *See Central Motorplex, Inc. v. Comm'r*, T.C. Memo. 2014-207 (Oct. 7, 2014)( "an officer of a corporation who performs more than minor services and receives remuneration for such services is a 'statutory' employee for employment purposes…"). Cf. 26 U.S.C. § 3508 classifies certain qualifying real estate agents as independent contractors whether or not such agents would otherwise be classified as employees under a common law analysis.

as defined in 26 U.S.C. § 401(c)(1). *Id.* at 14; s*ee also* 26 U.S.C. § 401(c)(1)(B). Importantly, in this regard, DOL has defined the requisite ownership interest to be "an equity ownership right *of any nature.*" App. p. 181, FN 3 (emphasis added). Self-employment status in turn requires that such individual receive "earned income" meaning "net earnings from self-employment." Yates at 14; s*ee also* 26 U.S.C. § 401(c)(1)(A)(i). Those net earnings, however, need only derive from "a trade or business in which personal services of the taxpayer are a material income producing factor." *Id.* Finally, the "employer" of a qualifying working owner who is a partner is the partnership. *Id.* at 16; s*ee also* 26 U.S.C. § 401(c)(4) and 29 U.S.C. § 1191a(d). Therefore, it necessarily follows that partners who are deemed to be statutory employees and who participate alongside common law employees of the partnership participate in a single-employer plan as defined in 29 U.S.C. § 1002(41). *Id.* at 17-18 and 21 ("plans covering working owners and their nonowner employees, on the other hand, fall entirely within ERISA's compass."). *See also* 29 C.F.R. § 2510.3-3(b), 29 U.S.C. § 1191a(d), App. pp. 161 – 177; *House*, 499 F.3d 433, 451-452. (5th Circuit held that partnership sponsored long term disability plan at issue which was an employee welfare benefit plan as defined in 29 U.S.C. § 1002(1) was a single-employer plan) and DOL explanation to the ABA Committee (discussed *supra*).

Although the definition of who qualifies as an owner employee and such owner employee's status for purposes of ERISA may have been uncertain before *Yates,* given the split of opinion between several Circuit Courts of Appeals, the Supreme Court stepped in and resolved all ambiguities in its opinion. In so doing, the Supreme Court made very clear that its ruling promoted regulatory uniformity which was the very reason for ERISA's enactment. As the Supreme Court expressly determined:

> Congress' aim is advanced by our reading of the text. The working
> employer's opportunity personally to participate and gain ERISA

43

coverage serves as an incentive to the creation of plans that will benefit employer and nonowner employees alike. See Brief for United States as Amicus Curiae 21-22. Treating working owners as participants not only furthers ERISA's purpose to promote and facilitate employee benefit plans. Recognizing the working owner as an ERISA-sheltered plan participant also avoids the anomaly that the same plan will be controlled by discrete regimes: federal-law governance for the nonowner employees; state-law governance for the working owner. *See, e.g., Agrawal*, 205 F3d, at 302 (because sole shareholder does not rank as a plan participant under ERISA, his state-law claims against insurer are not preempted). ERISA's goal, this Court has emphasized, is "uniform national treatment of pension benefits." *Patterson v Shumate*, 504 US 753, 765 (1992). Excepting working owners from the federal Act's coverage would generate administrative difficulties and is hardly consistent with a national uniformity goal. Cf. *Madonia*, 11 F3d, at 450 ("Disallowing shareholders . . . from being plan 'participants' would result in disparate treatment of corporate employees' claims, thereby frustrating the statutory purpose of ensuring similar treatment for all claims relating to employee benefit plans.").

*Yates,* 541 U.S. at 16-17.

