# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| | ) | |
| DATA MARKETING PARTNERSHIP, LP, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 4:19-cv-00800-O |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF LABOR, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' COMBINED BRIEF IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ......................................................................................................................... 1

BACKGROUND ............................................................................................................................ 2

I.     Legal Framework ........................................................................................................... 2

      A.    ERISA and State Regulation of Insurance .......................................................... 2

      B.    The Secretary's Authority Under ERISA ........................................................... 2

      C.    Employee Welfare Benefit Plans ........................................................................ 3

      D.    Application of ERISA to Partnerships ................................................................. 4

      E.    Advisory Opinions ............................................................................................... 6

II.    Factual Background ....................................................................................................... 7

III.   Procedural History ........................................................................................................ 9

ARGUMENT ............................................................................................................................... 10

I.     The Department Is Entitled to Summary Judgment .................................................... 10

      A.    Plaintiffs' Claim Is Not Cognizable Under the APA .........................................10

      B.    Plaintiffs' Claim Is Not Cognizable Under ERISA ...........................................14

            1.    The Advisory Opinion Is Not a Final Order of the Secretary ...................15

            2.    The Advisory Opinion Is Not An Action Contrary to ERISA ..................18

      C.    To the Extent Judicial Review Is Available, the Advisory Opinion Is
           Reasonable And Consistent With Law ...............................................................21

            1.    Standard of Review ...................................................................................22

            2.    The Statutory Text, Along With Judicial and Department
                 Interpretations, Uniformly Require Employee-like Behavior For
                 Owners to Participate In ERISA Plans .....................................................24

            3.    The Advisory Opinion Reasonably Applied These Legal Standards to
                 Plaintiffs' Asserted Facts ..........................................................................33

II.     Plaintiffs Are Not Entitled to Any Relief, Let Alone the Relief They Seek..................... 43

    A.     The Declaratory Relief Plaintiffs Seek Is Unwarranted ........................................44

    B.     The Court Should Deny a Preliminary or Permanent Injunction..........................45

        1.     Plaintiffs Have Not Established Irreparable Harm ...................................46

        2.     The Public Interest Weighs Strongly Against Injunctive Relief...............49

CONCLUSION....................................................................................................................... 50

## TABLE OF AUTHORITIES

**Cases**

*Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632 (6th Cir. 2004) ................................ 11, 17

*Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788 (5th Cir. 2000) ........................ 16

*Am. Airlines, Inc. v. Herman*, 176 F.3d 283 (5th Cir. 1999) ..................................... 10

*Am. Land Title Ass'n v. Clarke*, 743 F. Supp. 491 (W.D. Tex. 1989) .......................... 17, 20, 50

*Am. Telnet, Inc. v. GTE Corp.*, No. 3:99-0280-D, 1999 WL 242686
        (N.D. Tex. Apr. 16, 1999) .................................................................. 47

*American Tort Reform Ass'n v. OSHA*, 738 F.3d 387 (D.C. Cir. 2013) .................................... 16

*Arendt v. Solis*, No. 11-5135, 2012 WL 83035 (E.D. Wash. Mar. 9, 2012) ............................. 15

*AT&T Co. v. EEOC*, 270 F.3d 973 (D.C. Cir. 2001) .................................................... 11

*Barrett Computer Servs., Inc. v. PDA, Inc.*, 884 F.2d 214 (5th Cir. 1989) ........................... 15

*Baylor County Hosp. Dist. v. Price*, 850 F.3d 257 (5th Cir. 2017) ........................................... 24

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................. 10

*BizCapital Business & Indus. Dev. Corp. v. Comptroller of Currency*,
        467 F.3d 871 (5th Cir. 2006) .......................................................... 44

*Blackfeet Nat'l Bank v. Rubin*, 890 F. Supp. 48 (D.D.C. 1995) ................................. 20

*BNSF Railway Co. v. EEOC*, 385 F. Supp. 3d 512 (N.D. Tex. 2018) ............................... 11, 12

*Chemtech Royalty Assocs., L.P. v. United States*, 766 F.3d 453 (5th Cir. 2014) ................ 31, 32

*Chevron, U.S.A. v. Nat'l Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ...................... 24

*Christensen v. Harris Cnty.*, 529 U.S. 576 (2000) ...................................................... 18

*Christian v. Generation Mortg. Co.*, No. 12-5336, 2013 WL 2151681
        (N.D. Ill. May 16, 2013) ................................................................ 28

*City of Arlington, Tex. v. FCC*, 668 F.3d 229 (5th Cir. 2012) ................................... 43

*City of Dallas v. Hall*, No. 3:07-CV-0060-P, 2007 WL 3257188
        (N.D. Tex. Oct. 29, 2007) ............................................................... 24

*City of Miami v. ICC*, 669 F.2d 219 (5th Cir. 1982) ...................................................... 18

*Cobb v. Comm'r*, 185 F.2d 255 (6th Cir. 1950) ........................................................ 31

*Coca-Cola Co. v. FTC*, 475 F.3d 299 (5th Cir. 1973) ............................................... 19

*Coleman v. Champion Int'l Corp./Champion Forest Prod.*, 992 F.2d 530 (5th Cir. 1993) ....... 15

*Comm'r v. Culbertson*, 337 U.S. 733 (1949) ........................................................... 31

*Comm'r v. Tower*, 327 U.S. 280 (1946) .................................................................. 31

*Corley v. United States*, 556 U.S. 303 (2009) ......................................................... 21

*Cutaiar v. Marshall*, 590 F.2d 523 (3d Cir. 1979) .................................................... 17

*DeOtte v. Azar*, 393 F. Supp. 3d 490 (N.D. Tex. 2019) ............................................. 45

*Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir. 1982) (en banc) ............................. 13

*Dow Chemical v. EPA*, 832 F.2d 319 (5th Cir. 1987) ........................... 17-18, 20, 21, 50

*Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831 (5th Cir. 2004) ................ 45

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ......................................... 45

*Elite Rodeo Ass'n v. Prof. Rodeo Cowboys Ass'n*, 159 F. Supp. 3d 738 (N.D. Tex. 2016) . 46, 47

*Exelon Wind 1, LLC v. Nelson*, 766 F.3d 380 (5th Cir. 2014) .................................... 18

*Exxon Chems. Am. v. Chao*, 298 F.3d 464 (5th Cir. 2002) ....................................... 20

*Exxon Mobil Corp. v. Mnuchin,* No. 3:17-1930-B, 2019 WL 7370430
(N.D. Tex. Dec. 31, 2019) ............................................................................. 22

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) ........................................... 44

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*,
463 U.S. 1 (1983) ........................................................................................ 13

*Francis v. Perez*, 256 F. Supp. 3d 1 (D.D.C. 2017) ............................................. 14-15

*Franciscan Alliance, Inc. v. Azar*, 414 F. Supp. 3d 928 (N.D. Tex. 2019) ................... 49

*Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016) ..... 21, 45, 46

*Frick v. Comm'r of Internal Revenue*, 47 T.C.M. (CCH) 564, 1983 WL 14720
(T.C. 1983) ................................................................................................. 33

*Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330 (5th Cir. 2012) ..... 43-44

*Garcia for Congress v. FEC*, 22 F. Supp. 3d 655 (N.D. Tex. 2014) .......................................... 22

*Google, Inc. v. Hood*, 822 F.3d 212 (5th Cir. 2016) .................................................. 48

*Gulf Restoration Network v. McCarthy*, 783 F.3d 227 (5th Cir. 2015) ........................................ 15

*Harris Cnty., Tex. v. CarMax Auto Superstores Inc.*, 177 F.3d 306 (5th Cir. 1999) .................. 45

*Herman v. S. C. Nat'l Bank*, 140 F.3d 1413 (11th Cir. 1998) ..................................................... 3

*Horton v. Prudential Ins. Co. of Am.*, 51 F. App'x 928 (5th Cir. 2002) ..................................... 23

*House v. American United Life Ins. Co.*, 499 F.3d 443 (5th Cir. 2007) ................................ 4, 27

*In re Enron Corp. Securities, Derivative & ERISA Litig.*, 284 F. Supp. 2d 511
(S.D. Tex. 2003) ............................................................................................................ 18

*In re Franchise Servs. of N. Am., Inc.*, 891 F.3d 198 (5th Cir. 2018) ........................................ 14

*Innova Hosp. San Antonio, L.P. v. Blue Cross and Blue Shield of Georgia, Inc.*,
995 F. Supp. 2d 587 (N.D. Tex. 2014) ....................................................................... 39

*Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Georgia, Inc.*,
No. 3:12-cv-1607-O, 2014 WL 360291 (N.D. Tex. Feb. 3, 2014) ............................. 18

*INS v. Orlando Ventura*, 537 U.S. 12 (2002) ........................................................................ 44-45

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ................................................................................... 24

*Landry v. Georgia Gulf Corp.*, 91 F. App'x 950 (5th Cir. 2004) ............................................... 37

*Lane v. Pena*, 518 U.S. 187 (1996) .......................................................................................... 18

*Leedom v. Kyne*, 358 U.S. 184 (1958) ...................................................................................... 19

*Luminant Generation Co. v. EPA*, 757 F.3d 439 (5th Cir. 2014) .................................. 11, 12, 43

*Martin v. King*, No. 92-2116, 1993 WL 276918 (D. Md. Mar. 9, 1993) .................................... 17

*Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236 (5th Cir. 1990) ........................ 4

*Meredith v. Time Ins. Co.*, 980 F.2d 352 (5th Cir. 1993) ........................................................ 3, 4

*Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724 (1985) ............................................................... 2, 12

*Miller v. Comm'r of Internal Revenue*, 81 T.C.M. (CCH) 1258, 2001 WL 233963
(T.C. 2001) ............................................................................................................... 32-33

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) .................................................. 49

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .................. 23

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992) ................................... passim

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998) ............... 49

*Nat'l Pork Producers Council v. EPA*, 635 F.3d 738 (5th Cir. 2011) ........................ 12

*Nat'l Solid Waste Mgmt. Ass'n v. City of Dallas*, 903 F. Supp. 2d 446 (N.D. Tex. 2012) ........ 45

*Nemlowill v. United States*, No. 16-1642, 2016 WL 3552070 (S.D. Cal. June 29, 2016) ......... 15

*New Orleans Pub. Serv., Inc. v. Brown*, 507 F.2d 160 (5th Cir. 1975) ..................... 50

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................... 45

*Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680 (1991) .............................. 3

*Petroleum Exploration v. Pub. Serv. Comm'n of Kentucky*, 304 U.S. 209 (1938) .................... 50

*Provident Life & Acc. Ins. Co. v. Sharpless*, 364 F.3d 634 (5th Cir. 2004) ................... 5, 19, 26

*R2 Invs. LDC v. Phillips*, 401 F.3d 638 (5th Cir. 2005) ........................... 39

*Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*,
    541 U.S. 1 (2004) ("*Yates*") .......................................... passim

*Reich v. Valley Nat'l Bank of Ariz.*, 837 F. Supp. 1259 (S.D.N.Y. 1993) .................. 15

*Renkemeyer, Campbell & Weaver, LLP v. Comm'r of Internal Revenue*, 136 T.C. 137
    (T.C. 2011) ..................................................... 42

*Roark & Hardee L.P. v. City of Austin*, 394 F. Supp. 2d 911 (W.D. Tex. 2005) ...................... 47

*Rodriguez v. Reich*, 159 F.R.D. 38 (N.D. Cal. 1994) ............................ 17

*Ross v. Blake*, 136 S. Ct. 1850 (2016) ...................................... 25

*Sabella v. United States*, 863 F. Supp. 1 (D.D.C. 1994) ........................... 50

*Saunders v. Davis*, No. 15-cv-2026, 2016 WL 4921418 (D.D.C. Sept. 15, 2016) ................... 15

*Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682 (7th Cir. 1986) (en banc) .................... 3

*Shanbaum v. United States*, 32 F.3d 180 (5th Cir. 1994) ..................... 14, 15

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983) ...................... 2

*Shell Offshore, Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001) ...................... 17, 19, 23

*Shinseki v. Sanders*, 556 U.S. 396 (2009) ................................................ 43

*Sierra Club v. EPA*, 939 F.3d 649 (5th Cir. 2019) ............................... 22, 34

*Silvester v. Becerra*, 138 S. Ct. 945 (2018) ........................................ 28

*Simon v. Kaiser Permanente Hosps.*, No. 06-03913, 2006 WL 3318094
(N.D. Cal. Nov. 15, 2006) ................................................ 15

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .............................. 7, 24

*Smith v. Castaways Family Diner*, 453 F.3d 971 (7th Cir. 2006) ........................ 40, 41

*Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676 (7th Cir. 2012) ............ 47-48

*Taylor-Callahan-Coleman Counties Dist. Adult Probation Dep't v. Dole*, 948 F.2d 953
(5th Cir. 1991) ................................................ 14

*Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) .................................... 12, 13

*Texas v. Seatrain Int'l S.A.*, 518 F.2d 175 (5th Cir. 1975) ........................ 49

*Texas v. United States*, 336 F. Supp. 3d 664 (N.D. Tex. 2018) ................ 49

*Triplett v. Fed. Bureau of Prisons*, No. 3:08-CV-1252-K, 2009 WL 792799
(N.D. Tex. Mar. 24, 2009) ................................................ 23-24

*True v. Robles*, No. 08-CA-53, 2008 WL 11334971 (W.D. Tex. June 30, 2008) .................. 40

*U.S. Army Corps of Engineers v. Hawke*, 136 S. Ct. 1807 (2016) ............ 11, 12, 13, 14

*United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001) ............................. 46

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) .................................... 46

*Va. Beach Policemen's Benevolent Ass'n v. Reich*, 881 F. Supp. 1059 (E.D. Va. 1995) ........... 15

*William S. Hart Union High Sch. Dist. v. Romero*, No. 13-3382, 2014 WL 12493766
(C.D. Cal. Apr. 9, 2014) ................................................ 17

*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) ........................... 46

*Yates v. United States*, 135 S. Ct. 1074 (2015) ........................................ 21

*Young v. U.S. Dep't of Labor*, No. 17-2428, 2018 WL 3941948 (D.D.C. Aug. 16, 2018) ........ 20

**Statutes**

Pub. L. No. 104-191, 110 Stat. 1978 (1996) ........................................ 3

