**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

|  |  |  |
|---|---|---|
| DATA MARKETING PARTNERSHIP, LP, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 4:19-cv-00800-O |
| UNITED STATES DEPARTMENT OF LABOR, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. i

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 4

I.     Legal Framework .................................................................................................... 4

    A.     ERISA and State Regulation of Insurance................................................4

    B.     The Secretary's Authority Under ERISA ................................................4

    C.     ERISA Applies Only to Employee Welfare Benefit Plans.......................5

    D.     Application of ERISA to Partnerships......................................................6

    E.     Advisory Opinions ...................................................................................7

II.    Factual Background & Procedural History.......................................................... 9

LEGAL STANDARD...................................................................................................... 11

ARGUMENT ................................................................................................................... 13

I.     Plaintiffs Have Failed to Demonstrate Non-Speculative Irreparable Injury That Would Be Remedied By Their Proposed Permanent Injunction. ...................................... 13

II.    Plaintiffs Cannot Show That Only One Merits Outcome Is Possible............................. 16

    A.     The Merits of Any Future Agency Action Should Only Be Decided After Remand. ...................................................................................................17

    B.     There Is No Evidence Upon Which the Court Could Base the Proposed Permanent Injunction. ...........................................................................18

    C.     Plaintiffs Cannot Establish That There Are No Valid Grounds to Doubt Whether the Limited Partners Are Working.............................................20

         1.     "Working Owner"........................................................................21

         2.     "Bona Fide Partner".....................................................................28

III.   A Permanent Injunction Would Harm the Department And the Public Interest. ............ 32

IV.    Regardless, the Court Should Exercise its Discretion to Decline to Issue a Permanent
       Injunction. ....................................................................................................................... 34

CONCLUSION ............................................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

*Cases*

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*,
   78 F.4th 210 (5th Cir. 2023) ............................................................... 12, 18

*Am. Land Title Ass'n v. Clarke*,
   743 F. Supp. 491 (W.D. Tex. 1989) ........................................................ 32

*Anderson v. HMO Louisiana, Inc.*,
   No. CV 23-971, 2023 WL 3477325 (E.D. La. May 16, 2023) ........................................... 29, 31

*Aransas Project v. Shaw*,
   775 F.3d 641 (5th Cir. 2014) ............................................................... 13

*Babbitt v. United Farm Workers Nat'l Union*,
   442 U.S. 289 (1979) ........................................................................ 13

*Benisek v. Lamone*,
   585 U.S. 155 (2018) ........................................................................ 11

*BizCapital Bus. & Indus. Dev. Corp. v. Comptroller of Currency of U.S.*,
   467 F.3d 871 (5th Cir. 2006) ............................................................... 20, 21, 35

*Bowman v. Wildwood of Lubbock, LLC*,
   No. 5:19-CV-164-H, 2020 WL 10458628 (N.D. Tex. Oct. 23, 2020) ..................................... 13

*Bridge v. U.S. Parole Comm'n*,
   981 F.2d 97 (3d Cir. 1992) ................................................................. 35

*Chemtech Royalty Assocs., L.P. v. United States*,
   766 F.3d 453 (5th Cir. 2014) ............................................................... 29, 30, 31

*City of Dallas v. Hall*,
   No. 3:07-CV-0060-P, 2007 WL 3257188 (N.D. Tex. Oct. 29, 2007) ..................................... 19

*Cobb v. Comm'r*,
   185 F.2d 255 (6th Cir. 1950) ............................................................... 29

*Comm'r v. Culbertson*,
   337 U.S. 733 (1949) ........................................................................ 30

*Comm'r v. Tower*,
   327 U.S. 280 (1946) ........................................................................ 29

*Daniels Health Sciences LLC v. Vascular Health Sciences LLC,*
   710 F.3d 579 (5th Cir. 2013) ................................................................ 14

*Data Marketing P'ship v. U.S. Dep't of Labor,*
   490 F. Supp. 3d 1048 (N.D. Tex. 2020) .................................................. 15

*Data Marketing P'ship v. U.S. Dep't of Labor,*
   45 F.4th 846 (5th Cir. 2022) .......................................................... *passim*

*Dow Chemical v. EPA,*
   832 F.2d 319 (5th Cir. 1987) ................................................................ 32

*Elite Rodeo Ass'n v. Prof. Rodeo Cowboys Ass'n,*
   159 F. Supp. 3d 738 (N.D. Tex. 2016) .................................................. 13

*Exxon Mobil Corp. v. Mnuchin,*
   No. 3:17-1930-B, 2019 WL 7370430 (N.D. Tex. Dec. 31, 2019).......... 18

*FEC v. Akins,*
   524 U.S. 11 (1998)................................................................................ 20

*Florida Power & Light Co. v. Lorion,*
   470 U.S. 729 (1985)........................................................ 17, 18, 20, 35

*FMC Corp. v. Holliday,*
   498 U.S. 52 (1990).......................................................................... 4, 33

*Franciscan All., Inc. v. Becerra,*
   47 F.4th 368 (5th Cir. 2022) ........................................................ 13, 35

*Franciscan Alliance, Inc. v. Azar,*
   414 F. Supp. 3d 928 (N.D. Tex. 2019) .................................................. 35

*Franciscan Alliance, Inc. v. Burwell,*
   227 F. Supp. 3d 660 (N.D. Tex. 2016) .................................................. 16

*Frick v. Comm'r of Internal Revenue,*
   47 T.C.M. (CCH) 564, 1983 WL 14720 (T.C. 1983)........................ 23, 24

*Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l,*
   695 F.3d 330 (5th Cir. 2012) ................................................................ 14

*Garcia for Congress v. FEC,*
   22 F. Supp. 3d 655 (N.D. Tex. 2014) .................................................. 18

*Google, Inc. v. Hood,*
   822 F.3d 212 (5th Cir. 2016) ............................................................................... 12, 15

*Harris Cty. v. CarMax Auto Superstores Inc.,*
   177 F.3d 306 (5th Cir. 1999) ...................................................................................... 16

*Herman v. S.C. Nat'l Bank,*
   140 F.3d 1413 (11th Cir. 1998) ..................................................................................... 5

*Horton v. Prudential Ins. Co. of Am.,*
   51 F. App'x 928 (5th Cir. 2002) ................................................................................ 19

*House v. American United Life Ins. Co.,*
   499 F.3d 443 (5th Cir. 2007) ....................................................................................... 6

*Inclusive Communities Project, Inc. v. U.S. Dep't of Hous. & Urb. Dev.,*
   No. 3:07-CV-0945-O, 2009 WL 3122610 (N.D. Tex. Sept. 29, 2009) .............................. 13, 16

*INS v. Orlando Ventura,*
   537 U.S. 12 (2002) ..................................................................................................... 34

*Memorial Hosp. Sys. v. Northbrook Life Ins. Co.,*
   904 F.2d 236 (5th Cir. 1990) .................................................................................. 6, 22

*Meredith v. Time Ins. Co.,*
   980 F.2d 352 (5th Cir. 1993) ....................................................................................... 5

*Miller v. Comm'r of Internal Revenue,*
   81 T.C.M. (CCH) 1258, 2001 WL 233963 (T.C. 2001) .................................................. 23

*Mock v. Garland,*
   75 F.4th 563 (5th Cir. 2023) ...................................................................................... 32

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) ...................................................................................... 12, 16, 35

*MWK Recruiting Inc. v. Jowers,*
   833 F. App'x 560 (5th Cir. 2020) .............................................................................. 12

*N. Air Cargo v. U.S. Postal Serv.,*
   674 F.3d 852 (D.C. Cir. 2012) ................................................................................... 12

*Nationwide Mut. Ins. Co. v. Darden,*
   503 U.S. 318 (1992) ...................................................................................... 22, 24, 25

*Nat'l Ass'n for Gun Rts., Inc. v. Garland*,
    No. 4:23-CV-00830-O, 2023 WL 6613080 (N.D. Tex. Oct. 7, 2023) ..................................... 14

*Nat'l Solid Waste Mgmt. Ass'n v. City of Dallas*,
    903 F. Supp. 2d 446 (N.D. Tex. 2012) .................................................................................. 34

*New Orleans Ass'n of Cemetery Tour Guides & Companies v. New Orleans Archdiocesan Cemeteries*,
    56 F.4th 1026 (5th Cir. 2023) ............................................................................................... 35

*New Orleans Pub. Serv., Inc. v. Brown*,
    507 F.2d 160 (5th Cir. 1975) ................................................................................................ 32

*New York v. Dep't of Labor*,
    363 F. Supp. 3d 109 (D.D.C. 2019) ...................................................................................... 24

*Nuziard v. Minority Bus. Dev. Agency*,
    No. 4:23-CV-00278-P, 2024 WL 965299 (N.D. Tex. Mar. 5, 2024) ...................................... 34

*Oklahoma Press Publishing Co. v. Walling*,
    327 U.S. 186 (1946) .............................................................................................................. 33

*O'Reilly v. U.S. Army Corps of Eng'rs*,
    477 F.3d 225 (5th Cir. 2007) .......................................................................................... 20, 21

*Pauley v. BethEnergy Mines, Inc.*,
    501 U.S. 680 (1991) ................................................................................................................ 5

*Perez v. McCreary, Veselka, Bragg & Allen, P.C.*,
    45 F.4th 816 (5th Cir. 2022) ................................................................................................. 13

*Petroleum Exploration v. Pub. Serv. Comm'n of Kentucky*,
    304 U.S. 209 (1938) .............................................................................................................. 32

*Planned Parenthood of Greater Texas Surgical Health Servs. v. City of Lubbock, Texas*,
    542 F. Supp. 3d 465 (N.D. Tex. 2021) .................................................................................. 16

*Plumley v. Landmark Chevrolet, Inc.*,
    122 F.3d 308 (5th Cir. 1997) ................................................................................................ 13

*Provident Life & Acc. Ins. Co. v. Sharpless*,
    364 F.3d 634 (5th Cir. 2004) ............................................................................................ 7, 22

*Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*,
    541 U.S. 1 (2004) ........................................................................................................... *passim*

iv

*Renkemeyer, Campbell & Weaver, LLP v. Comm'r of Internal Revenue*,
    136 T.C. 137 (T.C. 2011) ................................................................ 28

*Sec'y of Labor v. Fitzsimmons*,
    805 F.2d 682 (7th Cir. 1986) .......................................................... 4