The legal standards set forth in *Yates* require a lockstep analysis. The Supreme Court very intentionally established this legal framework. The *Yates* opinion was the second time the Supreme Court addressed the inherent ambiguity in the ERISA term "employee."[47] Previously, in *Darden*, the Court weighed in on the meaning of "employee" when the issue presented concerned the traditional employee/employer relationship. With respect to that context, the Supreme Court held that since ERISA provided no textual clues defining the meaning of employee, said meaning must be derived from common law agency principles. *Darden*, 503 U.S. at 323. In *Yates*, the Supreme Court was presented with an entirely different issue. In that case, the Court had to consider the meaning of "employee" where the relationship of the individual with respect to the business was

---

[47] "ERISA's nominal definition of 'employee' as 'any individual employed by an employer,' is completely circular and explains nothing." *Yates*, 541 U.S. at 12 (citing *Darden*, 503 US 318, 323).

that of an owner. In that context, the Supreme Court found that ERISA specifically contemplated owner employees and that the meaning of that term was provided in the statute.

Therefore, the Supreme Court found that with respect to ERISA, there are at least two distinct meanings of the term "employee." This is very significant because the Supreme Court had previously undertaken the same review of another federal statute where such a distinction between common law employees and owners was not present. Just a year before *Yates*, in *Clackamas v. Gastroenterology Associates, P.C. v. Wells*, 538 US 440, 442 (2003), the Supreme Court interpreted the term "employee" as used in the Americans with Disabilities Act of 1990 (ADA). Like ERISA, the ADA defined employee to be an "individual employed by an employer." *Id*. at 444. Unlike ERISA, however, the ADA did not contemplate a different meaning for owners. Given this, the Supreme Court held in *Clackamas* that owners who have the attributes of employees are employees for purposes of the ADA, but owners who do not have those attributes are not employees. *Id*. at 449-450. Therefore, it is clear that the Supreme Court intentionally rejected the *Darden* employment test in *Yates* because the statute demanded that result. Likewise, this Court should not be distracted by DOL's plea to make it otherwise. *See Mertens v. Hewitt Assocs*., 508 U.S. 248, 259 (1993) ("The authority of the courts to develop a 'federal common law' under ERISA, see *Firestone*, 489 U.S. at 110, is not the authority to revise the text of the statute."). Only Congress can amend ERISA, not an unelected, ad hoc interagency committee of unnamed federal employees. *See, e.g., Darden* 503 U.S. at 325 ("Congressional reaction to [*Hearst*] was adverse and Congress passed an amendment…the obvious purpose of [which] was to have the…courts apply general agency principles in distinguishing between employees and independent contractors under the [National Labor Relations] Act." Citing *NLRB v. United Ins. Co. of America*, 390 U.S. 254, 256 (1968)).

45

All that is left is to apply the legal analysis set forth in *Yates* to the facts presented in Plaintiffs' AO Request. Stepping through these legal standards below, it is clear that this Court can and should determine as a matter of law that: (i) the partners are working owners as contemplated by *Yates*; (ii) the partners are eligible to participate in the Plan as deemed statutory employees; and (iii) the Plan is a single-employer plan and not a MEWA. Set forth below are the relevant legal standards established by ERISA, the Supreme Court and DOL. These standards are followed by a presentation of the facts in the AO Request and record which should be considered to be incorporated therein that definitively support each of the above determinations.

1.      **First Legal Standard – Working Owners Are Self-Employed Individuals Whose Personal Services Are Material Income-Producing Factors to the Partnerships**

A "working owner" as defined in U.S.C. § 401(c)(1)(3) is an "employee" as defined in 26 U.S.C. § 401(c)(1), which requires that such person be a "self-employed individual." *Yates*, at p. 14. 26 U.S.C. § 401(c)(1)(B). Self-employment status in turn requires such individual to have "earned income" meaning "net earnings from self-employment." *Id.; see also* 26 U.S.C. § 401(c)(1)(A)(i). Those net earnings, however, need only derive from "a trade or business in which personal services of the taxpayer are a material income producing factor." *Id.*