Reorganization Plan No. 4 of 1978, 92 Stat. 3790 (1978) ............................................................ 3

5 U.S.C. § 551 ............................................................................................................... 16, 17

5 U.S.C. § 553 ................................................................................................................... 16

5 U.S.C. § 704 ................................................................................................................... 10

5 U.S.C. § 706 ................................................................................................... 15, 22, 23, 43

26 U.S.C. § 401 ............................................................................................ 27, 28, 32, 34-36

26 U.S.C. § 469 ................................................................................................................. 35

26 U.S.C. § 707 ................................................................................................................. 38

29 U.S.C. § 732 ............................................................................................ 30, 34, 36, 38, 39

29 U.S.C. § 761 ................................................................................................................. 31

29 U.S.C. § 1001 ............................................................................................................. 2, 4

29 U.S.C. § 1002 ....................................................................................................... passim

29 U.S.C. § 1103 ............................................................................................................... 28

29 U.S.C. § 1108 ......................................................................................................... 28, 32

29 U.S.C. § 1132 ....................................................................................................... passim

29 U.S.C. § 1134 ............................................................................................................... 17

29 U.S.C. § 1135 ............................................................................................................... 19

29 U.S.C. § 1137 ......................................................................................................... 10, 16

29 U.S.C. § 1144 ................................................................................................................. 2

29 U.S.C. § 1191a ..................................................................................................... 5, 30, 39

29 U.S.C. § 1191b ......................................................................................................... 5, 30

29 U.S.C. § 1204 ................................................................................................................. 3

29 U.S.C. § 1301 ............................................................................................................... 28

**Regulations**

26 C.F.R. § 1.401-10 ......................................................................................................... 32

26 C.F.R. § 1.469-5 ....................................................................................... 35

26 C.F.R. § 1.469-5T ..................................................................................... 35

29 C.F.R. § 2510.3-3 ................................................................................. 5, 30

29 C.F.R. § 2590.732 ........................................................... 6, 30, 33, 34, 35, 36

ERISA Procedure 76-1, 41 Fed. Reg. 36281 (Aug. 27, 1976) ........................... passim

64 Fed. Reg. 70164 (Dec. 15, 1999) .................................................................. 3

68 Fed. Reg. 5374-01 (Feb. 3, 2003) .............................................................. 6, 7

69 Fed. Reg. 78720 (Dec. 30, 2004) ................................................................ 30

77 Fed. Reg. 1088 (Jan. 9, 2012) ..................................................................... 6

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ........................................................... 42

Sen. Rep. No. 87-992 (1961), 1962 U.S.C.C.A.N. 2964 ..................................... 32

**GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| DOL | U.S. Department of Labor |
| DMP | Plaintiff Data Marketing Partnership, LP |
| EBSA | Employee Benefits Security Administration |
| ERISA | Employee Retirement Income Security Act of 1974 |
| LPMS | Plaintiff LP Management Services, LLC |

## INTRODUCTION

Plaintiffs asked the U.S. Department of Labor (Department) to issue an advisory opinion regarding whether benefit plans they sponsor and administer for limited partners are covered by the Employee Retirement Income Security Act of 1974 (ERISA).  Because Plaintiffs failed to establish the most fundamental premise of the statute—an employment relationship—the Department's advisory opinion concluded that ERISA did not apply to Plaintiffs' plans for its limited partners under Plaintiffs' proffered facts.  This reasonable exercise of the Department's authority under ERISA is not binding on Plaintiffs and did not direct Plaintiffs to take any specific action; it is thus not final agency action reviewable under either ERISA or the Administrative Procedure Act (APA).  This case should be dismissed for lack of subject matter jurisdiction.

Even if judicial review were available, the Department is entitled to summary judgment because the Advisory Opinion is a reasonable interpretation of ERISA and a reasonable application of the statute to the facts presented in Plaintiffs' request.  It is true that the Department and courts have interpreted ERISA to permit "working owners," who wear two hats as both "employer" and "employee," to participate in employee benefit plans under ERISA. But Plaintiffs' limited partners are not "working owners."  The limited partners do not perform work or services for the partnership.  Instead, these individuals appear to join the partnership primarily to purchase health insurance, and the only "service" they provide to the business is to download software on their personal electronic devices and allow the partnership to track their personal activities on the Internet.  Even if this data has eventual monetary value to the business, generating it does not make the individuals de facto employees of the Plaintiffs.  The same sort of consumer data is tracked and monetized by many companies without creating an employment relationship with the individuals.  Thus, regardless of whether this arrangement is permissible under state law or a viable business plan, the Department reasonably concluded, on the facts presented by Plaintiffs, that

Plaintiffs' limited partners cannot participate in *employee benefit plans* under ERISA.

Finally, Plaintiffs are not entitled to the declaratory and injunctive relief they seek. On this limited review of agency action, any defect in the agency's reasoning should at most lead to remand of the action to the agency. In this record review case, the Court is in no position to determine the actual facts regarding Plaintiffs' business, let alone declare that Plaintiffs' limited partners in fact qualify for ERISA plans. Nor is preliminary or permanent injunctive relief appropriate because Plaintiffs' claims fail on the merits and because such extraordinary relief has no place here where there is no imminent action by the Department to enjoin. For all these reasons, the Department is entitled to summary judgment and Plaintiffs' motions for summary judgment and preliminary injunctive relief should be denied.

## BACKGROUND

### I.   Legal Framework

#### A.   ERISA and State Regulation of Insurance

In enacting ERISA, Congress established a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983); *see* 29 U.S.C. § 1001(b). Under ERISA, benefits provided in an employment context, including the provision of health insurance, are regulated by the U.S. Department of Labor. 29 U.S.C. § 1132(a)(2), (a)(5). By contrast, health insurance purchased from commercial insurance companies is primarily regulated by state insurance regulators. *See, e.g.*, *Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 729 (1985) ("The substantive terms of group-health insurance contracts, in particular, also have been extensively regulated by the States."). In short, where no employee benefit plan exists, ERISA has no force. *See* 29 U.S.C. § 1144(a).

#### B.   The Secretary's Authority Under ERISA

The Secretary of Labor has primary authority to interpret and enforce the provisions of

Title I of ERISA.  29 U.S.C. §§ 1132(a)(2) and (a)(5), 1135; *see Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 689-94 (7th Cir. 1986) (en banc).[1]  ERISA confers on the Secretary broad administrative powers, including "to supervise enforcement of ERISA, to guarantee uniform compliance with ERISA, to expose and deter plan asset mismanagement, to protect federal revenues, [and] to safeguard the enormous amount of assets and investments funded by ERISA plans."  *Herman v. S.C. Nat'l Bank*, 140 F.3d 1413, 1423 (11th Cir. 1998).  As the Fifth Circuit recognized, "ERISA 'has produced a complex and highly technical regulatory program.'"  *Meredith v. Time Ins. Co.*, 980 F.2d 352, 357 (5th Cir. 1993) (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991)).  "The identification and classification of persons and plans covered requires a considerable degree of dedicated expertise."  *Id.*  The Secretary, with his broad authority in administering ERISA, undeniably has the requisite expertise to interpret ERISA "with respect to the finite definition of employer and employee under the statute."  *Id.*

### C.    Employee Welfare Benefit Plans

ERISA does not regulate all benefit plans, but only "*employee* benefit plans."  29 U.S.C. §§ 1003, 1002(3) (emphasis added).  "[A]n employee benefit plan necessarily must center on the existence of an employer and an employee."  *Meredith*, 980 F.2d at 354.  Indeed, in enacting ERISA, Congress's express concern was for "the continued well-being and security of millions of *employees* and their dependents" and "the stability of *employment* and the successful development

---

[1] The Department of the Treasury's Internal Revenue Service (IRS) generally administers Title II of ERISA, except for the prohibited transaction provisions in Title II, which are administered by the Department of Labor.  *See* Reorganization Plan No. 4 of 1978, § 102, 92 Stat. 3790 (1978).  When administering provisions of ERISA and the Internal Revenue Code relating to the same subject matter, the two Departments must work together to ensure consistency and efficiency.  29 U.S.C. § 1204(a).  Further, on matters related to health insurance coverage, the Departments of Labor, Treasury, and Health and Human Services must coordinate policies with respect to parallel provisions of ERISA, the Public Health Service Act, and the Internal Revenue Code.  *See* Pub. L. No. 104-191, § 104, 110 Stat. 1978 (1996); 64 Fed. Reg. 70164 (Dec. 15, 1999).

of industrial relations." 29 U.S.C. § 1001(a) (emphases added).

This employment-based limitation on ERISA's scope derives from the statutory text. 29 U.S.C. §§ 1001-1003; *Meredith*, 980 F.2d at 356. ERISA governs an "employee benefit plan," which includes employee pension benefit plans and employee welfare benefit plans. 29 U.S.C. §§ 1002(3), 1003. This case involves a purported "employee welfare benefit plan," which ERISA defines as any plan

> established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services . . . .

*Id.* § 1002(1). ERISA defines "participant" as "any employee or former employee of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer." *Id.* § 1002(7). "Employee" means "any individual employed by an employer," *id.* § 1002(6), and "employer" means "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan," *id.* § 1002(5). In sum, in addition to providing the types of benefits described in ERISA section 3(1), a benefit program is an ERISA-governed plan when it is "establish[ed] or maint[ained] by an employer intending to benefit employees." *House v. American United Life Ins. Co.*, 499 F.3d 443, 450 (5th Cir. 2007); 29 U.S.C. § 1002(1). An ERISA plan therefore only exists where an employment relationship between an employer and employee is present. *See Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 243 (5th Cir. 1990) (concluding that, where an "employer-employee-plan relationship" existed, ERISA applied).

## D.    Application of ERISA to Partnerships

A partnership may act as an "employer" and establish an employee benefit plan that

includes partners, but an employment relationship is still required for ERISA to apply.  29 U.S.C. § 1002(5), (9).   A partner who is a "working owner may have dual status, i.e., he can be an employee entitled to participate in a plan and, at the same time, the employer (or owner or member of the employer) who established the plan." *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon* ("*Yates*"), 541 U.S. 1, 16 (2004); *see also Provident Life & Acc. Ins. Co. v. Sharpless*, 364 F.3d 634, 639 (5th Cir. 2004).  A "working owner" is an individual who "wear[s] two hats, as an employer and employee."  *Yates*, 541 U.S. at 16.  Thus, when a partnership, as employer, establishes and maintains an employee welfare benefit plan covering partners who are "working owners," ERISA applies.  *Id.* at 21; 29 C.F.R. § 2510.3-3(b).

ERISA may cover partnership-sponsored plans, even without an employee participant if they are "group health plans" under Part 7 of ERISA.[2]  A "group health plan" is defined as "an employee welfare benefit plan to the extent that the plan provides medical care."  29 U.S.C. § 1191b(a)(1).  Part 7 provides that:

> Any plan, fund, or program which would not be (but for this subsection) an employee welfare benefit plan and which is established or maintained by a partnership, to the extent that such plan, fund, or program provides medical care . . . to present or former partners in the partnership or to their dependents . . . shall be treated (subject to paragraph (2)) as an employee welfare benefit plan which is a group health plan.

29 U.S.C. § 1191a(d).  Paragraphs (2) and (3) provide that, in the case of a group health plan, the term "employer" also includes the partnership in relation to any partner and the term "participant" also includes an individual who is a partner in relation to the partnership.  *Id.* § 1191a(d)(2), (3). The Department's implementing regulations emphasize the need for an employment, services-

---

[2] Part 7 of ERISA contains additional standards applicable to "group health plans" and "health insurance issuers offering group health insurance coverage." 29 U.S.C. §§ 1191-1191c.  Part 7 applies only to this subset of employee welfare benefit plans, which are defined in ERISA section 3(1), 29. U.S.C. § 1002(1).

based relationship with respect to the partners participating in a group health plan maintained by a partnership.  Specifically, the regulations clarify that a partner must be a "bona fide partner" in order to be considered an employee, and the partnership is considered the employer of a partner only if the partner is a "bona fide partner." 29 C.F.R. § 2590.732(d)(2), (3).  Whether an individual is a bona fide partner "is determined based on all the relevant facts and circumstances, including whether the individual performs services on behalf of the partnership."  *Id.* § 2590.732(d)(2).

### E.    Advisory Opinions

Within the Department, authority to administer Title I of ERISA is delegated to the Assistant Secretary for the Employee Benefits Security Administration (EBSA).  *See* Secretary's Order 1-2011, 77 Fed. Reg. 1088, 1088 (Jan. 9, 2012).  It is EBSA's practice to answer inquiries from entities affected by ERISA "as to their status under the Act and as to the effect of their acts or transactions," under the agency's discretion "whenever appropriate, and in the interest of sound administration of the Act."  *See* ERISA Procedure 76-1 § 2, 41 Fed. Reg. 36281 (Aug. 27, 1976) (also available here and in Pls.' App. 153-160).  One type of response is an "advisory opinion," which is "a written statement issued to an individual or organization, or to [their] authorized representative . . . that interprets and applies the Act to a specific factual situation."  *Id.* § 3.02. Such statements are issued by EBSA's Office of Regulations and Interpretations.  *See* EBSA, What We Do (link).[3]  EBSA's responses are a matter of discretion, and it "may decline to issue advisory opinions . . . whenever warranted by the facts and circumstances of a particular case."  *Id.* § 5.02.