*Shaw v. Delta Air Lines, Inc.*,
    463 U.S. 85 (1983) ......................................................................... 4

*Shell Offshore, Inc. v. Babbitt*,
    238 F.3d 622 (5th Cir. 2001) .......................................................... 19

*Smith v. Castaways Family Diner*,
    453 F.3d 971 (7th Cir. 2006) .......................................................... 26

*Texas v. Biden*,
    20 F.4th 928 (5th Cir. 2021) .......................................................... 17

*Texas v. Seatrain Int'l S.A.*,
    518 F.2d 175 (5th Cir. 1975) .......................................................... 33

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) .......................................................... 12

*Texas v. United States*,
    336 F. Supp. 3d 664 (N.D. Tex. 2018) ........................................... 36

*Transit Mgmt. of Se. Louisiana, Inc. v. Grp. Ins. Admin., Inc.*,
    226 F.3d 376 (5th Cir. 2000) .......................................................... 30

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ................................................................. 13, 35

*Triplett v. Fed. Bureau of Prisons*,
    No. 3:08-CV-1252-K, 2009 WL 792799 (N.D. Tex. Mar. 24, 2009) .............. 19

*True v. Robles*, 08-CA-53,
    2008 WL 11334971 (W.D. Tex. June 30, 2008) ............................. 26

*United Motorcoach Ass'n, Inc. v. City of Austin*,
    851 F.3d 489 (5th Cir. 2017) ................................................. 11, 13, 32

*United States v. Marshall Durbin & Co. of Haleyville*,
    363 F.2d 1 (5th Cir. 1966) .............................................................. 33

*Valentine v. Collier,*
    993 F.3d 270 (5th Cir. 2021) ................................................................. 36

*VRC LLC v. City of Dallas,*
    460 F.3d 607 (5th Cir. 2006) ................................................................. 11

*Walsh v. Upright,*
    No. 22-MC-247, 2023 WL 2207604 (S.D.N.Y. Feb. 23, 2023) .................... 33

*Watson v. Geren,*
    569 F.3d 115 (2d Cir. 2009) .................................................................. 21

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ............................................................................ 34

**Statutes**

26 U.S.C. § 401(c)(2)(A) ........................................................................ 23

26 U.S.C. § 707(c) ................................................................................ 27

29 U.S.C. § 1001 ............................................................................... 4, 5

29 U.S.C. § 1002(1) ......................................................................... 6, 7, 9

29 U.S.C. § 1002(3) ........................................................................... 5, 6

29 U.S.C. § 1002(5) .............................................................................. 6

29 U.S.C. § 1002(9) .............................................................................. 6

29 U.S.C. § 1003 ...................................................................... 5, 6, 14, 22

29 U.S.C. § 1108(d)(1) .......................................................................... 22

29 U.S.C. § 1132 ............................................................................ 4, 14

29 U.S.C. § 1134 ................................................................................ 33

29 U.S.C. § 1135 ................................................................................. 4

29 U.S.C. § 1191 ................................................................................. 7

29 U.S.C. § 1191a(d) ......................................................................... 7, 28

29 U.S.C. § 1191b(a)(1) ......................................................................... 28

29 U.S.C. § 1204(a) .................................................................................................... 4

29 U.S.C. § 1301(b)(1) .............................................................................................. 22

Pub. L. No. 98-532, 98 Stat. 2705 (1984) .................................................................. 4

Pub. L. No. 104-191, § 104, 110 Stat. 1978 (1996) .................................................... 4

**_Regulations_**

26 C.F.R. § 1.401-10(c)(3) ........................................................................................ 23

29 C.F.R. § 2590.732(d) ................................................................................... 7, 10, 29

69 Fed. Reg. 78720 (Dec. 30, 2004) .......................................................................... 29

**_Other Authorities_**

64 Fed. Reg. 70164 (Dec. 15, 1999) ............................................................................ 4

89 Fed. Reg. 34106 (Apr. 30, 2024) .......................................................................... 24

ERISA Procedure 76-1 § 2,
41 Fed. Reg. 36281 (Aug. 27, 1976) .................................................................... 8

Department's Advisory Opinion 1999-04A .............................................................. 23

Secretary's Order 1-2003,
68 Fed. Reg. 5374-01 (Feb. 3, 2003) ................................................................... 8

Secretary's Order 1-2011,
77 Fed. Reg. 1088 (Jan. 9, 2012) ..................................................................... 7, 8

Sen. Rep. No. 87-992 (1961),
1962 U.S.C.C.A.N. 2964 ................................................................................... 23

**INTRODUCTION**

In August 2022, the U.S. Court of Appeals for the Fifth Circuit affirmed this Court's vacatur of the U.S. Department of Labor's (Department) advisory opinion regarding whether certain benefit plans Plaintiffs sponsor and administer for limited partners are covered by the Employee Retirement Income Security Act of 1974 (ERISA). *See Data Marketing P'ship v. U.S. Dep't of Labor*, 45 F.4th 846, 851 (5th Cir. 2022). The Fifth Circuit's opinion was based on the narrow ground that the advisory opinion did not address three prior agency actions and thus failed "to reasonably consider the relevant issues and reasonably explain the advisory opinion." *Id.* at 855-58. However, the Fifth Circuit vacated this Court's permanent injunction based on its conclusion that this Court had not applied the relevant interpretive standards to the merits questions in this case, which concerns whether the limited partners described in Plaintiffs' advisory opinion request are "working owners" or "bona fide partners," thereby qualifying as ERISA plan participants. *Id.* at 858-60 (vacating injunction "without opining on whether such relief might be appropriate" because the injunction "turned on the interpretive questions" that this Court had not analyzed).

Now, on remand to this Court, "the sole remaining issue is whether the Court should enter a permanent injunction as additional relief beyond the vacatur of the Department of Labor's Advisory Opinion." Order at 1, ECF No. 55; *see also* Pls.' Mot. Summ. J. at 1, ECF No. 56 (moving "for summary judgment as to a permanent injunction"). Plaintiffs have failed to carry their burden to show that a permanent injunction is essential under the circumstances here, where the Department's advisory opinion has been vacated since September 2020. None of the injunction factors weigh in favor of Plaintiffs' request for this extraordinary relief, and collectively the factors demonstrate that no permanent injunction should issue. Accordingly, the Court should deny Plaintiffs' motion for summary judgment seeking this additional relief and, instead, enter judgment

1

to close this case.

First, Plaintiffs have failed to establish that they will be subject to irreparable injury that could otherwise be remedied by a permanent injunction against the Department.  No injunction has been in place for more than 20 months, and yet Plaintiffs proffer no evidence that the Department caused any irreparable injury to Plaintiffs during this time related to the vacated agency action.  While Plaintiffs speculate about an imagined future enforcement action by the Department, they do not identify any plausible grounds for such an action.  The now-vacated Advisory Opinion took the position that Plaintiffs' partnership plans were not ERISA plans, and the Department has no enforcement authority over non-ERISA plans.  Moreover, to the extent Plaintiffs are concerned about the actions of state authorities, a permanent injunction by this Court against the Department would not redress such concerns, as it would have no binding effect on the actions of such third parties.  The Court need look no further to conclude that a permanent injunction is not warranted.

Second, Plaintiffs have failed to establish that the health benefits offered by their partnerships in fact qualify as ERISA plans.  Under the procedural posture of this case, the Department's advisory opinion was issued on the basis of Plaintiffs' representations in their request letter.  There has been no opportunity in litigation to test whether Plaintiffs' factual assertions are correct as to Data Marketing Partnership and the other unidentified partnerships serviced by LPMS.  A permanent injunction should not be issued on the basis of assumed facts.  Further, Plaintiffs have not established that their factual representations (even if true) point so clearly in one direction that the merits must inevitably be decided in their favor.  Instead, the Fifth Circuit's explanation that "working owner" and "bona fide partner" depend on the totality of the circumstances demonstrates that rendering a conclusive decision on the merits requires much more

to be known about those circumstances.

Third, the harm to the Department and the public interest further weigh against an injunction. Numerous cases hold that injunctions against agency investigations are generally unwarranted. Plaintiffs seek an order "enjoining Defendants from refusing to acknowledge the ERISA-status of the Plan or refusing to recognize the Limited Partners as working owners of DMP." Pls.' Br. in Supp. of Mot. for Summ. J. ("Pls.' Mem.") at 26, ECF No. 57. Such an order would effectively prevent the Department from reaching a different conclusion on the basis of any factual development, even if those facts showed that Plaintiffs' representations in their opinion-request letter were incomplete or untrue. This result would significantly harm the Department's ability to fulfill its statutory responsibilities, which is in the public interest. And here, it would also contravene the public interest to issue an injunction so that Plaintiffs could attempt to ward off state regulation of healthcare plans when they do not clearly qualify as ERISA plans.

Finally, even if entry of a permanent injunction were permissible, the Court should exercise its discretion to deny Plaintiffs' request. The speculative nature of Plaintiffs' injury, the way the proposed injunction would not redress that injury, the uncertainty regarding the actual facts about Plaintiffs' plans, the Department's and the public's strong interest in holding industry participants accountable to ERISA and state insurance regulations, all weigh against a permanent injunction. In addition, in Administrative Procedure Act ("APA") cases, the reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions. It would be highly anomalous not only to decide the merits after vacatur of the agency action, but also to foreclose any later analysis by the agency in light of a fuller factual record. And Plaintiffs have not identified any such meaningful practical effect that a permanent injunction against the Department would serve, especially where Plaintiffs' primary concern involves state

investigations and potential state enforcement actions.

For all these reasons, the Court should deny Plaintiffs' motion for summary judgment and instead enter judgment based on the Fifth Circuit's vacatur of the Advisory Opinion.

## BACKGROUND

### I.       Legal Framework

#### A.       ERISA and State Regulation of Insurance

In enacting ERISA, Congress established a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983); *see* 29 U.S.C. § 1001(b).  Under ERISA, benefits provided in an employment context, including the provision of health insurance, are regulated by the U.S. Department of Labor.  29 U.S.C. §§ 1132, 1135.  By contrast, health insurance purchased from commercial insurance companies outside the employment relationship is primarily regulated by state insurance regulators.  *See, e.g.*, *FMC Corp. v. Holliday*, 498 U.S. 52, 62 (1990) (explaining that insurance is an "area[] of traditional state regulation.").