The undisputed facts here establish that payments made by DMP to limited partners for their revenue-generating activities are treated as guaranteed payments.  As such, they are reported to the IRS as guaranteed payments, and would be subject to employment taxes.  In order to generate the necessary electronic data to provide for the primary business purpose of the partnership, participating partners who are willing to generate data for resale by the partnership install proprietary software for computers and mobile applications on the computers and mobile devices they choose to use to generate data for the partnership or transmit electronic sales leads for partnership customers. This software captures the electronic data generated by the partners as they

use the application on their computers and/or mobile devices and transmits it to a "data bank" maintained by the partnership.  The aggregated electronic data collected from the limited partners of all of the member limited partnerships is then anonymized and organized for marketing to third-party purchasers. Clearly, the partners provide personal services for the partnership by contributing electronic data that individually and collectively is a material, income-producing factor for the partnership.  In fact, it is the primary income producing factor for the partnership and is the source of income distributions to the limited partners.

2.   **Second Legal Standard – Working Owners Must Have an Equity Ownership of Any Nature[48]**

DMP is duly registered and formed in the State of Texas. The limited partners are individuals who have obtained an ownership interest through the execution of a joinder agreement with the partnership. Limited partners also participate in global management issues through periodic votes of all partners.  It is undisputed that the limited partners have an equity ownership right "of any nature."

3.   **Third Legal Standard – Plans Must Have One or More Common Law Employee Participants[49]**

The Plan automatically covers all common law employees, currently covers at least one common law employee, and is available to provide coverage for the limited partners if they choose to participate. As provided in footnote 5 of the AO Response, even DOL recognizes that the Plan is an ERISA plan as to the enrolled common law employees.

---

[48] See 99-04A, App. p. 181, FN 3.
[49] See 29 C.F.R  § 2510.3-3(b).

4.      **Fourth Legal Standard – Working Owner's Employer is the Partnership**

It is incontrovertible that the "employer" of a working owner who is a partner is the partnership where such working owner satisfies the requirements of 26 U.S.C. § 401(c)(1). 26 U.S.C. § 401(c)(4). *Yates,* 541 U.S. at 16; s*ee also* 29 U.S.C. § 1191a(d).

DMP is duly registered and formed in the State of Texas. The limited partners are individuals who have obtained an ownership interest through the execution of a joinder agreement with DMP. Limited partners also participate in global management issues through periodic votes of all partners. Any payments made by the partnership to limited partners for their revenue-generating activities are reported to the IRS as guaranteed payments, and subject to employment taxes. In other words, partners work for the partnership pursuant to their equity interest and are compensated by the partnership for their time and services, a classic arrangement of employer and employee under *Yates* and 26 U.S.C. § 401(c)(4).

5.      **Fifth Legal Standard – Working Owners and Common Law Employees Participate in Single-Employer Plan**

Partners who participate alongside common law employees of the partnership participate in a single-employer plan as defined in 29 U.S.C. § 1002(41). *Yates,* 541 U.S. at 17-18; see also 29 C.F.R. § 2510.3-3(b); 29 U.S.C. § 1191a(d); App. pp. 161 – 177; *House*, 499 F.3d at 451-452 (The 5th Circuit held that the partnership-sponsored long term disability plan at issue including both partners and common law employees was an employee welfare benefit plan as defined in 29 U.S.C. § 1002(1) constituted a single-employer plan.).

The Plan automatically covers all common law employees and is available to provide coverage for the limited partners if they choose to participate and qualify by actively contributing 500 hours of generated data to the partnership. DOL recognizes that the Plan is an ERISA plan as

to the enrolled common law employees. App. p. 6, FN 5. It is undisputed that the Plan is an ERISA plan in which one or more employees participate alongside of partners in the same partnership.