An advisory opinion "assumes that all material facts and representations set forth in the

---

[3] ERISA Procedure 76-1 § 3.02 provides for advisory opinions to be issued by "the Administrator of Pension and Welfare Benefit Programs or his delegate."  The Administrator later became an Assistant Secretary and the office's name was changed to EBSA in 2003.  *See* Sec'y's Order 1-2003, 68 Fed. Reg. 5374-01 (Feb. 3, 2003).

request are accurate, and applies only to the situation described" in the request. *Id.* § 10. The requester "may rely on the opinion only to the extent that the request fully and accurately contains all the material facts and representations necessary to issuance of the opinion and the situation conforms to the situation described in the request for opinion." *Id.* § 10. Advisory opinions have always been "open to public inspection" at the Department's office in Washington, D.C., *see id.* § 12.01, and are also published on the Department website: https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/advisory-opinions. The Supreme Court has characterized advisory opinions issued under ERISA Procedure 76-1 as "agency view[s] . . . reflect[ing] a 'body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Yates*, 541 U.S. at 18 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

## II.    Factual Background

On November 8, 2018, Plaintiff LP Management Services, LLC (LPMS) submitted an advisory opinion request to the Department, which it subsequently revised on January 15 and February 27, 2019. *See* Pls.' Request (as revised), Pls.' App. 007.[4] LPMS is the general partner of several similar limited partnerships, including Plaintiff Data Marketing Partnership, LP (DMP). 1st Am. Compl. ¶¶ 28-29, ECF No. 9. LPMS is also plan administrator and named fiduciary to a health benefits plan maintained for DMP's common law employees and limited partners. *Id.* ¶ 46. LPMS's request sought an opinion on whether a plan sponsored by a limited partnership and administered by LPMS is an "employee welfare benefit plan" within the meaning of ERISA

---

[4] For the Court's convenience and pursuant to LR 56.5(c), throughout this brief, the Department cites Plaintiffs' appendix when referring to Plaintiffs' Request, Pls.' App. 007-020; the Department's Advisory Opinion 2020-01A, *id.* 001-006; and Department's Advisory Opinion 1999-04A, *id.* 178-182. The Department does not concede that portions of Plaintiffs' appendix not cited are appropriate for the Court's consideration in this administrative record case.

section 3(1), 29 U.S.C. § 1002(1). Pls.' App. 007, 009. The request also asked whether the limited partners in the Plan are "participants" within the meaning of ERISA section 3(7) and whether the Plan is governed by Title I of ERISA. Pls.' App. 007.

The request represented that the limited partnerships' business is the "capture, segregation, aggregation, and sale to third-party marketing firms of electronic data generated by" limited partners who share their data with the partnership. Pls.' App. 009 (1st Am. Compl. ¶ 33). It explained that limited partners "install specific software" to track their data when using the Internet on personal devices such as "computers, phones, televisions, and other devices." *Id.* (1st Am. Compl. ¶ 33). Individuals become limited partners by executing a joinder agreement with the partnership. *Id.* 008-009 (1st Am. Compl. ¶ 31). Limited partners participate in "global management issues through periodic votes of all Partners." *Id.* 008 (1st Am. Compl. ¶ 32). Income distributions to limited partners are reported as guaranteed payments and subject to employment taxes. *Id.* (1st Am. Compl. ¶ 36). The partnership also employs at least one common law employee. *Id.* 009 (1st Am. Compl. ¶ 37).

The request described the health plan sponsored by the limited partnership for the benefit of common law employees and limited partners who choose to participate. *Id.* 010 (1st Am. Compl. ¶¶ 39-40). The limited partnership pays the premiums for its common law employees and limited partners pay their own premiums. *Id.* (1st Am. Compl. ¶ 42). The request asserted that the Plan is a single-employer, self-insured group health plan subject to ERISA. *Id.* 009 (1st Am. Compl. ¶ 44). It argued that limited partners "may permissibly be considered 'participants' in an ERISA-covered plan where at least one common law employee participates in the plans. *Id.* 016.

The Department later received, through the Complaint filed in this case, additional representations about the limited partnerships and their healthcare plans. *See* Compl., ECF No. 1.

The Complaint identified DMP as one of the limited partnerships described in the request.  *Id.* ¶ 2 (1st Am. Compl. ¶¶ 4, 28).  The Complaint also alleged that, to be eligible to enroll in the limited partnership health plan, each limited partner "agrees to contribute more than five hundred (500) hours of work per year through the generation, transmitting, and sharing of their data."  Compl. ¶ 26 (1st Am. Compl. ¶¶ 35, 40).

On January 24, 2020, the Department issued its advisory opinion, concluding that the partnerships' health benefits administered by LPMS do not comprise ERISA-covered plans.  *See* Opinion, Pls.' App. 001.  The advisory opinion determined that "[b]ased on [LPMS's] representations, in the Department's view, the limited partners as described in your request are not employees or bona fide partners of the limited partnerships."  *Id.*  This conclusion was based on a consideration of LPMS's representations, including the conclusion that the limited partners could not be considered to "work" for or "perform any services" for the partnership where they merely "install specific software on their personal electronic devices that capture data as they browse the Internet or use those devices for their own purposes."  *Id.* 002.  Because they could not be considered employees, the Department concluded that "the limited partners are not participants in a single-employer group health plan or in an ERISA plan at all."  *Id.*

## III.   Procedural History

Plaintiffs filed suit on October 4, 2019, *see* ECF No. 1, but did not serve the complaint until December 6, 2019, *see* ECF No. 4.  Plaintiffs took no further action in the case until after the Department issued the requested advisory opinion on January 24, 2020.  *See* Advisory Opinion 2020-01A ("Opinion"), Pls.' App. 001.  On January 29, 2020, after conferring, the parties notified the Court that the advisory opinion had been issued and jointly requested until February 21, 2020, for Plaintiffs to file an amended complaint.  ECF No. 7; *see also* Order, Jan. 30, 2020, ECF No. 8. On February 3, 2020, Plaintiffs filed their First Amended Complaint, ECF No. 9, along with a

Motion for Temporary Restraining Order and Preliminary Injunction, ECF No. 10.  On February 19, 2020, Plaintiffs filed their Motion for Summary Judgment, ECF No. 23.  After consideration of the parties' alternative scheduling proposals, ECF No. 18, the Court directed the Department to file a Cross-Motion for Summary Judgment, consolidated with its responses to Plaintiffs' motions. *See* Order, Feb. 17, 2020, ECF No. 19.

## ARGUMENT

## I.      The Department Is Entitled to Summary Judgment

The Department is entitled to summary judgment because the Court lacks subject matter jurisdiction over Plaintiffs' claims under the APA and ERISA, and because the Department's advisory opinion is a reasonable exercise of the Department's authority to interpret ERISA.

### A.      Plaintiffs' Claim Is Not Cognizable Under the APA

ERISA expressly incorporates the judicial review provisions of the APA.  *See* 29 U.S.C. § 1137(a).  Plaintiffs, however, have failed to state a claim under the APA.  Where the APA provides the cause of action, judicial review is limited to "final agency action."  5 U.S.C. § 704. Two conditions must be met:  "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  Because neither condition is met here, the Court lacks jurisdiction over Plaintiffs' APA claim.  *See Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 287 (5th Cir. 1999).

Here, the Advisory Opinion is not the "consummation" of the Department's decisionmaking process.  The Department has neither determined any facts after an investigation nor taken an enforcement action.  Instead, the head of EBSA's Office of Regulations and Interpretations merely responded to Plaintiffs' request with a "written statement . . . that interprets

and applies the Act to a specific factual situation." ERISA Procedure 76-1 § 3.02. This is a tentative or interim action because it is not based on an agency investigation or determination of Plaintiffs' actual circumstances, but instead relies exclusively on Plaintiffs' limited representations in their request. *See id.* § 10 ("The opinion assumes that all material facts and representations set forth in the request are accurate[.]"). Such "agency letters based on hypothetical facts or facts submitted to the agency, as opposed to fact-findings made by the agency, are classically non-final for this reason." *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 639 (6th Cir. 2004). This stands in marked contrast to decisions like the "jurisdictional determination," which was "issued after extensive factfinding," in *U.S. Army Corps of Engineers v. Hawke*, 136 S. Ct. 1807, 1813-14 (2016), or the six-year investigation that preceded the right-to-sue letters in *BNSF Railway Co. v. EEOC*, 385 F. Supp. 3d 512, 517 (N.D. Tex. 2018). It is significant that issuing this advisory opinion "does not commit the [agency] to any particular course of action." *Luminant Generation Co. v. EPA*, 757 F.3d 439, 442 (5th Cir. 2014). The advisory opinion does not commit the Department to pursue any enforcement action against Plaintiffs, or even to take any action at all. Indeed, if the Department were to investigate Plaintiffs and find the facts to be different than represented, it could reach an entirely different conclusion regarding whether Plaintiffs' activities are encompassed by ERISA.

Even if the issuance of the advisory opinion were narrowly construed to mark the consummation of Plaintiffs' request for that opinion under ERISA Procedure 76-1, that is not sufficient to make it cognizable "agency action." Legal consequences do not generally flow "when an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party." *AT&T Co. v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001). The Department's response to Plaintiffs' request for an advisory opinion does not "immediately trigger[] definite rights and

obligations." *BNSF Railway*, 385 F. Supp. 3d at 521 n.8.  It merely states "the Department's view that the proposed LP Management health benefit programs would not be single-employer group health care plans or ERISA plans at all."  Opinion, Pls.' App. 006.  Accordingly, this is similar to the notices at issue in *Luminant*, which the Fifth Circuit has explained did not trigger legal consequences because the statute "set forth the plaintiffs' rights and obligations" while the agency notices "merely expressed the agency's opinion about the legality of the plaintiff's conduct; it did not commit the administrative agency to a specific course of action should the plaintiff fail to comply with the agency's view."  *Texas v. EEOC*, 933 F.3d 433, 445 (5th Cir. 2019).

As in *Luminant*, any legal consequences flow from existing state and federal law.  Plaintiffs fear the practical consequence that some state authorities might initiate efforts to enforce state laws regarding the structure and sale of health insurance, *see* Pls.' PI Mem. at 6, ECF No. 11, but those states had precisely the same authority to pursue such claims before the Department issued its opinion.  *See Metro. Life Ins. Co.*, 471 U.S. at 727-29 ("Group insurance presently is subject to extensive state regulation, including regulation of the carrier, regulation of the sale and advertising of the insurance, and regulation of the content of the contracts.").  In fact, that state authority is why Plaintiffs pressed the Department to issue an advisory opinion.  *See* Renfro Decl. ¶ 17, ECF No. 11-1.  Accordingly, this is unlike the jurisdictional determination at issue in *Hawke*, which the Supreme Court held gave rise to a "legal consequence" because the agency's decision "limit[ed] the potential liability" from a third-party suit.  136 S. Ct. at 1814.  *See also Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 756 (5th Cir. 2011) (holding that agency guidance letters "neither create new legal consequences nor affect their rights or obligations" where they "merely restate" statutory prohibitions).

Nor does the abstract notion that advisory opinions may be binding on the Department in

some sense establish any legal consequences here.[5]   Unlike other cases, there is no meaningful "safe harbor" at stake regardless of the Department's opinion.  *See Hawke*, 136 S. Ct. at 1814 (relying on fact that one possible determination "creates a five-year safe harbor from [civil enforcement] proceedings" by "the two agencies authorized to bring" suit); *Texas v. EEOC*, 933 F.3d 433, 443-44 (finding that challenged guidance created "safe harbors" by "tell[ing] employers how to avoid Title VII disparate-impact liability").   Here, for example, if the Department's advisory opinion had determined that Plaintiffs' arrangements were encompassed by ERISA, such an opinion would not create any kind of "safe harbor" for Plaintiffs—it would not limit "agency employees' discretion" in exercising any of the Department's plenary authority to enforce ERISA requirements on the Plaintiffs.  *Texas*, 933 F.3d at 443.   Similarly, the Department's actual determination leaves Plaintiffs with nothing to "rely on," ERISA Procedure 76-1 § 10, against the Department—because the Department has no authority to take action regarding plans not encompassed by ERISA.  *Cf. Donovan v. Dillingham*, 688 F.2d 1367, 1370-71 (11th Cir. 1982) (en banc) (deciding the Secretary's authority by determining whether ERISA applied to purported employee benefit plan).  And as previously discussed, neither determination would limit state and territorial governments—they would be free to disagree and go to court to seek to enforce the notion that ERISA did not apply.  *See, e.g.*, *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 5-6 (1983).  Thus, this advisory opinion cannot have legal consequences by "narrow[ing] the field of potential" lawsuits against Plaintiffs.  *Hawke*, 136 S. Ct. at 1814.

---

[5] ERISA Procedure 76-1 provides that "[o]nly the parties described in the request for opinion may rely on the opinion, and . . . only to the extent that the request fully and accurately contains all the material facts and representations necessary to issuance of the opinion and the situation conforms to the situation described in the request for opinion," *id.* § 10, and that by contrast an informational letter "is not binding on the department with respect to any particular factual situation."  *Id.* § 11.

In sum, Plaintiffs have failed to show that the Department's advisory opinion is a cognizable agency action subject to immediate judicial review.  Plaintiffs are free to disagree with the Department and press their own view of the law in court if any state or territorial government initiated enforcement proceedings on the grounds that ERISA did not apply.  It cannot be that every request for an advisory opinion from an agency triggers an opportunity for judicial review. *See Taylor-Callahan-Coleman Counties Dist. Adult Probation Dep't v. Dole*, 948 F.2d 953, 959 (5th Cir. 1991) (concluding that opinion letters issued by Department of Labor were not "final agency action" where they "do not have the status of law with penalties for noncompliance," "do not have a direct or immediate impact on the [plaintiff]," and "do not require immediate compliance by the [plaintiff]").  Indeed, "[t]o permit suits for declaratory judgment upon mere informal, advisory, administrative opinions might well discourage the practice of giving such opinions." *Id.* at 959.  More importantly, it would undermine the consistent understanding that courts may not render advisory opinions, *see, e.g.*, *In re Franchise Servs. of N. Am., Inc.*, 891 F.3d 198, 205 (5th Cir. 2018), if a party could create a justiciable controversy merely by getting an agency to opine on a hypothetical situation.  Plaintiffs' APA claim therefore must be dismissed for lack of subject matter jurisdiction.