#### B.       The Secretary's Authority Under ERISA

The Secretary of Labor has primary authority to interpret and enforce the provisions of Title I of ERISA.  29 U.S.C. §§ 1132, 1135; *see Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 689-94 (7th Cir. 1986) (en banc).[1]  ERISA confers on the Secretary broad administrative powers,

---

[1] The Department of the Treasury's Internal Revenue Service (IRS) generally administers Title II of ERISA, but the Department of Labor has the interpretive, rulemaking, and exemptive authority for the fiduciary definition and prohibited transaction provisions that apply to both employer-based plans and Title II plans.  *See* Reorganization Plan No. 4 of 1978, § 102, 29 U.S.C. § 1001 note; Pub. L. No. 98-532, 98 Stat. 2705 (1984).  When administering provisions of ERISA and the Internal Revenue Code relating to the same subject matter, the two Departments must work together to ensure consistency and efficiency.  29 U.S.C. § 1204(a).  Further, on matters related to health insurance coverage, the Departments of Labor, Treasury, and Health and Human Services must coordinate policies with respect to parallel provisions of ERISA, the Public Health Service Act, and the Internal Revenue Code.  *See* Pub. L. No. 104-191, § 104, 110 Stat. 1978 (1996); 64 Fed.

including "to supervise enforcement of ERISA, to guarantee uniform compliance with ERISA, to expose and deter plan asset mismanagement, to protect federal revenues, [and] to safeguard the enormous amount of assets and investments funded by ERISA plans." *Herman v. S.C. Nat'l Bank*, 140 F.3d 1413, 1423 (11th Cir. 1998).  As the Fifth Circuit recognized, "ERISA 'has produced a complex and highly technical regulatory program.'" *Meredith v. Time Ins. Co.*, 980 F.2d 352, 357 (5th Cir. 1993) (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991)).  "The identification and classification of persons and plans covered requires a considerable degree of dedicated expertise." *Id.*  The Secretary, with his broad authority in administering ERISA, undeniably has the requisite expertise to interpret ERISA "with respect to the finite definition of employer and employee under the statute." *Id.*

### C.    ERISA Applies Only to Employee Welfare Benefit Plans

ERISA does not regulate all benefit plans, but only "*employee* benefit plans."  29 U.S.C. §§ 1003, 1002(3) (emphasis added).  "[A]n employee benefit plan necessarily must center on the existence of an employer and an employee." *Meredith*, 980 F.2d at 354.  Indeed, in enacting ERISA, Congress's express concern was for "the continued well-being and security of millions of *employees* and their dependents" and "the stability of *employment* and the successful development of industrial relations." 29 U.S.C. § 1001(a) (emphases added).

This employment-based limitation on ERISA's scope derives from the statutory text.  29 U.S.C. §§ 1001-1003; *Meredith*, 980 F.2d at 356.  ERISA governs an "employee benefit plan," which includes employee pension benefit plans and employee welfare benefit plans.  29 U.S.C. §§ 1002(3), 1003.  This case involves a purported "employee welfare benefit plan," which ERISA defines as any plan established or maintained by an employer and/or an employee association:

---

Reg. 70164 (Dec. 15, 1999).

> for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services[.]

*Id.* § 1002(1).

ERISA's definition of a "participant" is also tethered to the employment relationship. ERISA defines "participant" as "any employee or former employee of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer." *Id.* § 1002(7). "Employee" means "any individual employed by an employer," *id.* § 1002(6), and "employer" means "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan," *id.* § 1002(5).

In sum, a benefit program is an ERISA-governed plan only when it is "establish[ed] or maint[ained] by an employer intending to benefit employees." *House v. American United Life Ins. Co.*, 499 F.3d 443, 450 (5th Cir. 2007); 29 U.S.C. § 1002(1). An ERISA plan therefore only exists where an employment relationship between an employer and employee is present. *See Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 243 (5th Cir. 1990) (concluding that, where an "employer-employee-plan relationship" existed, ERISA applied). And where no employee benefit plan exists, ERISA has no force. *See* 29 U.S.C. § 1003(a).

### D.    Application of ERISA to Partnerships

A partnership may act as an "employer" and establish an employee benefit plan that includes partners, but an employment relationship is still required for ERISA to apply. 29 U.S.C. § 1002(5), (9). That is, to be a participant in an ERISA plan, a partner must still qualify as an "employee" of the partnership. A partner who is a "working owner may have dual status, i.e., he can be an employee entitled to participate in a plan and, at the same time, the employer (or owner or member of the employer) who established the plan." *Raymond B. Yates, M.D., P.C. Profit*

6

*Sharing Plan v. Hendon* ("*Yates*"), 541 U.S. 1, 16 (2004); *see also Provident Life & Acc. Ins. Co.*

*v. Sharpless*, 364 F.3d 634, 639 (5th Cir. 2004). A "working owner" is thus an individual who

"wear[s] two hats, as an employer and employee." *Yates*, 541 U.S. at 16.

ERISA also has specific provisions that allow for certain partner-only plans that qualify as

"group health plans" under Part 7 of ERISA.[2] Part 7 provides that:

> Any plan, fund, or program which would not be (but for this subsection) an
> employee welfare benefit plan and which is established or maintained by a
> partnership, to the extent that such plan, fund, or program provides medical care
> . . . to present or former partners in the partnership or to their dependents . . . shall
> be treated (subject to paragraph (2)) as an employee welfare benefit plan which is
> a group health plan.

29 U.S.C. § 1191a(d). Paragraphs (2) and (3) provide that, in the case of a group health plan, the

term "employer" also includes the partnership in relation to any partner and the term "participant"

also includes an individual who is a partner in relation to the partnership. *Id.* § 1191a(d)(2), (3).

The membership of "partnership" plans that are eligible for treatment as group health plans under

The Department's implementing regulations clarify that a partner must be a "bona fide partner" in

order to be considered an employee, and the partnership is considered the employer of a partner

only if the partner is a "bona fide partner." 29 C.F.R. § 2590.732(d)(2), (3). Whether an individual

is a bona fide partner "is determined based on all the relevant facts and circumstances, including

whether the individual performs services on behalf of the partnership." *Id.* § 2590.732(d)(2).

### E.    Advisory Opinions

Within the Department, authority to administer Title I of ERISA is delegated to the

Assistant Secretary for the Employee Benefits Security Administration (EBSA). *See* Secretary's

---

[2] Part 7 of ERISA contains additional standards applicable to "group health plans" and "health insurance issuers offering group health insurance coverage." 29 U.S.C. §§ 1191-1191c. Part 7 applies only to this subset of employee welfare benefit plans, which are defined in ERISA section 3(1), 29 U.S.C. § 1002(1).

Order 1-2011, 77 Fed. Reg. 1088, 1088 (Jan. 9, 2012).  It is EBSA's practice to answer inquiries

from entities affected by ERISA "as to their status under the Act and as to the effect of their acts

or transactions," under the agency's discretion "whenever appropriate, and in the interest of sound

administration of the Act."  *See* ERISA Procedure 76-1 § 2, 41 Fed. Reg. 36281 (Aug. 27, 1976)

(also available here and in Pls.' App. 153-160).  One type of response is an "advisory opinion,"

which is "a written statement issued to an individual or organization, or to [their] authorized

representative . . . that interprets and applies the Act to a specific factual situation."  *Id.* § 3.02.

Such statements are issued by EBSA's Office of Regulations and Interpretations.  *See* EBSA, What

We Do (link).[3]  EBSA's responses are a matter of discretion, and it "may decline to issue advisory

opinions . . . whenever warranted by the facts and circumstances of a particular case."  *Id.* § 5.02.

An advisory opinion "assumes that all material facts and representations set forth in the

request are accurate, and applies only to the situation described" in the request.  *Id.* § 10.  The

requester "may rely on the opinion only to the extent that the request fully and accurately contains

all the material facts and representations necessary to issuance of the opinion and the situation

conforms to the situation described in the request for opinion."  *Id.* § 10.  Advisory opinions have

always been "open to public inspection" at the Department's office in Washington, D.C., *see id.*

§ 12.01, and are also published on the Department website:

https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/advisory-opinions.

---

[3] ERISA Procedure 76-1 § 3.02 provides for advisory opinions to be issued by "the Administrator of Pension and Welfare Benefit Programs or his delegate."  The Administrator later became an Assistant Secretary and the office's name was changed to EBSA in 2003.  *See* Sec'y's Order 1-2003, 68 Fed. Reg. 5374-01 (Feb. 3, 2003).

## II.      Factual Background & Procedural History

Between November 2018 and February 2019, one of the named Plaintiffs, LP Management Services LLC ("LPMS"), submitted and later revised a request for an advisory opinion from the Department.  LPMS stated that it was the general partner "of various Limited Partnerships and manage[s] the day-to-day affairs of these Partnerships."  Pls.' SJ App. 007, ECF No. 24-2.  LPMS requested an advisory opinion regarding whether a plan sponsored by a limited partnership as described in its letter is an "employee welfare benefit plan" within the meaning of ERISA section 3(1), 29 U.S.C. § 1002(1); whether the limited partners in the plan are "participants" within the meaning of ERISA section 3(7); and whether the plan is governed by Title I of ERISA.  *See id.*  In January 2020, the Department issued its advisory opinion, concluding in light of LPMS's factual representations that the partnerships' health benefits administered by LPMS did not qualify as ERISA-covered plans.  *See* Pls.' SJ App. 001, 006, ECF No. 24-2.[4]

LPMS and one of its limited partnerships, Data Marketing Partnership (DMP), which had served the initial complaint in this case in December 2019, filed an amended complaint in February 2020 to challenge the advisory opinion under the APA.  *See* ECF Nos. 4, 9.  The parties filed cross-motions for summary judgment, which were considered simultaneously with Plaintiffs' preliminary injunction motion.  *See* Scheduling Order, ECF No. 19.  The Department did not conduct any fact-finding during the advisory opinion process, and the parties did not conducted discovery in this litigation.  *See* Order, Feb. 17, 2020, ECF No. 19 ("There will be no discovery conducted by either party.").  In September 2020, the Court granted summary judgment to

---

[4] The Department did not dispute that ERISA covered the common law employees who were receiving benefits.  *See* Pls.' SJ App. 006.  The Department explained that it would consider LPMS to have "established a separate welfare benefit plan for [any common law] employees [of the partnership]," which "plan would be subject to ERISA."  *Id.* n.5.

Plaintiffs, "set aside" the advisory opinion as "arbitrary and capricious under the APA and contrary to law under ERISA" and permanently enjoined the Department "from refusing to acknowledge the ERISA-status of the Plan or refusing to recognize the Limited Partners as working owners of DMP." Mem. Op. & Order at 30, ECF No. 37.