**6.     With All Legal Prongs Satisfied, Inescapable Conclusion is DMP Partners Qualify as Participants Under ERISA**

The foregoing demonstrates that Plaintiffs have satisfied each legal standard articulated in *Yates* concerning the status of partners as working owners who as such are statutory employees eligible to participate in the Plan. The Supreme Court contemplated and definitively endorsed this very result. DOL cannot simply ignore binding legal precedent that it inexplicably decided should not apply. ERISA simply requires this result based on its own terms and terms adopted from the Code. Moreover, the *Yates* opinion has stood the test of time. After sixteen years, the *Yates* opinion continues to shape the resolution of some of the most important legal issues of the day. *See, e.g., New York v. United States Dep't of Labor*, 363 F. Supp. 3d 109, 137-139 (D.D.C. 2019) (The Court relied extensively on *Yates* in its analysis of the meaning of the defined term "employer" for purposes of ERISA").

In submitting the AO Request, Plaintiffs sought certainty with respect to the Plan's compliance with ERISA and confirmation that the Plan was a single-employer plan as defined in 29 U.S.C. § 1002(41), and not a MEWA as defined in 29 U.S.C. § 1002(40). DOL has responsibility for faithfully interpreting ERISA and fully acknowledges the significance of this dual regulation framework in its *Guide* concerning MEWAs. In the *Guide*, DOL explains to interested parties that an ERISA plan which is a MEWA is subject to ERISA and regulation by state insurance laws. *See* 29 U.S.C. § 1144(b)(6)(A). The application of such laws to self-insured health plans, like the Plan, is fatal. *See* 29 U.S.C. § 1144(b)(6)(B). Therefore, the importance to Plaintiffs of gaining certainty with DOL also applies equally to gaining certainty about all fifty

49

states' scope of regulatory authority. DOL has issued many such opinions to individuals, businesses and government entities for this exact purpose.

## V.   CONCLUSION

DOL, having failed to engage in its own recommended process set forth in the *Guide* which DOL itself promulgated (discussed *supra*), has forfeited its authority to address the issues presented in the AO Request. The flaws in DOL's AO Response could hardly be more evident. DOL's decision is not grounded in well-established law or the actual facts presented in the record. The decision is not reasonably discerned, it fails to articulate a connection between the actual facts in the record and its decision, and it fails to take into consideration material information, all in violation of the APA's requirements for lawful agency action. Plaintiffs have met their burden of proof and are entitled to summary judgment on the issues presented in its AO Request, and to a permanent injunction supporting this Court's resolution of those issues. For these reasons, the Court should grant Plaintiffs' Motion for Summary Judgment.

Respectfully submitted,

**TAYLOR ENGLISH DUMA LLP**

*/s/Reginald Snyder*
Reginald Snyder
Texas Bar No. 24030138
Jonathan Crumly (*Pro Hac Vice Pending*)
Georgia Bar No. 199466
Bryan Jacoutot (*Pro Hac Vice Pending*)
Georgia Bar No. 668272

1600 Parkwood Circle, Suite 200
Atlanta, Georgia 30339
Telephone: (770) 434-6868
Facsimile: (770) 434-7376
rsnyder@taylorenglish.com
jcrumly@taylorenglish.com
bjacoutot@taylorenglish.com

*Counsel for Plaintiffs*

50

## <u>CERTIFICATE OF SERVICE</u>

IT IS HEREBY CERTIFIED that service of the foregoing *Plaintiffs' Brief in Support of Motion for Summary Judgment* was made, this 19th day of February, 2020, by the Court's Case Management/Electronic Files system upon the attorneys for the parties.

Respectfully submitted this 19th day of February, 2020.

**TAYLOR ENGLISH DUMA LLP**

*/s/Reginald Snyder*
Reginald Snyder
Texas Bar No. 24030138
Jonathan Crumly (*Pro Hac Vice Pending*)
Georgia Bar No. 199466
Bryan Jacoutot (*Pro Hac Vice Pending*)
Georgia Bar No. 668272

1600 Parkwood Circle, Suite 200
Atlanta, Georgia 30339
Telephone: (770) 434-6868
Facsimile: (770) 434-7376
rsnyder@taylorenglish.com
jcrumly@taylorenglish.com
bjacoutot@taylorenglish.com

*Counsel for Plaintiffs*

51