### B.    Plaintiffs' Claim Is Not Cognizable Under ERISA

Nor is Plaintiffs' claim cognizable under ERISA itself.  ERISA provides a limited waiver of sovereign immunity and cause of action for certain suits against the Secretary of Labor.  *See* 29 U.S.C. § 1132(k); *Shanbaum v. United States*, 32 F.3d 180, 182 n.2 (5th Cir. 1994); *Francis v. Perez*, 256 F. Supp. 3d 1, 6 (D.D.C. 2017).[6]  It is Plaintiffs' burden to prove that Congress

---

[6] Plaintiffs also purport to ground jurisdiction over their ERISA claims in 29 U.S.C. § 1132(a)(3), *see* 1st Am. Compl. ¶¶ 22, 100, 107, but that provision does not permit suit against the United States, the Department, or the Secretary.  *See Shanbaum*, 32 F.3d at 182 n.2; *Nemlowill v. United States*, No. 16-1642, 2016 WL 3552070, at *2 (S.D. Cal. June 29, 2016); *Arendt v. Solis*, No. 11-

14

"waiv[ed] sovereign immunity in the specific context at issue." *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 232 (5th Cir. 2015). Section 1132(k), in addition to strictly limiting who can bring suit against the Secretary,[7] permits only three limited types of judicial review. *See* 29 U.S.C. § 1132(k) (suits "to review a final order of the Secretary, to restrain the Secretary from taking any action contrary to the provisions of this chapter, or to compel him to take any action required under this subchapter"); *Simon v. Kaiser Permanente Hosps.*, No. 06-03913, 2006 WL 3318094, at *2-3 (N.D. Cal. Nov. 15, 2006) (characterizing § 1132(k) as a "narrow waiver of sovereign immunity" for "three types of suits"). Plaintiffs fail to state a claim under the two prongs of § 1132(k) upon which they rely (the "review a final order" and "restrain" prongs).

### 1. The Advisory Opinion Is Not a Final Order of the Secretary

Section 1132(k)'s grant of authority for courts "to review a final order of the Secretary" is analogous to APA review of final agency action under 5 U.S.C. § 706(2).[8] It is of no use to Plaintiffs because, contrary to their assertion, *see* Pls.' SJ Mem. at 9; 1st Am. Compl. ¶ 115, an

---

5135, 2012 WL 83035, at *3 (E.D. Wash. Mar. 9, 2012), *vacated on other grounds*, 539 F. App'x 813 (9th Cir. 2013).

[7] ERISA only permits such suits by "an administrator, fiduciary, participant, or beneficiary of an employee benefit plan." 29 U.S.C. § 1132(k); *see Coleman v. Champion Int'l Corp./Champion Forest Prod.*, 992 F.2d 530, 534 (5th Cir. 1993) (denying standing to "non-enumerated" parties). The Department concludes that, because ERISA does not apply to the limited partners' plan, Plaintiffs do not have standing as an "administrator [or] fiduciary" to bring an action against the Secretary under § 1132(k). But because the merits and standing are intertwined, the Court can appropriately resolve both on summary judgment. *See, e.g.*, *Barrett Computer Servs., Inc. v. PDA, Inc.*, 884 F.2d 214, 219 (5th Cir. 1989); *Coleman*, 992 F.2d at 535.

[8] Similarly, the third type of suit under § 1132(k)—"to compel him to take action required under this subchapter"—is analogous to APA review of agency inaction under 5 U.S.C. § 706(1), which mirrors the mandamus standard. *See, e.g.*, *Saunders v. Davis*, No. 15-cv-2026, 2016 WL 4921418, at *6 (D.D.C. Sept. 15, 2016); *Simon*, 2006 WL 3318094, at *3; *Va. Beach Policemen's Benevolent Ass'n v. Reich*, 881 F. Supp. 1059, 1073-74 (E.D. Va. 1995), *aff'd*, 96 F.3d 1440 (4th Cir. Sept. 10, 1996) (Table); *Reich v. Valley Nat'l Bank of Ariz.*, 837 F. Supp. 1259, 1302 (S.D.N.Y. 1993). Plaintiffs do not allege that they have such a claim.

advisory opinion is neither an "order" nor "final."

EBSA advisory opinions are not "orders" but are instead best understood as akin to "interpretive rules" under the APA.  ERISA incorporates the APA's broad distinction between rulemaking and adjudication by applying the definitions in 5 U.S.C. § 551.  *See* 29 U.S.C. § 1137(a).  Under the APA, "adjudication" is the "agency process for the formulation of an order," 5 U.S.C. § 551(7), and an order is the resulting "final disposition . . . in a matter other than rule making."  5 U.S.C. § 551(6).  By contrast, the APA's definition of rule includes "an agency statement of general or particular applicability . . . designed to . . . interpret . . . law or policy."  5 U.S.C. § 551(4).  In distinguishing between rulemaking and adjudication, courts "accord significant deference to an agency's characterization of its own action" and "look to the product of the agency action."  *Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 797 (5th Cir. 2000).[9]

The Department does not characterize its advisory opinions as orders or ERISA Procedure 76-1 as an adjudicatory process.  *See, e.g.*, ERISA Procedure 76-1 § 3.02 (defining advisory opinion as a "written statement . . . that interprets and applies the Act to a specific factual situation").  Nor do advisory opinions depend on an investigation or adjudication of the facts.  *See id.* § 10 ("The opinion assumes that all material facts and representations set forth in the request are accurate[.]").  And while requesters may "rely" on the opinion in limited circumstances, *see id.* § 10, requesters are not bound by an advisory opinion and cannot be charged with violating it.  *Cf.* 29 U.S.C. § 1134 (authorizing the Secretary to conduct investigations into "whether any person has violated . . . any provision of this subchapter or any regulation or *order* thereunder" (emphasis

---

[9] Interpretive rules are exempt from notice and comment rulemaking.  *See* 5 U.S.C. § 553(b).  Categorization of an agency action as an interpretive rule does not inherently make it "final."  *See, e.g.*, *American Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) (observing that interpretive rules "generally do not qualify" as final agency action and that where such rules "do not establish a binding norm [they] are not subject to judicial review under the APA").

16

added)).  Accordingly, EBSA's advisory opinions are akin to interpretive rules—"statements as to what the administrative officer thinks the statute or regulation means." *Shell Offshore, Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001).  *Cf. William S. Hart Union High Sch. Dist. v. Romero*, No. 13-3382, 2014 WL 12493766, at *4 (C.D. Cal. Apr. 9, 2014) (characterizing agency letter responding to school district inquiry as "interpretive rule"); *Am. Land Title Ass'n v. Clarke*, 743 F. Supp. 491, 494 (W.D. Tex. 1989) (characterizing interpretive letters as "rules" under § 551(4)).[10]  And § 1132(k) is not available simply to challenge the Department's legal reasoning in the absence of a final order.  *See, e.g.*, *Martin v. King*, No. 92-2116, 1993 WL 276918, at *1 (D. Md. Mar. 9, 1993) (concluding that counterclaim for declaratory judgment in suit brought by Secretary against plan administrator did not challenge "final order of the Secretary").

Even if the Advisory Opinion could be considered an order, it is not "final" for the reasons discussed above.  *See supra*, Arg. § I.A.  It is not "final" because it is based on the requester's factual representations, not the agency's investigation.  *Cf. Air Brake Sys.*, 357 F.3d at 639 ("[A]gency letters based on hypothetical facts or facts submitted to the agency, as opposed to fact-findings made by the agency, are classically non-final for this reason").  It is also not "final" because it does not determine rights or obligations or have legal consequences.  *Cf. Dow Chemical v. EPA*, 832 F.2d 319, 324 (5th Cir. 1987) (holding that agency letter enclosing statement of its legal view did not "fix a legal relationship" and was not "final action"); *City of Miami v. ICC*, 669 F.2d 219, 221-22 (5th Cir. 1982) (holding that ICC declaratory order was "advisory ruling" without

---

[10] Indeed, cases applying § 1132(k)'s "final order" provision have only found it satisfied where the agency took action against the plaintiff after an investigation.  *See, e.g.*, *Rodriguez v. Reich*, 159 F.R.D. 38, 39 (N.D. Cal. 1994) (characterizing $33,000 civil penalty accessed by Secretary as "final order" under § 1132(k)); *see also Cutaiar v. Marshall*, 590 F.2d 523, 525-26 (3d Cir. 1979) (reviewing "final action" under the APA—letter issued at conclusion of "investigation . . . [finding] that the loan violated ERISA" which "inform[ed the trustees] of the violation," noting in dicta that jurisdiction was also "properly exercised under 29 U.S.C. § 1132(k)").

legal consequences and therefore lacked finality).  Contrary to Plaintiffs' assertion, the Advisory

Opinion is not "binding on the parties to the [request]."  1st Am. Compl. ¶ 115.  Instead, ERISA

Procedure 76-1 § 10 merely allows "the parties described in the request" to "rely on the opinion"

so long as the facts and situation conform to what was "described in the request."  This at most

makes an Advisory Opinion "binding on the [D]epartment" in a limited way.  *Id.* § 11.  Thus,

Plaintiffs err in seeking a declaration that the Advisory Opinion has "no force or effect against

Plaintiffs or any similarly situated organizations,"  1st Am. Compl. ¶ 102, because the non-binding

nature of advisory opinions on the requester and entities not described in the request make such an

order meaningless.  As the Supreme Court has noted, "opinion letters . . . lack the force of law."

*Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000); *Exelon Wind 1, LLC v. Nelson*, 766 F.3d

380, 392 (5th Cir. 2014); *see also In re Enron Corp. Securities, Derivative & ERISA Litig.*, 284 F.

Supp. 2d 511, 593 (S.D. Tex. 2003) (noting that Department's ERISA advisory opinions "lack the

force of law" but reflect the view "of the agency with expertise in application of the statute").

### 2.    The Advisory Opinion Is Not An Action Contrary to ERISA

Moreover, Plaintiffs have not properly invoked § 1132(k) "to restrain the Secretary from

taking any action contrary to the provisions of this chapter."  This authority to grant certain

injunctive relief appears not to have been the basis for any prior published opinion.  Even so, it

cannot bear the expansive construction Plaintiffs suggest.  *See Innova Hosp. San Antonio, LP v.

Blue Cross & Blue Shield of Georgia, Inc.*, No. 3:12-cv-1607-O, 2014 WL 360291, at *7 (N.D.

Tex. Feb. 3, 2014) ("[A] waiver of the Government's sovereign immunity will be strictly

construed, in terms of its scope, in favor of the sovereign." (quoting *Lane v. Pena*, 518 U.S. 187,

192 (1996))).  Rather, the most reasonable reading of this prong is that it allows suit where the

Secretary is taking an action that ERISA expressly prohibits.  At the time ERISA was adopted,

judicial review was available for "the class of cases where an agency has exercised authority in

excess of its jurisdiction or otherwise acted in a manner that is clearly at odds with the specific language of a statute." *See Coca-Cola Co. v. FTC*, 475 F.3d 299, 303 (5th Cir. 1973) (citing *Leedom v. Kyne*, 358 U.S. 184 (1958)). This was a "widely recognized exception" to the "general rule against judicial consideration of interlocutory agency rulings." *Id.* at 303. The Fifth Circuit characterized this exception as a "rule that agency action contrary to a specific mandate of an Act of Congress is remediable judicially before administrative proceedings are at an end." *Id.* ERISA's text lends support to the notion that Congress was codifying this limited type of judicial review here. Not only is review limited to an "action contrary" to the statutory text, 29 U.S.C. § 1132(k), but the same statutory section also contains several express prohibitions against certain actions by the Secretary. *See, e.g.,* 29 U.S.C. § 1132(b)(1) (prohibiting the Secretary from filing suit with respect to particular tax-qualified plans unless requested by the Secretary of the Treasury or by a participant, beneficiary, or fiduciary of the plan); *id.* § 1132(b)(2) (prohibiting the Secretary from taking any enforcement action to collect delinquent employer contributions).

Issuing an advisory opinion is not an "'action contrary to the provisions of' ERISA." 1st Am. Compl. ¶¶ 102, 105. Like an interpretive rule, an advisory opinion merely states "what the administrative officer thinks the statute or regulation means." *Shell Offshore*, 238 F.3d at 628. And stating EBSA's view of the law is appropriate, even if a court later interprets the law differently. Not only does ERISA confer interpretive authority on the Secretary, *see* 29 U.S.C. § 1135; *Provident Life*, 364 F.3d at 639, but the Supreme Court has also treated such ERISA advisory opinions as an "agency view . . . merit[ing] respectful consideration." *Yates*, 541 U.S. at 18. More broadly, courts recognize the appropriateness of advisory letters to entities regulated by an agency. *See, e.g.*, *Dow Chemical*, 832 F.2d at 324 (stating that "pre-enforcement communications between [agencies] and industry" are "in the public interest"); *Am. Land Title*

*Ass'n*, 743 F. Supp. at 494 (describing the "value of advisory letters written by subordinate officials and [that the court] does not wish to discourage or disrupt this practice"). Plaintiffs requested this advisory opinion. Therefore, they do not argue that the Department lacks authority to issue it. Instead, Plaintiffs merely disagree with the Department's legal reasoning. That is not an action subject to immediate judicial review under the limited provision of § 1132(k). *Cf. Exxon Chems. Am. v. Chao*, 298 F.3d 464, 468 (5th Cir. 2002) (concluding that court lacked jurisdiction under *Kyne* where agency had "not exceeded the scope of its congressionally delegated authority or its clear statutory mandate").

By contrast, under Plaintiffs' approach, which appears never to have been employed in the decades since ERISA was adopted, any statement of the Department's view of the law could allow a party to run to court to enjoin that statement or any implementation of it. Thus for example, a notice of proposed rulemaking describing the Department's tentative understanding of the law could lead to a preemptive lawsuit before the agency even collected comments or decided whether to issue a final rule. *Cf. Blackfeet Nat'l Bank v. Rubin*, 890 F. Supp. 48, 53-54 (D.D.C. 1995), *affirmed*, 67 F.3d 972 (D.C. Cir. 1995) (per curiam) (holding that IRS notice of proposed rulemaking that attached "proposed regulations" was not final agency action under the APA); *Young v. U.S. Dep't of Labor*, No. 17-2428, 2018 WL 3941948, at *4 n.4 (D.D.C. Aug. 16, 2018) (rejecting notion that agency statements in notice of proposed rulemaking are final agency action). Section 1132(k) cannot reasonably be construed to permit entities associated with ERISA plans to sue anytime they disagree with the Secretary's stated views. Plaintiffs cite no case in which either the parties or courts advanced such an extraordinary reading of this narrow grant of jurisdiction. Indeed, such an interpretation would conflict with the other provisions of § 1132(k) which contain very narrow grants of authority—review of "final order[s]" not rules or interim actions, and

20

"compel[ling] action required by [the statute]."  Plaintiffs' interpretation would impermissibly swallow both of these companion provisions.  *Cf. Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (courts "resist a reading of [a statutory provision] that would render superfluous an entire provision passed in proximity as part of the same Act"); *Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660, 690 (N.D. Tex. 2016) ("In construing a statute, courts are obligated to give effect to all its provisions 'so that no part will be inoperative or superfluous, void or insignificant.'" (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).  Nor is there any need for immediate judicial review of the Department's statement of its view of the law—any party that disagrees with the Department's informal opinion is under no obligation to follow it and if any enforcement authority sought to implement that view of the law, it could be litigated at that point.  As the Fifth Circuit noted, "judicial review should not be a means of turning prosecutor into defendant" and premature judicial interference could "circumvent the [statutory] enforcement scheme . . . which gives [the agency] different enforcement options."  *Dow Chemical*, 832 F.2d at 324 n.20.