On August 17, 2022, the U.S. Court of Appeals for the Fifth Circuit "affirm[ed] the district court's vacatur of the agency action" but "vacate[d] and remand[ed] the district court's injunction for further consideration in light of this opinion." *Data Marketing P'ship v. U.S. Dep't of Labor*, 45 F.4th 846, 851 (5th Cir. 2022). The Fifth Circuit affirmed this Court's conclusions that the advisory opinion was final agency action reviewable under the APA, *id.* at 853-55, and that the advisory opinion was arbitrary and capricious on the ground that the Department "failed to reasonably consider the relevant issues and reasonably explain the advisory opinion" because the advisory opinion did not address two prior advisory opinions and a regulation that adopted a definition of "working owner." *Id.* at 855-58; *see also id.* at 856 ("These omissions doom the Department's action."). On this basis the Fifth Circuit upheld this Court's vacatur of the advisory opinion. *See id.* at 860.

The Fifth Circuit, however, concluded that this Court misinterpreted the Supreme Court's decision in *Yates* "to say that ERISA *always* provides specific guidance for *all* working-owner questions" and thus this Court "did not perform [the] analysis" *Yates* required to interpret the term "working owner" as applied to the particular circumstances here. 45 F.4th at 858; *see id.* ("[T]he question on remand is whether all of the *Yates* factors, including the various provisions of ERISA and the IRC, combine to make these particular working owners qualify as plan participants."). Similarly, with regard to the bona fide partner regulation, the Fifth Circuit concluded that this Court "did not appear to apply a totality-of-the-circumstances inquiry" as required by 29 C.F.R. §

10

2590.732(d)(2).  *See* 45 F.4th at 859.  For both of these reasons, the Fifth Circuit did not adopt this Court's conclusion that the advisory opinion was "contrary to law because it unreasonably interpreted the applicable statutory and regulatory provisions."  45 F.4th at 853.  The Fifth Circuit also vacated this Court's permanent injunction "without opining on whether such relief might be appropriate" because the injunction "turned on the interpretive questions" that this Court had not analyzed.  *See id.* at 860.

Instead, the Fifth Circuit "frame[d] the relevant interpretive questions for the district court's consideration on remand," 45 F.4th at 855, giving the district court the opportunity "to address certain interpretive questions in the first instance," *id.* at 858, before any permanent injunction could issue.

The Fifth Circuit's mandate issued on October 11, 2022.  *See* ECF No. 43.  The Department submitted a Motion for Remand to the Agency, *see* ECF No. 48, which the Court denied on August 11, 2023.  *See* Opinion & Order, ECF No. 51.  Plaintiffs filed a Motion for Summary Judgment as to a permanent injunction on January 15, 2024, *see* ECF No. 56, and briefing of that motion has been deferred several times for the parties to consider a non-judicial resolution.  *See* ECF Nos. 59, 61, 69 (orders deferring briefing through May 31, 2024).

## LEGAL STANDARD

To justify a permanent injunction, Plaintiffs must satisfy a four-part test:

> [They] must show (1) success on the merits; (2) the failure to grant the injunction will result in irreparable injury; (3) the injury outweighs any damage that the injunction will cause the opposing party; and (4) the injunction will not disserve the public interest.

*United Motorcoach Ass'n, Inc. v. City of Austin*, 851 F.3d 489, 492-93 (5th Cir. 2017) (citing *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006)).[5]  "Injunctive relief is considered an

---

[5] Plaintiffs mistakenly rely on the preliminary injunction standard stated in *Benisek v. Lamone*,

extraordinary remedy, to be granted only when the movant has *clearly* carried the burden of persuasion on all four requirements." *MWK Recruiting Inc. v. Jowers*, 833 F. App'x 560, 562 (5th Cir. 2020) (emphasis added, quotation marks omitted).

This is a heavy burden. "[A]n injunction is an equitable remedy that should only issue when *essential* to prevent an otherwise irreparable injury." *Google, Inc. v. Hood*, 822 F.3d 212, 221 (5th Cir. 2016) (emphasis added). "It is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue under the traditional four-factor test set out above." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 158 (2010).

"If a less drastic remedy (such as partial or complete vacatur of [the federal agency's] decision) was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted." *Monsanto*, 561 U.S. at 165-66 (internal citation omitted). The Fifth Circuit has explained that vacatur of an agency action is "a less drastic remedy" than an injunction because "vacatur does nothing but re-establish the status quo absent the unlawful agency action" and it "neither compels nor restrains further agency decision-making." *Texas v. United States*, 40 F.4th 205, 219-20 (5th Cir. 2022); *see also All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 254 (5th Cir. 2023), cert. granted, 144 S. Ct. 537 ("Between vacatur and an injunction, the former is the 'less drastic remedy.'"); *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) (explaining that, "[w]hen a district court . . . determines that the agency acted unlawfully," the issuance of an injunction is "anomalous").

---

585 U.S. 155, 158 (2018), *see* Pls.' Mem. at 23, which never mentioned a permanent injunction, and does not undermine the Fifth Circuit's consistent statement of the permanent injunction standard.

## ARGUMENT

### I.    Plaintiffs Have Failed to Demonstrate Non-Speculative Irreparable Injury That Would Be Remedied By Their Proposed Permanent Injunction.

 "To obtain a permanent injunction, [the movant] had to show that 'the failure to grant the injunction [would] result in irreparable injury.'" *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 380 (5th Cir. 2022) (quoting *United Motorcoach Ass'n*, 851 F.3d at 492-93). "An injunction may thus be issued only if future injury is "certainly impending." *Aransas Project v. Shaw*, 775 F.3d 641, 664 (5th Cir. 2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). This element "must be satisfied by independent proof." *Elite Rodeo Ass'n v. Prof. Rodeo Cowboys Ass'n*, 159 F. Supp. 3d 738, 744 (N.D. Tex. 2016). Plaintiffs also must have standing to pursue the specific injunctive relief they seek. *See Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 821 (5th Cir. 2022) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing . . . for each form of relief that they seek (for example, injunctive relief and damages)." (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021))). Thus, courts must address "whether the remedy requested by plaintiff is likely to redress its injuries." *Inclusive Communities Project, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, No. 3:07-CV-0945-O, 2009 WL 3122610, at *4 (N.D. Tex. Sept. 29, 2009). Accordingly, "to obtain standing for injunctive relief, [a plaintiff] must show that there is reason to believe that he would directly benefit from the equitable relief sought." *Bowman v. Wildwood of Lubbock, LLC*, No. 5:19-CV-164-H, 2020 WL 10458628, at *8 (N.D. Tex. Oct. 23, 2020) (quoting *Plumley v. Landmark Chevrolet, Inc.*, 122 F.3d 308, 312 (5th Cir. 1997)).

Plaintiffs have failed to carry their burden to establish an irreparable injury that could be remedied by the proposed injunction. Plaintiffs principally claim that "[e]ven though the Advisory Opinion has been vacated, the Plaintiffs are still subject to enforcement action by the Defendants

as to the Plan." Pls.' Mem. at 25. But this falls far short of their burden for several reasons. First, the "view of the law espoused in the now vacated Advisory Opinion," Pls.' Mem. at 25, was that Plaintiffs' plans were *not* ERISA plans, which would mean that, in the Department's view, Plaintiffs' plans were not subject to the Department's enforcement authority. *See* 29 U.S.C. § 1003(a) (ERISA only applies to "employee benefit plans"); *id.* § 1132(a) (only authorizing the Department to pursue violations of ERISA); *id.* § 1134(a) (authorizing the Department to investigate only potential violations of Title I of ERISA. Accordingly, any imagined enforcement action is highly speculative. *Cf. Nat'l Ass'n for Gun Rts., Inc. v. Garland*, No. 4:23-CV-00830-O, 2023 WL 6613080, at *16 (N.D. Tex. Oct. 7, 2023) ([T]he alleged irreparable injury must also be concrete—'speculative injury is not sufficient' and 'there must be more than an unfounded fear on the part of the applicant.'" (quoting *Daniels Health Sciences LLC v. Vascular Health Sciences LLC*, 710 F.3d 579, 585 (5th Cir. 2013)). have not specified—and the Department cannot surmise—any concrete injury Plaintiffs would suffer, absent an injunction, rendering Plaintiffs' alleged injury entirely speculative.[6]

Second, Plaintiffs have not identified how the possibility of some future unspecified enforcement action would cause irreparable injury. They have thus failed to identify a concrete and imminent threat of injury by the Department. *See Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 342 (5th Cir. 2012) (holding that a plaintiff lacks standing to seek injunctive relief without an "actual and imminent" and "concrete and particularized" threat of injury, for which it is not "speculative[] that a favorable decision will redress the injury-in-fact").

---

[6] Plaintiffs confusingly state "[t]hat the Defendants have an alternative enforcement theory and strategy is evidenced by their unsuccessful Motion to Remand to Agency previously filed with this Court [Doc. 48]." Pls.' Mem. at 25. The Department's remand motion was supported by voluminous caselaw regarding remedies in APA cases, *see* Defs.' Mot. for Remand at 4-11, ECF No. 48, and is not evidence of any intent to take enforcement action against Plaintiffs.

For example, in *Google, Inc. v. Hood*, 822 F.3d 212 (5th Cir. 2016), the Fifth Circuit concluded that a 79-page administrative subpoena served on the plaintiff by a state attorney general did not make an enforcement action "sufficiently imminent . . . to justify an injunction."  *See id.* at 219, 227-28.  There, the Fifth Circuit overturned the district court's preliminary injunction both (1) because the mere issuance of an administrative subpoena is not ripe for judicial review, *id.* at 226, and (2) "at this early stage of a state investigation" the court could not conclude "that any suit that could follow would necessarily violate [the law]," *id.* at 228.  Here, similarly, Plaintiffs have not and cannot identify any "imminent, nonspeculative irreparable injury," 822 F.3d at 228, that would be caused by the Department.[7]

Third, it appears that Plaintiffs' most pressing concern is that "several state agencies have . . . initiat[ed] administrative proceedings against several other LPMS-managed limited partnerships," and Plaintiffs believe that "[a]bsent an injunction . . . nothing prevents a state insurance agency from acting on the view espoused in the Advisory Opinion."  *See* Pls.' Mem. at 26 & n.19 (citing administrative proceedings in Washington State and Wisconsin).  But Plaintiffs' proposed remedy would not redress this alleged risk.  While Plaintiffs claim that a permanent injunction against the Department "would show that state action is beyond [the states'] authority and that the Plan is exclusively a federal, not state, concern," Pls.' Mem. at 26, it would do no such thing.  A decision by this Court to enjoin the Department would have no binding effect on Wisconsin, Washington, or any other state, thus failing the requirement of redressability.  *See*

---

[7] Plaintiffs also argue that where "an agency has committed itself to a view of the law, it forces a person or entity to 'either alter its conduct or expose itself to potential liability.'"  Pls.' Mem. at 25 (quoting *Data Marketing P'ship v. U.S. Dep't of Labor*, 490 F. Supp. 3d 1048, 1059 (N.D. Tex. 2020)).  But here, the Department has not committed itself to a view of the law.  The Fifth Circuit vacated the Advisory Opinion, and Plaintiffs are not "expose[d] to potential liability" from the Department.  In other words, vacatur of the Department's opinion alone is sufficient to remedy Plaintiffs' sense that they must alter their conduct or risk liability.