### C.   To the Extent Judicial Review Is Available, the Advisory Opinion Is Reasonable And Consistent With Law

Even if judicial review were available, the Department is entitled to summary judgment because the Advisory Opinion is a reasonable exercise of the Department's interpretive authority. The Advisory Opinion reasonably concluded that, based on the representations made in the Plaintiffs' advisory opinion request, the limited partners did not perform work or services for the partnership and therefore were not "working owners."  More specifically, the limited partners were neither "employees" nor "bona fide partners" who qualified under the statute to be ERISA plan participants.  The Advisory Opinion is consistent with ERISA, implementing regulations, Supreme Court case law, and the Department's prior sub-regulatory guidance.[11]

---

[11] Plaintiffs complain that the Department "ignored" the question of whether the partnership plans

### 1.      Standard of Review

"When the court reviews a federal administrative agency's decision, a motion for summary judgment stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the court's review." *Exxon Mobil Corp. v. Mnuchin*, No. 3:17-1930-B, 2019 WL 7370430, at *4 (N.D. Tex. Dec. 31, 2019). "[T]he summary-judgment standard for APA claims is not whether there is a genuine dispute of material fact, but whether the agency action violated [APA] Section 706." *Exxon Mobil Corp.*, 2019 WL 7370430, at *4; *see also Garcia for Congress v. FEC*, 22 F. Supp. 3d 655, 658 (N.D. Tex. 2014) ("[W]hen a district court reviews a summary judgment motion concerning an agency's action, the court determines not whether the material facts are disputed, but whether the agency properly dealt with the facts.").

The APA permits courts to "set aside an agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Sierra Club v. EPA*, 939 F.3d 649, 663 (5th Cir. 2019) (quoting 5 U.S.C. § 706(2)(A)). An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to

---

were multiple employer welfare arrangements (MEWAs) under ERISA, 29 U.S.C. § 1002(40), *see* Pls.' SJ Mem. at 6 n.16, 49, but they did not actually ask whether the plans were MEWAs. *See* Pls.' Request, Pls. App. 007. Plaintiffs requested confirmation that Title I of ERISA applied to their plan, *id.*, a question not contingent on whether the plan is a MEWA. By definition, a MEWA is "an employee welfare benefit plan, or *any other arrangement* . . . , which is established or maintained for the purpose of offering or providing any benefit described in [29 U.S.C. § 1002(1)] to the employees of two or more employers (including one or more self-employed individuals)." 29 U.S.C. § 1002(40) (emphasis added). A MEWA therefore includes both ERISA-covered employee welfare benefit plans and other arrangements that provide medical, surgical, or any other benefit described in § 1002(1). Accordingly, the Department acknowledged that MEWA status was not relevant to a determination of whether Plaintiffs' plans were ERISA plans. *See* Opinion, Pls.' App. 006 n.6. Regardless, Plaintiffs state no claim regarding this issue because, even if they had requested an opinion about MEWA status, the Department retains discretion not to answer all or part of an advisory opinion request. *See* ERISA Procedure 76-1 § 5.02 ("[T]he department may decline to issue advisory opinions . . . whenever warranted by the facts and circumstances of a particular case.").

consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 663-64 (ultimately quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  The arbitrary and capricious standard is "narrow" and courts "ensure that the agency examined the relevant data and articulated a satisfactory explanation for its actions." *Id.* at 664.

Here, regardless of whether Plaintiffs' claims are construed to be brought under ERISA or the APA, the only question before the Court is whether the Department reasonably applied ERISA and its regulations to the factual assertions contained in Plaintiffs' request.  The administrative record includes only Plaintiffs' request, Plaintiffs' original complaint, and the Advisory Opinion. *See* Opinion, Pls.' App. 001, 006 (explaining that the Department considered facts asserted in both Plaintiffs' request and their complaint).  Any additional facts asserted in Plaintiffs' declarations and other attachments were not before the agency and cannot provide a basis for the Court's decision.[12]  *See Shell Offshore, Inc. v. Babbitt*, 238 F.3d 622, 630 n.8 (5th Cir. 2001) ("[I]t is well established that reviewing courts generally should, in evaluating agency action, avoid considering evidence that was not before the agency when it issued its final decision."); *Horton v. Prudential Ins. Co. of Am.*, 51 F. App'x 928 (5th Cir. 2002) (reversing district court for, among other things, considering "determination [that] was not before the [decisionmaker]" because "the district court should have confined itself to the administrative record"); *Triplett v. Fed. Bureau of Prisons*, No. 3:08-CV-1252-K, 2009 WL 792799, at *8 (N.D. Tex. Mar. 24, 2009) (declining to consider plaintiff's "numerous affidavits that are not part of the administrative record and were not

---

[12] Specifically, except to the extent certain facts may be subject to judicial notice, Plaintiffs may not rely upon the documents contained in Tabs 4, 5, 6, 7, 14, and 15 of Plaintiffs' Appendix, *see* ECF No. 24-1, for purposes of the cross-motions for summary judgment.

considered by the [agency]"); *City of Dallas v. Hall*, No. 3:07-CV-0060-P, 2007 WL 3257188, at *4 (N.D. Tex. Oct. 29, 2007) ("[M]atters not considered by the agency are generally outside the record [and] are legally irrelevant[.]").

Finally, when undergoing judicial review, an advisory opinion is entitled to deference as the persuasive view of the agency tasked with interpreting and enforcing ERISA's complex regime. As the Supreme Court has recognized, such ERISA advisory opinions "reflect[] a 'body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Yates*, 541 U.S. at 18 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). "The degree of deference depends on 'the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Baylor Cnty. Hosp. Dist. v. Price*, 850 F.3d 257, 261 (5th Cir. 2017) (quoting *Skidmore*, 323 U.S. at 140). Courts analyze agency action under this deference standard and the "distinct but potentially overlapping" arbitrary and capricious standard simultaneously. *See id.* at 262.[13]

## 2. The Statutory Text, Along With Judicial and Department Interpretations, Uniformly Require Employee-like Behavior For Owners to Participate In ERISA Plans

Plaintiffs' request and their lawsuit seek to show that "limited partners in partnerships like DMP are 'employees' within the meaning of 29 U.S.C. § 1002(7)." 1st Am. Compl. ¶ 57. Several authorities inform the analysis of whether working owners are "employees" for purposes of being eligible to participate in an ERISA-covered benefit plan. ERISA, the Internal Revenue Code, and

---

[13] Because courts clearly apply *Skidmore* deference to the type of advisory opinions at issue here, there is no need to respond to Plaintiffs' extensive arguments about other forms of judicial deference to agency action. *See Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) (deference to agency interpretation of its own regulation); *Chevron, U.S.A. v. Nat'l Resources Defense Council, Inc.*, 467 U.S. 837 (1984) (deference to agency interpretation of ambiguous statutes).

their implementing regulations require an examination into the substance of an individual's activity to determine whether the individual is in fact working. The courts and the Department have consistently construed ERISA to require some employment relationship and performance of services in order for the statute to apply.

i.     *The Supreme Court's Treatment of ERISA's Definition of "Employee"*

"Statutory interpretation . . . begins with the text." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Accordingly, the Advisory Opinion appropriately turned to ERISA's statutory text, which is "replete with references to the employment relationship," including ERISA's title and its key definitions. *See* Opinion, Pls.' App. 003. Indeed, it is undisputed that an ERISA plan can only exist where an employment relationship between an employer and employee is present. *See supra*, Background § I.C; 1st Am. Compl. ¶ 54 (accepting that "ERISA is designed to protect 'participants' who are 'employees' that participate in employee benefit plans which are subject to its regulatory scope").

The Supreme Court consistently employs a two-step process in analyzing the meaning of the term "employee" under ERISA. *See Yates*, 541 U.S. at 12; *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992). First, the Court reviews ERISA's definitions and considers whether related statutory provisions give "specific guidance on the term's meaning." *Darden*, 503 U.S. at 323; *see also Yates*, 541 U.S. 12 & n.3 (surveying ERISA as a whole for "textual clues" and finding "multiple indications" of Congressional intent that resolved the question presented). Second, if the text is ambiguous, the Court turns to common law principles so long as they do not "thwart [ERISA's] congressional design or lead to absurd results." *Darden*, 503 U.S. at 323; *see also Yates*, 541 U.S. at 12 (finding no need "to resort to common law" where the text provided "specific guidance" on the question presented); *Provident Life*, 364 F.3d at 638 n.2 (characterizing *Darden*

as holding "that in the absence of textual clues, courts should look to the federal common law in order to determine who is an employee").

While ERISA is clearly limited to the employment context, its definition of employee "is completely circular and explains nothing." *Darden*, 503 U.S. at 323; *see* 29 U.S.C. § 1002(6) ("The term 'employee' means any individual employed by an employer."). In *Darden*, to address whether an insurance agent was an employee of an insurance company, the Court did not find "any provision . . . giving specific guidance on the term's meaning." 503 U.S. at 323. Accordingly, the Court "adopt[ed] a common-law test for determining who qualifies as an 'employee' under ERISA," which depends on the "hiring party's right to control the manner and means by which the product is accomplished." *Id.* Under this approach, "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Id.*; *see also Provident Life*, 364 F.3d at 638 n.2 (factors are "considered together, with no one factor being dispositive").

In *Yates*, the Supreme Court addressed the argument "that a business owner may rank only as an 'employer' and not also as an 'employee' for purposes of ERISA-sheltered plan participation." 541 U.S. at 6. The Court examined "ERISA's text" as a whole and found "multiple indications that Congress intended working owners to qualify as plan participants." *Id.* at 12. Because ERISA was thus "adequately informative" on the narrow question presented, *id.* at 16, *Yates* did not need to "resort to common law" to answer it. *Id.* at 12. Agreeing with the reasoning of a Department advisory opinion, the Court concluded Congress intended for a "working owner" who "wear[s] two hats, as an employer and employee," to participate in ERISA plans. *Id.* at 16.

Both *Darden* and *Yates* are relevant to Plaintiffs' claims here. While *Yates* relied on observations about the treatment of sole proprietors and partners in various ERISA provisions to conclude that "working owners" are permitted to be participants in an ERISA plan, *see* 541 U.S.

at 14-16, it did not adopt any specific definition of that functional term.  Because *Yates* concerned a medical doctor whose medical practice operated through a professional corporation, *see* 541 U.S. at 7-8, 15, there was no ambiguity about his role as a working owner.  Thus, *Yates*'s holding did not address how to distinguish between such "working owners" and other employers who could not also be considered employees.  *Cf.* 541 U.S. at 26 n.* (Thomas, J., concurring in judgment) ("The Court does not clearly define who exactly makes up this class of 'working owners' . . .").  Plaintiffs' claims here do not present a clear-cut case of working owners like medical doctors who own their practices or the law firm partners addressed by the Fifth Circuit in *House*.  *See* 499 F.3d at 50.  Accordingly, it is essential to determine the circumstances under which an owner can be considered a "working owner" and thus an employee for purposes of participating in an ERISA plan.  This inquiry is informed by some of the same sources considered in *Yates*, along with *Darden*'s "employee" factors, since working owners have dual status with characteristics of both employer and employee, as those terms are understood under the common law.

Plaintiffs misread *Yates* by arguing that it "specifically rejected" any consideration of *Darden*'s common law "employment-related factors" for questions regarding working owners.  Pls.' SJ Mem. at 32; *see also id.* at 45 (claiming that the Supreme Court "rejected the *Darden* employment test in *Yates*").  They argue that *Yates* concluded that the "meaning of [owner employees] was provided in the statute," *id.* at 45, claiming that *Yates* "relies on the [Internal Revenue] Code to establish the relevant standards."  *Id.* at 32.  Accordingly, they propose that *Yates* "requires a lockstep analysis," *id.* at 44, apparently referring to the Internal Revenue Code's definition of a "self-employed individual."  *See id.* at 46-47 (relying on 26 U.S.C. § 401(c)(1)).

The Supreme Court in *Yates* did nothing of the kind.  Instead, the Court discussed § 401(c)(1) only where it was expressly incorporated into ERISA provisions.  The Court surveyed

27

ERISA as a whole for "textual clues," 541 U.S. at 12 n.3, and found "multiple indications that Congress intended working owners to qualify as plan participants." *Id.* at 12. Among those indications were three instances in different titles of ERISA that expressly incorporated definitions from § 401(c) and which "would be unnecessary if working owners could not qualify as participants in ERISA-protected plans in the first place," *id.* at 13:

- An exemption from ERISA's Title I fiduciary responsibility requirements that expressly incorporated 26 U.S.C. § 401(c)(1). *See id.* at 14 (discussing 29 U.S.C. § 1103(b)(3)(A)).

- An exemption from ERISA's Title I prohibited transaction provisions permitting "loans to plan participants" but not to "owner-employees" as defined by 26 U.S.C. § 401(c)(3). *See id.* at 14-15 (discussing 29 U.S.C. § 1108(d)(1)).

- A provision in Title IV of ERISA which again incorporated 26 U.S.C. § 401(c)(1). *Id.* at 16 (discussing 29 U.S.C. § 1301(b)(1)).