Inclusive Communities Project, Inc., 2009 WL 3122610 , at *4;  *cf. Planned Parenthood of Greater Texas Surgical Health Servs. v. City of Lubbock, Texas*, 542 F. Supp. 3d 465, 480 (N.D. Tex. 2021) ("[A]n injunction does not bind unrelated nonparties.") (citing *Harris Cty. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 314 (5th Cir. 1999)).  The states would remain free to pursue administrative proceedings against Plaintiffs' plans in their states and litigate these issues in whatever judicial forum they might arise.  It is not appropriate to issue a permanent injunction in order to influence the actions of unrelated nonparties.[8]

In sum, Plaintiffs have failed to show that their proposed injunction would "have a[] meaningful practical effect independent of [the advisory opinion's] vacatur"—which is a precondition to permanent injunctive relief.  *Monsanto*, 561 U.S. at 165.  Their failure on this injunction factor is a sufficient basis by itself to deny their motion.  *See Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660, 677 (N.D. Tex. 2016) ("If the movant fails to establish any one of the four prerequisites to injunctive relief, relief will not be granted.").

## II.    Plaintiffs Cannot Show That Only One Merits Outcome Is Possible.

Plaintiffs' motion presents an unusual procedural posture with regard to the merits for four reasons:

(1) the Department's advisory opinion has been vacated but the merits of the position stated in the advisory opinion have not been decided;

(2) both the Department's now-vacated advisory opinion and this litigation have been based on Plaintiffs' representations, not any discovery or adjudication of

---

[8] It is also significant that Plaintiffs no longer argue, as they did on appeal, that absent an injunction they will be forced to shutter their business.  That argument has been rendered implausible by the passage of time.  More than 20 months have passed since this Court's injunction was vacated and Plaintiffs' business apparently continues.  Moreover, the proposed injunction would not remedy the cited risks to Plaintiffs' business because the States may continue investigating Plaintiffs notwithstanding any injunction against the Department.  Indeed, the Department could not—and did not—compel States to initiate any of their own investigations.

the facts regarding DMP and LPMS's actual structure;

(3) the Department has had no opportunity for a remand to fully analyze DMP's and LPMS's representations in light of the Fifth Circuit's decision or determine whether it has sufficient information to reach a conclusion about the merits; and

(4) Plaintiffs do not seek merely to prevent the Department from issuing another advisory opinion contrary to Plaintiffs' views; instead, they seek to permanently enjoin the Department from "refusing to acknowledge the ERISA-status of the Plan or refusing to recognize the Limited Partners as working owners of DMP," Pls.' Mem. at 1-2, 26.

Because this case is brought under the Administrative Procedure Act, these factors collectively demonstrate why it would be improper for the Court to issue the merits findings necessary to support Plaintiffs' proposed permanent injunction.  Indeed, the Court need not decide the merits to conclude that this factor weighs against a permanent injunction here.

### A.     The Merits of Any Future Agency Action Should Only Be Decided After Remand.

While this Court, in denying the Department's remand motion, has explained that it considers itself bound by the mandate rule to decide the permanent injunction motion in light of the remanded issues, *see* Opinion & Order at 5-6, ECF No. 51, that rule constrains district courts but cannot give them authority beyond what the APA confers.  Accordingly, in deciding Plaintiffs' motion, the APA standards are relevant to several of the injunction factors, including how to determine success on the merits.

It is well-established that "[i]f the record before the agency does not support the agency action [or] if the agency has not considered all relevant factors . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."  *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  Indeed, in this case, the Fifth Circuit approvingly quoted an opinion stating that "by default, remand with vacatur is the appropriate remedy."  *Data Marketing P'ship*, 45 F.4th at 859 (quoting *Texas v. Biden*, 20 F.4th 928, 1000

(5th Cir. 2021), *rev'd and remanded on other grounds*, 213 L. Ed. 2d 956 (June 30, 2022)).  Once

an agency action is set aside under the APA, remand to the agency for additional action is usually

necessary because the Court "is not generally empowered to conduct a *de novo* inquiry into the

matter being reviewed and to reach its own conclusions based on such an inquiry." *Fla. Power &*

*Light*, 470 U.S. at 744.  "Upon a successful APA claim, vacatur effectively rescinds the unlawful

agency action." *All. For Hippocratic Med.*, 78 F.4th at 254 (citing *Data Mktg. P'ship*, 45 F.4th at

859 ("Vacatur . . . retroactively undoes or expunges a past state action. . . . Unlike an injunction,

which merely blocks enforcement, vacatur unwinds the challenged agency action.")).

Neither the Fifth Circuit nor this Court has identified any reason for relief beyond vacatur

of the advisory opinion and remand to the agency.  Because the only agency action identified for

review under the APA has been vacated, it is premature to determine whether some future agency

action would violate the APA.  For the reasons discussed throughout this brief, because Plaintiffs

have failed to carry their burden, the Court should deny the injunction motion and remand the

matter to the Department under *Florida Power & Light* and its progeny.

**B.**    **There Is No Evidence Upon Which the Court Could Base the Proposed**
       **Permanent Injunction.**

Contrary to Plaintiffs' assertions, there is no "evidentiary support," Pls.' Mem. at 5 n.1, for

the factual findings that Plaintiffs wish the Court to make in this case.  Instead, "[w]hen the court

reviews a federal administrative agency's decision, a motion for summary judgment stands in a

somewhat unusual light, in that the administrative record *provides the complete factual predicate*

for the court's review." *Exxon Mobil Corp. v. Mnuchin*, No. 3:17-1930-B, 2019 WL 7370430, at

*4 (N.D. Tex. Dec. 31, 2019) (emphasis added).  "[T]he summary-judgment standard for APA

claims is not whether there is a genuine dispute of material fact, but whether the agency action

violated [APA] Section 706." *Exxon Mobil Corp.*, 2019 WL 7370430, at *4; *see also Garcia for*

*Congress v. FEC*, 22 F. Supp. 3d 655, 658 (N.D. Tex. 2014) ("[W]hen a district court reviews a summary judgment motion concerning an agency's action, the court determines not whether the material facts are disputed, but whether the agency properly dealt with the facts.").

Accordingly, Plaintiffs err in repeatedly referencing the "genuine dispute of material fact" standard by claiming that various facts are "specifically undisputed." *See* Pls.' Mem. at 17, 18, 22. While the Department does not dispute that Plaintiffs made the representations stated in LPMS's advisory opinion request, *see* Pls.' SJ App. 007-020, the administrative record in this case contains nothing more regarding the underlying facts. Because advisory opinions are decided only on the basis of requestor representations, the Department did not conduct its own fact-finding. And there has been no discovery to validate the facts Plaintiffs allege regarding DMP and LPMS. Therefore, the Department cannot admit or deny Plaintiffs' factual allegations about their own businesses. Nor may Plaintiffs evade the procedural posture of this case by inviting the Court to rely on a declaration prepared for and submitted with their preliminary injunction briefing more than four years ago. *See* Pls.' SJ App. 053-058.[9] Still less may Plaintiffs make and rely upon unsupported factual allegations in their briefing. *See* Pls.' Mem. at 5 n.2 (asserting that "[a]ll of

---

[9] Plaintiffs state that the Johnson declaration "is offered to provide sworn testimony of the facts contained in the AO Request," Pls.' Mem. at 5 n.4, but such information may not be considered in this posture. *See Shell Offshore, Inc. v. Babbitt*, 238 F.3d 622, 630 n.8 (5th Cir. 2001) ("[I]t is well established that reviewing courts generally should, in evaluating agency action, avoid considering evidence that was not before the agency when it issued its final decision."); *Horton v. Prudential Ins. Co. of Am.*, 51 F. App'x 928 (5th Cir. 2002) (reversing district court for, among other things, considering "determination [that] was not before the [decisionmaker]" because "the district court should have confined itself to the administrative record"); *Triplett v. Fed. Bureau of Prisons*, No. 3:08-CV-1252-K, 2009 WL 792799, at *8 (N.D. Tex. Mar. 24, 2009) (declining to consider plaintiff's "numerous affidavits that are not part of the administrative record and were not considered by the [agency]"); *City of Dallas v. Hall*, No. 3:07-CV-0060-P, 2007 WL 3257188, at *4 (N.D. Tex. Oct. 29, 2007) ("[M]atters not considered by the agency are generally outside the record [and] are legally irrelevant[.]"). *Cf.* Defs.' SJ Br. at 23 n.12, ECF No. 28 (stating that "Plaintiffs may not rely upon the documents contained in Tabs 4, 5, 6, 7, 14, and 15 of Plaintiffs' Appendix, *see* ECF No. 24-1, for purposes of the cross-motions for summary judgment").

the facts concerning partnership governance, business activity and the self-insured single-employer group health plan of DMP are equally applicable to all other LPMS-managed limited partnerships").

For all these reasons, there is no factual basis the Court could use to determine whether the plans described in Plaintiffs' request letter are *in fact* governed by ERISA.