Thus, *Yates* did not rely on § 401(c)(1) except where expressly incorporated by ERISA. Nor did it adopt § 401(c)(1) as a definition of "working owner." Instead, in its discussion of the fiduciary responsibility exception, it observed that "self-employed individual" as defined by § 401(c)(1) "no doubt encompasses working sole proprietors and partners." *Id.* at 14. Plaintiffs commit a basic logical fallacy by presuming that merely because one term "encompasses" a second term, the first term therefore defines the second term. *See, e.g.*, *Silvester v. Becerra*, 138 S. Ct. 945, 949 n.5 (2018) (Thomas, J., dissenting from denial of certiorari) ("By assuming that a conclusion about the whole applies to each of its parts, the Ninth Circuit committed the 'fallacy of division.'"); *see also Christian v. Generation Mortg. Co.*, No. 12-5336, 2013 WL 2151681, at *3 (N.D. Ill. May 16, 2013). Indeed, *Yates* specifically noted that it was only in "combination" that all of the surveyed provisions supplied adequate guidance regarding the statutory meaning, *see* 541 U.S. at 16 n.5, negating Plaintiffs' effort to characterize *Yates* as directly adopting the Code definition.

Plaintiffs are also mistaken in their assertion that *Yates* "adopted" the "'working owner'

definition . . . set forth" in the Department's Advisory Opinion 1999-04A.  Pls.' SJ Mem. at 26.
This advisory opinion reviewed many of the same ERISA provisions discussed above to conclude
that Congress intended for a working owner to be a "participant" in ERISA plans.  *See* Advisory
Opinion 1999-04A (link) (also available at Pls.' App. 178).  The underlying request encompassed
"working owners" who were "journeyman electricians who had worked initially as bargaining unit
members for other employers that contributed to the [multiemployer pension plan] on their behalf
[and who] subsequently acquired ownership interest in those employers or started their own
electrical businesses . . . They continue to work as electricians . . ."  Pls.' App. 179.  For purposes
of its response, the Department assumed that by "working owner" the requester meant "any
individual who has an equity ownership right of any nature in a business enterprise and who is
actively engaged in providing services to that business."  *Id.* n.3, Pls.' App. 181.  The Department
did not adopt this as a statutory definition, but instead used it as a functional term to answer the
request.  While *Yates* found that advisory opinion persuasive and echoed its analysis of relevant
ERISA provisions, the Supreme Court never quoted the Department's assumption about what the
requester meant by "working owner" and certainly did not adopt that assumption as a formal
definition.  *See* 541 U.S. at 17-18.[14]

     In sum, *Yates* did not adopt a definition of "working owner" or negate the relevance of
common law considerations to distinguish the term from non-working owners.

### ii.      *Relevant Statutory and Regulatory Evidence*

     Returning to *Yates* and *Darden*'s first step, the question here is whether ERISA's text itself

---

[14] Plaintiffs likewise err in attempting to draw "implication[s]" from "silence" in the Department's
2005 response to questions from the American Bar Association Standing Committee on Employee
Benefits.  *See* Pls.' SJ Mem. at 25-26.  This response neither employed a specific "definition" of
working owner nor concluded that "the Code's concept of self-employment [was] dispositive."  *Id.*
at 26.

definitively sets the outer limits of what constitutes a "working owner" who "wear[s] two hats, as an employer and employee," and is thus eligible to participate in ERISA plans. *Yates*, 541 U.S. at 16. Because "working owner" does not appear in ERISA, this remains an effort to define "employee," as applied to an individual who is also an owner. The two primary textual sources for this evidence both suggest that a key question is whether the individual provides "services" to the business.[15]

First is the treatment of "bona fide partners" within the meaning of ERISA § 732(d), 29 U.S.C. § 1191a(d). This section applies only to a group health plan, an ERISA plan that "provides medical care." 29 U.S.C. § 1191b(a)(1). It states that a plan "established or maintained by a partnership" which "provides medical care . . . to present or former partners in the partnership or their dependents" shall be treated as an ERISA plan. *Id.* § 1191a(d)(1). It allows the partnership to be considered the "employer" and the individual partners to be "participants" in the plan. *Id.* § 1191a(d)(2), (3). The implementing regulation clarifies that ERISA § 732(d) applies only to "bona fide partners" which is to be determined "based on all the relevant facts and circumstances, including whether the individual performs services on behalf of the partnership." 29 C.F.R. § 2590.732(d)(2); *see also* 69 Fed. Reg. 78720, 78735 (Dec. 30, 2004) (regulation clarifies that one "must be a bona fide partner in order to be considered an employee" under ERISA Part 7).

This facts-and-circumstances approach to determining whether the partner can be a participant in an ERISA plan echoes the determination of whether a partnership is genuine under

---

[15] Other statutory or regulatory provisions discussed in *Yates*, while relevant to the appropriateness of "working owners" as participants in ERISA plans, do not aid in determining the scope of that concept. For example, 29 C.F.R. § 2510.3-3(b), the Department's regulation "addressing . . . what plans qualify as 'employee benefit plans' under Title I of ERISA," *Yates*, 541 U.S. at 21, acknowledged that "self-employed individuals" could be participants in an ERISA plan, but did not further define that term. *See* Opinion, Pls.' App. 004.

the Internal Revenue Code, which follows common law principles. *See Yates*, 541 U.S. at 12-13 (recognizing that Congress intended "to harmonize ERISA with longstanding tax provisions"); *cf. Cobb v. Comm'r*, 185 F.2d 255, 258 (6th Cir. 1950) ("the over-all criteria of the existence of a partnership are the same under the revenue laws as under common law"). Tax law "deals in economic realities, not legal abstractions" and it is a cardinal rule that tax consequences "depend on [a transaction's] substance, not its form." *Chemtech Royalty Assocs., L.P. v. United States*, 766 F.3d 453, 460 (5th Cir. 2014).[16] The Supreme Court has explained, "A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses." *Comm'r v. Tower*, 327 U.S. 280, 286 (1946).[17] In assessing whether a partnership is genuine, a court asks

> whether, *considering all the facts*—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—*the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.*

*Comm'r v. Culbertson*, 337 U.S. 733, 742 (1949) (emphasis added). The parties' intent is the key factor in determining whether a particular arrangement constitutes a partnership. In distinguishing valid partnerships from shams, the Fifth Circuit has restated the *Tower* test:

> [T]he parties, to form a valid tax partnership, must have two separate intents: (1) the intent to act in good faith for some genuine business purpose and (2) the intent to be partners, demonstrated by an intent to share "the profits and losses." If the

---

[16] For this reason, it is not dispositive for purposes of ERISA or the Code that Plaintiffs allege that they are organized as partnerships under state law. *See* Pls.' SJ Mem. at 5, 8, 47, 48.

[17] Under the Code, a "partner" means a member of a "partnership," and "partnership" means "a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on." 29 U.S.C. § 761(a), (b).

parties lack either intent, then no valid tax partnership has been formed.

*Chemtech Royalty*, 766 F.3d at 460-61.  These intents are determined based on "all the relevant facts and circumstances."  *Id.* at 461.

Second, as noted in *Yates*, several ERISA provisions incorporate § 401(c)(1)'s definition of an "employee" as a "self-employed individual."  *See Yates*, 541 U.S. at 14 (discussing 29 U.S.C. §§ 1103(b)(3)(A), 1108(d)(1), 1301(b)(1)).[18]   Section 401(c)(1), under a provision governing contributions to qualified retirement plans, defines a "self-employed individual" as one "who has earned income," which is "net earnings from self-employment . . . only with respect to a trade or business in which *personal services* of the taxpayer are a material income-producing factor."  26 U.S.C. § 401(c)(2)(A) (emphasis added).  This requirement derives from the need to distinguish active, working owners from inactive ones "[s]ince the objective of [a qualified plan for the self-employed] is to provide retirement benefits based on personal services."  Sen. Rep. No. 87-992 (1961), 1962 U.S.C.C.A.N. 2964, 2975; *see also id.* ("This concept of earned income is designed to place proprietors and partners on the same basis as corporate shareholders who can participate in a qualified retirement plan under present law *only if they are employees* of the corporation." (emphasis added)).  Treasury regulations specify that earned income "includes only professional fees and other amounts received as compensation for personal services actually rendered by the individual" and that this does not include all "net earnings from self-employment from a trade or business." 26 C.F.R. § 1.401-10(c)(3).  *See, e.g., Miller v. Comm'r of Internal Revenue*, 81 T.C.M. (CCH) 1258, 2001 WL 233963, at *17 (T.C. 2001) ("[W]e have upheld the requirement that

---

[18] One of those provision incorporates 26 U.S.C. § 401(c)(3)'s definition of "owner-employee," *see* 29 U.S.C. § 1108(d)(1), which in turn relies on § 401(c)(1)'s definition of employee.  The distinct aspects of "owner-employees" for purposes of those limited ERISA and Code provisions are not relevant to the question here.

personal services be actually performed in order to yield earned income[.]"); *Frick v. Comm'r of Internal Revenue*, 47 T.C.M. (CCH) 564, 1983 WL 14720 (T.C. 1983) ("earned income" came only from taxpayer's advertising business, not from his investments or sales of real estate).

While neither of these provisions sets a comprehensive definition for partners who can also be employees for purposes of participating in an ERISA plan—because one applies only to plans under Part 7 of ERISA and the other is never used to define who may participate in an ERISA plan—they both suggest that a key element for a working owner is providing personal services to the business. Moreover, 29 C.F.R. § 2590.732(d)(2), along with the background tax law principles regarding partnerships, require a broader facts-and-circumstances analysis. Because that analysis is open-ended, the common law factors set forth in *Darden* remain helpful.

> ### 3. The Advisory Opinion Reasonably Applied These Legal Standards to Plaintiffs' Asserted Facts

Plaintiffs' claims fail because the Department reasonably concluded that the facts Plaintiffs presented in their request for an advisory opinion do not establish that their limited partners are "employees" entitled to participate in employee benefit plans under ERISA. None of Plaintiffs' objections to the reasoning and scope of the Advisory Opinion are meritorious.

> #### i. The Advisory Opinion Considered All Relevant Legal Standards

The Department's Advisory Opinion is rooted in all of the relevant legal standards. While Plaintiffs claim that it "fails to give a reasonable explanation for how it reached its decision," because it did not specifically cite *Yates*, *Darden*, and Advisory Opinion 1999-04A, Pls.' SJ Mem. at 31, the Advisory Opinion demonstrates consideration of all of these authorities. For example, it twice acknowledges *Yates*'s holding regarding working owners and frames Plaintiffs' burden in light of that holding. *See* Opinion, Pls.' App. 004 (stating that "limited partners must participate in the plan as 'working owners' to be covered as plan participants within the meaning of Title I of

33

ERISA"); *id.* 003 (relying on the "absence of factual representations supporting an actual employment or working owner relationship").  The Advisory Opinion addressed "bona fide" partners under ERISA § 732(d) at length.  *See id.* 004-005.  Plaintiffs themselves acknowledge that the Advisory Opinion "engage[s] in a robust common law employment analysis" informed by *Darden*.  Pls.' SJ Mem. at 31.  And while the 1999 advisory opinion and 26 U.S.C. § 401(c)(1) are not directly cited, those sources' focus on services to the business pervades the Advisory Opinion.  *See, e.g.*, Opinion, Pls.' App. 001 (partners "do not receive income for performing services for . . . the partnership"); *id.* 001-002 ("[Y]ou have provided no facts that would support a conclusion that the limited partners . . . perform any services on its behalf."); *id.* 002 (describing the "purported and sole 'service'" as installing software to permit electronic tracking); *id.* 005 (limited partners "do not work or perform services for the partnership"); *id.* ("[T]here is no basis to conclude the limited partners will derive any income from the partnership for the performance of services.").  Plaintiffs cite no authority for the proposition that an agency must expressly cite relevant caselaw and its own prior interpretations in order to comply with the APA.  *See* 1st Am. Compl. ¶ 116.b (claiming that the Advisory Opinion violates the APA because it "[f]ails to cite relevant law").  To the contrary, courts merely "ensure that the agency examined the relevant data and articulated a satisfactory explanation for its actions."  *Sierra Club*, 939 F.3d at 664.  As discussed in the next section, the Advisory Opinion is very clear regarding its reasoning and analysis.  Thus, at bottom, Plaintiffs merely believe this was the "wrong analysis," Pls.' SJ Mem. at 34, due to their mistaken reading of *Yates*.  *See supra*, Arg. § I.C.2.i.

> ii.    ***The Advisory Opinion Reasonably Applied Those Legal Standards to Plaintiffs' Asserted Facts***

The Advisory Opinion concluded that "the limited partners here are neither employed nor self-employed with respect to the partnership, but rather are merely consumers purchasing health

coverage in exchange for premiums and an agreement that the partnership can track their personal activities on their electronic devices."  Opinion, Pls.' App. 004.  The Advisory Opinion reached this conclusion based on several different streams of analysis.

First, the Advisory Opinion considered whether, under the proffered facts, the limited partners would perform "services" for the business.  *See id.* 001-002 ("[Y]ou have provided no facts that would support a conclusion that the limited partners are meaningfully employed by the partnership or perform any services on its behalf."); *id.* 005 (concluding that the limited partners "do not work or perform services for the partnership").  Plaintiffs themselves acknowledge that this is relevant and treat it as the dispositive factor.  *See* Pls.' SJ Mem. at 27-28, 43, 46.  It is plainly one way that the sources sought to quantify "work" or "employment."  *See* 26 U.S.C. § 401(c)(1); 29 C.F.R. § 2590.732(d); Advisory Opinion 1999-04A, Pls.' App. 181.  The Department reasonably concluded that allowing one's electronic data to be tracked, collected, and marketed is not "work" or "performing any services."  Opinion, Pls.' App. 002.  Allowing the partnership to "track consumers' activities on the Internet" is instead similar to what consumers already permit "numerous firms, such as internet browsers and social media companies" to do "without claiming that the tracked consumers work for them."  *Id.* 002.  And the limited partners' activities, while comprising 500 hours of data, do not appear to "differ[] in any meaningful way from the personal activities . . . [they] would otherwise engage in while using their personal devices."  *Id.* 002.[19]

---

[19] Plaintiffs suggest that the Code's discussion of "material participation" in a business for purposes of recognizing income or losses, 26 U.S.C. § 469, helps their case.  *See* Pls.' SJ Mem. at 35-36.  They did not discuss this provision in their request, but it is apparently why they have set a 500-hour requirement for data generation.  *See id.* at 36.  Treasury regulations define "participation" as "any work done by an individual . . . in connection with an activity in which the individual owns an interest at the time the work is done," 26 C.F.R. § 1.469-5(f), and "material participation" as "participating in the activity for more than 500 hours during [the tax] year."  *Id.* § 1.469-5T(a)(1).  None of this authority suggests that what the limited partners do constitutes "work."