### C.   Plaintiffs Cannot Establish That There Are No Valid Grounds to Doubt Whether the Limited Partners Are Working.

Only if the remand and administrative record could be set aside—and they cannot, *see supra* Arg. § III.A, B—would the Court need to address the possibility of Plaintiffs' "success on the merits" though *Florida Power & Light* admonishes that the proper course of action "is to remand to the agency for additional investigation or explanation," absent "rare circumstances." 470 U.S. at 744.  Rare circumstances do not exist here.  As the Fifth Circuit has recognized, the proper course of action where "a reviewing court agrees that the agency misinterpreted the law" is to "set aside the agency's action and remand the case."  *BizCapital Bus. & Indus. Dev. Corp. v. Comptroller of Currency of U.S.*, 467 F.3d 871, 874 (5th Cir. 2006) (citing *FEC v. Akins*, 524 U.S. 11, 25 (1998)).  It is not "an idle and useless formality" for an agency to be given an opportunity to re-review "[plaintiff's] request based on the factors in its regulation," *id.*, nor is it a given that the agency would reach the same result.  In the context of APA review, before foreclosing additional agency review and issue a permanent injunction against an agency, the Court would—at the very least—need to conclude that there is no rational basis on which the agency could "reach the same result for a different reason."  *BizCapital*, 467 F.3d at 874; *cf. O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 240 (5th Cir. 2007) (holding that "the proper remedy under this court's precedents is to remand the case to the agency to correct the deficiencies in its analysis" because the possibility that the agency reached the right conclusion "has not been entirely

20

foreclosed") (quotation marks omitted)); *Watson v. Geren*, 569 F.3d 115, 118 (2d Cir. 2009) (holding that "remand would be futile, and is therefore not required, where there is *no* basis in fact to support the [agency's action] on *any* valid ground.") (emphasis added).[10]

Here, the permanent injunction is inappropriate because the possibility that Plaintiffs' plans do not qualify as ERISA plans "has not been entirely foreclosed." *O'Reilly*, 477 F.3d at 240. Rather, it is plausible that the Department, upon reviewing all relevant factors as required by the Fifth Circuit—or acquiring more precise facts—could still "reach the same result," *BizCapital*, 467 F.3d at 874, and have some "basis in fact to support" such a conclusion, *Watson*, 569 F.3d at 118. Indeed, the Fifth Circuit recognized that applying the key statutory terms to the facts Plaintiffs propose depends on a searching inquiry of the statutory and regulatory scheme and a balancing of the totality of the circumstances. *See Data Marketing P'Ship*, 45 F.4th at 858 (requiring an examination into "all four titles of ERISA and the Internal Revenue Code" to determine whether limited partners are 'working owners'"); *id.* at 859 ("In essence, the regulation commands a totality-of-the-circumstances analysis" to identify "bona fide partners").

### 1.    "Working Owner"

The Fifth Circuit held that this Court misinterpreted *Yates* "to say that ERISA *always* provides specific guidance for *all* working-owner questions." *Data Marketing P'Ship*, 45 F.4th at 858. Instead, *Yates* "concluded that a 'working owner' may qualify as an 'employee' and a 'participant' under ERISA" but left it to lower courts to "determine the scope of the term." *Id.* at 858; *see also id.* (quoting Justice Thomas's concurrence in the judgment, which observed that

---

[10] The Department has previously explained at length why *Watson* does not represent the Fifth Circuit's approach to deciding whether remand is necessary after vacatur of an agency action. *See* Defs.' Remand Mot. at 8-11 & nn. 2-3, ECF No. 48.  Nevertheless, if the merits are to be decided after vacatur, the standard should be at least as strict as *Watson*, especially where a permanent injunction is concerned.

*Yates* did not "clearly define who exactly makes up this class of 'working owners'"). The Fifth Circuit explained that "*Yates* . . . provided courts a framework for assessing working-owner questions," which first involves "determin[ing] whether ERISA's text provides 'specific guidance' on the precise question before the court, such that resort to the common law is unnecessary." *Id.* at 858. Courts must consider "among other things, all four titles of ERISA and the Internal Revenue Code." *Id.* By implication, *Yates* and *Data Marketing* make clear that if the statutory text does not itself provide "specific guidance," the next step is to review relevant common law principles. *Cf. Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992) ("adopt[ing] a common-law test for determining who qualifies as an 'employee' under ERISA" because the statute did not provide "specific guidance" or suggest that the common law test "would thwart the congressional design or lead to absurd results"); *Provident Life & Acc. Ins. Co. v. Sharpless*, 364 F.3d 634, 638 n.2 (5th Cir. 2004) (characterizing *Darden* as holding "that in the absence of textual clues, courts should look to the federal common law in order to determine who is an employee").

The statutory text is abundantly clear that ERISA is focused on employment relationships. *See supra* Background § I.A. ERISA applies only to employee benefit plans where an employment-based relationship exists between the employer and the plan participants. *See Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 243 (5th Cir. 1990) (concluding that, where an "employer-employee-plan relationship" existed, ERISA applied). Fundamental to that employment relationship is the actual performance of work. For example, and as noted in *Yates*, several ERISA provisions incorporate § 401(c)(1)'s definition of a "self-employed individual" as an "employee." *See Yates*, 541 U.S. at 14 (discussing 29 U.S.C. §§ 1103(b)(3)(A), 1108(d)(1), 1301(b)(1)). Section 401(c)(1), under a provision governing contributions to qualified retirement plans, defines a "self-employed individual" as one "who has earned income," which is

"net earnings from self-employment . . . only with respect to a trade or business in which *personal services* of the taxpayer are a material income-producing factor."  26 U.S.C. § 401(c)(2)(A) (emphasis added).[11]  This requirement derives from the need to distinguish active, working owners from inactive ones "[s]ince the objective of [a qualified plan for the self-employed] is to provide retirement benefits based on personal services."  Sen. Rep. No. 87-992 (1961), 1962 U.S.C.C.A.N. 2964, 2975; *see also id.* ("This concept of earned income is designed to place proprietors and partners on the same basis as corporate shareholders who can participate in a qualified retirement plan under present law *only if they are employees* of the corporation." (emphasis added)).  Treasury regulations specify that earned income "includes only professional fees and other amounts received as compensation for personal services actually rendered by the individual" and that this does not include all "net earnings from self-employment from a trade or business."  26 C.F.R. § 1.401-10(c)(3).  *See, e.g., Miller v. Comm'r of Internal Revenue*, 81 T.C.M. (CCH) 1258, 2001 WL 233963, at *17 (T.C. 2001) ("[W]e have upheld the requirement that personal services be actually performed in order to yield earned income[.]"); *Frick v. Comm'r of Internal Revenue*, 47 T.C.M. (CCH) 564, 1983 WL 14720 (T.C. 1983) ("earned income" came only from taxpayer's

---

[11] Plaintiffs also point to the Department's Advisory Opinion 1999-04A (link) (also available at Pls.' SJ App. 178), which was discussed in *Yates*.  The underlying request encompassed "working owners" who were "journeyman electricians who had worked initially as bargaining unit members for other employers that contributed to the [multiemployer pension plan] on their behalf [and who] subsequently acquired ownership interest in those employers or started their own electrical businesses . . . They continue to work as electricians . . . ." Pls.' SJ App. 179.  For purposes of its response, the Department assumed that by "working owner" the requester meant "any individual who has an equity ownership right of any nature in a business enterprise and who is actively engaged in providing services to that business." *Id.* n.3, Pls.' SJ App. 181.  The Department did not adopt this as a comprehensive definition of "working owner" but instead used it as a functional term to answer the request.  The treatment of work as "providing services" to the business matches what has already been discussed, but it does not rule out the relevance of other aspects of behaving like an employee.

advertising business, not from his investments or sales of real estate).[12]

The clear implication of the statutory and regulatory provisions, in conjunction with *Yates*, is that a "working owner" is an owner who behaves like an employee, thus "wear[ing] two hats, as an employer and employee."  541 U.S. at 16; *cf.* Pls.' Mem. at 15 ("the word 'working' denotes function").   In other words, an owner must be *working*.   The parties apparently agree that performing "personal services" is a relevant part of behaving like an employee, *see* Pls.' Mem. at 18, 22 (claiming that the limited partners "provide personal services for the partnership"), but the statutory provisions provide little further guidance.[13]  Accordingly, it is appropriate to consider the non-exhaustive common law agency principles set out in *Darden*:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Darden*, 503 U.S. at 324 (quotation marks omitted).  While a "right to control" is less dispositive in the context of "working owners," many of the *Darden* factors go to the nature of work itself. And the key aspect is that "[s]ince the common-law test contains 'no shorthand formula or magic

---

[12] Plaintiffs briefly mention a 2018 regulation regarding association health plans, *see* Pls.' Mem. at 15-16, but acknowledge that this regulation was vacated by a court in 2019.  *See id.* n.18 (citing *New York v. Dep't of Labor*, 363 F. Supp. 3d 109 (D.D.C. 2019)).  That regulation has now been formally rescinded.  *See* 89 Fed. Reg. 34106 (Apr. 30, 2024).  Accordingly, it should play no role in the analysis here.

[13] Plaintiffs argue that courts should find significant "the absence of limiting definitions as to who can be a 'working owner' for purposes of ERISA," and claim that *Yates* was "unwilling to identify any restrictions on who could be a working owner."  Pls.' Mem. at 12, 13.  These assertions are directly contrary to the Fifth Circuit's explanation of *Yates* and how the *Yates* factors should be applied.  *See Data Marketing P'Ship,* 45 F.4th at 858.

phrase that can be applied to find the answer, . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Id.* (quotation marks omitted).

Applied here, there is significant reason to doubt that the limited partners in Plaintiffs' plans are actually working. While Plaintiffs claim that "contributing electronic data" amounts to "personal services" that are "a material, income-producing factor for the partnership," Pls.' Mem. at 18, permitting one's internet behavior to be monitored and monetized is not inherently "work" by any common understanding. The limited partners are not required to possess any particular work-related skills. The partnership provides no tools by which to perform services; rather, limited partners are expected to install software on their existing, personal devices to collect and transmit data. Indeed, it appears that, after joining Plaintiffs' partnerships and downloading software, limited partners are expected to continue their personal activities on their electronic devices as though they had no arrangement with the partnership at all. While there might be a totality of the circumstances in which passive behavior could be part of an employment relationship, there is not sufficient information here to conclude that Plaintiffs' limited partners are working. As best the Department understands Plaintiffs, the limited partners need do nothing more than let their internet behavior be monitored for 500 hours per year.[14] These actions are not "personal services" or "work" in any recognizable sense. Nor is voting evidence of work because voting is common in business structures and is not typically considered work or personal services to the business—e.g., corporate shareholder voting or voting by the members of a mutual insurance company. *See, e.g.*,

---

[14] Recent news reports suggest that people in the United States spend an average of more than seven hours per day online, *see* Lindsey Leake, "17 years of your adult life may be spent online. These expert tips may help curb your screen time," Fortune.com, Mar. 6, 2024, https://fortune.com/well/article/screen-time-over-lifespan/. This suggests that the limited partners need only provide access to less than three months of their annual activity to purchase health insurance from DMP.