This reasoning alone is fatal to Plaintiffs' claims, whether under their approach to ERISA or the Department's.  To be a "bona fide partner" under ERISA § 732(d), one must "perform[] services on behalf of the partnership."  *See* 29 C.F.R. § 2590.732(d)(2).  To be a self-employed individual under the Code, one must earn income "for personal services actually rendered by the individual."  *See* 26 U.S.C. § 401(c)(1).[20]  Likewise, the Department's 1999 advisory opinion took it as a given that a working owner must be "actively engaged in providing services to that business."  *See* Pls.' App. 181.  Because Plaintiffs have failed to meet that factor, they cannot show that they are the sort of owners permitted to participate in ERISA plans as an employee.

Second, the Advisory Opinion considered many of the factors prescribed by *Darden*'s "common law test," 503 U.S. at 323, because they illuminate the employment relationship:

- "skill required" – limited partners "are not required to possess any particular work-related skills," Opinion, Pls.' App. 002;

- "the source of the instrumentalities and the tools" – limited partners "install specific software on their personal devices that capture data as they browse the Internet or use those devices for their own purposes," *id.*;

- "the location of the work" – limited partners "do not appear to report to any assigned 'work' location or otherwise notify the partnership that they are commencing their work," *id.*;

- "whether the hiring party has the right to assign additional projects to the hired party" – partnership agreement "does not appear to require that a limited partner perform any service . . . apart from permitting tracking of the limited partner's use of the Internet on a personal device, as the limited partner sees fit," *id.* 002;

---

[20] While the data itself could be a "material income-producing factor" for the partnership, 26 U.S.C. § 401(c)(2)(A), the same is true for data that companies collect from consumers in any number of ways.  *See, e.g.*, Pls.' SJ Mem. at 37 ("It is unquestionable that internet companies such as Google® and Facebook® take data about their users' usage and sell that data to third parties for massive profits.").  That does not turn the largely passive contribution of this data into "personal services" creating an employment relationship.

- "extent of the hired party's discretion over when and how long to work" – limited partners "agree to contribute more than five hundred (500) hours of 'work' through the generation, transmission, and sharing of their data" but this does not appear to "differ[] in any meaningful way from the personal activities . . . [they] would otherwise engage in while using their personal devices," *id.*;

- "the method of payment" – limited partners "do not receive income for performing services for . . . the partnership," *id.* 001; cannot "expect any appreciable financial benefit for their participation in the partnership," *id.* 002; "revenue that a limited partner could reasonably expect from the limited partnership will typically be approximately zero," *id.* 003; and "it does not appear that the limited partners depend on the limited partnership as a source of business revenue," *id.* 003;

- "the provision of employee benefits" – only identified benefit is "the health coverage for which the limited partners pay separate premiums," *id.* 002, and "the primary reason for an individual . . . to participate . . . in the arrangement appears to be to acquire health coverage," *id.* 003.

In this way, the Department appropriately assessed and weighed "all of the incidents of the relationship." *Darden*, 503 U.S. at 324; *see also Landry v. Georgia Gulf Corp.*, 91 F. App'x 950, 952 (5th Cir. 2004) (affirming district court conclusion that individuals were not common law employees where "plurality of the *Darden* factors" supported that conclusion and "[m]any of the other factors . . . are neutral"). While a "right to control" is less dispositive in the context of "working owners," many of the *Darden* factors go to the nature of work itself. Here, the limited partners are not required to possess any particular work-related skills. The partnership provides no tools by which to perform services; rather, limited partners are expected to install software on their existing, personal devices to collect and transmit data. Indeed, it appears that, after joining Plaintiffs' partnerships and downloading software, limited partners are expected to continue their personal activities on their electronic devices as though they had no arrangement with the partnership at all. It was reasonable for the Department to conclude that under traditional agency law factors, Plaintiffs' limited partners are not "employees" and are thus ineligible to be "participants" in an ERISA-covered health plan. *See* 29 U.S.C. § 1002(1), (6), (7).

Third, the Advisory Opinion applied the same reasoning to the "facts and circumstances"

test required to identify "bona fide partners" under ERISA § 732(d).   It observed that the Department's regulation "emphasize[s] the need for an employment or self-employment, services-based relationship with respect to the partners participating in a group health plan maintained by a partnership."  Opinion, Pls.' App. 005.  It concluded that Plaintiffs' limited partners are not "bona fide partners" because they "do not work or perform services for the partnership; they have only a nominal (at best) ownership interest in the partnership; and they do not earn income based on work performed for or through the partnership that is a material income-producing factor for the partnership."  *Id.* 005.  This is a reasonable application of the "facts and circumstances" test.  As discussed, the limited partners do not work or perform services for the partnership; other than installing a specific software on their personal devices, they merely engage in personal activities online as they normally would, while the software tracks their actions.  1st Am. Compl. ¶¶ 33, 35.  There is no evidence that limited partners have any intent to join together and contribute money, labor, or skills toward furthering the partnership's business purpose.  Rather, it appears any individual can become a limited partner simply by signing an agreement, with no particular or specialized contribution from the individual.  *Id.* ¶ 31.  Indeed, the limited partners make no contribution at all to join the partnership.  Johnson Decl. ¶ 11, ECF No. 11-2 ("The limited partners of DMP are individuals who have obtained a limited partnership interest for free . . .").  Thus, there is no "intent to be partners" as there appears no intent for the limited partners to share in profits *and* losses, because the partners have nothing to lose.[21]  The limited partners' ownership interests

---

[21] Plaintiffs also make much of their assertion that limited partners receive "guaranteed payments[] and would be subject to employment taxes."  Pls.' SJ Mem. at 46.  It appears from their declaration, however, that payments to partners are contingent on profits, which by definition cannot be "guaranteed payments" under the Code.  *Compare* 26 U.S.C. § 707(c) (defining "guaranteed payments" as "payments to a partner for services" but only "[t]o the extent determined *without regard to the income of the partnership*" (emphasis added)), *with* Johnson Decl. ¶ 18 ("*Profit* generated by the sale of the limited partners' data can then be dispersed via payments by DMP to

are nominal at best, with no economic or operational substance.  Since Plaintiffs' limited partners are not "bona fide" for purposes of § 732(d), 29 U.S.C. § 1191a(d), they do not qualify to be participants in an ERISA group health plan and Plaintiffs cannot claim that its health benefits are governed by ERISA.

### iii. The Advisory Opinion Did Not Mischaracterize Plaintiffs' Factual Assertions

Plaintiffs claim that the Advisory Opinion "invent[ed] facts" and "failed to take into consideration" important facts asserted by Plaintiffs.  Pls.' SJ Mem. at 32.  Plaintiffs argue that this violates the APA on the ground that the Department failed to follow its own regulation.  *See id.*  On the contrary, Defendant reasonably construed the proffered facts.

The Department's advisory opinion procedure explains that it will "assume[] that all material facts and representations set forth in the request are accurate." ERISA Procedure 76-1 § 10.  Plaintiffs are mistaken that this procedure requires the Department to blindly accept all of a requester's factual assertions.  After all, even when a court, for purposes of a motion to dismiss "accept[s] all well-pleaded facts in the complaint as true," it is still not required to accept "conclusory allegations, unwarranted deductions, or legal conclusions."  *Innova Hosp. San Antonio, L.P. v. Blue Cross and Blue Shield of Georgia, Inc.*, 995 F. Supp. 2d 587, 598 (N.D. Tex. 2014) (quoting *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005)).

Plaintiffs primarily object to the Advisory Opinion's conclusion that the partners "do not work for or through the partnership," Opinion, Pls.' App. 001, and do not "perform any services on [the partnership's] behalf."  *Id.* 002.  *See* Pls.' SJ Mem. at 33-34.  These are legal conclusions based on the totality of the circumstances.  *See supra*, Arg. § I.C.2-4.  They are rooted in the

---

limited partners. This will be reported as guaranteed payments and subject to employment taxes." (emphasis added)).

Department's reasonable conclusion that the only alleged service Plaintiffs identified was "installing specific software on personal electronic devices that capture data as they browse the Internet or use their devices for their own purposes." Opinion, Pls.' App. 002. Plaintiffs suggest that it should also be considered "work" or "service" that partners allegedly "vote on how aggregated data will be sold or used by LP as well as votes on partnership matters." Pls.' SJ Mem. at 33. But that statement is too generic to be informative, *see* Opinion, Pls.' App. 002 (noting that Plaintiffs "provided no information on such votes"), especially because voting is common in business structures without being considered work or personal services to the business—e.g., corporate shareholder voting or voting by the members of a mutual insurance company. *See, e.g.*, *True v. Robles*, No. 08-CA-53, 2008 WL 11334971, at *3 (W.D. Tex. June 30, 2008) (discussing subscribers of a "reciprocal interinsurance exchange" as compared to ownership and voting rights of members of mutual insurance company, corporate stockholders, and limited partners). At most, the limited partners' ability to vote on partnership matters evidences their "owner" status rather than their "working" status. *See Smith v. Castaways Family Diner*, 453 F.3d 971, 983 (7th Cir. 2006) (describing cases where a party's position as partner or shareholder "gave him a vote in the affairs of the organization" and thus distinguished him from non-owners).

Similarly, Plaintiffs object to the Advisory Opinion's statement that Plaintiffs provided "no information on how the 'work' differs in any meaningful way from the personal activities individual limited partners would otherwise engage in while using their personal devices." Opinion, Pls.' App. 002. Plaintiffs respond by alleging that the Department should have considered their assertion that partners are "empower[ed]" with some "control" regarding "their own data." Pls.' SJ Mem. at 34 (quoting Pls.' Request, Pls.' App. 009). Plaintiffs assert, for the first time in their summary judgment motion, that limited partners download software on "the

40

device dedicated to partnership use" and sign in before creating and transmitting data to a "data bank" for use by the partnership.  *Id.* at 31 n.39. But these assertions are entirely non-responsive to the significant question whether the partners' alleged "work" (the generation of data) involves employing a particular skill or doing anything meaningfully different from personal activities.

Plaintiffs also object to the Advisory Opinion's observations concerning income:  "the revenue that a limited partner could reasonably expect from the limited partnership will typically be zero," Opinion, Pls.' App. 003; partners "do not receive income for performing services for or as partners of the partnership," *id.* 001; no suggestion that partners "can expect any appreciable financial benefit for their participation in the partnership except health coverage," *id.* 002; and partners do not "depend on the limited partnership as a source of business revenue," *id.* 003.  *See* Pls.' SJ Mem. at 33-35.  The reasonableness of these observations is confirmed by the declarations Plaintiffs have more recently submitted.  They admit that these startups have made no substantial revenue let alone profits, and that no payments have been made to the limited partners, *see* Johnson Decl. ¶ 6, yet they have nearly 50,000 people signed up, *see id.* ¶ 23.  It is entirely speculative whether these partners will ever receive any payments from the partnership.  Even if there is ultimately a buyer for the data, there is no reason to presume that the purchase will exceed the cost of overhead for the business and rise to the level of a "profit" to be distributed to the partners.  Moreover, it is not obvious that distributions from the sale of aggregate data could reasonably be considered "income" for the partner's own generation of data.

The Advisory Opinion also states that Plaintiffs have not "suggested that individual limited partners will have any meaningful equity interest in the limited partnership."  Opinion, Pls.' App. 002.  Plaintiffs object, pointing to their statement that the limited partners "wholly control and operate" the partnership together with LPMS.  Pls.' SJ Mem. at 34 (quoting Pls.' Request, Pls.'

41

App. 008).  Again, this objection is nonresponsive.  An "owner's equity" is typically related to his financial interests in or capital contribution to a business, not to his level of control in the business. *See, e.g.*, *Black's Law Dictionary* (11th ed. 2019) ("The aggregate of the owners' financial interests in the assets of a business entity; the capital contributed by the owners plus any retained earnings.").  Here, the Plaintiffs' declaration demonstrates that the limited partners make no financial contribution in exchange for their ownership interest in the enterprise.  Johnson Decl. ¶ 11.  Moreover, the assertion that the limited partners control and operate the partnership runs counter to the conventional understanding of the role of limited partners, who are typically restricted in their ability to influence the affairs of the enterprise.  *See, e.g.*, *Black's Law Dictionary* (11th ed. 2019) ("Partnership," including definition of "limited partnership" as a "partnership composed of one or more persons who *control the business* and are personally liable for the partnership's debts (called general partners), and one or more persons who contribute capital and share profits but *who cannot manage the business* and are liable only for the amount of their contribution (called limited partners)" (emphasis added)); *Renkemeyer, Campbell & Weaver, LLP v. Comm'r of Internal Revenue*, 136 T.C. 137, 147-48 (T.C. 2011) ("[I]t is generally understood that a limited partner could lose his limited liability protection were he to engage in the business operations of the partnership. Consequently, the interest of a limited partner in a limited partnership is generally akin to that of a passive investor.").

Plaintiffs cannot dispute that partners do not have "any assigned 'work' location" and do not "notify the partnership that they are commencing work." Opinion, Pls.' App. 002.  Instead they argue that focusing on these factors is an "antiquated view of commerce," Pls.' SJ Mem. at 35, but the mere fact that contemporary employees can "work remotely" with their time "track[ed]" electronically, *id.* at 34, does not make the Department's observations inaccurate or irrelevant.

42

Lastly, Plaintiffs fault the Advisory Opinion for observing that "in operation, the primary reason for an individual or employer to participate as a 'limited partner' in the arrangement appears to be to acquire health coverage."  Opinion, Pls.' App. 003.  They allege that limited partners are also attracted by "control over their data and a share in the revenue from the sale of the data."  Pls.' SJ Mem. at 35 (quoting Pls.' Request, Pls.' App. 009).  Such conclusory allegations are not persuasive where there is no explanation how permitting the partnership to track individuals' data actually increases control over the rampant collection of personal data on the Internet and where the potential for any actual revenue is speculative.