*True v. Robles*, No. 08-CA-53, 2008 WL 11334971, at *3 (W.D. Tex. June 30, 2008) (equating subscribers of a "reciprocal interinsurance exchange" to the nonmanaging investors or owners of any other business organization).[15]

Moreover, while Plaintiffs claim that "DMP's primary business purpose" is the "sale to third parties of electronic data generated by its partners," Pls.' Mem. at 5, and that the plans were created "to attract, retain, and motivate talent in service" of that business, *id.* at 7, it seems at least as likely that this inverts Plaintiffs' true purpose. Plaintiffs admit that the limited partnerships have generated no substantial revenue and no profits to be distributed to the limited partners. *See* Pls.' SJ App. 054. If that remains true after more than four years, it seems plausible that the true purpose is simply to make health insurance widely available without being subject to state regulation. This colors the reliability of Plaintiffs' representations here, and the likelihood that Plaintiffs have any incentive to follow through on their alleged requirements for limited partners.

Even if sharing internet data could conceivably qualify as work, Plaintiffs have not shown that every limited partner in Plaintiffs' plans actually "download[s] specific software on their device," and then permits the "software [to] collect[ meaningful amounts of] data," Pls.' Mem. at 18. And even if the agreement the limited partners sign—which is not in evidence—requires them to "contribute at least five hundred (500) hours of work per year through the generation, transmission, and sharing of their marketable electronic data," Pls.' Mem. at 7, those requirements may not be enforced. Indeed, Plaintiffs have identified no way that they actually monitor or enforce these requirements. Thus, it is well within the realm of possibility that these terms are just

---

[15] At most, the limited partners' ability to vote on partnership matters evidences their "owner" status rather than their "working" status. *See Smith v. Castaways Family Diner*, 453 F.3d 971, 983 (7th Cir. 2006) (describing cases where a party's position as partner or shareholder "gave him a vote in the affairs of the organization" and thus distinguished him from non-owners).

toothless, mere fig leaves to support an ERISA theory, without actual follow through. This would significantly undermine the notion that the limited partners are "working" in any meaningful sense. Nor is it clear that Plaintiffs have mechanisms for the limited partners to "collectively decide what to do with that data bank on behalf of the partnership," Pls.' Mem. at 18, or even have ever actually engaged in such collective decisionmaking in the years that these plans have been in operation.[16]

Moreover, there are reasons to doubt whether the limited partners are actually "owners." An "owner's equity" is typically related to financial interests in or capital contribution to a business, not the level of control in the business. *See, e.g.*, *Black's Law Dictionary* (11th ed. 2019) ("The aggregate of the owners' financial interests in the assets of a business entity; the capital contributed by the owners plus any retained earnings."). Here, the Plaintiffs assert that the limited partners make no financial contribution in exchange for their ownership interest in the enterprise. Pls.' SJ App. 055. Moreover, the assertion that the limited partners control and operate the partnership runs counter to the conventional understanding of the role of limited partners, who are typically restricted in their ability to influence the affairs of the enterprise. *See, e.g.*, *Black's Law Dictionary* (11th ed. 2019) ("Partnership," including definition of "limited partnership" as a "partnership composed of one or more persons who *control the business* and are personally liable for the partnership's debts (called general partners), and one or more persons who contribute

---

[16] Moreover, it is not obvious that distributions from the sale of aggregate data could reasonably be considered "income" for the partner's own generation of data. Plaintiffs assert that any payments to the limited partners would be "reported to the IRS as guaranteed payments and are subject to employment taxes." Pls.' Mem. at 7. It appears, however, that payments to partners are contingent on profits, which by definition cannot be "guaranteed payments" under the Code. *Compare* 26 U.S.C. § 707(c) (defining "guaranteed payments" as "payments to a partner for services" but only "[t]o the extent determined *without regard to the income of the partnership*" (emphasis added)), *with* Pls.' SJ App. 056 ("*Profit* generated by the sale of the limited partners' data can then be dispersed via payments by DMP to limited partners. This will be reported as guaranteed payments and subject to employment taxes." (emphasis added)).

capital and share profits but *who cannot manage the business* and are liable only for the amount of their contribution (called limited partners)" (emphasis added)); *Renkemeyer, Campbell & Weaver, LLP v. Comm'r of Internal Revenue*, 136 T.C. 137, 147-48 (T.C. 2011) ("[I]t is generally understood that a limited partner could lose his limited liability protection were he to engage in the business operations of the partnership. Consequently, the interest of a limited partner in a limited partnership is generally akin to that of a passive investor."). Moreover, if the "ownership interest," Pls.' Mem. at 17, is revocable at the discretion of LPMS, it might not actually qualify as ownership. And, while Plaintiffs rely on the allegation of periodic voting to distinguish the limited partners from "passive owners," *id.* at 17-18, they point to no authority stating that passive owners cannot vote and they specify not details about whether or how such voting has occurred.

For all these reasons, the Court should not conclude that Plaintiffs have established on the merits that their untested factual representations would qualify their plans as ERISA plans, let alone that their plans, based on the totality of the actual factual circumstances, qualify as ERISA plans.

### 2. "Bona Fide Partner"

Plaintiffs assert that their injunction request does not rely on Part 7 of ERISA and its provisions permitting "partner only" group health care plans. *See* Pls.' Mem. at 21. Nevertheless, ERISA's treatment of partners under this provision further supports a totality of the circumstances approach to determining whether the limited partners qualify as ERISA plan participants. ERISA § 732(d) applies only to a group health plan, which is an ERISA plan that "provides medical care." 29 U.S.C. § 1191b(a)(1). It states that a plan "established or maintained by a partnership" which "provides medical care . . . to present or former partners in the partnership or their dependents" shall be treated as an ERISA plan. *Id.* § 1191a(d)(1). It allows the partnership to be considered the "employer" and the individual partners to be "participants" in the plan. *Id.* § 1191a(d)(2), (3).

The implementing regulation clarifies that ERISA § 732(d) applies only to "bona fide partners" which is to be determined "based on all the relevant facts and circumstances, including whether the individual performs services on behalf of the partnership."  29 C.F.R. § 2590.732(d)(2); *see also* 69 Fed. Reg. 78720, 78735 (Dec. 30, 2004) (regulation clarifies that one "must be a bona fide partner in order to be considered an employee" under ERISA Part 7).[17]  The Fifth Circuit specifically endorsed this facts-and-circumstances approach to determining whether the partner can be a participant in an ERISA plan.  *See Data Marketing*, 45 F.4th at 859 ("In essence, the regulation commands a totality-of-the-circumstances analysis.").

This echoes the determination of whether a partnership itself is a genuine one under the Internal Revenue Code, which follows common law principles.  *See Yates*, 541 U.S. at 12-13 (recognizing that Congress intended "to harmonize ERISA with longstanding tax provisions"); *cf. Cobb v. Comm'r*, 185 F.2d 255, 258 (6th Cir. 1950) ("the over-all criteria of the existence of a partnership are the same under the revenue laws as under common law").  Tax law "deals in economic realities, not legal abstractions" and it is a cardinal rule that tax consequences "depend on [a transaction's] substance, not its form."  *Chemtech Royalty Assocs., L.P. v. United States*, 766 F.3d 453, 460 (5th Cir. 2014).  The Supreme Court has explained, "A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses."  *Comm'r v. Tower*, 327 U.S. 280, 286 (1946); *see also Anderson v. HMO Louisiana,*

---

[17] This Court has stated that the Fifth Circuit "told the Court to consider on remand whether Defendants forfeited any *Auer* deference arguments."  Opinion & Order at 3, ECF No. 51. Plaintiffs argue that the Department has waived *Auer* deference "as to its interpretation of 29 C.F.R. § 2590.732(d)(2)."  Pls.' Mem. at 21-22.  As Plaintiffs note, the Department has not sought *Auer* deference for this regulation or any other agency statement in this case.  However, any such "forfeiture" would not preclude arguing for deference with respect to a future agency action that met the appropriate standard.

*Inc.*, No. CV 23-971, 2023 WL 3477325, at *2 (E.D. La. May 16, 2023) ("[A] partnership exists if the parties mutually consented to form a partnership and share in the profits and losses, and the enterprise's property or stock must form "a community of goods in which each party has a proprietary interest." (quoting *Transit Mgmt. of Se. Louisiana, Inc. v. Grp. Ins. Admin., Inc.*, 226 F.3d 376, 384 (5th Cir. 2000)).  In assessing whether a partnership is genuine, a court asks

> whether, *considering all the facts*—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—*the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.*

*Comm'r v. Culbertson*, 337 U.S. 733, 742 (1949) (emphasis added).  The parties' intent is the key factor in determining whether a particular arrangement constitutes a partnership.  In distinguishing valid partnerships from shams, the Fifth Circuit has restated the *Tower* test:

> [T]he parties, to form a valid tax partnership, must have two separate intents: (1) the intent to act in good faith for some genuine business purpose and (2) the intent to be partners, demonstrated by an intent to share "the profits and losses."  If the parties lack either intent, then no valid tax partnership has been formed.

*Chemtech Royalty*, 766 F.3d at 460-61.  These intents are determined based on "all the relevant facts and circumstances."  *Id.* at 461.

Under the facts represented here, it is unlikely that Plaintiffs' limited partners qualify as "bona fide partners."  There is no evidence that limited partners have any intent to join together and contribute money, labor, or skills toward furthering the partnership's business purpose.  Rather, it appears any individual can become a limited partner simply by signing an agreement, with no particular or specialized contribution from the individual.  Indeed, the limited partners make no contribution at all to join the partnership.  *See* Pls.' SJ App. 055 ("The limited partners of DMP are individuals who have obtained a limited partnership interest for free . . .").  Thus, there

is no "intent to be partners" as there is no apparent intent for the limited partners to share in profits *and* losses, the limited partners have nothing to lose.  *Cf. Anderson*, 2023 WL 3477325, at *2 (holding that the challenged entity was a partnership that had established an ERISA-covered group health plan, because the partners established a company "distinct from its members," because both partners "combined their efforts in determined proportions (50/50) to collaborate for common profit," and because the "partners had the intent to join together to share CARS's profits and losses, as demonstrated by the parties' description of the business" and tax documents).  Plaintiffs are not able to make the same showing here.  And as discussed above, the only alleged "services" the limited partners may perform is installing a specific software on their personal devices and then engaging in personal activities online as they normally would, while the software tracks their actions.  This is significantly less recognizable as "services" to a business than the service provided in *Anderson*, where the two owners of "Certified Auto Reconditioning Specialists" explained that they both worked by "pull[ing] door dings out of automobiles."  2023 WL 3477325, at *3.  While additional factual development might fill out the picture here, the facts Plaintiffs have represented fall far short of a totality of the circumstances that could meet the "bona fide partner" standard.