In sum, none of the statements Plaintiffs single out demonstrate the Department relied on inaccuracies or mischaracterizations, let alone that it "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency."  *Luminant*, 714 F.3d at 850.  At any rate, any inadvertent misstatement of Plaintiffs' representations would at most be harmless error.  For the reasons discussed above, the Department's reasoning is clear and reasonable.  If the Department made an error, it is Plaintiffs' burden to show prejudice from the error.  *See City of Arlington, Tex. v. FCC*, 668 F.3d 229, 243 (5th Cir. 2012); *see also* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); *Shinseki v. Sanders*, 556 U.S. 396, 406 (2009) (describing § 706 as an "administrative law . . . harmless error rule").

## II.    Plaintiffs Are Not Entitled to Any Relief, Let Alone the Relief They Seek

For the reasons discussed above, Defendants are entitled to summary judgment.  Accordingly, Plaintiffs are entitled to no relief.  However, even if the Court found some defect in the Department's reasoning, Plaintiffs would still not be entitled to the extraordinary relief they seek here.  Plaintiffs have failed to identify a concrete and imminent action for which injunctive relief is necessary.  *See Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 342

(5th Cir. 2012) (holding that a plaintiff lacks standing to seek injunctive relief without an "actual and imminent" and "concrete and particularized" threat of injury, for which it is not "speculative[] that a favorable decision will redress the injury-in-fact"). They have not alleged that any other action by the Department is looming. Nor do they identify any way that the Department might seek to enforce this advisory opinion on Plaintiffs. For numerous additional reasons, Plaintiffs are not entitled to the declaratory and injunctive relief they seek.

A.    **The Declaratory Relief Plaintiffs Seek Is Unwarranted**

Plaintiffs ask the Court to go far beyond the limited nature of judicial review of agency action, seeking a judicial determination that their limited partners *in fact* satisfy ERISA's requirements as "employees" and "working owners" who may participate in employee benefit plans. *See* 1st Am. Compl. ¶¶ 101-104. Such relief is not appropriate here where the Advisory Opinion merely accepted Plaintiffs' factual representations. *See* Opinion, Pls.' App. 001, 006. The Department conducted no fact-finding in the advisory opinion process, nor have the parties conducted discovery in this litigation. *See* Order, Feb. 17, 2020, ECF No. 19 ("There will be no discovery conducted by either party."). Thus, it would not be warranted for this Court to declare that Plaintiffs actually satisfy the statutory standards.

Even apart from this procedural posture, the Supreme Court has held:

If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.

*BizCapital Business & Indus. Dev. Corp. v. Comptroller of Currency*, 467 F.3d 871, 873 (5th Cir. 2006) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). Thus, any finding of inadequacy in the Department's analysis would at most be the basis for a remand to the agency.

44

*See INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002) ("Generally speaking, a court . . . should remand a case to an agency for decision of a matter that statutes place primarily in agency hands.").

### B.   The Court Should Deny a Preliminary or Permanent Injunction

"Any injunctive relief is considered an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *Harris Cnty., Tex. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 312 (5th Cir. 1999). "[T]he standard for a permanent injunction is essentially the same as for a preliminary injunction with the exception that the plaintiff must show actual success on the merits rather than a mere likelihood of success." *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 847 (5th Cir. 2004). "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *DeOtte v. Azar*, 393 F. Supp. 3d 490, 500 (N.D. Tex. 2019) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). "Even when a movant establishes the four requirements, the decision to grant or deny a permanent injunction remains in the court's discretion." *Nat'l Solid Waste Mgmt. Ass'n v. City of Dallas*, 903 F. Supp. 2d 446, 459 (N.D. Tex. 2012).

For the reasons discussed above, *see supra*, Arg. § I, Plaintiffs cannot make the requisite "strong showing that [they are] likely to succeed on the merits." *Nken v. Holder*, 556 U.S. 418, 434 (2009). This is a sufficient basis to deny their motion for injunctive relief. *See Franciscan Alliance*, 227 F. Supp. 3d at 677 ("If the movant fails to establish any one of the four prerequisites to injunctive relief, relief will not be granted."). Moreover, Plaintiffs have also failed to establish the other prerequisites for an injunction.

### 1.    Plaintiffs Have Not Established Irreparable Harm

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  Plaintiffs must also show, not just "a possibility of irreparable harm," *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22 (2008), but "a *likelihood* that irreparable harm will occur." *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001).  "An injunction is appropriate only if the anticipated injury is imminent and not speculative." *Franciscan Alliance*, 227 F. Supp. 3d at 693.  And this element "must be satisfied by independent proof." *Elite Rodeo Ass'n v. Prof. Rodeo Cowboys Ass'n*, 159 F. Supp. 3d 738, 744 (N.D. Tex. 2016).  Here, where cross-motions for summary judgment will be fully briefed in 46 days, *see* Order, Feb. 17, 2020, ECF No. 19, Plaintiffs have entirely failed to show that they will be irreparably harmed before the Court can rule on the merits.  Nor have Plaintiffs demonstrated that the injunctive relief they seek would preserve the status quo or remedy that alleged harm—whether on a preliminary or permanent basis.

First, Plaintiffs have not shown that the mere publication of this advisory opinion *actually disrupted the status quo*.  The advisory opinion states the Department's interpretation of the law but does not bind Plaintiffs or direct them to take any immediate action.  Plaintiffs principally complain about uncertainty regarding the legal status of the health insurance plans they have created and operated despite that uncertainty.  *See* Pls.' PI Mem. at 21, ECF No. 11 (alleging that they are harmed "[e]very day" by the "uncertainty surrounding their novel partnership and health plan structure").  But that uncertainty preceded this lawsuit, and is the reason Plaintiffs sought the advisory opinion and filed this lawsuit in the first place.  *See* Renfro Decl. ¶ 17, ECF No. 11-1 (explaining that Plaintiffs sought the advisory opinion because "the fifty-six separate state and territorial insurance commissioners could pose significant and indefinite regulatory burdens on LPMS-managed partnership plans through investigations and rulings of their own"); Compl. ¶ 11,

ECF No. 1 (asserting that "the lack of clarity . . . will continue to result in many potential limited partners declining to join DMP for fear that their health coverage will be cancelled").  Nor can a temporary ruling from this Court alleviate that uncertainty, because it is likely that "potential partners [will] sit on the sidelines," Pls.' PI Mem. at 21, until an actual ruling on the merits.

Second, Plaintiffs' alleged economic harms are speculative.  They acknowledge that they are startups that have not "generated profits or substantial revenue yet," Johnson Decl. ¶ 6, and lack "sufficient numbers of partners to reach the quantity of electronic data necessary to generate profitable offers to purchase the data," *id.* ¶ 24.  They have not alleged that they currently make any money.  Nor do they allege that any of the existing partnerships under LPMS's umbrella are already generating electronic data for sale, or that they have any buyers for that data.  Thus, it is entirely speculative to suggest that a delay of a few weeks or months would somehow irreparably harm them from reaching their goals.  *See Roark & Hardee L.P. v. City of Austin*, 394 F. Supp. 2d 911, 921 (W.D. Tex. 2005) (concluding that "the mere showing of some decrease in revenue is not the kind of irreparable harm that the grant of a preliminary injunction may rest upon" and further noting that because plaintiff provided "so little financial data," it was "difficult for this Court to conclude that any loss of revenue was directly correlated to the [government action] or would be lasting and long term"); *Am. Telnet, Inc. v. GTE Corp.*, No. 3:99-0280-D, 1999 WL 242686, at *3 (N.D. Tex. Apr. 16, 1999) (finding that mere assertions of lost goodwill, reputational damage, fewer customers, and fears of being forced out of business, when unsupported by evidence, "fail to clearly establish irreparable harm").  Nor do they provide any basis for the assertion that the limited partners' "coverage would terminate immediately absent [an] injunction."  Pls.' PI Mem. at 2.  Neither of their declarants make such an assertion, nor do Plaintiffs explain why they would choose to remove the limited partners or terminate these plans before judicial resolution of the

case.  *Cf. Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 679 (7th Cir. 2012) (reasoning that, where an injury is readily avoidable and truly self-inflicted if not avoided, then the injury is not irreparable harm).

Third, Plaintiffs improperly disclaim their "burden . . . to prove any [state] actions are imminent in order to obtain injunctive relief," Joint Statement Regarding Proposed Schedule at 3, ECF No. 18.  The Fifth Circuit has held that even where constitutional rights are at stake—unlike here—the plaintiff must still show "an imminent, non-speculative irreparable injury."  *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016).  In that case, the Fifth Circuit concluded that a 79-page administrative subpoena served on the plaintiff by a state attorney general did not make an enforcement action "sufficiently imminent . . . to justify an injunction."  *See id.* at 219, 227-28. Plaintiffs have not shown that any enforcement action, either from the Department or from the states, is imminent.  Indeed, any state that reviews the advisory opinion—which expressly acknowledges this lawsuit, *see* Advisory Opinion, Pls.' App. 001—likely will await the conclusion of this litigation before taking regulatory action.  But even if a state opened an investigation and subpoenaed Plaintiffs, that would merely make the case analogous to *Google*.  Plaintiffs have failed to show that any sort of enforcement action is sufficiently imminent to require an injunction before summary judgment briefing can be completed.

Finally, the injunctive relief they seek is mismatched to their alleged harms.  For example, they provide no explanation for why "enjoin[ing] the Defendants from engaging in any investigation activities," *supra* at 6, is necessary or what irreparable harm would flow from mere investigation by the Department or state or territorial authorities.  *Cf. Google*, 822 F.3d at 224-25 (discussing cases concluding that "pre-enforcement relief" would be "inappropriate" for many administrative subpoenas).    More fundamentally, because Plaintiffs primarily fear state

enforcement actions, their proposed injunctions against the Department would not prevent any of the harms they allege. Enjoining the Department would not prevent states from initiating their own enforcement or remove the uncertainty that is limiting the growth of their business. And forcing the Department to remove its advisory opinion from its website before the Court's final ruling on the merits, *see* Pls.' PI Mot. at 2, ECF No. 10, would not alter the Department's view of the law or the public's awareness of that view.

### 2.    The Public Interest Weighs Strongly Against Injunctive Relief

This Court has concluded that when a reviewing court finds that an agency rule violates the APA, "the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Franciscan Alliance, Inc. v. Azar*, 414 F. Supp. 3d 928, 944-45 (N.D. Tex. 2019) (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)). And a "district court vacating an agency action under the APA should not issue an injunction unless doing so would 'have [a] meaningful practical effect independent of its vacatur.'" *Id.* at 946 (ultimately quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)). Thus, even if the Court ruled in Plaintiffs' favor on the merits, a permanent injunction would be unwarranted. Plaintiffs have identified no reason that injunctive relief would be necessary. *See Texas v. United States*, 336 F. Supp. 3d 664, 676 (N.D. Tex. 2018) (denying permanent injunction because "the Court must assume that [the agency] will follow the law going forward" and plaintiffs had not "rebutted that presumption").

To the extent Plaintiffs still seek a preliminary injunction, the balance of interests weigh against an injunction. "[A] court should take no action calculated to interfere seriously with an agency's ability to apply its expertise to solve those technical and complex regulatory problems which have been entrusted to it." *Texas v. Seatrain Int'l S.A.*, 518 F.2d 175, 180-81 (5th Cir. 1975). Here Plaintiffs seek an order preventing the Department from "taking any action with

respect to the AO Response pending this Court's final adjudication," "compel[ling] Defendants to remove the AO Response from the DOL website," and "restrain[ing] Defendants from taking any action with respect to the Plaintiffs until a final ruling from this Court."  Pls.' PI Mot. at 2, ECF No. 10.  These injunctions would harm the public interest.  Plaintiffs appear to be asking the Court to prevent the Department from investigating the facts Plaintiffs allege.  It has long been recognized that injunctions against agency investigations are generally unwarranted where agencies are entrusted with "the preliminary investigation into possible violations."  *See New Orleans Pub. Serv., Inc. v. Brown*, 507 F.2d 160, 165 (5th Cir. 1975); *see also Petroleum Exploration v. Pub. Serv. Comm'n of Kentucky*, 304 U.S. 209, 220-23 (1938) (rejecting injunction against a state commission "to investigate matters entrusted to its care by a [permissible] statute" because the expense of "preparing for and [responding to] an investigation" is not "the sort of irreparable injury against which equity protects").  Moreover, it is not in the public interest to take actions that would "adversely affect pre-enforcement communications between [agencies] and industry."  *Dow Chemical*, 832 F.2d at 324; *Am. Land Title Ass'n*, 743 F. Supp. at, 494.  Thus, "advisory opinions" such as the one at issue here "should, to the greatest extent possible, be available to the public as a matter of routine."  *Sabella v. United States*, 863 F. Supp. 1, 5 (D.D.C. 1994).  Particularly here, where the Advisory Opinion concluded that ERISA protections do not apply to benefits currently being administered to limited partners, Plaintiffs' current and potential partners have a substantial interest in knowing the Department's opinion.  Because an injunction would harm these public interests, they readily outweigh Plaintiffs' speculative alleged injuries.  Plaintiffs are not entitled to injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to the Department and deny Plaintiffs' motions for summary judgment and for a preliminary injunction.

Dated:  March 9, 2020                              Respectfully submitted,

                                                  JOSEPH H. HUNT
Of Counsel:                                       Assistant Attorney General

KATE S. O'SCANNLAIN                               BRAD P. ROSENBERG
Solicitor of Labor                                Assistant Director
                                                  Civil Division, Federal Programs Branch

G. WILLIAM SCOTT
Associate Solicitor                               */s/ Galen N. Thorp*
                                                  GALEN N. THORP (VA Bar # 75517)
                                                  Senior Counsel
GLENN M. LOOS                                     United States Department of Justice
Counsel for Litigation                            Civil Division, Federal Programs Branch
                                                  1100 L Street NW
KATRINA LIU                                        Washington, D.C. 20530
Trial Attorney                                    Tel: (202) 514-4781 / Fax: (202) 616-8460
United States Department of Labor                 galen.thorp@usdoj.gov
Office of the Solicitor

                                                  *Counsel for Defendants*

CERTIFICATE OF SERVICE

On March 9, 2020, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties to this action electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Galen N. Thorp*
GALEN N. THORP