In sum, in the absence of factual development, Plaintiffs have failed to carry their burden to establish success on the merits sufficient to justify a permanent injunction against the Department.  And the numerous ways Plaintiffs attempt to use terminology divorced from reality—e.g., limited partner, guaranteed payment, active owner—is deeply contrary to the principle that tax law (and ERISA)  "deals in economic realities, not legal abstractions," and "substance, not [] form."  *Chemtech Royalty*, 766 F.3d at 460.  Because ERISA depends on an employment relationship, reducing the nature of "work" and "employment" to extreme abstraction would fundamentally distort ERISA's purposes and expand it well beyond what Congress

31

intended.

III.   **A Permanent Injunction Would Harm the Department And the Public Interest.**

However, even if the Court was inclined to rule in Plaintiffs' favor on the merits, and even if the injunction could conceivably forestall some non-speculative irreparable injury, Plaintiffs would still not be entitled to the extraordinary relief they seek here both because the "damage that the injunction will cause" the Department "outweigh[s]" Plaintiffs' alleged irreparable injury and because the injunction will "disserve the public interest." *United Motorcoach Ass'n*, 851 F.3d at 492-93; *see also Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023) ("The government's and the public's interests merge when the government is a party.").

Here Plaintiffs seek an order "enjoining Defendants from refusing to acknowledge the ERISA-status of the Plan or refusing to recognize the Limited Partners as working owners of DMP." Pls.' Mem. at 26.  Such an order would effectively prevent the Department from reaching a different conclusion on the basis of any factual development.  This result would significantly harm the Department's ability to fulfill its statutory charge from Congress, which is clearly in the public interest.  It has long been recognized that injunctions against agency investigations are generally unwarranted where agencies are entrusted with "the preliminary investigation into possible violations."  *See New Orleans Pub. Serv., Inc. v. Brown*, 507 F.2d 160, 165 (5th Cir. 1975); *see also Petroleum Exploration v. Pub. Serv. Comm'n of Kentucky*, 304 U.S. 209, 220-23 (1938) (rejecting injunction against a state commission "to investigate matters entrusted to its care by a [permissible] statute" because the expense of "preparing for and [responding to] an investigation" is not "the sort of irreparable injury against which equity protects").  It is also not in the public interest to take actions that would "adversely affect pre-enforcement communications between [agencies] and industry." *Dow Chemical v. EPA*, 832 F.2d 319, 324 (5th Cir. 1987); *Am. Land Title Ass'n v. Clarke*, 743 F. Supp. 491, 494 (W.D. Tex. 1989).  Moreover, "a court should

take no action calculated to interfere seriously with an agency's ability to apply its expertise to solve those technical and complex regulatory problems which have been entrusted to it." *Texas v. Seatrain Int'l S.A.*, 518 F.2d 175, 180-81 (5th Cir. 1975).

Congress has given the Department broad investigative authority to determine whether a plan is ERISA-compliant. *See* 29 U.S.C. § 1134. And a long line of cases shows that this investigative authority also encompasses determining whether a plan is covered by ERISA. *See, e.g.*, *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 214 (1946) ("Congress has authorized the [agency], rather than the District Courts in the first instance, to determine the question of coverage in the preliminary investigation of possibly existing violations."); *United States v. Marshall Durbin & Co. of Haleyville*, 363 F.2d 1, 4 (5th Cir. 1966) (applying *Oklahoma Press* to Packers and Stockyards Act); *Walsh v. Upright*, No. 22-MC-247, 2023 WL 2207604, at *5 (S.D.N.Y. Feb. 23, 2023). Plaintiffs' proposed injunction would forestall that agency authority, without the Court even having undertaken its own factual inquiry. Moreover, the proposed injunction requiring the Department "to recognize the Limited Partners as working owners of DMP" in perpetuity, Pls.' Mem. at 26, does not account for the possibility that Plaintiffs' plans or their implementation could change in material ways in the future that would be relevant to the totality of the circumstances analyses ERISA calls for.

Plaintiffs' desire to somehow use a permanent injunction as a shield against non-party state authorities would also be contrary to the public interest. While Plaintiffs emphasize that Congress made ERISA plans exempt from state regulation, *see* Pls.' Mem. at 26, that immunity (derived from ERISA's preemption provision) applies only to plans that are in fact ERISA plans. If the plans are instead vehicles to sell health insurance to individuals, the states would have full regulatory authority unobstructed by ERISA's preemption provision. *FMC Corp.*, 498 U.S. at 62

33

(referring to insurance as an "area[] of traditional state regulation").  An injunction based on unproven and unvetted statements requiring the Department to treat Plaintiffs' plans as ERISA plans risks chilling state regulators from investigating the plans, *even if* the facts are not as represented by Plaintiffs—or have changed since Plaintiffs submitted their advisory opinion request—and the states have jurisdiction.  Such a broad hindrance of not only federal, but also state powers certainly harms the public interest, by failing to ensure that Plaintiffs' plans are regulated by the appropriate regulator.

## IV.    Regardless, the Court Should Exercise its Discretion to Decline to Issue a Permanent Injunction.

"Even when a movant establishes the four requirements, the decision to grant or deny a permanent injunction remains in the court's discretion." *Nat'l Solid Waste Mgmt. Ass'n v. City of Dallas*, 903 F. Supp. 2d 446, 459 (N.D. Tex. 2012).  "When 'exercising their sound discretion,' federal courts sitting in equity must 'pay particular regard for the public consequences' of an injunction."  *Nuziard v. Minority Bus. Dev. Agency*, No. 4:23-CV-00278-P, 2024 WL 965299, at *46 (N.D. Tex. Mar. 5, 2024) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

Here, many of the factors discussed above combine to show that the Court should use its discretion to deny a permanent injunction, even if entry of an injunction were not impermissible. The speculative nature of Plaintiffs' injury, the way the proposed injunction would not redress that injury, the uncertainty regarding the actual facts about Plaintiffs' plans, the Department's and the public's strong interest in holding industry participants accountable to ERISA and state insurance regulations, all weigh against a permanent injunction.

The procedural posture in this case under the APA also warrants a final word.  First, the question of whether Plaintiffs' plans are "employee benefit plans" under ERISA is plainly "a matter that statutes place primarily in agency hands."  *INS v. Orlando Ventura*, 537 U.S. 12, 16

(2002) (holding that "generally speaking, a court . . . should remand a case to the agency" in such circumstances).  It would be highly anomalous not only to decide the merits after vacatur of the agency action, but also to foreclose any later analysis by the agency in light of any factual record.  For "[t]he reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry."  *BizCapital*, 467 F.3d at 873 (quoting *Fla. Power & Light*, 470 U.S. at 744); *see also Bridge v. U.S. Parole Comm'n*, 981 F.2d 97, 104 (3d Cir. 1992) ("A district court, however, may not ordinarily freeze the [agency's] record and prevent it from admitting new evidence on remand" because under a "guiding principle of administrative law" "legal error in an agency decision does not prevent the agency from expanding its record and rethinking its original order").  Indeed, because the advisory opinion has been vacated, a conclusive judicial determination of the merits risks being purely advisory.  *See TransUnion LLC*, 594 U.S. at 431 ("Under Article III, federal courts do not adjudicate hypothetical or abstract disputes. Federal courts do not possess a roving commission to publicly opine on every legal question."); *cf. New Orleans Ass'n of Cemetery Tour Guides & Companies v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1033 (5th Cir. 2023) ("any opinion ruling on the correctness of [the preliminary injunction] analysis would be relevant only to a complaint that is no longer operative and thus purely advisory"); *Franciscan All.*, 47 F.4th at 377 (noting, for mootness purposes, that where "there was no longer any order to challenge, [] any decision on whether the order was legally correct would have been purely advisory").

Second, this Court has specifically held that a "district court vacating an agency action under the APA should not issue an injunction unless doing so would 'have [a] meaningful practical effect independent of its vacatur.'" *Franciscan Alliance, Inc. v. Azar*, 414 F. Supp. 3d 928, 946 (N.D. Tex. 2019) (ultimately quoting *Monsanto*, 561 U.S. at 165).  Plaintiffs have not identified

any such meaningful practical effect that the permanent injunction would serve.  Indeed, "[a] permanent injunction is appropriate only if a defendant's past conduct gives rise to an inference that, in light of present circumstances, there is a reasonable likelihood of future transgressions." *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021) (quotation marks omitted).  Here, there is no basis to conclude that any future action by the Department would fail to apply the standards set out in the Fifth Circuit's *Data Marketing* decision to the available facts.  *See Texas v. United States*, 336 F. Supp. 3d 664, 676 (N.D. Tex. 2018) (denying permanent injunction because "the Court must assume that [the agency] will follow the law going forward" and plaintiffs had not "rebutted that presumption").

For all these reasons, the Court should use the discretion it has to decline Plaintiffs' request for a permanent injunction.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment as to a permanent injunction and close the case.

36

Dated:  May 31, 2024

Of Counsel:

SEEMA NANDA
Solicitor of Labor

WAYNE R. BERRY
Associate Solicitor for Plan Benefits Security

JEFFREY HAHN
Counsel for Appellate and Special Litigation

KATRINA LIU
Senior Trial Attorney

SARAH HOLZ
Trial Attorney
United States Department of Labor
Office of the Solicitor

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JULIE STRAUS HARRIS
Assistant Director
Civil Division, Federal Programs Branch

*/s/ Galen N. Thorp*
GALEN N. THORP (VA Bar # 75517)
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20530
Tel: (202) 514-4781 / Fax: (202) 616-8460
galen.thorp@usdoj.gov

*Counsel for Defendants*

CERTIFICATE OF SERVICE

On May 31, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties to this action electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Galen N. Thorp
GALEN N. THORP