**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORTH WORTH DIVISION**

| | |
|---|---|
| DATA MARKETING PARTNERSHIP, LP, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 4:19-cv-00800-O ) |
| UNITED STATES DEPARTMENT OF LABOR, et al., | ) ) ) |
| Defendants. | ) ) |

**SUPPLEMENTAL COMPLAINT FOR DECLARATORY/INJUNCTIVE RELIEF**

COME NOW Plaintiffs Data Marketing Partnership, LP ("DMP"), and LP Management Services, LLC ("LPMS") (collectively "Plaintiffs'), and by way of supplemental complaint against Defendants United States Department of Labor ("the DOL"), Acting Secretary of Labor Julie A. Su ("Su"), and the United States of America (collectively "Defendants") state as follows:

**INTRODUCTION**

1.    At stake in this suit are welfare plans which provide health coverage for more than 30,000 individuals. Plaintiffs have sought to protect these plans under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.,* by petitioning (a) the DOL for an advisory opinion acknowledging such protection, and (b) this Court for an injunction enjoining Defendants from denying such protection. Defendants have fought these petitions vigorously. Now, rather than face potential judicial defeat, Defendants have tied imminent and now contemporaneous litigation in Puerto Rico against Plaintiffs' vendors to Plaintiffs' withdrawal of their DOL petition and the dismissal of this suit. This extortive strategy threatens not only the reputation and financial viability of Plaintiffs' vendors but the plans themselves which are

dependent upon the services of Plaintiffs' vendors. By undertaking this strategy Defendants are (a) infringing on Plaintiffs' First Amendment Petition rights; (b) circumventing the authority of this Court to hear Plaintiffs' petition; (c) violating the Administrative Procedure Act ("APA"); and (d) jeopardizing the health coverage of more than 30,000 individuals who, without the plans, would need to scramble to find higher-priced health insurance elsewhere. Plaintiffs seek injunctive relief from this Court ending Defendants' actual and threatened unlawful and harmful course of conduct.

## I. FIRST AMENDMENT

2.      The First Amendment "right to petition the government for a redress of grievances is "one of the most precious of the liberties safeguarded by the Bill of Rights," and is "high in the hierarchy of First Amendment values." *Lozman v. City of Riviera Beach, Fla*., 585 U.S. 87, 101 (2018). "The right to petition is cut from the same cloth as the other guarantees of [the First] Amendment, and is an assurance of a particular expression of freedom." *McDonald v. Smith,* 472 U.S. 479, 482 (1985). The right to petition the government for redress of grievances is such a fundamental right as to be "implied by '[t]he very idea of a government, republican in form.'"*BE & K Const*., 536 U.S. at 524–25.

3.      The right to petition "extends to all departments of the Government", including administrative agencies and courts. *Cal. Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972) ("The right of access to the courts is indeed but one aspect of the right of petition"). The right to petition includes not just petitions to redress grievances but petitions to influence government action. *E.R.R. Pres. Conf. v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 143 (1961).

4.      It is a violation of the First Amendment for the federal government to directly or indirectly thwart, or endeavor to thwart, the availability of judicial machinery to resolve disputes with a federal court. *Doe v. Schneider*, 443 F.Supp. 780, 787 (D.Kan. 1978). An unconstitutional

2

deprivation of the right of access to the courts takes place "when government officials thwart vindication of a claim by violating basic principles that enable civil claimants to assert their rights effectively." *Barrett v. U.S*.., 798 F.2d 565, 575 (2nd Cir. 1986).

5. "Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *ACLU of Md., Inc. v. Wicomico County,* 999 F.2d 780, 785 (4th Cir. 1993).

6. Even otherwise lawful conduct by government officials can run afoul of the First Amendment. In *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963), the Supreme Court affirmed that the First Amendment prohibits government officials from relying on the "threat of invoking legal sanctions and other means of coercion … to achieve the suppression" of disfavored speech. Just this past term, in *NRA v. Vullo*, 602 U.S. 175 (2024), the Supreme Court acknowledged in a 9-0 decision that actionable coercion includes actions directed at vendors which do business with the person or entity who exercised rights guaranteed by the First Amendment. Similarly, in *American Motor Club, Inc. v. Corcoran*, 644 F.Supp. 862 (S.D.N.Y. 1986), the U.S. District Court for the Southern District of New York issued a preliminary injunction against the New York Department of Insurance which, in response to a civil rights action against the Department by an automobile club, allegedly threatened the licenses of brokers who sold memberships in the automobile club. *See also Floridians Protecting Freedom, Inc. v. Ladapo*, et al, Case No. 4:24-cv-00419 (N.D. Florida).

7. Federal courts are empowered to issue general injunctive relief that enjoins a government defendant from retaliating against or otherwise infringing upon a plaintiff's rights under the First Amendment. *Mahan v. Texas Dept. of Public Safety*, No. 9:20-CV-119-RC-ZJH, 2020 WL 6935555 at *3 (E.D.Tex. Oct. 29, 2020).

## II. THIS COURT'S INHERENT AUTHORITY

8.    Just this past term, in *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244, 2266 (2024), the Supreme Court confirmed that federal "agencies have no special competence in resolving statutory ambiguities. Courts do."

9.    The Fifth Circuit recognizes that a federal court may issue injunctive relief to protect the court's inherent authority and control of its docket. *Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181 (5th Cir. 2008); *Farguson v. MBank Houston, N.A.*, 808 F.2d 358, 359 (5th Cir. 1986). Indeed, the traditional standards for issuing relief (i.e., irreparable injury and inadequate remedy at law) are inapplicable to such injunctions. *Id.* The court's power to enter such orders flows not only from various statutes and rules relating to sanctions, but the inherent power of the court to protect its jurisdiction, its judgments, and to control its docket. *Fargason*, 808 F.2d at 359; *Citizens Bank & Trust Co. v. Case*, 931 F.2d 1014 (5th Cir. 1991).

10.    As acknowledged by Chief Judge Lay in *McBride v. Coleman*, 955 F.2d 571, 582-83 (8th Cir. 1992):

> "The federal courts must have the inherent authority to enforce executive branch compliance with judicial orders which serve to restore to the status quo a party injured as a direct result of the government's contumacious conduct. Otherwise, the judiciary would be powerless to impose the most effective remedy for ensuring compliance with its order against the most frequent litigant in the federal courts."

*See also Chilcutt v. U.S.*, 4 F.3d 1313, 1327 (5th Cir 1993) (citing Judge Lay).

11.    The exercise of inherent authority over parties by a federal court "is particularly appropriate for impermissible conduct that adversely impacts the entire litigation." *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 516 (6th Cir. 2002).

12.    A U.S. District Court hearing a particular case possesses the power to enjoin the filing of related lawsuits in other courts. *Kerotest Manufacturing Co. v. C–O–Two Fire Equipment Co.,* 342 U.S. 180 (1952).

### III. BENEFITS OF ERISA

13.     In an Aug. 1, 2023 publication, the U.S. Chamber of Commerce recognized:

"For nearly 50 years, the Employee Retirement Income Security Act (ERISA) has provided the framework needed to provide a stable employer-sponsored insurance (ESI) system. As the single largest source of health benefits in the United States, ESI provides health coverage for nearly 160 million American workers and their families. ERISA underpins the success of system, playing an important role to keep employer-sponsored health coverage accessible and affordable… ERISA works for ESI. This foundation is critical to keeping our health care system efficient and cost-effective for tens of millions of American workers. For nearly five decades, ERISA has successfully strengthened the ESI system and contributed to the growing number of Americans covered by ESI plans."

14.     The legal protections afforded these millions of Americans by ERISA are uniform and strict. As noted by the Supreme Court: "ERISA's primary aim is to protect individuals who participate in employee benefit plans" and "[t]o effectuate this goal, Congress established 'strict standards' of conduct for those with discretionary authority over employee benefit plans." *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985).

### IV. PLAINTIFFS' PETITIONS AND DEFENDANTS' RESPONSES

15.     In reliance upon and in comportment with Supreme Court precedent and prior DOL advisory opinions, Plaintiffs design and sponsor single employer employee welfare plans to comply with ERISA. The plans ("Partnership Plans"), which collectively provide affordable health insurance to more than 30,000 individuals, combine limited partners with common law employees.

16.     In 2018, Plaintiffs petitioned Defendants directly for an advisory opinion, in accordance with ERISA Procedure 76-1. Plaintiffs specifically requested acknowledgment by the DOL that the Partnership Plans are subject to ERISA, and therefore not subject to regulation by state insurance departments.

17.     Almost immediately after this petition, Defendants undertook an investigation, which came to be known as the "Anjo Investigation", of vendors for the Partnership Plans, including (a) Suffolk Administrative Services, LLC ("SAS"), which co-developed, owns, and

provides the intellectual property necessary to operate the Partnership Plans; and (b) Providence Insurance Company ("PIC"), which provides reinsurance needed to protect and provide financial capacity and stability for the self-funded Partnership Plans. Defendants would not have undertaken an investigation of these vendors, but for the exercise by Plaintiffs of their right of petition under the First Amendment.

18.    The Anjo Investigation evolved into threats of litigation by Defendants against SAS and PIC, as well as Alexander Renfro ("Renfro"), a benefits attorney, former SAS principal, and filer of the original advisory opinion request on behalf of Plaintiffs, Arjan Zieger ("Zieger") and William Bryan ("Bryan"), principals in both SAS and PIC (collectively "the Anjo Targets"). These threats included allegations and monetary demands which would bankrupt and destroy the business reputations of SAS, PIC, and their respective principals.

19.    Plaintiffs' second petition was filed with this Court after Defendants issued an Advisory Opinion finding the Partnership Plans are not subject to ERISA. Plaintiffs' *First Amended Complaint for Declaratory and Injunctive Relief* [Doc. 9] ("*First Amended Complaint*") specifically sought (a) vacatur of the Advisory Opinion as being arbitrary and capricious in violation of the Administrative Procedure Act, and (b) an injunction enjoining Defendants from refusing to acknowledge the ERISA status of the Partnership Plans.

20.    Defendants' direct response to this second petition has largely been unsuccessful. This Court vacated the Advisory Opinion and the Fifth Circuit affirmed. The Court issued an injunction as to Defendants, which the Fifth Circuit vacated and remanded to this Court for further findings rather than reversing outright. Defendants' Motion for a "do-over" with respect to the Advisory Opinion was denied by this Court. Pending before this Court is Plaintiffs' Motion for Summary Judgment as to the injunction.

21.     Faced with the prospect of further adverse rulings by this Court and the Fifth Circuit, Defendants have now attempted to leverage their threats of litigation against the Anjo Targets to indirectly achieve what they have henceforth been unable to directly achieve in this suit – an end to Plaintiff's two petitions. Although the Anjo Targets are not parties to this suit, Defendants have expressly tied their fate in imminent and now contemporaneous litigation to the abandonment by Plaintiffs of both petitions. Defendants have specifically said they would only agree to a settlement of the imminent litigation if Plaintiffs (a) withdraw their request for an advisory opinion from DOL as the Partnership Plans, and (b) dismiss this suit.

22.     The coercion being brought to bear on the Anjo Targets by Defendant is potentially devastating not only to The Anjo Targets, but also to Plaintiffs. If SAS and PIC stop doing business with Plaintiffs either involuntarily or through financial and reputational ruin in conjunction with imminent and now contemporaneous litigation, the Partnership Plans would cease to operate. There are no other vendors which provide the services currently provided by the Anjo Targets to the Partnership Plans.  The ability of Plaintiffs to offer group health coverage to prospective new partners through the Partnership Plans is an important attraction and retention tool, without which Plaintiff's core business of aggregating and marketing large volumes of electronic data would suffer significant impairment.

23.     Lest this Court intervene with declaratory and injunctive relief against Defendants in this lawsuit, Defendants will likely make the relief sought herein by Plaintiffs moot: the Partnership Plans would cease to exist, and the limited partnerships which sponsor them would suffer great financial harm. In other words, by doing an end-around of this Court, Defendants would accomplish what Defendant's zealous efforts have heretofore failed to accomplish, an end to Plaintiffs' two petitions protected by the First Amendment.

24.     This Supplemental Complaint therefore seeks merely to preserve the integrity of this lawsuit and maintenance of the status quo as to the injunctive relief already requested in Plaintiffs' *First Amended Complaint*.  As set forth further in this pleading, Plaintiffs specifically seek a supplemental injunction enjoining Defendants from engaging in any conduct against Plaintiffs or third parties which is intended to circumvent, moot or otherwise thwart the injunction requested in the *First Amended Complaint* or its issuance by the Court.

## PARTIES

25.     Plaintiffs are limited partnerships aggrieved by the actions of Defendants following their AO Request against the Anjo Targets upon whose services Plaintiffs depend in the operation of the Partnership Plans, and the General Partner of said partnerships and other similar entities.

26.     The DOL is an agency of the United States government and has responsibility for implementing and enforcing portions of ERISA. It is an "agency" under 5 U.S.C. § 551(1).

27.     Su is the Acting Secretary of Labor and is sued solely in her official capacity.

28.     The United States of America is joined as a defendant in this action as permitted by 5 U.S.C. § 702.

## JURISDICTION AND VENUE

29.     Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over the claims asserted in this Supplemental Complaint because this Supplemental Complaint involves claims based on the First Amendment and because the action seeks to prevent the deprivation of federal rights.  The relief requested is authorized pursuant to 28 U.S.C. § 1651(a) (injunctive relief); 28 U.S.C. §§ 2201 and 2202 (declaratory and other appropriate relief); 42 U.S.C. § 1983 (deprivation of rights, privileges, and immunities secured by the Constitution); 5 U.S.C. § 702 (APA); and 42 U.S.C. § 1988 (attorney's fees and costs).

30.     The United States has waived its sovereign immunity in this action pursuant to 5 U.S.C. § 702, 28 U.S.C. § 2201, and 29 U.S.C. § 1132(k).

31.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) & (e)(1). Defendants are U.S. agencies or officers sued in their official capacities; Defendants reside in this District; and a substantial part of the events giving rise to this action occurred in this District.

## HISTORY OF APA VIOLATIONS BY DOL

32.     As emphasized in *Texas v. DOL*, Civil Action No. 4:24-CV-499 (E.D.Tex. Nov. 15, 2024), "an agency cannot 'exercise its authority in a manner that is inconsistent with the administrative structure that Congress has enacted into law' no matter how difficult the issue it seeks to address" *See FDA v. Brown & Williamson*, 529 U.S. 120, 125 (2000).  In addition to the findings of this Court and the Fifth Circuit in this suit, federal jurisprudence nevertheless has repeatedly found the DOL to have exceeded or abused its statutory authority in violation of the APA.

33.     In *New York v. United States Department of Labor*, 363 F.Supp.3d 109 (D.D.C. 2019), the U.S. District Court for the District of Columbia vacated, in part, the DOL rule regarding association health plans under ERISA.

34.     In *Chamber of Commerce of United States of America v. United States Department of Labor*, 885 F.3d 360 (5th Cir. 2018), the Fifth Circuit vacated the DOL's 2016 "fiduciary rule" under ERISA, which purported to expand fiduciaries to include broker-dealers and insurance agents in conflict with the plain text of ERISA.

35.     In *Federation of Americans for Consumer Choice, Inc. v. United States Department of Labor*, Case No. 6:24-cv-163, 2024 WL 3554879 (E.D.Tex. July 25, 2024), the U.S. District Court for the Eastern District of Texas stayed the DOL's 2024 "fiduciary rule" under ERISA,

which purported to impose ERISA-fiduciary status on "any insurance agent who merely complies with state insurance laws when dealing with an ERISA plan member or owner of an [IRA]."

36.     In *American Council of Life Insurers v. United States Department of Labor*, Case No. 4:24-cv-00482 (N.D.Tex. July 26, 2024), this Court similarly stayed the DOL's 2024 "fiduciary rule" under ERISA as conflicting with ERISA.

37.     In *American Securities Association v. United States Department of Labor*, Case No. 8:22-cv-330-VMC-CPT, 2023 WL 1967573 (M.D.Fla. Feb. 13, 2023), the U.S. District Court for the Middle District of Florida vacated, in part, guidance promulgated by the DOL interpreting its ERISA Prohibited Transaction Exemption 2020-02, 85 Fed.Reg. 82798 (Dec. 18, 2020).

38.     In *Nevada v. United States Department of Labor*, 275 S.Supp.3d 795 (E.D.Tex. 2017), the U.S. District Court for the Eastern District of Texas invalidated a 2016 DOL rule purporting to interpret the executive, administrative and professional employee exemptions of the Fair Labor Standards Act ("FLSA").

39.     In *Texas v. United States Department of Labor*, Case No. 4:24-cv-00499, 2024 WL 3240618 (E.D.Tex. June 28, 2024), the U.S. District Court for the Eastern District of Texas issued a preliminary injunction as to a 2024 DOL rule purporting to interpret the executive, administrative and professional employee exemptions of the FLSA.

40.     In *Restaurant Law Center v. DOL*, ___ F.4[th] ___, 2024 WL 3911308 (5th Cir. Aug. 23, 2024), the Fifth Circuit vacated the DOL's so-called 80/20/30 Rule that governed how tipped employees must be paid under the FLSA.

41.     In *New York v. United States Department of Labor*, 477 F.Supp.3d 1 (S.D.N.Y. 2020), the U.S. District Court for the Southern District of New York vacated, in part, a DOL rule interpreting the Families First Coronavirus Response Act.

42.     In *New York v. Scalia*, 490 F.Supp.3d 758 (S.D.N.Y. 2020), the U.S. District Court for the Southern District of New York vacated, in part, a DOL rule narrowing the definition of "joint employer" under the FLSA.

43.     In *State of Kansas v. DOL*, 2024 WL 3938839 (S.D.Ga. Aug. 26, 2024) the U.S. District Court for the Southern District of Georgia issued a preliminary injunction halting the effective date of the DOL's farmworker protection rule.

44.     In *Texas v. DOL*, Civil Action No. 4:24-CV-499 (E.D.Tex. Nov. 15, 2024), the U.S. District Court for the Eastern District of Texas vacated a 2024 DOL rule again purporting to interpret the executive, administrative and professional employee exemptions of the FLSA.

## FACTS

### I. BACKGROUND
### A. The DMP Plan

45.     The primary business purpose of DMP is the production, capture, segregation, aggregation, anonymization, organization, and sale to third parties of electronic data generated by its partners.

46.     The generation and aggregation of electronic data transmitted by each limited partner of DMP represents the most significant, income-generating commodity which DMP seeks to sell to third parties.

47.     As a business seeking to profit from the electronic data generation, aggregation, and sales market, DMP must collect and aggregate data generated by as many active users of its proprietary software and mobile applications as possible.

48.     The limited partners of DMP are compensated for, control and manage the production, capture, segregation, aggregation, and sale of, data they individually produce, empowering Limited Partners in a manner not otherwise available to them.

49. To attract and retain limited partners willing to contribute the data they generate for aggregation and sale, DMP established the DMP Plan. The DMP Plan provides health coverage more affordable than found elsewhere in non-ERISA plans, in particular those sold to individuals on the various "exchanges" established under the Patient Protection and Affordable Care Act (ACA).

50. Without the DMP Plan as a recruiting and retention tool, DMP would not be able to successfully attract and retain limited partners willing to generate and contribute their data as working owners for the business purpose of the limited partnership.

**B. LPMS**

51. LPMS is a general partner for DMP and other similar limited liability partnerships which rely upon the participation of limited partners to contribute their electronic data for aggregation and sale.

52. Dozens of companies, including DMP, are currently competing with each other to gain market share in the user-driven electronic data aggregation space, which is colloquially known as "Own Your Data," or "OYD." Without the DMP Plan as a recruiting and retention tool, DMP would be severely hampered in its ability to compete in OYD, by attracting and retaining limited partners willing to generate and contribute their data as working owners for the business purpose of the limited partnership.

**C. SAS**

53. The Partnership Plans, including the DMP Plan, were established with the irreplaceable assistance of SAS. SAS expended resources, time, and expertise to develop compliance structures and products tailored to assist LPMS in implementing the novel Partnership Plan structure through limited partnerships such as DMP.

54.    LPMS and DMP do not have the expertise or resources to ensure proper compliance with applicable ERISA provisions and regulations of the self-insured group health plans without the expertise of SAS.

55.    There are no companies other than SAS able and willing to provide the compliance services to plans that utilize the structure of the Partnership Plans.

### D. PIC

56.    The Partnership Plans, including the DMP Plan, obtain reinsurance, or stop loss insurance, from PIC to cover the potential financial exposure inherent in sponsoring self-insured group health plans.

57.    PIC expended resources, time, and expertise to develop insurance and reinsurance products tailored to assist LPMS in implementing the Partnership Plans structure through limited partnerships such as DMP.

58.    LPMS and DMP do not have the revenues to properly manage the risk of covered claims exceeding contributions without the stop loss insurance provided by PIC.

59.    There are no insurance carriers other than PIC willing to underwrite the risk of covered claims exceeding contributions to the Partnership Plans.

### E.  What End of Services of SAS and PIC Would Mean to DMP and LPMS

60.    Without the services provided by SAS and reinsurance provided by PIC, DMP could not continue the DMP Plan and LPMS could not continue the other Partnership Plans.

61.    If the DMP Plan and the Partnership Plans are discontinued, DMP and the other LPMS managed limited partnerships would have more difficulty attracting and retaining partners, thus threatening the long-term viability their core businesses, which rely upon achieving sufficient scale to profitably monetize electronic data.

## II. PLAINTIFFS PETITION DOL FOR AN ADVISORY OPINION

62.    As set forth in ERISA Procedure 76-1, DOL "invites inquiries of individuals or organizations affected, directly or indirectly, by the Employee Retirement Income Security Act …. as to their status under the Act and as to their status under the Act."

63.    In 2018, Renfro was retained as legal counsel for LPMS to assist it in pursuing an advisory opinion from the DOL concerning a novel application of the "working owner" theory to the proposed Partnership Plans. At the time, Renfro was a principal of and salaried consultant to SAS, and provided services to LPMS with the consent and participation of SAS, facts which are known to the DOL.

64.    On Nov. 8, 2018 (revised on Jan. 15, 2019, and Feb. 27, 2019), Renfro submitted a formal Advisory Opinion Request ("AO Request") under ERISA Procedure 76-1 with the DOL on behalf of LPMS, for the Partnership Plans. (See Exhibit A, attached hereto).

65.    The AO Request detailed the legal and factual basis for application of ERISA to the Partnership Plans building upon the recognized concept under ERISA of "working owners", including the concepts recognized by the U.S. Supreme Court in *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1 (2002), and the DOL in Advisory Opinion 99-04A.

66.    As noted in the AO Request, LPMS sought to implement this Plan structure through limited partnerships for which LPMS would act as general partner.

67.    Given the novel nature of the structure applicable to limited partnerships, LPMS retained Renfro to seek guidance from DOL that the proposed application was consistent with ERISA statutes and regulations.

68.    In October 2018, prior to submitting the AO Request, Renfro attended a meeting in Washington DC with various DOL representatives to discuss the applicability of ERISA to the Partnership Plans. At this meeting, Renfro was representing the interests of LPMS. In attendance

14

at the October meeting and representing the interests of DOL was Preston Rutledge, then Assistant Secretary of Labor for the Employee Benefits Security Administration ("EBSA"), the division of DOL responsible for ERISA compliance and interpretations.

69.      At the meeting, Renfro and other LPMS representatives explained the Partnership Plan structure to DOL representatives and provided high level detail of the goals of the plan and the business structure sought to be implemented by LPMS. At this meeting, Assistant Secretary Rutledge told the representatives that an Advisory Opinion Request was the best route to ensure approval of the Plan by DOL. Renfro drafted and submitted the AO Request after this meeting.

70.      On March 6, 2019, Renfro attended another meeting with various DOL officials in Washington DC. Also attending this meeting was then Louisiana Attorney General Jeff Landry, who was the lead signatory among seven sitting state Attorneys General of a letter sent to the DOL, stressing the urgency of the public health problem that the LPMS structure addressed and requesting expedited consideration of the AO Request. (See Exhibit B, attached hereto).

71.      Defendants only became aware of the Anjo Targets through the AO Request.

### III. Defendants Initiate Anjo Investigation and Threaten Litigation

72.      Within weeks of the March 6, 2019 meeting, Defendants began systematic efforts to discredit and dismantle the Partnership Plans. In what came to be known as the "Anjo Investigation," - Defendants began requesting information and issuing subpoenas, starting on April 19, 2019, as to the Anjo Targets.

73.      Shortly after opening the Anjo Investigation, DOL issued numerous requests for information and subpoenas not only to SAS and PIC, but to numerous entities doing business with SAS or PIC. (See Exhibit C, attached hereto). The subpoenas were issued despite DOL having never posed at the time a single written question or other formal response to the AO Request.

74.     This lack of interaction on the AO Request is highly unusual for DOL's advisory opinion process, as questions from DOL to the requestor routinely occur following submission of an advisory opinion request.

75.     The very existence of the Anjo Investigation both frightened potential Partnership Plan vendors and dissuaded them from providing services to the Partnership Plans. It also frightened potential vendors and partners from conducting business with SAS and PIC, both generally and with respect to Partnership Plans.

76.     Additionally, existing vendors of SAS and PIC reduced or terminated relations with SAS and PIC as a result of the Anjo Investigation.

77.     On Nov. 6, 2020, counsel for SAS and PIC sent a letter to all known DOL officials involved in the investigation in an effort to seek clarity on the purpose, scope, and need for the Anjo Investigation. (See Exhibit D, attached hereto).

78.     On Dec 14, 2020, 20 months after the commencement of the Anjo Investigation, Katrina Liu, Trial Attorney, Office of the Solicitor of DOL (also an attorney representing DOL in the instant litigation), responded on behalf of DOL with a letter essentially noting DOL's "ample authority to conduct its investigation in order to determine whether ERISA violations have or are about to occur" noting that DOL was "not in a position to provide the specific information you seek regarding the timing and scope" of the Anjo Investigation. (See Exhibit E, attached hereto).

79.     On Dec. 30, 2020, SAS and PIC responded to Attorney Liu with citations to authority showing that, while broad, DOL's investigatory authority is not as limitless as portrayed in her December 14th letter. (See Exhibit F, attached hereto)

80.     SAS and PIC closed their reply letter with yet another request that DOL reconsider its inexplicable approach to the Anjo Investigation. Counsel for SAS and PIC noted "In the midst

of the harsh economic impacts of this pandemic on all small businesses in America, I would hope DOL would reconsider the position taken in your letter."

81.    The Anjo Investigation ultimately prompted a suit in the U.S. District Court for the District of Puerto Rico on Jan. 19, 2021 against Defendants, styled as *Suffolk Administrative Services, LLC, et al. v. U.S. Department of Labor, et al*, Cause No. 3:21-CV-01031. This suit was dismissed on March 28, 2022, on the ground of lack of ripeness without addressing the substantive merits.

82.    On July 21, 2022, after over three years of seemingly endless subpoenas and "investigation," Defendants finally gave notice to the Anjo Targets as to the substance of its Anjo Investigation and alleged violations of ERISA. (See Exhibit G, attached hereto).

83.    After July 21, 2022, the Anjo Targets were engaged in active settlement negotiations with Defendants.

84.    Nearly one year later, on June 8, 2023, Defendants submitted their first threat of litigation against the Anjo Targets which included an express demand for injunctive and monetary relief. (See Exhibit H, attached hereto).

85.    Progress towards settlement between Defendants and the Anjo Targets was very slow between June 2023 and January 2024. During this time, Defendants and the Anjo Targets entered into several tolling agreements which (1) extended the statute limitations for legal action, and (2) precluded Defendants and the Anjo Targets from initiating any legal proceedings with respect to the Anjo Investigation.

86.    Under a continuing threat of litigation, Defendants sent the Anjo Targets, on Jan. 24, 2024, a demand for $15 million, a figure which would severely and negatively impact the companies and lead SAS and PIC to file for bankruptcy protection.

### IV. PLAINTIFFS PETITION FOR RELIEF IN THIS COURT

87.    On Feb. 3, 2020, DOL responded to the AO Request by issuing an Advisory Opinion finding the Partnership Plans are not subject to ERISA. (See Exhibit I, attached hereto).

88.    This Advisory Opinion was the subject of the *First Amended Complaint* [Doc. 9] filed herein on February 3, 2020. In a *Memorandum Opinion and Order* [ Doc. 37] dated Sept. 28, 2020, this Court (a) found the DMP Plan to be a single employer ERISA plan; (b) vacated the Advisory Opinion as arbitrary and capricious, and in material conflict with previous DOL advisory opinions, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2); and (c) enjoined the DOL "from refusing to recognize the ERISA-status of the [DMP Partnership] Plan." On appeal, an Aug. 17, 2022 Opinion [Doc. 44] by the Fifth Circuit affirmed the vacatur of the Advisory Opinion but remanded the matter to this Court for further findings to support its injunction.

89.    On remand, Defendants filed a *Motion to Remand* [Doc. 48] with this Court asking for a chance at a do-over as to the Advisory Opinion. This Court denied the Motion in an *Opinion and Order* [ Doc. 51] dated Aug. 11, 2023. On Jan. 15, 2024, Plaintiffs filed a *Motion for Summary Judgment* [Doc. 56] and supporting *Brief* [Doc. 57] to reinstate the injunction enjoining the DOL from refusing to recognize the ERISA-status of the DMP Partnership Plan.

### V. DEFENDANTS DIRECTLY TIE FATE OF THREATENED LITIGATION AGAINST ANJO TARGETS TO PLAINTIFFS' PETITIONS

90.    Immediately after signaling that certain DOL personnel were adamantly opposed to consideration of the AO Request, the DOL initiated the Anjo Investigation.

91.    As the Anjo investigation got under way, a long-scheduled June 2019 meeting between LPMS, Plaintiffs' representatives, and DOL was abruptly pushed back to July 2019. When the postponed meeting finally occurred, it lasted only ten minutes and the representatives

from DOL demonstrated little interest in continuing discussions with LPMS representatives about the Partnership Plans, or the AO Request.

92.    The DOL subpoenaed more than ten entities related to LPMS and DMP as part of the Anjo Investigation.

93.    On Jan. 11, 2024, counsel for DMP and LPMS sent a letter to counsel for the DOL as to potential settlement discussions in this suit. (See Exhibit J, attached hereto).

94.    In response, the DOL sent an e-mail on February 8, 2024 to DMP, LPMS, SAS, PIC, and the individual Defendants proposing "global" settlement discussions as to this suit and the threatened litigation against the Anjo Targets. (See Exhibit K, attached hereto). Counsel for DMP, LPMS, and the Anjo Targets replied that although one individual attorney – Jonathan Crumly of Freeman, Mathis, & Gary – had at times represented some parties in each matter, the parties were nevertheless distinct, sharing no common ownership or control. Further, Mr. Crumly did not and does not represent all of the targets of the Anjo Investigation, and each party was and is represented by additional counsel. Counsel made these facts clear to the DOL, and also stressed that no "global settlement" which favored one or more parties at the expense of others would be possible, nor could any attorney ethically advise any client to accept demands against its self-interest in order to assist another, separate client. The DOL nonetheless pressed for "global settlement."

95.    Thereafter, settlement discussions as to the Anjo Investigation accelerated substantially once Plaintiffs and the Anjo Targets agreed to participate in "global settlement discussions." The DOL's monetary demands for settling with the Anjo Targets lowered considerably over the next two months. Even as the demands for settling with the Anjo Targets

were lowered, the DOL's demand as to this suit remained constant – dismiss this suit entirely and withdraw the AO Request.

96.     That any settlement with the Anjo Targets was entirely dependent upon the dismissal of this suit was made plain in the DOL's April 26, 2024 demand. The settlement demand was $5.5 million as to the Anjo Targets but was contingent upon the withdrawal of the AO Request and the dismissal of this suit by Plaintiffs. (See Exhibit L, attached hereto).[1]

97.     On Friday, May 10, 2024, counsel for the DOL directly stated to counsel for Plaintiffs and the Anjo Targets that if this suit was not dismissed, the monetary demands for settling threatened litigation against the Anjo Targets would increase.

98.     On Thursday, May 23, 2024, counsel for the DOL repeated that the AO Request needed to be withdrawn and this suit needed to be dismissed as part of a settlement with the Anjo Targets. Counsel for the DOL stated that either both matters were settled together, or neither matter would be settled.

---

[1] Although Federal Rule of Evidence 408 says that evidence of a statement made during compromise negotiations is "inadmissible … either to prove or disprove the validity or amount of a disputed claim or to impeach a prior inconsistent statement or a contradiction …", the Rule also states that a "court may admit this evidence for another purpose…" Purposes for which a statement has been found to be admissible include, as here, the improper use of settlement statements to harass or extort another person or entity. *See Block v. Washington State Bar Ass'n*, 860 F.App'x 508, 510 (9th Cir. 2021) ("Because the emails were offered to prove [Plaintiff's] pattern of harassment, they were not offered "to prove or disprove the validity or amount of a disputed claim or to impeach," as is required under the rule. Fed. R. Evid. 408(a)"); *Collier v. Town of Harvard*, No. Civ. A.95-11652, 1997 WL 33781338 at *3 n. 10 (D. Mass. March 28, 1997) ("The other purpose here, of course, is to show an extortionate scheme"). Since the statements made by the DOL are themselves the basis of this Supplemental Complaint, the grounds for their admissibility are even more compelling. *See Service Employees Int'l Union v. Local 1199,* 70 F.3d 647, 654, n. 7 (1st Cir.1995) (citing *Overseas Motors, Inc. v. Import Motors Ltd., Inc.,* 375 F.Supp. 499, 537 (E.D.Mich.1974) ("it would also seem reasonable to admit such evidence where the settlement negotiations are themselves ... operative facts"), *aff'd* 519 F.2d 119 (6th Cir.), *cert. denied,* 423 U.S. 987 (1975)).

99.    In an e-mail dated Monday, May 27, 2024, counsel for the DOL again tied the settlement with the Anjo Targets to the dismissal of this suit. (See Exhibit M, attached hereto).

100.    On Tuesday, May 28, 2024, counsel for DOL stated that if this suit were not dismissed, the DOL's monetary settlement demand as to the Anjo Targets would increase from $5.5 million inclusive of penalties back up to $15 million inclusive of penalties, the last demand from the DOL before it tied this suit to the settlement with the Anjo Targets.

101.    On Tuesday, June 11, 2024, counsel for the DOL, responded to an inquiry from counsel for the Anjo Targets whether the January 24, 2024 demand of $15 million was still on the table if this case was not dismissed. The e-mail responded: "Yes, that January 24 demand is still on the table… But we'd have to know relatively soon if your clients are interested in that offer, as we're planning on filing the complaint by the end of the week, and I can't promise what our client would be willing to do once we file." (See Exhibit N, attached hereto)

102.    Counsel for the Anjo Targets advised the DOL that even if, in order to avoid litigation and reputational damage, their clients were willing to accept such a large and disproportionate penalty, they would be unable to pay it immediately. The DOL refused to entertain a payment schedule that the Anjo Targets were capable of meeting.

103.    Plaintiffs did not agree to undo the findings of this Court by dismissing this lawsuit or withdrawing the AO Request. As a result, Defendants now demand payment of $15 million in a time frame which would likely bankrupt SAS and PIC to avoid a costly federal complaint against them in the U.S. District Court for the District of Puerto Rico.

104.    On Thursday, October 31, 2024, Defendants sent the Anjo Targets, through their legal counsel, an e-mail expressly referencing previous settlement negotiations tying this case to

the Anjo Investigation and other investigations. (See Exhibit O, attached hereto). The e-mail advised:

> "It appears we have reached an impasse. Accordingly, with the tolling period expiring on November 6, the Department will prepare to file suit before that date. Please advise as soon as possible if anything changes for your clients.  Otherwise, **please let us know if you will accept service of the complaint on behalf of your clients via email**. [emphasis in original]."

Previous e-mails had indicated any suit would be filed in the U.S. District Court for the District of Puerto Rico.

105.    On Nov. 5, 2024, Defendants carried through on their threats by filing suit ("*Puerto Rico Complaint*") against the Anjo Targets in the U.S. District Court for the District of Puerto Rico, styled as *Julie A. Su v. Suffolk Administrative Services, LLC; et al.*, Case 3:24-cv-01512. According to the Civil Cover Sheet accompanying the *Puerto Rico Complaint*, Defendants now seek $40,000,000 from the Anjo Targets.

## VI. PLAINTIFFS' PREDICAMENT

106.    As a result of imminent litigation with Defendants, SAS and PIC are considering terminating their relationships with the Partnership Plans to avoid bankruptcy. Both Plaintiffs and the Anjo Targets fear retaliatory action by Defendants and believe the Defendants' actions against them to be retaliatory in nature.

107.    Even if they do not terminate their relationships with the Partnership Plans, SAS and PIC face financial and reputational ruin if Defendants carry through on their threat of imminent litigation.

108.    Plaintiffs are not parties to the imminent litigation threatened by Defendants against the Anjo Targets, and cannot control or direct the prospective litigation defense.

109.    The choices presented to Plaintiffs by the threats by Defendants against SAS and PIC are two-fold.

110.    One choice is to await the Court's ruling on Plaintiff's *Motion for Summary Judgment* in this suit. A likely result of this choice is the end of the Partnership Plans irrespective of this Court's ruling, as the pressure being applied by Defendants against the Anjo Targets, the services of which are essential to the continued operation of the Partnership Plans, are likely to prove to be more than the Anjo Targets can bear. The immediate victims of this choice would be the 30,000 individuals covered by the Partnership Plans who would need to seek health insurance coverage elsewhere.

111.    The second choice is the withdrawal of the AO Request and the dismissal of this suit. The result of this choice would be to expose the plans to the jurisdiction of state insurance laws in each individual state, several of which have already demonstrated hostility toward Partnership Plans. This is the result Plaintiffs sought to avoid in making the AO Request and petitioning this Court for declaratory and injunctive relief.

### COUNT I: VIOLATION OF FIRST AMENDMENT RIGHTS (42 U.S.C. § 1983) AS TO AO REQUEST

112.    Plaintiffs incorporate and re-allege the allegations in paragraphs 1 to 111 as if fully set forth herein.

113.    The AO Request was a petition by Plaintiffs protected by the First Amendment of the Constitution regarding a matter of public concern, i.e., the applicability of ERISA to single employer employee welfare plans providing health coverage to more than 30,000 individuals.

114.    Defendants have intentionally undertaken the following actions to obstruct, chill, deter, and retaliate against Plaintiffs for submitting the AO Request, and/or to coerce Plaintiffs to withdraw the AO Request:

a.      Launching the Anjo Investigation as to the Anjo Targets, which Defendants knew, based upon the AO Request, provided services essential to the continued operation of the Partnership Plans;

b.      Making unsupported allegations of wrongdoing against the Anjo Targets, with inflated monetary demands, and refusing to consider or acknowledge evidence provided by the Anjo Targets which largely, if not entirely, refutes or mitigates said allegations and monetary demands;

c.      Making exorbitant unwarranted monetary demands on the Anjo Targets, under threat of litigation;

d.      Conditioning settlement on achievable terms with the Anjo Targets on the withdrawal of the AO Request by Plaintiffs;

e.      Conditioning settlement with the Anjo Targets, after Plaintiffs refused to withdraw the AO Request, on a public complaint which threatened to jeopardize their reputations in the employee benefits industry; and

f.      Threatening imminent litigation and now filing contemporaneous litigation against the Anjo Targets after Plaintiffs refused to withdraw the AO Request.

115.    Such actions have been undertaken by Defendants with full knowledge as to their potential devastating impact on the Partnership Plans.

116.    Defendants' unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

117.    As a proximate result of the conduct of Defendants as alleged under this Count, Plaintiffs have engaged legal counsel to prepare and prosecute this Supplemental Complaint. Accordingly, Plaintiffs have incurred substantial attorney's fees and costs.

118.    Plaintiffs currently are seeking that this Court reinstate the injunction vacated by the Fifth Circuit enjoining the Defendants "from refusing to acknowledge the ERISA-status of the [DMP] Plan or refusing to recognize the Limited Partners as working owners of DMP."

119.    As a direct and result of Defendants' unlawful conduct as alleged under this Count, the DMP Plan and the other Partnership Plans now face imminent, irrevocable, and irreparable harm which includes (a) the end of the DMP Plan and Partnership Plans and the termination of health insurance for more than 30,000 individual participants; or (b) vulnerability of the DMP Plan and Partnership Plans to regulation under state law rather than ERISA. Accordingly, in addition to the permanent injunction currently sought in this suit, Plaintiffs also seek and are entitled to a permanent injunction enjoining Defendants from engaging in any conduct against Plaintiffs or third parties which is intended to circumvent, moot or otherwise thwart the injunction or its issuance by this Court.

## COUNT II: VIOLATION OF FIRST AMENDMENT
## RIGHTS (42 U.S.C. § 1983) AS TO THIS SUIT

120.    Plaintiffs incorporate and re-allege the allegations in paragraphs 1 to 119 as if fully set forth herein.

121.    The *First Amended Complaint,* filed herein on Feb. 3, 2020, was a petition protected by the First Amendment of the Constitution regarding a matter of public concern, i.e., the applicability of ERISA to single employer employee welfare plans providing health coverage to more than 30,000 individuals.

122.    Defendants have intentionally undertaken the following actions to obstruct, chill, deter, and retaliate against Plaintiffs for filing the *First Amended Complaint*, and/or to coerce Plaintiffs to dismiss this suit:

   a.    Making exorbitant unwarranted monetary demands on the Anjo Targets, under threat of litigation;

   b.    Making unsupported allegations of wrongdoing against the Anjo Targets, with inflated monetary demands, and refusing to consider or acknowledge evidence provided by the Anjo Targets which largely, if not entirely, refutes or mitigates said allegations and monetary demands;

   c.    Conditioning settlement on achievable terms with the Anjo Targets on the dismissal of this suit by Plaintiffs;

   d.    Conditioning settlement with the Anjo Targets, after Plaintiffs refused to dismiss this suit, on a public complaint which threatened to jeopardize their reputations in the employee benefits industry; and

   e.    Threatening imminent litigation and now filing contemporaneous litigation against the Anjo Targets because Plaintiffs refused to dismiss this suit.

123.    Such actions have been undertaken by Defendants with full knowledge as to their potential devastating impact on the Partnership Plans.

124.    Defendants' unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

125.    As a direct result of the conduct of Defendants as alleged under this Count, Plaintiffs have engaged legal counsel to prepare and prosecute this Supplemental Complaint. Accordingly, Plaintiffs have incurred substantial attorney's fees and costs.

126.    Plaintiffs currently are seeking that this Court reinstate the injunction vacated by the Fifth Circuit enjoining the Defendants "from refusing to acknowledge the ERISA-status of the [DMP] Plan or refusing to recognize the Limited Partners as working owners of DMP."

127.    As a direct and result of Defendants' unlawful conduct as alleged under this Count, the DMP Plan and other Partnership Plans now face imminent, irrevocable, and irreparable harm which includes (a) the end of the DMP Plan and the Partnership Plans and the termination of health coverage for more than 30,000 individual participants or (b) vulnerability of the DMP Plan and Partnership Plans to regulation under state law rather than ERISA. Accordingly, in addition to the permanent injunction sought by the *First Amended Complaint*, Plaintiffs also seek and are entitled to a permanent injunction enjoining Defendants from engaging in any conduct against Plaintiffs or third parties which is intended to circumvent, moot or otherwise thwart the injunction or its issuance by the Court.

## COUNT III: CIRCUMVENTION OF COURT'S AUTHORITY

128.    Plaintiffs incorporate and re-allege the allegations in paragraphs 1 to 127 as if fully set forth herein.

129.    In the *First Amended Complaint*, Plaintiffs seek injunctive relief to protect the Partnership Plans under ERISA.

130.    Defendants have intentionally undertaken the following actions to moot the injunctive relief sought by Plaintiffs in this action thereby circumventing this Court's authority to provide such relief:

a.    Making exorbitant unwarranted monetary demands on The Anjo Targets, under threat of litigation;

b.    Making unsupported allegations of wrongdoing against the Anjo Targets, with inflated monetary demands, and refusing to consider or acknowledge

evidence provided by the Anjo Targets which largely, if not entirely, refutes or mitigates said allegations and monetary demands;

c.     Conditioning settlement on achievable terms with the Anjo Targets on the dismissal of this suit;

d.     Conditioning settlement with the Anjo Targets, after Plaintiffs refused to dismiss this suit, on a public complaint which threatened to jeopardize their reputations in the employee benefits industry; and

e.     Threatening imminent litigation and now filing contemporaneous litigation against the Anjo Targets because Plaintiffs refused to dismiss this suit.

131.    Such actions have been undertaken by Defendants with full knowledge as to their potential devastating impact on the Partnership Plans.

132.    Defendants' unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

133.    As a proximate result of the conduct of Defendants as alleged under this Count, Plaintiffs have engaged legal counsel to prepare and prosecute this Supplemental Complaint. Accordingly, Plaintiffs have incurred substantial attorney's fees and costs.

134.    Plaintiffs currently are seeking that this Court reinstate the injunction vacated by the Fifth Circuit enjoining the Defendants "from refusing to acknowledge the ERISA-status of the [DMP] Plan or refusing to recognize the Limited Partners as working owners of DMP."

135.    As a direct result of Defendants' defiance of this Court's authority as alleged under this Count, the DMP Plan and other Partnership Plans now face imminent, irrevocable, and irreparable harm which includes (a) the end of the DMP Plan and the Partnership Plans and the termination of health coverage for more than 30,000 individual participants or (b) vulnerability of

the DMP Plan and Partnership Plans to regulation under state law rather than ERISA. Accordingly, in addition to the permanent injunction sought by the *First Amended Complaint*, Plaintiffs also seek and are entitled to a permanent injunction enjoining Defendants from engaging in any conduct against Plaintiffs or third parties which is intended to circumvent, moot or otherwise thwart the injunction or its issuance by the Court.

## COUNT IV: VIOLATION OF APA

136.    Plaintiffs incorporate and re-allege the allegations in paragraphs 1 to 135 as if fully set forth herein.

137.    Plaintiffs are suffering legal harm because of Defendants' threats of imminent litigation against the Anjo Targets and are otherwise adversely affected or aggrieved by such action, within the meaning of 5 U.S.C. § 702.

138.    Under 5 U.S.C. § 706(2)(A) this Court has jurisdiction "[t]o the extent necessary to decision and when presented to … hold unlawful and set aside agency action, findings and conclusions to be (A) arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law."

139.    Under 5 U.S.C. § 706(2)(B) this Court has jurisdiction "[t]o the extent necessary to decision and when presented to … hold unlawful and set aside agency action, findings and conclusions to be (B) contrary to constitutional right, power, privilege, or immunity."

140.    Under 5 U.S.C. § 706(2)(C) this Court has jurisdiction "[t]o the extent necessary to decision and when presented to … hold unlawful and set aside agency action, findings and conclusions to be (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

141.    Under 5 U.S.C. § 706(2)(D) this Court has jurisdiction "[t]o the extent necessary to decision and when presented to … hold unlawful and set aside agency action, findings and conclusions to be (D) without observance of procedure required by law."

142.     It is a clear abuse of power for Defendants, in violation of 5 U.S.C. § 706(2)(A), to sue or threaten imminent litigation against the Anjo Targets, not on the basis of their own actions or inactions, or any losses to the plans which they service, but rather to obstruct, chill, deter, and retaliate against Plaintiffs for (a) creating the DMP Plan and the Partnership Plans; (b) sending an AO Request to Defendants; and (c) filing this suit against Defendants.

143.    It is likewise a clear abuse of power for Defendants, in violation of 5 U.S.C. § 706(2)(B), to sue or threaten imminent litigation against the Anjo Targets, not on the basis of their own actions or inactions, or any losses to the plans which they service, but rather to obstruct, chill, deter, and retaliate against Plaintiffs for (a) creating the DMP Plan and the Partnership Plans; (b) sending an AO Request to Defendants; and (c) filing this suit against Defendants.

144.    It is also in clear excess of the authority of Defendants, in violation of 5 U.S.C. § 706(2)(C), for them to sue or threaten imminent litigation against the Anjo Targets, not on the basis of their own actions or inactions, or any losses to the plans which they service, but rather to obstruct, chill, deter, and retaliate against Plaintiffs for (a) creating the DMP Plan and the Partnership Plans; (b) sending an AO Request to Defendants; and (c) filing this suit against Defendants.

145.    Plaintiffs currently are seeking that this Court reinstate the injunction vacated by the Fifth Circuit enjoining the Defendants "from refusing to acknowledge the ERISA-status of the [DMP] Plan or refusing to recognize the Limited Partners as working owners of DMP."

146.     As a direct result of Defendants' unlawful conduct as alleged under this Count, the DMP Plan and other Partnership Plans now face imminent, irrevocable, and irreparable harm which includes (a) the end of the DMP Plan and the Partnership Plans and the termination of health coverage for more than 30,000 individual participants or (b) vulnerability of the DMP Plan and Partnership Plans to regulation under state law rather than ERISA. Accordingly, in addition to the permanent injunction sought by the *First Amended Complaint*, Plaintiffs also seek and are entitled to a permanent injunction enjoining Defendants from engaging in any conduct against Plaintiffs or third parties which is intended to circumvent, moot or otherwise thwart the injunction or its issuance by the Court.

## ATTORNEY'S FEES

147.     Plaintiffs hereby incorporate and re-allege the allegations in paragraphs 1 to 146 as if fully set forth herein.

148.     By reason of the foregoing, Plaintiffs are entitled to recover reasonable and necessary attorney's fees and expenses from Defendants pursuant to 42 U.S.C. § 1988 and the inherent power of this Court to issue attorney's fees as sanctions.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs demand judgment against Defendants and in favor of Plaintiffs as follows:

A.     That this Court declare the conduct of Defendants violated and continues to violate the First Amendment, as enforced by 42 U.S.C. § 1983.

B.     That this Court declare the conduct of Defendants violated and continues to violate the integrity of this suit.

C.    That this Court issue a permanent injunction enjoining Defendants engaging in any conduct against Plaintiffs or third parties which is intended to circumvent, moot or otherwise thwart the injunction sought by the *First Amended Complaint*.

D.    Award Plaintiffs their reasonable attorneys' fees, costs, and expenses associated with this action pursuant to 42 U.S.C. § 1988 and the inherent power of this Court to issue attorney's fees as sanctions.

E.    Award Plaintiffs such other and further relief as this Court deems necessary and proper.

Respectfully submitted this 25th day of November 2024.

/s/ Jonathan D. Crumly, Sr.
Jonathan D. Crumly, Sr.
*Pro Hac Vice*
**Freeman Mathis & Gary, LLP**
100 Galleria Parkway, Suite 1600
Atlanta, GA 30339
Tel: 770.8180000
Fax: 770.937.9960
Email: Jonathan.Crumly@fmglaw.com

Robert G. Chadwick, Jr.
Texas Bar No. 04056075
**Freeman Mathis & Gary, LLP**
7160 Dallas Parkway, Suite 625
Plano, Texas 75024
Tel: 469.895.3003
Fax: 888.356.3602
Email: bob.chadwick@fmglaw.com

Michael L Jones
Texas Bar No. 10929460
**Law Office of Michael Jones**
16901 Dallas Parkway, Suite 202
Addison, TX 75001
Tel: 214-954-9700
Email: mjones@henryandjones.com

**Attorneys For Plaintiffs**

**CERTIFICATE OF SERVICE**

On November 25, 2024, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I certify that I have served the parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Robert G. Chadwick, Jr.
Robert G. Chadwick, Jr.



*The Law Office of Alexander Renfro*

November 8, 2018

***Submitted Electronically via email***

Joseph Canary
Director, Office of Regulations and Interpretations
U.S. Department of Labor
Employee Benefits Security Administration
Office of Regulations and Interpretations
200 Constitution Avenue, NW
Suite N-5655
Washington, DC 20210

      RE:    <u>Request for Advisory Opinion Concerning a Limited Partnership and Its Sponsorship of</u>
               <u>a Single-Employer Self-Insured Group Health Plan</u>

Dear Director Canary:

      The Law Office of Alexander Renfro ("Renfro") makes this request for consideration and possible issuance of an Advisory Opinion on behalf of our client, LP Management Services, LLC, a Georgia Limited Liability Company ("LPMS"). The primary business purpose of LPMS is to serve as General Partner of various Limited Partnerships and manage the day-to-day affairs of these Partnerships. At least one of these Limited Partnerships (the "LP") desires to sponsor an "employee welfare benefit plan" as defined under section 3(1) of the Employee Retirement Income Security Act ("ERISA"). The plan will be organized as a single-employer self-insured group health plan that will provide major medical health benefits to LP's eligible employees, along with LP's limited partners. On behalf of LP, Renfro hereby seeks confirmation from the Department of Labor, Employee Benefits Security Administration (the "Department") that:

     (1) The single-employer self-insured group health plan sponsored by LP is an "employee welfare benefit plan" within the meaning of ERISA section 3(1).

     (2) The limited partners participating in LP's single-employer self-insured group health plan are "participants" within the meaning of ERISA section 3(7).

     (3) The single-employer self-insured group health plan sponsored by LP is governed by Title I of ERISA.

3200 West End Avenue, Suite 500
Nashville, TN 37204
214-734-3330
alexander.renfro@gmail.com

## I.    <u>Background</u>

### A.  Statement of Facts Concerning Corporate Structure of LP

LP is a Limited Partnership duly registered and formed in the State of Georgia. LP's Partnership Agreement appoints LPMS as General Partner and delegates day-to-day business management decisions to LPMS, including but not limited to the execution of rental agreements, employment contracts, distribution of revenue producing agreements, and grantor decisions to form a group health plan. LP's Limited Partners ("LPartners") are individuals who have obtained a Limited Partnership Interest ("LPI") through the execution of a joinder agreement with LP. LPMS, as General Partner, correspondingly counter-executes such agreements, files a resolution on the addition of a new LPartner, and updates LP's partnership information to include the addition of a new LPartner. LPartners participate in global management issues through periodic votes of all Partners, as well as contribute time and service to revenue-generating activities of LP. Together, LPMS, as General Partner, and LPartners wholly control and operate LP.

LP's primary business purpose and main source of revenue is the capture, segregation, aggregation, and sale to third-party marketing firms of electronic data generated by LPartners who share such data with LP. Participating LPartners install specific software which, among other things, tracks the capture of such data by other companies, such as Google or Facebook, and provides access of such data to LP. LP then decides how such data is used and sold to third-party marketing firms, generating revenue. LPartners control and manage the capture, segregation, aggregation, and sale of their own data, empowering LPartners in a manner not otherwise available to them when they utilize services over the Internet through their computers, phones, televisions, and other devices.

As discussed above, LPartners all gain status as a limited partner in LP by executing a joinder agreement, establishing each LPartner's rights. These rights are subsequently exercised on a regular basis through votes on how aggregated data will be sold or used by LP as well as votes on other partnership matters. Finally, through the sharing of data, LPartners are committing time and service to revenue-generating activity on behalf of LP.

LP also employs at least one common law employee to assist the partnership with administrative and/or revenue generating services.

### B.  Statement of Facts Concerning LP's Single-Employer Self-Insured Group Health Plan

In an effort to attract, retain, and motivate talent in service of LP's primary business purpose, LP will establish a single-employer self-insured group health plan (the "Plan"). Since this Plan is formed and sponsored only by LP – and not in concert with any other employer – the Plan is a single-employer self-insured group health plan. LPMS, as the General Partner, serves as the Named Fiduciary and Plan Administrator of the Plan.

3200 West End Avenue, Suite 500
Nashville, TN 37204
214-734-3330
alexander.renfro@gmail.com

The Plan has a number of third-party vendors which LPMS engages on behalf of LP to administer the Plan.  First, LPMS hires a consulting and benefits design firm for guidance and assistance with fulfilling plan requirements pursuant to the ERISA and related statutes.  Second, LPMS appoints a licensed and bonded Third Party Administrator ("TPA") to collect funds and allocate funds, adjudicate claims, manage claims' appeals, execute the payment of claims for benefits under the Plan, and perform other traditional services performed by a TPA.  Third, LPMS appoints a benefits administrator to assist its staff in managing eligibility data and plan participant customer service issues on an ongoing basis.  Fourth, LPMS creates a Trust to hold any plan assets related to the Plan.  Finally, LPMS obtains a reinsurance policy for the Plan. This reinsurance policy is of a comprehensive and specific nature, as described more fully below.

The terms of the Plan are outlined in a Plan Document.  This Plan Document contains information on the benefits provided by the Plan to Plan participants, eligibility information, instructions on claims for benefits, claims appeals information, coordination of benefits provisions, disclaimers concerning certain federal statutes, and other information.  With respect to eligibility, the Plan Document notes that both employees and partners are eligible to participate in the Plan.  As discussed above, at least one common law employee participates in the Plan, as well as a number of LPartners, although not all LPartners participate in the Plan.  LP will pay 100% of the premiums for coverage under the Plan for LP's employees.  LPartners will be 100% responsible for paying their own premiums for coverage under the Plan.  According to the enrollment procedures as outlined in the Plan Document, annual Open Enrollment periods, as well as Special Enrollment periods as required by law, are utilized to permit eligible plan participants to join the Plan.

The aforementioned third-party vendors service the Plan as their delegated duties require. For example, the TPA collects monthly premium payments from the Plan's participants.  The TPA allocates these funds appropriately, routing plan assets to the Trust (which is solely controlled by a Directed Trustee), paying vendors their fees, and ensuring premium payments are timely made to the reinsurance carrier underwriting the Plan's reinsurance policy.  The TPA withholds a certain amount of premium due to the reinsurance carrier covering the Plan in order to expedite payment of claims for benefits.  With respect to paying claims for benefits, in cases where the TPA has received and approved a claim, the TPA will access the plan assets held in Trust to pay said claim.  Should a claim require a payment in excess of the funds available to the TPA on an immediate basis, the TPA coordinates with the reinsurance carrier covering the Plan for transmission of additional funds to the TPA's claims-paying account.  Once received, the TPA will continue paying claims.

## C. Additional Plan Features

LP is sensitive to prospective concerns with respect to the solvency of its Plan as well as the need for credibility of its Named Fiduciary.  To that end, LP has obtained comprehensive and extremely well-funded layers of reinsurance policies, and LPMS – as General Partner and Named Fiduciary – has obtained a fiduciary liability policy.

With respect to the primary reinsurance policy covering the Plan, coverage is obtained from first-dollar and to an unlimited degree per the terms of the reinsurance policy. This policy is supported by multiple layers of retrocessionary coverage without a risk corridor by retrocessionaires with an excess of $7,000,000,000 in assets to cover risk with respect to the Plan. LPMS requires the following features of any policy it obtains to cover the Plan now or in the future:

Any group health plan sponsored by LP, or by any other entity managed by LPMS and which offers ERISA plan participation to its eligible plan participants, including certain employees and partners, must first obtain Qualifying Reinsurance Coverage. "Qualifying Reinsurance Coverage" means excess/stop loss insurance, indemnity insurance for a self-insured plan or employee benefit trust, insurance for a self-insured plan or trust, or reinsurance coverage purchased from an excess/stop loss, indemnity, insurance, or reinsurance carrier that meets the following requirements:

- The carrier providing Qualifying Reinsurance Coverage must provide the following information to LPMS:

  o The name, address, and phone number of the carrier;
  o Statement(s) certifying compliance with all requirements described in below;
  o A statement of compliance with the reserve requirements described below;
  o A notification of any material changes to the Qualifying Reinsurance Coverage.

- The Qualifying Reinsurance Coverage:

  o May only be issued by a carrier which establishes and maintains retrocessionary coverage from one or more (re)insurer(s) with at least $100,000,000 in aggregate equity for any claims which the plan is unable to satisfy by reason of a solvency event affecting said carrier's ability to pay claims, to an unlimited degree;
  o Must note on any contract for coverage a definite starting or attachment point of such coverage which is conspicuous and clear to the plan member(s) prior to purchase of such coverage, and qualifying (re)insurance coverage issued on a non-stop loss (re)insurance basis must have a first-dollar starting point;
  o Must note on any contract for coverage an unlimited liability of the carrier issuing such coverage for benefits covered by such coverage which is conspicuous and clear to the plan member(s) prior to purchase of such coverage;
  o Must have been approved by one or more regulatory body or bodies duly authorized to license and regulate the business of insurance within the

4

United States and/or a member of the National Association of Insurance Commissioners, for a minimum of twenty-four months, and been issued to at least one insured party for the direct and/or indirect coverage of health and/or medical benefits, and in force throughout said period;

o   May only be issued by a carrier which establishes and maintains reserves with respect to covered benefits, in an amount recommended (or the mid-point of multiple recommendations) by an actuary certified by the American Academy of Actuaries, consisting of reserves sufficient for:

  - Unearned contributions;
  - Benefit liabilities which have been incurred, which have not been satisfied, and for which risk of loss has not yet been transferred, and for expected administrative costs with respect to such benefit liabilities;
  - Any other obligations of the plan; and
  - A margin of error and other fluctuations, taking into account the specific circumstances of the plan.

o   May only be issued by a carrier which establishes and maintains additional reserves of at least $500,000 above the reserves noted above.

- Carriers issuing Qualifying Reinsurance Coverage may demonstrate compliance with the reserve requirements described above with alternative reserves in the form of a contract of indemnification, lien, bonding, (re)insurance, letter of credit, or security.

- Any business of insurance, including but not limited to the obtaining of Qualified Reinsurance Coverage, conducted in any State must comply with the insurance laws of said State, and obtain all required State approvals.

3200 West End Avenue, Suite 500
Nashville, TN 37204
214-734-3330
alexander.renfro@gmail.com

## II.    <u>Law and Analysis</u>

### A.  Treatment of a Partner Under ERISA

ERISA provides specific rules and regulations applicable to (1) an "employee welfare benefit plan," (2) "employees," and (3) "participants" that may participate an "employee welfare benefit plan."

An "employee welfare benefit plan" is defined as:[1]

 "any plan, fund, or program…established or maintained by an employer…for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, medical, surgical, or hospital care or benefits…"

An "employee" is defined as:[2]

"an individual employed by an employer."

A "participant" is defined as:[3]

"any employee or former employee of an employer…who is or may become eligible to receive a benefit…from an employee benefit plan which covers employees of such employer."

On its face and without further context provided elsewhere in ERISA, it appears that a partner in a partnership is not an "employee" within the meaning of ERISA section 3(6).  Relying on the common law definition of an "employee," a partner also would not be considered an employee.[4]  If a partner is not considered an "employee" for ERISA purposes, a partner cannot be considered a "participant" in an ERISA-covered "employee welfare benefit plan."

DOL Reg. section 2510.3-3(b) confirms that, for limited purposes, a partner is not considered an "employee" for purposes of determining the existence of an "employee benefit plan," which includes an "employee welfare benefit plan."  DOL Reg. section 2510.3-3(b) further explains that a "plan without employees" is excluded from the requirements under Title I of ERISA (i.e., a plan covering partners is not considered an ERISA-covered plan).

---

[1] Section 3(1) of the Employee Income Retirement Security Act ("ERISA").

[2] ERISA section 3(6).

[3] ERISA section 3(7).

[4] In accordance with the Supreme Court's ruling in *Nationwide Mutual Insurance Company v. Darden,* the Department has found that the common law standard for determining employee status is whether someone is hired by an employer, with the employer having the "right to control and direct" the individual's work. [*See* DOL Information Letter (May 8, 2006); DOL Advisory Opinion 95-29A (Dec. 7, 1995); DOL Advisory Opinion 95-22A (Aug. 25, 1995)].

3200 West End Avenue, Suite 500
Nashville, TN 37204
214-734-3330
alexander.renfro@gmail.com

**B. A Partner May Be a "Participant" In an ERISA-Covered Single-Employer Plan Alongside At Least One Common Law Employee**

The Department, however, has concluded that if a partner participates in an employee benefit plan along with at least one common law employee, DOL Reg. section 2510.3-3 does *not* exclude this plan from being covered by Title I of ERISA.[5]  Specifically, the Department has found that a plan covering partners (who are considered "working owners") as well as their non-owner employees clearly falls within ERISA's scope.[6]  The Department explained that "[t]he definition of 'plans without employees' in DOL Reg. section 2510.3-3(b) simply defines a limited circumstance in which the only parties participating in a benefit arrangement are an individual owner/partner…and declines to deem the individual[], in that limited circumstance, as [an] employee[]…for purpose of the regulation."[7]  The Department explains further that DOL Reg. section 2510.3-3(b) "does not apply, however, outside that limited context and, accordingly, does not prevent sole proprietors or other working owners – [including partners] – from being participants in broader benefit plan arrangements…"[8]

The conclusion that partners can participate in an ERISA-covered plan so long as the plan also covers at least one common law employee is consistent with the finding of the courts.  For example, the Supreme Court in *Yates v. Hendon*[9] found that a plan covering both a "working owner" – including a partner in a partnership – and at least one common law employee is governed by ERISA.[10]  In other words, in cases where a benefit plan covers both partners and common law employees, the plan will be covered by Title I of ERISA.[11]

The Fifth Circuit Court of Appeals, in *House v. American United Life Insurance Company*, also concluded that ERISA applies to a benefit arrangement that provided coverage to a firm's partners that also covered the firm's common law employees without reliance on whether said partner was a "working owner."[12]  In *House*, a partnership established a plan that provided disability benefits to both employees of the partnership, as well as the partners.  The partnership – as the employer of the employees – paid 100% of the premiums for the disability coverage for its employees and automatically enrolled them in the plan.  The partners, on the other hand, were responsible for 100% of their own premium payments.  The Circuit Court found that despite the differences in the manner in

---

[5] 83 Fed. Reg. 614, 621 (Jan. 5, 2018).

[6] *Id.*

[7] *Id.*; *see also*, 83 Fed. Reg. 28912, 28930 (June 21, 2018).

[8] *Id.*

[9] 41 U.S. 1 (2004).

[10] *Id.* at 9.

[11] *Id.*

[12] 499 F.3d 443 (5ᵗʰ Cir. 2007).

3200 West End Avenue, Suite 500
Nashville, TN 37204
214-734-3330
alexander.renfro@gmail.com

which premiums were paid, the partnership established a comprehensive employee welfare benefit plan covering both partners and employees, thus creating a single-employer ERISA-covered plan.[13]

In our opinion, *House* is instructive because of its similarities to our facts described in Section I.B. above, where LPartners will be required to pay their own premiums for the self-insured group health plan coverage sponsored by LP, while LP will pay 100% of the premiums for eligible employees, who are automatically enrolled in the plan. Based on the conclusion in *House*, the Supreme Court in *Yates*, and the Department's interpretations as set forth in proposed and final regulations, it is clear that LPartners may permissibly be considered "participants" in an ERISA-covered plan so long as at least one common law employee participates in the plan.

It is also clear that the single-employer self-insured group health plan sponsored by LP – acting in the capacity of an employer – to provide medical health benefits to LP's common law employees and limited partners is an "employee welfare benefit plan" within the meaning of ERISA section 3(1). As a result, because both LP's employees and LPartners may permissibly participate in this single-employer ERISA-covered "employee welfare benefit plan," the plan would be governed by Title I of ERISA.

### C. A Partner Has Dual Status as an "Employer" and "Employee" and Thus May Be Considered a "Participant" In an ERISA-Covered Plan

In line with the reasoning discussed above, the Department has concluded that a partner may have dual status as an "employer" and an "employee," and thus, permissibly be considered a "participant" in an ERISA-covered plan.[14] Specifically, the Department opined that ERISA section 401(a)(2), ERISA section 403(b)(3)(A), ERISA section 408, ERISA section 4001(b)(1), ERISA section 4021(b)(9), and ERISA section 4022(b)(5)(A) all serve as indications that "working owners" – including partners – may be considered "participants" for purposes of ERISA coverage.[15] The Department has found that there is a clear Congressional design to include "working owners" – including partners – within the definition of "participant" for purposes of Title I of ERISA.[16]

Based on the foregoing, it is clear that LPartners may permissibly be considered "participants" in LP's single-employer self-insured group plan. In addition, because the Plan is considered an "employee welfare benefit plan" within ERISA section 3(1), the Plan would be governed by Title I of ERISA.

### D. For Purposes of ERISA, a Partner Should Be Defined as an Individual Who Commits Time to and Performs Services on Behalf of the Partnership

---

[13] *Id.* at 451-452.

[14] DOL Adv. Op. 99-04A (Feb. 4, 1999).

[15] *Id.*; *see also*, 83 Fed. Reg. at 621 (Jan. 5, 2018) and 83 Fed. Reg. at 28930 (June 21, 2018).

[16] *Id.*

3200 West End Avenue, Suite 500
Nashville, TN 37204
214-734-3330
alexander.renfro@gmail.com

The fact that a partner is considered a "working owner" must not be confused with the definition of a "working owner" under the Department's final association health plan (AHP) regulations.[17]  Under the final AHP regulations, a "working owner" – which in the case of the final AHP regulations is a self-employed individual with no employees – means an individual who (1) has an ownership right in a "trade or business," regardless of whether the "trade or business" is incorporated or unincorporated, (2) earns wages or self-employment income from the "trade or business," and (3) works at least 20 hours a week (or 80 hours per month) providing personal services to the "trade or business" *or* earns income from the "trade or business" that at least equals the "working owner's" cost of the health coverage.[18]

As discussed above, the Department and the Supreme Court have concluded that a "working owner" may also include a partner in a partnership.  Although the term "partner" is not specifically defined in ERISA, ERISA section 732(d) contemplates a partner participating in a group health plan. Section 732(d) is relevant in cases where partners are the *only* participants in a group health plan, which would cause the plan to fall outside of Title I of ERISA (as required under DOL Reg. section 2510.3-3(b)).  However, ERISA section 732(d) is also guiding on how a partner should be defined for purposes of participating in a group health plan, regardless of whether the plan is governed by Title I of ERISA or not.  Stated differently, ERISA section 732(d)'s reference to and description of a partner serves to define a partner participating in a "plan without employees," as well as a partner who may permissibly participate in an ERISA-covered plan alongside at least one common law employee.

The regulations implementing ERISA 732(d) provide that for purposes of treating a partner as an "employee" – and thus a "participant" in a group health plan subject to the requirements under Part 7 of ERISA – the "the term employee includes any bona fide partner."[19]  The implementing regulations go on to state that "whether or not an individual is a bona fide partner is determined based on all the relevant facts and circumstances, including whether the individual *performs services on behalf of the partnership*."[20]

Although a "bona fide partner" is not further defined in ERISA or its implementing regulations, the term "bona fide partner" can be found elsewhere in federal law, specifically in guidance from the Internal Revenue Service ("IRS").[21]  According to the IRS, a bona fide partner is an individual with rights in a partnership, who exercises said rights, and who *commits time and service to the partnership*.[22]  The consistency between the IRS's definition of a bona fide partner and the manner in

---

[17] *See* 83 Fed. Reg. 28912 et. seq. (June 21, 2018).

[18] DOL Reg. section 2510.3-5(e)(2).

[19] DOL Reg. section 2590.732(d)(2).

[20] *Id.*

[21] *See* Rev. Rul. 69-184.

[22] *Id.*

9

3200 West End Avenue, Suite 500
Nashville, TN 37204
214-734-3330
alexander.renfro@gmail.com

which the Department described a bona fide partner in ERISA section 732(d) implementing regulations supports the interpretation that for purposes of ERISA, a partner should be defined as "an individual who commits time to and performs services on behalf of the partnership."

In our opinion, LPartners satisfy the definition of a "bona fide partner." LPartners have actual rights in LP as dictated in both LP's Partnership Agreement and the joinder to said agreement signed by each LPartner. LPartners regularly exercise these rights in periodic votes on partnership business. Finally, LPartners contribute time and energy to LP by sharing data and assisting in LP's primary business purpose and revenue generation activity. The time and services contributed by LPartners comprise the sole means of revenue generation of LP. In other words, without this activity, LP would not earn revenue or survive as an entity. By these acts, LPartners meet both the IRS's and the Department's standards to qualify as bona fide partners.

## III.    **Request for Determination**

Based on the foregoing, Renfro respectfully asks that the Department to confirm that:

(1) The single-employer self-insured group health plan sponsored by LP is an "employee welfare benefit plan" within the meaning of ERISA section 3(1).

(2) LPartners participating in LP's single-employer self-insured group health plan are "participants" within the meaning of ERISA section 3(7).

(3) The single-employer self-insured group health plan sponsored by LP is governed by Title I of ERISA.

Thank you in advance for considering this request. Please do not hesitate to contact me with any questions, or with any request for additional information.

Respectfully submitted,

*Alexander Renfro*

ALEXANDER T. RENFRO, JD, LLM

3200 West End Avenue, Suite 500
Nashville, TN 37204
214-734-3330
alexander.renfro@gmail.com

EXHIBIT
B



**State of Louisiana**

DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 94005
BATON ROUGE
70804-9005

Jeff Landry
Attorney General

February 21, 2019

The Honorable Alexander Acosta
Secretary of Labor
200 Constitution Ave. NW
Washington, DC 20210
*executivesecretariat@dol.gov*

Dear Mr. Secretary:

We, the undersigned Attorneys General of Louisiana, Arkansas, Georgia, Indiana, Nebraska, S. Carolina, and Texas, have recently become aware of a request for an Advisory Opinion ("AO") made to the Department of Labor ("DOL") on behalf of LP Management Services, L.L.C.

We are interested in this request and encourage the DOL to respond as soon as possible. The AO sought by LP Management Services provides an alternative for expanded access to ERISA plans. We support the intent behind the request and find its legal arguments well-reasoned and thorough, but interpretation and enforcement of ERISA falls under the exclusive authority of the DOL Guidance from DOL would, nevertheless, provide much needed direction to states assessing applicability of their own insurance regulations in similar circumstances. States would retain meaningful regulatory oversight, because so long as the McCarran Ferguson Act of 1945 remains law, states will have primary authority over insurance business conducted within their borders. We do not seek or support repeal of McCarran Ferguson, inasmuch as ERISA-subject plans have worked well alongside it for more than forty years.

We have a strong interest in the DOL's response to the AO request for three principal reasons:

● More than fifteen million Americans who are self-employed or work for small businesses and earn too much to qualify for Patient Protection and Affordable Care Act ("ACA," or "Obamacare") subsidies are currently uninsured or under-insured due to the unavailability of affordable coverage. The considerable efforts by the Administration to bring relief to these people have thus far been of limited effect, primarily due to the actions of obstructionist states.

● An AO confirming the validity of the structure described in the request would add much-needed health coverage options for these hard-working Americans, and would not negatively impact anyone. No plan offered in reliance on the proposed AO could discriminate against people with pre-existing conditions or fail to offer dependent coverage through age 26. Although some (likely including the plaintiffs in the anti-AHP suit) will claim that anything which provides an alternative to ACA is a threat to those people who have benefitted from it, we strongly disagree. Younger, healthier people who pay for their own health coverage cannot be "lured away" from ACA because they have already left -- by the millions. And people whose combination of health and economic status make them ACA "winners" will continue to enjoy its protections and subsidies, unless and until Congress passes an alternative.

● Because the demand for affordable health coverage is so acute, many non-ACA "solutions" have already appeared in the nationwide marketplace. We put "solutions" in quotes, because we believe many of these alternatives are ill-conceived, underfunded, and in some cases constitute outright consumer fraud. The bulk of LP Management's AO request is not spent asking the DOL to relax its regulatory authority. To the contrary, asks the DOL to establish solvency and fiduciary requirements where none currently exist for ERISA-subject plans and makes specific recommendations for these protections. With such specific requirements in place, the DOL and state Departments of Insurance could focus their resources on needed enforcement actions against ill-funded plans and bad actors. Safe harbor guidelines for solvency and fiduciary requirements will also encourage more reputable and financially-stable companies to enter the expanded ERISA market - which will in turn increase competition and choice, and drive down costs.

We believe a timely and favorable response to the AO request could provide a valuable and much-needed alternative for those citizens adversely impacted by the ACA. While providing government-paid health care to certain citizens, Obamacare stripped away coverage from many millions of working Americans who formerly paid for their own health insurance but can no longer afford it due to ACA-driven premium increases in excess of 200%. We attach for your reference a recent opinion column written by former New York Lieutenant Governor Betsy McCaughey, which concisely articulates this dilemma as well as the hurdles faced by those of us who are trying to do something about it.

In the absence of legislative solutions to this crisis, various other measures have become necessary. Ours are among the twenty states that joined as plaintiffs in *Texas, et al. v. United States, et al.*, and we were very gratified by the recent ruling by District Judge Reed O'Connor in the Northern District of Texas finding that ACA is unconstitutional. It is our hope and expectation that this decision will be upheld. Congress will thus be compelled to find a solution which, while preserving some of the positive aspects of ACA (including protections for people with pre-existing

medical conditions), will once again allow self-employed middle-class Americans to access quality, affordable health coverage.

But Judge O'Connor's ruling has been appealed, and appeals take time. It could take years for the case to run its course. For this reasons and others, we find it unlikely that a constructive and successful ACA replacement process can take place in Congress sooner than 2021. We must therefore continue to search for interim solutions.

We strongly supported the October 2017 Presidential Executive Order Promoting Healthcare Choice and Competition Across the United States and the regulatory actions that followed. We were particularly encouraged by the DOL's Rule expanding access to Association Health Plans (AHPs) because ERISA-subject plans are proven solutions that have largely spared more than 160 million Americans from the negative impacts of ACA. But we were disappointed when twelve of our fellow Attorneys General sued the DOL seeking to block the AHP Rule, despite the great deference shown in it to the individual states as to how - and whether - they may allow AHP expansion in each of their jurisdictions. It is apparently not enough for these states to block AHP expansion within their own borders; they seek to prevent all other states, including ours, from accessing solutions to a problem that no one can deny exists.

Based upon the questions and comments from Judge Bates at the January 24 hearing, along with the determination of the plaintiffs to accept nothing less than complete rescission of AHP expansion, it appears likely that the DOL will be forced to continue defending the Rule for some time. Our states include those that filed an *amicus* brief in support of the DOL, and we will encourage additional Attorneys General to join us in subsequent actions.

Thank you for your consideration.

Respectfully yours,

Jeff Landry
Louisiana Attorney General

Chris Carr
Georgia Attorney General

Leslie Rutledge
Arkansas Attorney General

Curtis T. Hill, Jr.
Indiana Attorney General

Doug Peterson
Nebraska Attorney General

Ken Paxton
Texas Attorney General

Alan Wilson
South Carolina Attorney General


Attachments:
- LP Management Services LLC Advisory Opinion Request, 1/15/2019
- Betsy McCaughey, "Democrats Are Waging War Against Affordable Health Insurance," 12/18/2018 New York Post

*The Law Office of Alexander Renfro*

November 8, 2018
Revised as of January 15, 2019

***Submitted Electronically via email***

Joseph Canary
Director, Office of Regulations and Interpretations
U.S. Department of Labor
Employee Benefits Security Administration
Office of Regulations and Interpretations
200 Constitution Avenue, NW
Suite N-5655
Washington, DC 20210

> RE:    Request for Advisory Opinion Concerning a Limited Partnership and Its Sponsorship of
> a Single-Employer Self-Insured Group Health Plan

Dear Director Canary:

The Law Office of Alexander Renfro ("Renfro") makes this request for consideration and possible issuance of an Advisory Opinion on behalf of our client, LP Management Services, LLC, a Georgia Limited Liability Company ("LPMS"). The primary business purpose of LPMS is to serve as General Partner of various Limited Partnerships and manage the day-to-day affairs of these Partnerships. At least one of these Limited Partnerships (the "LP") desires to sponsor an "employee welfare benefit plan" as defined under section 3(1) of the Employee Retirement Income Security Act ("ERISA"). The plan will be organized as a single-employer self-insured group health plan that will provide major medical health benefits to LP's eligible employees, along with LP's limited partners. On behalf of LP, Renfro hereby seeks confirmation from the Department of Labor, Employee Benefits Security Administration (the "Department") that:

> (1) The single-employer self-insured group health plan sponsored by LP is an "employee welfare benefit plan" within the meaning of ERISA section 3(1).

> (2) The limited partners participating in LP's single-employer self-insured group health plan are "participants" within the meaning of ERISA section 3(7).

> (3) The single-employer self-insured group health plan sponsored by LP is governed by Title I of ERISA.

Renfro and LP recognize that any contemplated expansion of the traditional scope of ERISA, even if permissible under the existing statutes, may raise concerns at the Department as to the potential for plan failure(s), whether due to ill-conceived structure, inadequate (re)insurance reserves,

3200 West End Avenue, Suite 500
Nashville, TN 37204
214-734-3330
alexander.renfro@gmail.com

fraud, or some combination of these and other factors. We share these concerns, and LP has strong safeguards - which are described in detail below - in place to address each partnership plan vulnerability. LP anticipates that if the Department provides the confirmations requested above, it will do so in explicit consideration of all the specific facts and circumstances provided herein, and that neither LP nor any other ERISA plan sponsor will be able to rely upon a favorable Advisory Opinion unless all such safeguard standards are met or exceeded.

Further, while Renfro and LP have gone to considerable effort to foresee and guard against all possible causes of plan failure, we welcome input from the Department as to any additional areas of concern and solutions thereto. Such solutions could be incorporated into LP's manual of Standard Operating Procedures, as well into a further revision of this request (and any subsequent Advisory Opinion). Finally, we believe that while an Advisory Opinion is the appropriate first step toward defining allowable uses of partnerships as ERISA plan sponsors, it should perhaps be followed by informal Department guidance, and/or rulemaking in accordance with the Administrative Procedures Act, primarily in order to strengthen the enforceability of the safeguard requirements.


## I.    <u>Background</u>

### A. Statement of Facts Concerning Corporate Structure of LP

LP is a Limited Partnership duly registered and formed in the State of Georgia. LP's Partnership Agreement appoints LPMS as General Partner and delegates day-to-day business management decisions to LPMS, including but not limited to the execution of rental agreements, employment contracts, distribution of revenue producing agreements, and grantor decisions to form a group health plan. LP's Limited Partners ("LPartners") are individuals who have obtained a Limited Partnership Interest ("LPI") through the execution of a joinder agreement with LP. LPMS, as General Partner, correspondingly counter-executes such agreements, files a resolution on the addition of a new LPartner, and updates LP's partnership information to include the addition of a new LPartner. LPartners participate in global management issues through periodic votes of all Partners, as well as contribute time and service to revenue-generating activities of LP. Together, LPMS, as General Partner, and LPartners wholly control and operate LP.

LP's primary business purpose and main source of revenue is the capture, segregation, aggregation, and sale to third-party marketing firms of electronic data generated by LPartners who share such data with LP. Participating LPartners install specific software which, among other things, tracks the capture of such data by other companies, such as Google or Facebook, and provides access of such data to LP. LP then decides how such data is used and sold to third-party marketing firms, generating revenue. LPartners control and manage the capture, segregation, aggregation, and sale of

3200 West End Avenue, Suite 500
Nashville, TN 37204
214-734-3330
alexander.renfro@gmail.com

their own data, empowering LPartners in a manner not otherwise available to them when they utilize services over the Internet through their computers, phones, televisions, and other devices.

As discussed above, LPartners all gain status as a limited partner in LP by executing a joinder agreement, establishing each LPartner's rights. These rights are subsequently exercised on a regular basis through votes on how aggregated data will be sold or used by LP as well as votes on other partnership matters. Finally, through the sharing of data, LPartners are committing time and service to revenue-generating activity on behalf of LP.

LP also employs at least one common law employee to assist the partnership with administrative and/or revenue generating services.

**B. Statement of Facts Concerning LP's Single-Employer Self-Insured Group Health Plan**

In an effort to attract, retain, and motivate talent in service of LP's primary business purpose, LP will establish a single-employer self-insured group health plan (the "Plan"). Since this Plan is formed and sponsored only by LP – and not in concert with any other employer – the Plan is a single-employer self-insured group health plan. LPMS, as the General Partner, serves as the Named Fiduciary and Plan Administrator of the Plan.

The Plan has a number of third-party vendors which LPMS engages on behalf of LP to administer the Plan. First, LPMS hires a consulting and benefits design firm for guidance and assistance with fulfilling plan requirements pursuant to the ERISA and related statutes. Second, LPMS appoints a licensed and bonded Third Party Administrator ("TPA") to collect funds and allocate funds, adjudicate claims, manage claims' appeals, execute the payment of claims for benefits under the Plan, and perform other traditional services performed by a TPA. Third, LPMS appoints a benefits administrator to assist its staff in managing eligibility data and plan participant customer service issues on an ongoing basis. Fourth, LPMS creates a Trust to hold any plan assets related to the Plan. Finally, LPMS obtains a reinsurance policy for the Plan. This reinsurance policy is of a comprehensive and specific nature, as described more fully below.

The terms of the Plan are outlined in a Plan Document. This Plan Document contains information on the benefits provided by the Plan to Plan participants, eligibility information, instructions on claims for benefits, claims appeals information, coordination of benefits provisions, disclaimers concerning certain federal statutes, and other information. With respect to eligibility, the Plan Document notes that both employees and partners are eligible to participate in the Plan. As discussed above, at least one common law employee participates in the Plan, as well as a number of LPartners, although not all LPartners participate in the Plan. LP will pay 100% of the premiums for coverage under the Plan for LP's employees. LPartners will be 100% responsible for paying their own premiums for coverage under the Plan. According to the enrollment procedures as outlined in the Plan

3

Document, annual Open Enrollment periods, as well as Special Enrollment periods as required by law, are utilized to permit eligible plan participants to join the Plan.

The aforementioned third-party vendors service the Plan as their delegated duties require. For example, the TPA collects monthly premium payments from the Plan's participants. The TPA allocates these funds appropriately, routing plan assets to the Trust (which is solely controlled by a Directed Trustee), paying vendors their fees, and ensuring premium payments are timely made to the reinsurance carrier underwriting the Plan's reinsurance policy. The TPA withholds a certain amount of premium due to the reinsurance carrier covering the Plan in order to expedite payment of claims for benefits. With respect to paying claims for benefits, in cases where the TPA has received and approved a claim, the TPA will access the plan assets held in Trust to pay said claim. Should a claim require a payment in excess of the funds available to the TPA on an immediate basis, the TPA coordinates with the reinsurance carrier covering the Plan for transmission of additional funds to the TPA's claims-paying account. Once received, the TPA will continue paying claims.

### C. Additional Plan Features

LP is sensitive to prospective concerns with respect to the solvency of its Plan as well as the need for credibility of its Named Fiduciary. To that end, LP has obtained comprehensive and extremely well-funded layers of reinsurance policies, and LPMS – as General Partner and Named Fiduciary – has obtained a fiduciary liability policy.

With respect to the primary reinsurance policy covering the Plan, coverage is obtained from first-dollar and to an unlimited degree per the terms of the reinsurance policy. This policy is supported by multiple layers of retrocessionary coverage without a risk corridor by retrocessionaires with an excess of $7,000,000,000 in assets to cover risk with respect to the Plan. LPMS requires the following features of any policy it obtains to cover the Plan now or in the future:

> Any group health plan sponsored by LP, or by any other entity managed by LPMS and which offers ERISA plan participation to its eligible plan participants, including certain employees and partners, must first obtain Qualifying Reinsurance Coverage. "Qualifying Reinsurance Coverage" means excess/stop loss insurance, indemnity insurance for a self-insured plan or employee benefit trust, insurance for a self-insured plan or trust, or reinsurance coverage purchased from an excess/stop loss, indemnity, insurance, or reinsurance carrier that meets the following requirements:

> - The carrier providing Qualifying Reinsurance Coverage must provide the following information to LPMS:

>   - The name, address, and phone number of the carrier;

4

- o Statement(s) certifying compliance with all requirements described in below;
- o A statement of compliance with the reserve requirements described below;
- o A notification of any material changes to the Qualifying Reinsurance Coverage.

- The Qualifying Reinsurance Coverage:

  - o Must (re)insure, without limitation, all benefits covered by the Group Health Plan which it (re)insures. Plan and Reinsurance coverage must be identical as to benefits and limitations.
  - o May only be issued by a carrier which establishes and maintains retrocessionary coverage from one or more (re)insurer(s) with at least $100,000,000 in aggregate equity for any claims which the plan is unable to satisfy by reason of a solvency event affecting said carrier's ability to pay claims, to an unlimited degree;
  - o Must note on any contract for coverage a definite starting or attachment point of such coverage which is conspicuous and clear to the plan member(s) prior to purchase of such coverage, and qualifying (re)insurance coverage issued on a non-stop loss (re)insurance basis must have a first-dollar starting point;
  - o Must note on any contract for coverage an unlimited liability of the carrier issuing such coverage for benefits covered by such coverage which is conspicuous and clear to the plan member(s) prior to purchase of such coverage;
  - o Must have been approved by one or more regulatory body or bodies duly authorized to license and regulate the business of insurance within the United States and/or a member of the National Association of Insurance Commissioners, for a minimum of twenty-four months, and been issued to at least one insured party for the direct and/or indirect coverage of health and/or medical benefits, and in force throughout said period;
  - o May only be issued by a carrier which establishes and maintains reserves with respect to covered benefits, in an amount recommended (or the mid-point of multiple recommendations) by an actuary certified by the American Academy of Actuaries, consisting of reserves sufficient for:

    - ▪ Unearned contributions;
    - ▪ Benefit liabilities which have been incurred, which have not been satisfied, and for which risk of loss has not yet been transferred, and

5

for expected administrative costs with respect to such benefit liabilities;
- ▪ Any other obligations of the plan; and
- ▪ A margin of error and other fluctuations, taking into account the specific circumstances of the plan.

- o May only be issued by a carrier which establishes and maintains additional reserves of at least $500,000 above the reserves noted above.

- ● Carriers issuing Qualifying Reinsurance Coverage may demonstrate compliance with the reserve requirements described above with alternative reserves in the form of a contract of indemnification, lien, bonding, (re)insurance, letter of credit, or security.

- ● Any business of insurance, including but not limited to the obtaining of Qualified Reinsurance Coverage, conducted in any State must comply with the insurance laws of said State, and obtain all required State approvals.

## II.   Law and Analysis

### A. Treatment of a Partner Under ERISA

ERISA provides specific rules and regulations applicable to (1) an "employee welfare benefit plan," (2) "employees," and (3) "participants" that may participate an "employee welfare benefit plan."

An "employee welfare benefit plan" is defined as:[1]

 "any plan, fund, or program…established or maintained by an employer…for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, medical, surgical, or hospital care or benefits…"

An "employee" is defined as:[2]

"an individual employed by an employer."

---

[1] Section 3(1) of the Employee Income Retirement Security Act ("ERISA").
[2] ERISA section 3(6).

3200 West End Avenue, Suite 500
Nashville, TN 37204
214-734-3330
alexander.renfro@gmail.com

*The Law Office of Alexander Renfro*

A "participant" is defined as:[3]

"any employee or former employee of an employer…who is or may become eligible to receive a benefit…from an employee benefit plan which covers employees of such employer."

On its face and without further context provided elsewhere in ERISA, it appears that a partner in a partnership is not an "employee" within the meaning of ERISA section 3(6). Relying on the common law definition of an "employee," a partner also would not be considered an employee.[4] If a partner is not considered an "employee" for ERISA purposes, a partner cannot be considered a "participant" in an ERISA-covered "employee welfare benefit plan."

DOL Reg. section 2510.3-3(b) confirms that, for limited purposes, a partner is not considered an "employee" for purposes of determining the existence of an "employee benefit plan," which includes an "employee welfare benefit plan." DOL Reg. section 2510.3-3(b) further explains that a "plan without employees" is excluded from the requirements under Title I of ERISA (i.e., a plan covering partners is not considered an ERISA-covered plan).

## B. A Partner May Be a "Participant" In an ERISA-Covered Single-Employer Plan Alongside At Least One Common Law Employee

The Department, however, has concluded that if a partner participates in an employee benefit plan along with at least one common law employee, DOL Reg. section 2510.3-3 does *not* exclude this plan from being covered by Title I of ERISA.[5] Specifically, the Department has found that a plan covering partners (who are considered "working owners") as well as their non-owner employees clearly falls within ERISA's scope.[6] The Department explained that "[t]he definition of 'plans without employees' in DOL Reg. section 2510.3-3(b) simply defines a limited circumstance in which the only parties participating in a benefit arrangement are an individual owner/partner…and declines to deem the individual[], in that limited circumstance, as [an] employee[]…for purpose of the regulation."[7] The Department explains further that DOL Reg. section 2510.3-3(b) "does not apply, however, outside

---

[3] ERISA section 3(7).

[4] In accordance with the Supreme Court's ruling in *Nationwide Mutual Insurance Company v. Darden,* the Department has found that the common law standard for determining employee status is whether someone is hired by an employer, with the employer having the "right to control and direct" the individual's work. [*See* DOL Information Letter (May 8, 2006); DOL Advisory Opinion 95-29A (Dec. 7, 1995); DOL Advisory Opinion 95-22A (Aug. 25, 1995)].

[5] 83 Fed. Reg. 614, 621 (Jan. 5, 2018).

[6] *Id*.

[7] *Id*.; *see also*, 83 Fed. Reg. 28912, 28930 (June 21, 2018).

7

that limited context and, accordingly, does not prevent sole proprietors or other working owners – [including partners] – from being participants in broader benefit plan arrangements…"[8]

The conclusion that partners can participate in an ERISA-covered plan so long as the plan also covers at least one common law employee is consistent with the finding of the courts. For example, the Supreme Court in *Yates v. Hendon*[9] found that a plan covering both a "working owner" – including a partner in a partnership – and at least one common law employee is governed by ERISA.[10] In other words, in cases where a benefit plan covers both partners and common law employees, the plan will be covered by Title I of ERISA.[11]

The Fifth Circuit Court of Appeals, in *House v. American United Life Insurance Company*, also concluded that ERISA applies to a benefit arrangement that provided coverage to a firm's partners that also covered the firm's common law employees without reliance on whether said partner was a "working owner."[12] In *House*, a partnership established a plan that provided disability benefits to both employees of the partnership, as well as the partners. The partnership – as the employer of the employees – paid 100% of the premiums for the disability coverage for its employees and automatically enrolled them in the plan. The partners, on the other hand, were responsible for 100% of their own premium payments. The Circuit Court found that despite the differences in the manner in which premiums were paid, the partnership established a comprehensive employee welfare benefit plan covering both partners and employees, thus creating a single-employer ERISA-covered plan.[13]

In our opinion, *House* is instructive because of its similarities to our facts described in Section I.B. above, where LPartners will be required to pay their own premiums for the self-insured group health plan coverage sponsored by LP, while LP will pay 100% of the premiums for eligible employees, who are automatically enrolled in the plan. Based on the conclusion in *House*, the Supreme Court in *Yates*, and the Department's interpretations as set forth in proposed and final regulations, it is clear that LPartners may permissibly be considered "participants" in an ERISA-covered plan so long as at least one common law employee participates in the plan.

It is also clear that the single-employer self-insured group health plan sponsored by LP – acting in the capacity of an employer – to provide medical health benefits to LP's common law employees and limited partners is an "employee welfare benefit plan" within the meaning of ERISA section 3(1).

---

[8] *Id.*

[9] 41 U.S. 1 (2004).

[10] *Id.* at 9.

[11] *Id.*

[12] 499 F.3d 443 (5th Cir. 2007).

[13] *Id.* at 451-452.

8

As a result, because both LP's employees and LPartners may permissibly participate in this single-employer ERISA-covered "employee welfare benefit plan," the plan would be governed by Title I of ERISA.

### C. A Partner Has Dual Status as an "Employer" and "Employee" and Thus May Be Considered a "Participant" In an ERISA-Covered Plan

In line with the reasoning discussed above, the Department has concluded that a partner may have dual status as an "employer" and an "employee," and thus, permissibly be considered a "participant" in an ERISA-covered plan.[14] Specifically, the Department opined that ERISA section 401(a)(2), ERISA section 403(b)(3)(A), ERISA section 408, ERISA section 4001(b)(1), ERISA section 4021(b)(9), and ERISA section 4022(b)(5)(A) all serve as indications that "working owners" – including partners – may be considered "participants" for purposes of ERISA coverage.[15]  The Department has found that there is a clear Congressional design to include "working owners" – including partners – within the definition of "participant" for purposes of Title I of ERISA.[16]

Based on the foregoing, it is clear that LPartners may permissibly be considered "participants" in LP's single-employer self-insured group plan.  In addition, because the Plan is considered an "employee welfare benefit plan" within ERISA section 3(1), the Plan would be governed by Title I of ERISA.

### D. For Purposes of ERISA, a Partner Should Be Defined as an Individual Who Commits Time to and Performs Services on Behalf of the Partnership

The fact that a partner is considered a "working owner" must not be confused with the definition of a "working owner" under the Department's final association health plan (AHP) regulations.[17]  Under the final AHP regulations, a "working owner" – which in the case of the final AHP regulations is a self-employed individual with no employees – means an individual who (1) has an ownership right in a "trade or business," regardless of whether the "trade or business" is incorporated or unincorporated, (2) earns wages or self-employment income from the "trade or business," and (3) works at least 20 hours a week (or 80 hours per month) providing personal services to the "trade or business" *or* earns income from the "trade or business" that at least equals the "working owner's" cost of the health coverage.[18]

---

[14] DOL Adv. Op. 99-04A (Feb. 4, 1999).

[15] *Id*.; *see also*, 83 Fed. Reg. at 621 (Jan. 5, 2018) and 83 Fed. Reg. at 28930 (June 21, 2018).

[16] *Id*.

[17] *See* 83 Fed. Reg. 28912 et. seq. (June 21, 2018).

[18] DOL Reg. section 2510.3-5(e)(2).

3200 West End Avenue, Suite 500
Nashville, TN 37204
214-734-3330
alexander.renfro@gmail.com

As discussed above, the Department and the Supreme Court have concluded that a "working owner" may also include a partner in a partnership. Although the term "partner" is not specifically defined in ERISA, ERISA section 732(d) contemplates a partner participating in a group health plan. Section 732(d) is relevant in cases where partners are the *only* participants in a group health plan, which would cause the plan to fall outside of Title I of ERISA (as required under DOL Reg. section 2510.3-3(b)). However, ERISA section 732(d) is also guiding on how a partner should be defined for purposes of participating in a group health plan, regardless of whether the plan is governed by Title I of ERISA or not. Stated differently, ERISA section 732(d)'s reference to and description of a partner serves to define a partner participating in a "plan without employees," as well as a partner who may permissibly participate in an ERISA-covered plan alongside at least one common law employee.

The regulations implementing ERISA 732(d) provide that for purposes of treating a partner as an "employee" – and thus a "participant" in a group health plan subject to the requirements under Part 7 of ERISA – the "the term employee includes any bona fide partner."[19] The implementing regulations go on to state that "whether or not an individual is a bona fide partner is determined based on all the relevant facts and circumstances, including whether the individual *performs services on behalf of the partnership*."[20]

Although a "bona fide partner" is not further defined in ERISA or its implementing regulations, the term "bona fide partner" can be found elsewhere in federal law, specifically in guidance from the Internal Revenue Service ("IRS").[21] According to the IRS, a bona fide partner is an individual with rights in a partnership, who exercises said rights, and who *commits time and service to the partnership*.[22] The consistency between the IRS's definition of a bona fide partner and the manner in which the Department described a bona fide partner in ERISA section 732(d) implementing regulations supports the interpretation that for purposes of ERISA, a partner should be defined as "an individual who commits time to and performs services on behalf of the partnership."

In our opinion, LPartners satisfy the definition of a "bona fide partner." LPartners have actual rights in LP as dictated in both LP's Partnership Agreement and the joinder to said agreement signed by each LPartner. LPartners regularly exercise these rights in periodic votes on partnership business. Finally, LPartners contribute time and energy to LP by sharing data and assisting in LP's primary business purpose and revenue generation activity. The time and services contributed by LPartners comprise the sole means of revenue generation of LP. In other words, without this activity, LP would

---

[19] DOL Reg. section 2590.732(d)(2).

[20] *Id*.

[21] *See* Rev. Rul. 69-184.

[22] *Id*.

10

3200 West End Avenue, Suite 500
Nashville, TN 37204
214-734-3330
alexander.renfro@gmail.com

not earn revenue or survive as an entity. By these acts, LPartners meet both the IRS's and the Department's standards to qualify as bona fide partners.

### E. Tax Considerations

The IRS has for decades maintained and enforced a clear set of regulations regarding tax treatment of partners in all health and welfare benefit plans, including group health plans. The Internal Revenue Code (the "Code") does not comment on the ability of a partner to participate in a group health plan. However, once a partner becomes a participant, the IRS treats that participant differently than common law employee participants. For the purpose of tax treatment, said partners are treated as independent contractors by the IRS.

Wage withholding for the payment of premiums for a group health plan on a pre-tax basis is not possible for partners.[23] In other words, partners are not allowed to join a §125 cafeteria plan in order to pay premiums in a group health plan on a pre-tax basis. This prohibition likely exists because of the difficulty in distinguishing a partner's wages from a partner's distributable income (which might be considered earned income) from a partnership. As a result, such funds cannot be used for the payment of premiums for a group health plan on a pre-tax basis through a cafeteria plan. A further consequence of this rule is that Health Savings Accounts ("HSAs"), which are typically offered through cafeteria plans, are also not available (with a meaningful tax benefit) to partners participating in a plan sponsored by their partnership. LPMS acknowledges these standards, does not seek special or separate tax treatment for its partners. Inasmuch as LP does not pay wages to its partners, no pre-tax payment of premium could be available to partners participating in LP's plan. Finally, LP does not sponsor and does not plan to sponsor either a cafeteria plan or an HSA.

While the benefit of pre-tax payments of premium is not available to partners, such payments could under certain limited circumstances be deductible as an ordinary and necessary business expense.[24] The Code provides that if a partner qualifies as a working owner with earned income, said partner may deduct the cost of premiums for a group health plan against their earned income from the same source that sponsors said group health plan[25]. This regime both acknowledges that a plan sponsor of a group health plan may have participants that are equity partners and that a limited scope deduction should be available in said circumstances. With respect to LP's plan, as with any other partnership, this deduction would only be available if LP distributed funds to partners participating in LP's plan which was then used to pay for premiums from LP's plan. (In the event that LP distributed funds to a partner insufficient to pay said partner's premium, any deduction would be limited to the

---

[23] See IRC § 125(d)(1)(A).
[24] See IRC § 162(l).
[25] Id.

amount distributed.)  LPMS is not seeking special or separate treatment with respect to this deduction.  Other rules and limitations also apply and are acknowledged.[26]

The IRS has comprehensive, existing rules in place with respect to partners participating in a group health plan, within which LP's plan is regulated in similar fashion to any other partnership. No special treatment or extralegal tax benefit is sought by or available to partners participating in LP's plan.

### III.    <u>Request for Determination</u>

Based on the foregoing, Renfro respectfully asks that the Department to confirm that:

(1) The single-employer self-insured group health plan sponsored by LP is an "employee welfare benefit plan" within the meaning of ERISA section 3(1).

(2) LPartners participating in LP's single-employer self-insured group health plan are "participants" within the meaning of ERISA section 3(7).

(3) The single-employer self-insured group health plan sponsored by LP is governed by Title I of ERISA.

Thank you in advance for considering this request.  Please do not hesitate to contact me with any questions, or with any request for additional information.

Respectfully submitted,

ALEXANDER T. RENFRO, JD, LLM

---

[26] See IRC § 162(l)(2-5).

3200 West End Avenue, Suite 500
Nashville, TN 37204
214-734-3330
alexander.renfro@gmail.com

## Democrats are waging war against affordable health insurance

By Betsy McCaughey, *New York Post*

December 18, 2018 | 10:26pm | Updated

A federal district judge in Texas struck down the Affordable Care Act as unconstitutional Friday. The lawsuit was brought by Republican officials from 20 states, who want their residents to have more insurance choices and lower premiums.

Though the suing states won in Texas v. Azar, their victory won't help consumers reeling from ObamaCare sticker-shock anytime soon. ObamaCare will stay on the books while the decision is appealed, which could take more than a year. The outcome is uncertain.

Fortunately, President Trump is using his regulatory power to accomplish precisely what these states want: relief from ObamaCare's rigid regulations.

One of Trump's most helpful moves is to allow the sale of "short-term plans," renewable for up to three years, in any state that permits them. These plans cost 80 percent less than ObamaCare plans, on average, according to ehealthinsurance.com.

Short-term plans omit maternity coverage and don't cover pre-existing conditions. They're not for everyone, but for many middle-class buyers, they're a good deal.

In Tampa, Fla., a short-term plan for a family of three costs $1,169 a year, less than one-tenth the $12,071 sticker price of an ObamaCare plan.

The outrage is that people who live in New York, New Jersey, California and other states dominated by Democrats can't take advantage of these deals. Blue states are doubling down on ObamaCare, refusing to allow consumers other choices.

Welcome to the Democrats' health care prison.

Gov. Andrew Cuomo even wants the New York Legislature to copy all of ObamaCare's federal regulations into state law. Yikes — those regulations have caused premiums to more than double in five years.

In Congress, Democrats are pushing a bill to outlaw short-term plans everywhere. They've titled it the "Undo Sabotage" bill. As if allowing an exit ramp off ObamaCare is sabotage. Dems would rather prop up the Affordable Care Act than ease the pain of middle-class consumers.

Last week, former President Barack Obama made a video to coax people to buy his signature health plans, promising that for most of them, the plans wouldn't cost more than a cellphone bill.

But that's only true for low-income buyers getting taxpayer-funded subsidies. Single adults earning more than $48,560 are considered middle class, and they're on their own.

Obama wasn't talking to them. Some 4 million ObamaCare customers who paid full freight have dropped their coverage. They can't afford the soaring premiums. The middle class are becoming the new uninsured in this country.

What's to blame for the huge premiums? According to McKinsey consultants, it's because ObamaCare forces healthy buyers in the individual market to pay the same as people with serious illnesses.

But 5 percent of the population uses nearly 50 percent of the health care. To make everyone pay the same is sheer extortion.

Democrats and Republicans agree that people with pre-existing conditions must be protected. But the lie perpetuated by the Democrats is that ObamaCare is the only way to do it. In truth, it's just the least fair way.

The Trump administration is encouraging states to do it in a fairer way, by departing from ObamaCare rules and allowing insurers to charge healthy buyers less than sick ones.

That doesn't mean people with pre-existing conditions are abandoned. The cost of their care is paid for out of general state revenues, spreading the burden widely instead of skewering buyers in the individual insurance market. Alaska, one of the first states to try it, was able to lower ObamaCare premiums by double digits in 2018.

When the Texas v. Azar decision was announced on Friday, Obama called it "scary," warning that it "puts people's pre-existing-conditions coverage at risk." That's the same demagoguery Democrats used in the midterm elections.

Don't fall for it.

With help from the Trump administration, some states are forging better ways to make health insurance fair to the sick and affordable for the middle class. Regardless of the fate of ObamaCare.

*Betsy McCaughey is a former lieutenant governor of New York.*



**EXHIBIT**
**C**

**U.S. Department of Labor**

Employee Benefits Security Administration
230 South Dearborn Street, Suite 2160
Chicago, Illinois 60604
Phone:    (312) 353-0900



OCT 2 1 2019

CERTIFIED MAIL -
RETURN RECEIPT REQUESTED

Suffolk Administrative Services, LLC
Custodian of Records
361 San Francisco St., PH
San Juan, PR 00901

Re:    Anjo, LLC
Case Number: 99-000016(50)

Dear Custodian of Records:

This office is conducting an investigation of the above-referenced matter pursuant to § 504(a)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1134(a)(1), to determine whether any person has violated or is about to violate any provision of Title I of ERISA. Enclosed is a subpoena which requires you to produce certain documents and records in connection with that investigation.

Your personal appearance pursuant to this subpoena will not be required at this time provided the documents are produced on or before the date noted in the subpoena. You will be informed at a later date if your personal appearance to testify is required. Even though your appearance is not now being required, please provide a cover letter with your response which identifies the documents being produced. Your cover letter should also state whether a diligent search has been made for the subpoenaed documents and that the documents transmitted constitute all documents called for by the subpoena.

The subpoena requests that you produce documents maintained in electronic form, Electronically Stored Information (ESI), in electronic form. The formats in which EBSA can accept ESI are listed in the subpoena. When producing ESI, you should produce the materials as maintained on your computer system, i.e., you should produce ESI with all files, folders and sub-folders intact, and you should produce emails with all attachments intact.

If any documents called for are not produced, please list such documents and indicate their location and the reason for their non-production.

If you have any questions concerning your rights and duties, you may wish to consult counsel. If you have any questions concerning the subpoena or the documents required to be produced,

including the production of ESI and the appropriate format and media, please call Senior Investigator Thomas C. Gewin at (404) 302-3917 or Investigator Devon King at (415) 625-2491.

Sincerely,

Jeffrey A. Monhart
Regional Director
Chicago Regional Office
Employee Benefits Security Administration

Enclosure

## SUBPOENA                                    99-002107

# UNITED STATES OF AMERICA
## DEPARTMENT OF LABOR
### Employee Benefits Security Administration

To:   *Suffolk Administrative Services, LLC*
      *Custodian of Records*
      *361 San Francisco St., PH*
      *San Juan, PR 00901*

*You are hereby required to appear before*

*Senior Investigator Thomas C. Gewin*

*of the Employee Benefits Security Administration,*

*U.S. Department of Labor, at*

*61 Forsyth Street SW, Suite 7B54,*

*in the City of Atlanta, Georgia, 30303, on the 8th day of November 2019, at 10:00 a.m. of that day, to testify in*
*the matter of an investigation of*

**Anjo, LLC**

*being conducted pursuant to Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29*
*U.S.C. Section 1134, in order to determine whether any person has violated or is about to violate any provision*
*of Title I of ERISA or any regulation or order thereunder;*

*And you are hereby required to bring with you and produce at said time and place the following books, papers,*
*and documents:*

   *SEE ATTACHMENT*

*Fail not at your peril.*



**In testimony whereof** *I have hereunto affixed my signature*
*and the seal of the* **United States Department of Labor**
*at Chicago, Illinois on this* 21ˢᵗ *day of October 2019.*

*Jeffrey A. Monhart, Regional Director*

**ATTACHMENT TO SUBPOENA**
**Suffolk Administrative Services, LLC**

**DEFINITIONS**

A. "Suffolk," "Company," "You," and "Your" shall mean Suffolk Administrative Services, LLC, including any predecessors, successors, affiliates parent companies, or subdivisions or units (including Affordable Benefit Choices, Incela HR, and others), its officers and directors, employees or anyone acting on behalf of Suffolk Administrative Services, LLC.

B. "Claim(s)" means an itemized statement of Services and costs made by Health Providers to any Employee Welfare Benefit Plan clients for any health care Services, including Pre-Service Claims, Post-Service Claims, Concurrent Care Decisions and Urgent Care Claims as defined by 29 C.F.R. § 2560.503-1.

C. "Communication" means any oral, written, electronic or other exchange or transmission of information (in the form of facts, ideas, inquiries, opinions, analysis or otherwise), including correspondence, memos, reports, electronic mail, electronic documents, telephone conversations, telephone or voicemail messages, face-to-face meetings or conversations, and Internet postings and discussions.

D. "Describe" including its various forms such as "describing," means to fully identify, narrate, present, recite, recount, or otherwise set forth in detail.

E. "Discuss" including its various forms such as "discussing," means to review, report, summarize, evaluate, examine, explain, or consider, as well as discuss.

F. "Document(s)" means, including but not limited to, all writings, recordings or electronic data consisting of letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, word processing, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, still photographs, X-ray films, video tapes, motion pictures, Emails, voicemail messages, electronic instant messages (IM), spreadsheets, databases, electronic calendars and contact managers, back-up data, and/or other form of data compilation, stored in any medium from which information can be obtained (including but not limited to magnetic tape, magnetic disk, CD-ROM, DVD, optical disk, flash drive or other electronic or mechanical storage device), however produced, reproduced or stored, of every kind of description within Your possession, custody or control, or within the possession, custody or control of any agent, employee, representative or other persons acting or purporting to act for or on behalf of You, including but not limited to notes; memoranda; records; reports; correspondence; communications; telexes and faxes; agreements; contracts; accounting or financial records or worksheets; account books; journals; ledgers; bills; receipts; vouchers; transcripts or notes of conversations or meetings; minutes of meetings; statements; directives in any form from general partners or other representatives; diary entries; studies; summaries and/or records of telephone conversations; interviews, meetings and/or conferences; tabulations; and shall include the original and all nonidentical copies; all drafts even if not published, disseminated, or used for any purpose; all notes,

schedules, footnotes, attachments, enclosures, and documents attached or referred to in any document to be produced pursuant to this Subpoena.

G. "EIN" means the employer identification number issued by the Internal Revenue Service for an Employer or Employee Welfare Benefit Plan.

H. "Email" means any electronic communication made using computer communications software, whether through a local computer network or through the Internet, and whether maintained in electronic form and/or paper form. Email maintained in electronic form may be produced in electronic form.

I. "Employee" means any individual employed by an Employer, as defined in Section 3(6) of ERISA, 29 U.S.C. § 1002(6).

J. "Employee Welfare Benefit Plan(s)" means any plan, fund, or program which was established or maintained by an Employer by an Employee Organization or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing through the purchase of insurance or otherwise, medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability or death, as defined in Section 3(1) of ERISA, 29 U.S.C. § 1002(1).

K. "Employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an Employee Welfare Benefit Plan; includes a group or association of employers acting for an employer in such capacity, as defined in Section 3(5) of ERISA, 29 U.S.C. § 1002(5).

L. "ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, et. seq., as amended.

M. "Fee(s)" means any charge, including administration Fees, Service Fees, per capita Fees, management Fees, and participating Health Provider Fees.

N. "Health Care Professional(s)" or "Health Provider(s)" means a physician, healthcare professional, laboratory, laboratory testing Service, or health care facility licensed, certified or accredited as required by law.

O. "Participant" means a person as defined by ERISA Section 3(7), 29 U.S.C. § 1002(7).

P. "Plan Document" shall mean a document or instrument governing any term of the Plan, including any document or instrument that describes plan operations and administration, eligibility rules, the provision of health care Services, and Claims and appeals procedures.

Q. "Plan Sponsor" means (i) the employer in the case of an Employee Welfare Benefit Plan established or maintained by a single employer, (ii) the employee organization in the case of a plan established or maintained by an employee organization, or (iii) for a plan established or maintained by two or more employers or jointly by one or more employers and one or more employee organization, the association, committee, joint board of trustees, or other similar group of representatives of the parties who establish or maintain the plan, as defined in Section 3(16)(B) of ERISA, 29 U.S.C. § 1002(16).

R. "Service(s)" means any kind of product or Service offered by Suffolk, whether directly or

indirectly, to any Employee Welfare Benefit Plan, and however the expenses for such Service or product is paid for or reimbursed, including but not limited to medical or health Services, insurance coverage, Claims processing, recordkeeping, customer or call center Services, enrollee education, group insurance products, and third-party administration products or Services. Medical and health Services shall be broadly construed to include dental, vision, physical therapy, speech therapy, occupational therapy, psychotherapy, therapy for drug and alcohol addiction, treatment for eating disorders, and drugs or devices.

S. "Service Agreement" means a document setting forth specific Services to be rendered by Suffolk and the compensation to be paid for those Services by the person retaining Suffolk, as provided herein.

T. "Service Provider" shall mean any person or entity that performed, or continues to perform, any Services to or for the Plan, including any billing agent, marketing agent, recordkeeper, plan administrator, third party administrator, call center service, insurer, underwriter, Claims administrator, broker, consultant, adviser, custodian, subadviser, transition manager, or investment manager (as defined by ERISA Section 3(38), 29 U.S.C. §1002(38)).

U. "Report(s)" means any information produced or generated by Suffolk relating to Services provided to any Employee Welfare Benefit Plan, including electronic reports.

## INSTRUCTIONS

A. Scope of search. You are required to search for, obtain and produce all responsive documents, including without limitation documents that are in Your custody or control, but not in Your immediate possession. This includes any responsive documents in the possession, custody or control of any person acting on Your behalf or under Your direction or control, such as Your employees, accountants, agents, representatives, attorneys or advisors.

B. Relevant time period. Unless otherwise specified, the time period covered by this Subpoena is from January 1, 2016 to the present. Documents created prior to January 1, 2016 which have been used or relied on since January 1, 2016 or which describe legal duties which remain in effect after January 1, 2016 (such as contracts and trust agreements), shall be considered as included within the time period covered by this Subpoena.

C. Privileges and Protections. If You do not produce documents because You object to part of or an aspect of a request, please provide a written response stating the precise basis for the objection and produce all documents responsive to the remaining part or aspect of the requests.

If any documents responsive to this Subpoena are withheld because of a claim of privilege, please identify the documents You claim are privileged in a written response, and please indicate for each such document: 1) the nature of the privilege or protection claimed; 2) the factual basis for claiming the privilege or protection asserted; 3) the

subject matter of the document; 4) the type, length and date of the document; 5) the author of and/or signatory on the document; 6) the identity of each person to whom the document was directed or distributed; and 7) the nature of the document, e.g., letter, memorandum.

D. <u>Proprietary and Confidential.</u> If You contend documents responsive to this Subpoena are proprietary or confidential, You should mark those documents as such and produce the documents. The Department of Labor follows procedures in accordance with the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and Executive Order 12600, which allows for the withholding of certain proprietary and confidential documents pursuant to the requirements of Exemption 4 of FOIA.

E. <u>Electronically stored information.</u> If any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, then You are directed to produce the document in the format in which the document was created and maintained, provided it is one of the following formats: Microsoft Word (doc), WordPerfect (wpd), Rich Text (rtf), Microsoft Outlook (pst), Microsoft Outlook Express (msg), Microsoft Excel (xls), Microsoft Access (mdb), Adobe Acrobat (PDF), TIFF, comma separated values (CSV), ASCII, TXT, Concordance, or Quickbooks. Files of the preceding types can be submitted in a ZIP compressed format. Sufficient information including sufficient identification of the applicable software program and passwords, if any, should be provided to permit access to and use of the documents. Images created through a scanning process should have a minimum resolution of 300 dots per inch (dpi).

Where available, Claims data should be provided in Microsoft Excel (xls) or delimited flat file (e.g. text, comma-separated values (CSV), etc.), which allows for the sorting and filtering of data. A sample format of the Claims data to be provided may be made available upon request.

To the extent that any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, and it is not in one of the previously identified formats, please identify the document and the corresponding format. Regardless of the format in which a document may exist, You are requested to preserve the integrity of the original electronic document and its contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

F. <u>Tenses.</u> Verbs used in the past tense should be read also to include the present tense, and verbs used in the present tense should be read also to include the past tense.

G. <u>Singular/Plural.</u> The singular number of a noun, pronoun, or verb should be read also to include the plural, and the plural number of a noun, pronoun, or verb should be read also to include the singular.

H. <u>Word Neutrality.</u> All words and phrases shall be construed as masculine, feminine or gender neutral as necessary to bring within the scope of this Subpoena documents that might otherwise be construed to be outside its scope.

I. <u>Sufficient to Show.</u> Where a request seeks documents "sufficient" to show specified information, in lieu of producing documents, You may submit a sworn affidavit attested

to by an authorized representative that provides the requested information.

J. <u>All/Any.</u> "All" and "any" shall be construed as necessary to make the request inclusive rather than exclusive.

K. <u>Manner of Production.</u> All documents produced in response to this Subpoena shall comply with the following instructions:

1. You should conduct Your searches for responsive documents in a manner sufficient to identify the source and location where each responsive document is found.

2. All documents produced in response to this Subpoena shall be segregated and labeled to show the document request to which the documents are responsive and the source and location where the documents were found.

3. To the extent that documents are found in file folders and other similar containers that have labels or other identifying information, the documents shall be produced with such file folder and label information intact.

4. To the extent that documents are found attached to other documents, by means of paper clips, staples, or other means of attachment, such documents shall be produced together in their condition when found.

5. All documents provided in response to this Subpoena are to include the notes written in a margin and post-its, as well as any attachment referred to or incorporated by the documents.

6. In the event that there are no documents responsive to a particular request, please specify that You have no responsive documents.

7. If documents relied upon or required to respond to any of this Subpoena, or requested documents, are no longer in Your possession, custody, or control, You are required to state what disposition was made of such documents, including identification of the person(s) who are believed to be in possession or control of such documents; the date or dates on which such disposition was made, and the reason for such disposition.

8. If no Claims/requests/appeals are identified pursuant to any part of this Subpoena, please provide copies of the identifiable source documents evidencing Your determination yielding the existence of no results, to include an explanation of how the search was conducted in Your databases, the search parameters, and any screen shots or other dated documents utilized to arrive at Your finding of no results.

L. <u>Electronic media.</u> To the extent that the documents that are responsive to this Subpoena may exist on electronic media, those documents should be provided on one of the following media: Compact Disk – Read Only Memory (CD-ROM), Digital Versatile Disc – Read Only Memory (DVD) or USB hard drive.

## DOCUMENTS TO BE PRODUCED

1. Documents sufficient to show Your ownership, legal identity, and organizational structure, including:

   a. State registrations, articles of incorporation, by-laws, and partnership agreements;
   b. Organizational charts, descriptions of Your organizational and supervisory structure, and any documents describing the responsibilities of principals, officers, directors, managers, employees, representatives, and independent contractors;
   c. Documents sufficient to show the names and addresses of all divisions, affiliates, or subsidiaries and their principal lines of business;
   d. Documents sufficient to show the identities and percentage of ownership of all of Your shareholders, limited partners, and/or members, excluding those persons holding only publicly traded shares of a parent organization; and
   e. Documents sufficient to identify the members of Suffolk's Board of Directors, including their titles, tenures, and addresses.

2. Documents sufficient to identify Suffolk's officers and employees, including their employment agreements, titles, tenures, and addresses.

3. Documents sufficient to show all entities owned, either in whole or in part, by Suffolk; for those entities that Suffolk holds a partial interest, the names and percentages of ownership for all other owners.

4. For all entities identified in response to item 3 above, please provide:

   a. An organizational chart;
   b. Articles of Incorporation or Partnership Agreements;
   c. Most recent state filings (such as anything filed with state insurance agencies); and
   d. List of Board of Directors and entity officers.

5. All of Suffolk's licenses and certifications with any government entity, including all local, State or Federal entities located in the United States.

6. Documents sufficient to show all Employee Welfare Benefit Plans for which Suffolk provides Services, including:

   a. The name and address of the Plan Sponsor, including the number of employees and the EIN;
   b. The name and address of the Employee Welfare Benefit Plan, including the number of participants in the plan and the EIN;

    c. Whether the Employee Welfare Benefit plan is self-funded or fully-insured;
    d. Name of associated broker(s), including firm name, person name, and contact information;
    e. Name and address of the Plan's custodian;
    f. The Services Suffolk provides;
    g. Date Suffolk was hired; and
    h. Date Suffolk was terminated, if applicable.

7. All contracts and agreements relating to Services Suffolk provides to Employee Welfare Benefit Plans.

8. Documents sufficient to show all clients to which Suffolk provides and/or licenses products, including:

    a. The name and address of the client;
    b. Product(s) Suffolk provides;
    c. Services Suffolk provides; and
    d. The states and geographic areas in which such products are sold.

9. All template and prototype documents and forms used to solicit, enroll, administer, maintain, and terminate clients, including all template versions of contract and service agreements, fee schedules, amendments and riders, enrollment packages, disclosures, disclaimers, and waiver and releases of liability.

10. Documents showing the name, address, and phone number of each entity and person that marketed Services or products provided by Suffolk to potential Clients, including all brokers, promoters, producers, agents, or aggregators.

11. For all products and/or Services that Suffolk markets through the entities and people identified in item 10 above, please provide all marketing materials they use, including:

    a. Brochures;
    b. Product eligibility sheets; and
    c. All other marketing materials.

12. Prototype documents prepared on behalf of Employee Welfare Benefit Plans to whom Suffolk provides Services, including:

    a. Benefit booklets or brochures;
    b. Summaries of benefits and coverage (SBC);
    c. Plan documents;
    d. Summary plan descriptions (SPD);
    e. Evidence(s) of coverage (EOC); and
    f. Any other document relating to the Employee Welfare Benefit Plan's benefits or Claims procedures.

13. Documents showing compensation or monies charged to and collected from each Plan on a quarterly (or other periodic) basis for Suffolk's Services, including fees, expenses, premiums, funding contributions, premium equivalents, and who is responsible for paying such fees.

14. Documents relating to all bank accounts maintained by You for the benefit of any Employee Welfare Benefit plan for which you hold the assets, including checking accounts, savings accounts, certificates of deposit, money market accounts, etc. For each account identified, include documents sufficient to show:

    a.  Name of the custodian;
    b.  Account number;
    c.  Contact information for account representatives;
    d.  Purpose of the account; and
    e.  Authorized persons with deposit and/or withdrawal authority.

15. Documents sufficient to show the procedures used by You with respect to the billing of all Employee Welfare Benefit Plans to whom You provide Services, to include invoices, evidence of payment, and any reconciliations.

16. All Fee schedules and all other documents provided to clients regarding the clients' payment of Fees to Suffolk.

17. Documents sufficient to show internal policies and procedures, manuals, policy changes or performance measurements used by You relating to Services You provide to Employee Welfare Benefit Plans.

18. Documents sufficient to show all of the network providers used by the Employee Welfare Benefit Plans to whom You provide Services, including:

    a.  Your ownership interest in any network provider(s);
    b.  The manner in which the network(s) was selected;
    c.  The identity of the person who was responsible for selecting the network(s);
    d.  The manner in which the fees for the network(s) are determined;
    e.  Whether You earn additional compensation directly or indirectly through Your ownership interest in the network(s); and
    f.  The procedures used by You to furnish network(s) services.

19. Documents and communications reflecting complaints made to Suffolk with respect to the Services You provide to clients, including letters and documents memorializing telephone calls received from Participants, Health Care Professionals, Employers, or state or federal regulatory agencies.

20. Fidelity bond(s) currently in effect for any Employee Welfare Benefit Plans to whom You provide Services.

21. Documents relating to Fiduciary liability insurance, stop loss insurance, reinsurance, excess loss insurance, and captive insurance purchased, established, or negotiated for or on behalf of any Client, including contracts and documents demonstrating the establishment of rates, claims underwriting, history of premiums and recoverables, and attachment points and deductibles.

22. Suffolk's audited financial statements for 2016, 2017, and 2018, and any quarterly and/or monthly statements for 2019.

23. Suffolk's General Ledger and chart of accounts.

**U.S. Department of Labor**    Employee Benefits Security Administration
230 South Dearborn Street, Suite 2160
Chicago, Illinois 60604
Phone:   (312) 353-0900



July 7, 2020

CERTIFIED MAIL -
RETURN RECEIPT REQUESTED

Providence Insurance Company, I.I.
Custodian of Records
954 Ave Ponce de Leon
Suite 802
San Juan, PR 00907

      Re:  Anjo, LLC
         Case Number: 99-000016(50)

Dear Custodian of Records:

This office is conducting an investigation of the above-referenced matter pursuant to § 504(a)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1134(a)(1), to determine whether any person has violated or is about to violate any provision of Title I of ERISA. Enclosed is a subpoena which requires you to produce certain documents and records in connection with that investigation.

Your personal appearance pursuant to this subpoena will not be required at this time provided the documents are produced on or before the date noted in the subpoena. You will be informed at a later date if your personal appearance to testify is required. Even though your appearance is not now being required, please provide a cover letter with your response which identifies the documents being produced. Your cover letter should also state whether a diligent search has been made for the subpoenaed documents and that the documents transmitted constitute all documents called for by the subpoena.

The subpoena requests that you produce documents maintained in electronic form, Electronically Stored Information (ESI), in electronic form. The formats in which EBSA can accept ESI are listed in the subpoena. When producing ESI, you should produce the materials as maintained on your computer system, i.e., you should produce ESI with all files, folders and sub-folders intact, and you should produce emails with all attachments intact.

If any documents called for are not produced, please list such documents and indicate their location and the reason for their non-production.

If you have any questions concerning your rights and duties, you may wish to consult counsel. If you have any questions concerning the subpoena or the documents required to be produced,

including the production of ESI and the appropriate format and media, please call or email Senior Investigator Thomas C. Gewin ((404-302-3917) or gewin.thomas@dol.gov) or Senior Investigator Alanna Evans ((415-625-2447 or evans.alanna@dol.gov).

Sincerely,

Jeffrey A. Monhart
Regional Director
Chicago Regional Office
Employee Benefits Security Administration

Enclosure

**SUBPOENA**

99-002151

# UNITED STATES OF AMERICA
## DEPARTMENT OF LABOR
### Employee Benefits Security Administration

*To:    Providence Insurance Company, I.I.*
*Custodian of Records*
*954 Ave Ponce de Leon*
*Suite 802*
*San Juan, PR 00907*

*You are hereby required to appear before*

*Senior Investigator Thomas C. Gewin*

*of the Employee Benefits Security Administration,*

*U.S. Department of Labor, at*

*61 Forsyth Street SW, Suite 7B54,*

*in the City of Atlanta, Georgia, 30303, on the 31st day of July 2020, at 10:00 a.m. of that day, to testify in the matter of an investigation of*

**Anjo, LLC**

*being conducted pursuant to Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1134, in order to determine whether any person has violated or is about to violate any provision of Title I of ERISA or any regulation or order thereunder;*

*And you are hereby required to bring with you and produce at said time and place the following books, papers, and documents:*

*SEE ATTACHMENT*

*Fail not at your peril.*



**In testimony whereof** *I have hereunto affixed my signature and the seal of the* **United States Department of Labor** *at Chicago, Illinois on this 7th day of July 2020.*

**Jeffrey A. Monhart, Regional Director**

### ATTACHMENT TO SUBPOENA
### Providence Insurance Company, I.I.

## **DEFINITIONS**

A. "PIC," "Company," "You," and "Your" shall mean Providence Insurance Company, I.I., a Puerto Rico Domestic Insurance Company, including any predecessors, successors, affiliates or parent companies, its officers and directors, employees or anyone acting on behalf of Providence Insurance Company, I.I.

B. "Claim(s)" means an itemized statement of Services and costs made by Health Providers to any Employee Welfare Benefit Plan clients for any health care Services, including Pre-Service Claims, Post-Service Claims, Concurrent Care Decisions and Urgent Care Claims as defined by 29 C.F.R. § 2560.503-1.

C. "Communication" means any oral, written, electronic or other exchange or transmission of information (in the form of facts, ideas, inquiries, opinions, analysis or otherwise), including correspondence, memos, reports, electronic mail, electronic documents, telephone conversations, telephone or voicemail messages, face-to-face meetings or conversations, and Internet postings and discussions.

D. "Describe" including its various forms such as "describing," means to fully identify, narrate, present, recite, recount, or otherwise set forth in detail.

E. "Discuss" including its various forms such as "discussing," means to review, report, summarize, evaluate, examine, explain, or consider, as well as discuss.

F. "Document(s)" means, including but not limited to, all writings, recordings or electronic data consisting of letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, word processing, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, still photographs, X-ray films, video tapes, motion pictures, Emails, voicemail messages, electronic instant messages (IM), spreadsheets, databases, electronic calendars and contact managers, back-up data, and/or other form of data compilation, stored in any medium from which information can be obtained (including but not limited to magnetic tape, magnetic disk, CD-ROM, DVD, optical disk, flash drive or other electronic or mechanical storage device), however produced, reproduced or stored, of every kind of description within Your possession, custody or control, or within the possession, custody or control of any agent, employee, representative or other persons acting or purporting to act for or on behalf of You, including but not limited to notes; memoranda; records; reports; correspondence; communications; telexes and faxes; agreements; contracts; accounting or financial records or worksheets; account books; journals; ledgers; bills; receipts; vouchers; transcripts or notes of conversations or meetings; minutes of meetings; statements; directives in any form from general partners or other representatives; diary entries; studies; summaries and/or records of telephone conversations; interviews, meetings and/or conferences; tabulations; and shall include the original and all nonidentical copies; all drafts even if not published, disseminated, or used for any purpose; all notes, schedules, footnotes, attachments, enclosures, and documents attached or referred to in

any document to be produced pursuant to this Subpoena.

G. "EIN" means the employer identification number issued by the Internal Revenue Service for an Employer or Employee Welfare Benefit Plan.

H. "Email" means any electronic communication made using computer communications software, whether through a local computer network or through the Internet, and whether maintained in electronic form and/or paper form. Email maintained in electronic form may be produced in electronic form.

I. "Employee" means any individual employed by an Employer, as defined in Section 3(6) of ERISA, 29 U.S.C. § 1002(6).

J. "Employee Welfare Benefit Plan(s)" means any plan, fund, or program which was established or maintained by an Employer by an Employee Organization or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing through the purchase of insurance or otherwise, medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability or death, as defined in Section 3(1) of ERISA, 29 U.S.C. § 1002(1).

K. "Employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an Employee Welfare Benefit Plan; includes a group or association of employers acting for an employer in such capacity, as defined in Section 3(5) of ERISA, 29 U.S.C. § 1002(5).

L. "ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, et. seq., as amended.

M. "Fee(s)" means any charge, including administration Fees, Service Fees, per capita Fees, management Fees, and participating Health Provider Fees.

N. "Health Care Professional(s)" or "Health Provider(s)" means a physician, healthcare professional, laboratory, laboratory testing Service, or health care facility licensed, certified or accredited as required by law.

O. "Participant" means a person as defined by ERISA Section 3(7), 29 U.S.C. § 1002(7).

P. "Plan Document" shall mean a document or instrument governing any term of the Plan, including any document or instrument that describes plan operations and administration, eligibility rules, the provision of health care Services, and Claims and appeals procedures.

Q. "Plan Sponsor" means (i) the employer in the case of an Employee Welfare Benefit Plan established or maintained by a single employer, (ii) the employee organization in the case of a plan established or maintained by an employee organization, or (iii) for a plan established or maintained by two or more employers or jointly by one or more employers and one or more employee organization, the association, committee, joint board of trustees, or other similar group of representatives of the parties who establish or maintain the plan, as defined in Section 3(16)(B) of ERISA, 29 U.S.C. § 1002(16).

R. "Service(s)" means any kind of product or Service offered by PIC, whether directly or indirectly, to any Employee Welfare Benefit Plan, and however the expenses for such

Service or product is paid for or reimbursed, including but not limited to medical or health Services, insurance coverage, Claims processing, recordkeeping, customer or call center Services, enrollee education, group insurance products, and third-party administration products or Services. Medical and health Services shall be broadly construed to include dental, vision, physical therapy, speech therapy, occupational therapy, psychotherapy, therapy for drug and alcohol addiction, treatment for eating disorders, and drugs or devices.

S. "Service Agreement" means a document setting forth specific Services to be rendered by PIC and the compensation to be paid for those Services by the person retaining PIC, as provided herein.

T. "Service Provider" shall mean any person or entity that performed, or continues to perform, any Services to or for the Plan, including any billing agent, marketing agent, recordkeeper, plan administrator, third party administrator, call center service, insurer, underwriter, Claims administrator, broker, consultant, adviser, custodian, subadviser, transition manager, or investment manager (as defined by ERISA Section 3(38), 29 U.S.C. §1002(38)).

U. "Report(s)" means any information produced or generated by PIC relating to Services provided to any Employee Welfare Benefit Plan, including electronic reports.


## <u>INSTRUCTIONS</u>

A. <u>Scope of search</u>.  You are required to search for, obtain and produce all responsive documents, including without limitation documents that are in Your custody or control, but not in Your immediate possession. This includes any responsive documents in the possession, custody or control of any person acting on Your behalf or under Your direction or control, such as Your employees, accountants, agents, representatives, attorneys or advisors.

B. <u>Relevant time period</u>.  Unless otherwise specified, the time period covered by this Subpoena is from <u>January 1, 2016</u> to the present. Documents created prior to <u>January 1, 2016</u> which have been used or relied on since <u>January 1, 2016</u> or which describe legal duties which remain in effect after <u>January 1, 2016</u> (such as contracts and trust agreements), shall be considered as included within the time period covered by this Subpoena.

C. <u>Privileges and Protections</u>.  If You do not produce documents because You object to part of or an aspect of a request, please provide a written response stating the precise basis for the objection and produce all documents responsive to the remaining part or aspect of the requests.

If any documents responsive to this Subpoena are withheld because of a claim of privilege, please identify the documents You claim are privileged in a written response, and please indicate for each such document: 1) the nature of the privilege or protection claimed; 2) the factual basis for claiming the privilege or protection asserted; 3) the subject matter of the document; 4) the type, length and date of the document; 5) the

author of and/or signatory on the document; 6) the identity of each person to whom the document was directed or distributed; and 7) the nature of the document, e.g., letter, memorandum.

D. <u>Proprietary and Confidential.</u>  If You contend documents responsive to this Subpoena are proprietary or confidential, You should mark those documents as such and produce the documents. The Department of Labor follows procedures in accordance with the Freedom of Information Act (FOIA), 5 U.S.C. § 552,  and Executive Order 12600, which allows for the withholding of certain proprietary and confidential documents pursuant to the requirements of Exemption 4 of FOIA.

E. <u>Electronically stored information.</u>  If any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, then You are directed to produce the document in the format in which the document was created and maintained, provided it is one of the following formats:  Microsoft Word (doc), WordPerfect (wpd), Rich Text (rtf), Microsoft Outlook (pst), Microsoft Outlook Express (msg), Microsoft Excel (xls), Microsoft Access (mdb), Adobe Acrobat (PDF), TIFF, comma separated values (CSV), ASCII, TXT, Concordance, or Quickbooks.  Files of the preceding types can be submitted in a ZIP compressed format.  Sufficient information including sufficient identification of the applicable software program and passwords, if any, should be provided to permit access to and use of the documents.  Images created through a scanning process should have a minimum resolution of 300 dots per inch (dpi).

Where available, Claims data should be provided in Microsoft Excel (xls) or delimited flat file (e.g., text, comma-separated values (CSV), etc.), which allows for the sorting and filtering of data.  A sample format of the Claims data to be provided may be made available upon request.

To the extent that any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, and it is not in one of the previously identified formats, please identify the document and the corresponding format. Regardless of the format in which a document may exist, You are requested to preserve the integrity of the original electronic document and its contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

F. <u>Tenses</u>. Verbs used in the past tense should be read also to include the present tense, and verbs used in the present tense should be read also to include the past tense.

G. <u>Singular/Plural</u>.  The singular number of a noun, pronoun, or verb should be read also to include the plural, and the plural number of a noun, pronoun, or verb should be read also to include the singular.

H. <u>Word Neutrality</u>.  All words and phrases shall be construed as masculine, feminine or gender neutral as necessary to bring within the scope of this Subpoena documents that might otherwise be construed to be outside its scope.

I. <u>Sufficient to Show</u>. Where a request seeks documents "sufficient" to show specified information, in lieu of producing documents, You may submit a sworn affidavit attested to by an authorized representative that provides the requested information.

J.  <u>All/Any</u>.  "All" and "any" shall be construed as necessary to make the request inclusive rather than exclusive.

K.  <u>Manner of Production.</u>  All documents produced in response to this Subpoena shall comply with the following instructions:

1.  You should conduct Your searches for responsive documents in a manner sufficient to identify the source and location where each responsive document is found.

2.  **All documents produced in response to this Subpoena shall be segregated and labeled to show the document request to which the documents are responsive and the source and location where the documents were found.**

3.  To the extent that documents are found in file folders and other similar containers that have labels or other identifying information, the documents shall be produced with such file folder and label information intact.

4.  To the extent that documents are found attached to other documents, by means of paper clips, staples, or other means of attachment, such documents shall be produced together in their condition when found.

5.  All documents provided in response to this Subpoena are to include the notes written in a margin and post-its, as well as any attachment referred to or incorporated by the documents.

6.  In the event that there are no documents responsive to a particular request, please specify that You have no responsive documents.

7.  If documents relied upon or required to respond to any of this Subpoena, or requested documents, are no longer in Your possession, custody, or control, You are required to state what disposition was made of such documents, including identification of the person(s) who are believed to be in possession or control of such documents; the date or dates on which such disposition was made, and the reason for such disposition.

8.  If no Claims/requests/appeals are identified pursuant to any part of this Subpoena, please provide copies of the identifiable source documents evidencing Your determination yielding the existence of no results, to include an explanation of how the search was conducted in Your databases, the search parameters, and any screen shots or other dated documents utilized to arrive at Your finding of no results.

L.  <u>Electronic media.</u>  To the extent that the documents that are responsive to this Subpoena may exist on electronic media, those documents should be provided on one of the following media or via secure file system: Compact Disk – Read Only Memory (CD-ROM), Digital Versatile Disc – Read Only Memory (DVD) or USB hard drive.

## <u>DOCUMENTS TO BE PRODUCED</u>

1. Documents sufficient to show Your ownership, legal identity, and organizational structure, including:
   a. State, territory, commonwealth, or other relevant jurisdictional registrations, articles of incorporation, by-laws, and partnership agreements;
   b. Organizational charts and descriptions of Your organizational and supervisory structure, including changes to Your organizational structure during the relevant time period, and any documents describing the responsibilities of principals, officers, directors, managers, employees, representatives, and independent contractors;
   c. Documents sufficient to show the names and addresses of all divisions, affiliates, or subsidiaries and their principal lines of business;
   d. Documents sufficient to show the identities and percentage of ownership of all of Your shareholders, limited partners, and/or members, excluding those persons holding only publicly traded shares of a parent organization; Documents sufficient to show any change in ownership during the relevant time period, along with the identities and percentage of ownership before and after the change of all of Your shareholders, limited partners, and/or members, excluding those persons holding only publicly traded shares of a parent organization; and
   e. Documents sufficient to identify the members of PIC's Board of Directors, including their titles, tenures, and addresses.

2. Documents sufficient to identify PIC's officers and employees, including their employment agreements, titles, tenures, and addresses.

3. Documents sufficient to show all entities owned, either in whole or in part, by PIC; for those entities that PIC holds a partial interest, the names and percentages of ownership for all other owners.

4. For all entities identified in response to item 3 above, please provide:
   a. An organizational chart;
   b. Articles of Incorporation, Partnership Agreements, or Membership Agreements;
   c. Most recent state, territory, commonwealth, or other regulatory filings (such as anything filed with state insurance agencies); and
   d. List of Board of Directors and entity officers.

5. All of PIC's licenses, registrations and certifications with any government entity.

6. Documents or lists sufficient to show all Employee Welfare Benefit Plans for which PIC provides Services, including:
   a. The name and address of the Plan Sponsor, including the number of employees and the EIN;

      b.  The name and address of the Employee Welfare Benefit Plan, including the number of participants in the plan and the EIN;
      c.  Whether the Employee Welfare Benefit plan is self-funded or fully-insured;
      d.  Name of associated broker(s), including firm name, person name, and contact information;
      e.  Name and address of the Plan's custodian;
      f.  The Services PIC provides;
      g.  Type of product PIC provides;
      h.  Date PIC was hired; and
      i.  Date PIC was terminated, if applicable.

7. All contracts and agreements relating to Services PIC provides to Employee Welfare Benefit Plans, including all contracts for PIC's provision of reinsurance.

8. Documents or lists sufficient to show all clients to which PIC provides and/or licenses products, including:
      a.  The name and address of the client;
      b.  Product(s) PIC provides;
      c.  Services PIC provides; and
      d.  The states and geographic areas in which such products are sold.

9. PIC's audited or unaudited financial statements for 2016-2019, and any quarterly and/or monthly statements for 2020.

10. PIC's Income Statements.

11. PIC's Balance Sheets.

12. PIC's General Ledger and chart of accounts.

13. Documents sufficient to determine the following amounts on a monthly basis for all Employee Welfare Benefit Plans to whom You provide Services:
      a.  Total premiums or contributions received;
      b.  Total reinsurance paid;
      c.  Total paid claims;
      d.  Total incurred claims;
      e.  Loss ratio;
      f.  Surplus;
      g.  Estimates and/or actual measures of incurred but not paid (IBNR or IBNP).

14. Documents relating to all bank accounts maintained by You which receive premiums, funding contributions, or premium equivalents directly or indirectly for the benefit of any Employee Welfare Benefit plan for which You provide Services, including checking accounts, savings accounts, certificates of deposit, money market accounts, etc. For each account identified, include documents sufficient to show:
      a.  Name of the custodian;

      b.  Account number;
      c.  Contact information for account representatives;
      d.  Purpose of the account;
      e.  Authorized persons with deposit and/or withdrawal authority; and
      f.  Name of Account holder/owner.

15. To the extent they differ from Documents described in Request #14, Documents relating to all bank accounts maintained by You which pays or funds claims directly or indirectly for the benefit of any Employee Welfare Benefit plan for which You provide Services, including checking accounts, savings accounts, certificates of deposit, money market accounts, etc. For each account identified, include documents sufficient to show:
      a.  Name of the custodian;
      b.  Account number;
      c.  Contact information for account representatives;
      d.  Purpose of the account;
      e.  Authorized persons with deposit and/or withdrawal authority; and
      f.  Name of Account holder/owner.

16. Documents showing compensation or monies charged to and collected from each Plan for PIC's Services, including fees, expenses, premiums, funding contributions, and premium equivalents.

17. The name(s) and title(s) of all individuals responsible for paying on behalf of the Plans and of all individuals responsible for collecting on behalf of PIC such fees, expenses, premiums, funding contributions, and premium equivalents as described in Request #16.

18. Documents relied on to set fees and expenses charged to Employee Welfare Benefit Plans to whom You provide services.

19. All Fee schedules and all other documents provided to Employee Welfare Benefit Plans regarding the Plans' payment of Fees to PIC.

20. Documents and communications relating to how the amount of funding contributions or premium equivalents is determined for each client Employee Welfare Benefit Plan, including:
      a.  Actuarial analysis and actuarial reports, along with any underlying drafts and workpapers;
      b.  Information about employee health status and demographics;
      c.  Employer enrollment applications;
      d.  Rate sheets;
      e.  Underwriting and rating guidelines; and
      f.  Claims history.

21. Documents sufficient to show internal policies and procedures, manuals, policy changes or performance measurements used by You relating to Services You provide to Employee Welfare Benefit Plans.

22. Names and addresses of all agents and brokers who are licensed to sell PIC products and Services.

23. All commission schedules, marketing materials, and all other Documents provided to agents and brokers licensed to sell Your products and Services.

24. Insurance department or other federal, state, territorial, commonwealth, or other regulatory agency examination reports.

25. Documents and communications reflecting complaints made to PIC with respect to the Services You provide to clients, including letters and documents memorializing telephone calls received from Participants, Health Care Professionals, Employers, or federal, state, territorial, or other regulatory agencies.

26. All documents and communications relating to investigations, findings, fines, or penalties by any federal, state, commonwealth, territorial, or other regulatory agencies.

27. Fidelity bond(s) currently in effect for any Employee Welfare Benefit Plans to whom You provide Services.

28. Documents relating to Fiduciary liability insurance, stop loss insurance, reinsurance, excess loss insurance, and captive insurance purchased, established, negotiated for or for the benefit of any Client, including (but not limited to) contracts and documents demonstrating the rates, claims underwriting, history of premiums, funding contributions, or premium equivalents and receivables, attachment points and deductibles.

29. Communications related to any Employee Welfare Benefit Plan either from or to (including as carbon copies) the following individuals and entities:
    a. Alexander Renfro;
    b. William Bryan;
    c. Arjen Zieger;
    d. Tom Santi;
    e. Roland Brewer;
    f. Randall Johnson;
    g. David Appel;
    h. Hawaii Mainland Administrators (aka HMA);
    i. Patrick Hagan;
    j. The Boon Group;
    k. Jaime Gulli;
    l. David Lindsey
    m. Agentra;
    n. Affordable Benefit Choices, LLC;
    o. Robert Fey;
    p. BeneServ;
    q. Jesseka Fusco;

      r.  Crystal Bay Insurance Services;
      s.  Hazen Mirts;
      t.  and Enrollment First, Inc.

30. Communications with any of the following words or phrases and related to any Employee Welfare Benefit Plan for whom You provide, provided, or bid to provide Services:
      a.  "Funding";
      b.  "Transfer";
      c.  "Authority", "discretion", or "fiduciary";
      d.  "Premium" or "rate";
      e.  "Actuary" or "actuarial"
      f.  "Insufficient funds", "insufficient money", "insufficient assets", or "insufficient cash";
      g.  "Solvent", "insolvent", "solvency", "insolvency", or "bankruptcy";
      h.  "Complain" or "complaint";
      i.  "Claim lag";
      j.  "Adverse", "claim denial", "pend claim", "pended claim" or "denied claim";
      k.  "Loss Ratio";
      l.  "Reserves", or "Surplus";
      m.  "ERISA,";  and
      n.  "Market" or "marketing".

## U.S. Postal Service™
## CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®.*

O F F I C I A L   U S E

Certified Mail Fee

$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)          $ _____
☐ Return Receipt (electronic)        $ _____
☐ Certified Mail Restricted Delivery $ _____
☐ Adult Signature Required           $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage

$

Total Postage and Fees

$

Sent To  Providence Ins Co. Custodian of Records

Street and Apt. No., or PO Box No.  954 Ave Ponce de Leon-Suite 802

City, State, ZIP+4®  San Juan, PR 00907

7017  3040  0000  1188  5724

PS Form 3800, April 2015 PSN 7530-02-000-9047          See Reverse for Instructions

**U.S. Department of Labor**

Employee Benefits Security Administration
230 South Dearborn Street, Suite 2160
Chicago, Illinois 60604
Phone:   (312) 353-0900



OCT 2 1 2019

CERTIFIED MAIL -
RETURN RECEIPT REQUESTED

Providence Insurance Partners, LLC
Custodian of Records
3200 West End Ave.
Suite 500
Nashville, TN 37203

Re:   Anjo, LLC
Case Number: 99-000016(50)

Dear Custodian of Records:

This office is conducting an investigation of the above-referenced matter pursuant to § 504(a)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1134(a)(1), to determine whether any person has violated or is about to violate any provision of Title I of ERISA. Enclosed is a subpoena which requires you to produce certain documents and records in connection with that investigation.

Your personal appearance pursuant to this subpoena will not be required at this time provided the documents are produced on or before the date noted in the subpoena.  You will be informed at a later date if your personal appearance to testify is required.  Even though your appearance is not now being required, please provide a cover letter with your response which identifies the documents being produced.  Your cover letter should also state whether a diligent search has been made for the subpoenaed documents and that the documents transmitted constitute all documents called for by the subpoena.

The subpoena requests that you produce documents maintained in electronic form, Electronically Stored Information (ESI), in electronic form.  The formats in which EBSA can accept ESI are listed in the subpoena.  When producing ESI, you should produce the materials as maintained on your computer system, i.e., you should produce ESI with all files, folders and sub-folders intact, and you should produce emails with all attachments intact.

If any documents called for are not produced, please list such documents and indicate their location and the reason for their non-production.

If you have any questions concerning your rights and duties, you may wish to consult counsel.  If you have any questions concerning the subpoena or the documents required to be produced,

including the production of ESI and the appropriate format and media, please call Senior Investigator Thomas C. Gewin at (404) 302-3917 or Investigator Devon King at (415) 625-2491.

Sincerely,

Jeffrey A. Monhart
Regional Director
Chicago Regional Office
Employee Benefits Security Administration

Enclosure

SUBPOENA

99-002108

# UNITED STATES OF AMERICA
## DEPARTMENT OF LABOR
### Employee Benefits Security Administration

To:    *Providence Insurance Partners, LLC*
      *Custodian of Records*
      *2500 West End Ave.*
      *Suite 500*
      *Nashville, TN 37203*

*You are hereby required to appear before*

*Senior Investigator Thomas C. Gewin*

*of the Employee Benefits Security Administration,*

*U.S. Department of Labor, at*

*61 Forsyth Street SW, Suite 7B54,*

*in the City of Atlanta, Georgia, 30303, on the 8th day of November 2019, at 10:00 a.m. of that day, to testify in the matter of an investigation of*

**Anjo, LLC**

*being conducted pursuant to Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1134, in order to determine whether any person has violated or is about to violate any provision of Title I of ERISA or any regulation or order thereunder;*

*And you are hereby required to bring with you and produce at said time and place the following books, papers, and documents:*

      *SEE ATTACHMENT*

*Fail not at your peril.*



**In testimony whereof** *I have hereunto affixed my signature and the seal of the* **United States Department of Labor** *at Chicago, Illinois on this* 21st *day of October 2019.*

Jeffrey A Monhart

**Jeffrey A. Monhart, Regional Director**

ATTACHMENT TO SUBPOENA
Providence Insurance Partners, LLC

## DEFINITIONS

A. "Providence," "Company," "You," and "Your" shall mean Providence Insurance Partners, LLC, a Tennessee Limited Liability Company, including any predecessors, successors, affiliates or parent companies, its officers and directors, employees or anyone acting on behalf of Providence Insurance Partners, LLC.

B. "Claim(s)" means an itemized statement of Services and costs made by Health Providers to any Employee Welfare Benefit Plan clients for any health care Services, including Pre-Service Claims, Post-Service Claims, Concurrent Care Decisions and Urgent Care Claims as defined by 29 C.F.R. § 2560.503-1.

C. "Communication" means any oral, written, electronic or other exchange or transmission of information (in the form of facts, ideas, inquiries, opinions, analysis or otherwise), including correspondence, memos, reports, electronic mail, electronic documents, telephone conversations, telephone or voicemail messages, face-to-face meetings or conversations, and Internet postings and discussions.

D. "Describe" including its various forms such as "describing," means to fully identify, narrate, present, recite, recount, or otherwise set forth in detail.

E. "Discuss" including its various forms such as "discussing," means to review, report, summarize, evaluate, examine, explain, or consider, as well as discuss.

F. "Document(s)" means, including but not limited to, all writings, recordings or electronic data consisting of letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, word processing, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, still photographs, X-ray films, video tapes, motion pictures, Emails, voicemail messages, electronic instant messages (IM), spreadsheets, databases, electronic calendars and contact managers, back-up data, and/or other form of data compilation, stored in any medium from which information can be obtained (including but not limited to magnetic tape, magnetic disk, CD-ROM, DVD, optical disk, flash drive or other electronic or mechanical storage device), however produced, reproduced or stored, of every kind of description within Your possession, custody or control, or within the possession, custody or control of any agent, employee, representative or other persons acting or purporting to act for or on behalf of You, including but not limited to notes; memoranda; records; reports; correspondence; communications; telexes and faxes; agreements; contracts; accounting or financial records or worksheets; account books; journals; ledgers; bills; receipts; vouchers; transcripts or notes of conversations or meetings; minutes of meetings; statements; directives in any form from general partners or other representatives; diary entries; studies; summaries and/or records of telephone conversations; interviews, meetings and/or conferences; tabulations; and shall include the original and all nonidentical copies; all drafts even if not published, disseminated, or used for any purpose; all notes, schedules, footnotes, attachments, enclosures, and documents attached or referred to in

any document to be produced pursuant to this Subpoena.

G. "EIN" means the employer identification number issued by the Internal Revenue Service for an Employer or Employee Welfare Benefit Plan.

H. "Email" means any electronic communication made using computer communications software, whether through a local computer network or through the Internet, and whether maintained in electronic form and/or paper form. Email maintained in electronic form may be produced in electronic form.

I. "Employee" means any individual employed by an Employer, as defined in Section 3(6) of ERISA, 29 U.S.C. § 1002(6).

J. "Employee Welfare Benefit Plan(s)" means any plan, fund, or program which was established or maintained by an Employer by an Employee Organization or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing through the purchase of insurance or otherwise, medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability or death, as defined in Section 3(1) of ERISA, 29 U.S.C. § 1002(1).

K. "Employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an Employee Welfare Benefit Plan; includes a group or association of employers acting for an employer in such capacity, as defined in Section 3(5) of ERISA, 29 U.S.C. § 1002(5).

L. "ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, et. seq., as amended.

M. "Fee(s)" means any charge, including administration Fees, Service Fees, per capita Fees, management Fees, and participating Health Provider Fees.

N. "Health Care Professional(s)" or "Health Provider(s)" means a physician, healthcare professional, laboratory, laboratory testing Service, or health care facility licensed, certified or accredited as required by law.

O. "Participant" means a person as defined by ERISA Section 3(7), 29 U.S.C. § 1002(7).

P. "Plan Document" shall mean a document or instrument governing any term of the Plan, including any document or instrument that describes plan operations and administration, eligibility rules, the provision of health care Services, and Claims and appeals procedures.

Q. "Plan Sponsor" means (i) the employer in the case of an Employee Welfare Benefit Plan established or maintained by a single employer, (ii) the employee organization in the case of a plan established or maintained by an employee organization, or (iii) for a plan established or maintained by two or more employers or jointly by one or more employers and one or more employee organization, the association, committee, joint board of trustees, or other similar group of representatives of the parties who establish or maintain the plan, as defined in Section 3(16)(B) of ERISA, 29 U.S.C. § 1002(16).

R. "Service(s)" means any kind of product or Service offered by Providence, whether directly or indirectly, to any Employee Welfare Benefit Plan, and however the expenses

for such Service or product is paid for or reimbursed, including but not limited to medical or health Services, insurance coverage, Claims processing, recordkeeping, customer or call center Services, enrollee education, group insurance products, and third-party administration products or Services. Medical and health Services shall be broadly construed to include dental, vision, physical therapy, speech therapy, occupational therapy, psychotherapy, therapy for drug and alcohol addiction, treatment for eating disorders, and drugs or devices.

S.  "Service Agreement" means a document setting forth specific Services to be rendered by Providence and the compensation to be paid for those Services by the person retaining Providence, as provided herein.

T.  "Service Provider" shall mean any person or entity that performed, or continues to perform, any Services to or for the Plan, including any billing agent, marketing agent, recordkeeper, plan administrator, third party administrator, call center service, insurer, underwriter, Claims administrator, broker, consultant, adviser, custodian, subadviser, transition manager, or investment manager (as defined by ERISA Section 3(38), 29 U.S.C. §1002(38)).

U.  "Report(s)" means any information produced or generated by Providence relating to Services provided to any Employee Welfare Benefit Plan, including electronic reports.

## INSTRUCTIONS

A.  <u>Scope of search</u>.  You are required to search for, obtain and produce all responsive documents, including without limitation documents that are in Your custody or control, but not in Your immediate possession. This includes any responsive documents in the possession, custody or control of any person acting on Your behalf or under Your direction or control, such as Your employees, accountants, agents, representatives, attorneys or advisors.

B.  <u>Relevant time period</u>.  Unless otherwise specified, the time period covered by this Subpoena is from January 1, 2016 to the present. Documents created prior to January 1, 2016 which have been used or relied on since January 1, 2016 or which describe legal duties which remain in effect after January 1, 2016 (such as contracts and trust agreements), shall be considered as included within the time period covered by this Subpoena.

C.  <u>Privileges and Protections</u>.  If You do not produce documents because You object to part of or an aspect of a request, please provide a written response stating the precise basis for the objection and produce all documents responsive to the remaining part or aspect of the requests.

If any documents responsive to this Subpoena are withheld because of a claim of privilege, please identify the documents You claim are privileged in a written response, and please indicate for each such document: 1) the nature of the privilege or protection claimed; 2) the factual basis for claiming the privilege or protection asserted; 3) the subject matter of the document; 4) the type, length and date of the document; 5) the

author of and/or signatory on the document; 6) the identity of each person to whom the document was directed or distributed; and 7) the nature of the document, e.g., letter, memorandum.

D. <u>Proprietary and Confidential.</u> If You contend documents responsive to this Subpoena are proprietary or confidential, You should mark those documents as such and produce the documents. The Department of Labor follows procedures in accordance with the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and Executive Order 12600, which allows for the withholding of certain proprietary and confidential documents pursuant to the requirements of Exemption 4 of FOIA.

E. <u>Electronically stored information.</u> If any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, then You are directed to produce the document in the format in which the document was created and maintained, provided it is one of the following formats: Microsoft Word (doc), WordPerfect (wpd), Rich Text (rtf), Microsoft Outlook (pst), Microsoft Outlook Express (msg), Microsoft Excel (xls), Microsoft Access (mdb), Adobe Acrobat (PDF), TIFF, comma separated values (CSV), ASCII, TXT, Concordance, or Quickbooks. Files of the preceding types can be submitted in a ZIP compressed format. Sufficient information including sufficient identification of the applicable software program and passwords, if any, should be provided to permit access to and use of the documents. Images created through a scanning process should have a minimum resolution of 300 dots per inch (dpi).

Where available, Claims data should be provided in Microsoft Excel (xls) or delimited flat file (e.g. text, comma-separated values (CSV), etc.), which allows for the sorting and filtering of data. A sample format of the Claims data to be provided may be made available upon request.

To the extent that any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, and it is not in one of the previously identified formats, please identify the document and the corresponding format. Regardless of the format in which a document may exist, You are requested to preserve the integrity of the original electronic document and its contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

F. <u>Tenses.</u> Verbs used in the past tense should be read also to include the present tense, and verbs used in the present tense should be read also to include the past tense.

G. <u>Singular/Plural.</u> The singular number of a noun, pronoun, or verb should be read also to include the plural, and the plural number of a noun, pronoun, or verb should be read also to include the singular.

H. <u>Word Neutrality.</u> All words and phrases shall be construed as masculine, feminine or gender neutral as necessary to bring within the scope of this Subpoena documents that might otherwise be construed to be outside its scope.

I. <u>Sufficient to Show.</u> Where a request seeks documents "sufficient" to show specified information, in lieu of producing documents, You may submit a sworn affidavit attested to by an authorized representative that provides the requested information.

J.  <u>All/Any</u>.  "All" and "any" shall be construed as necessary to make the request inclusive rather than exclusive.

K.  <u>Manner of Production.</u>  All documents produced in response to this Subpoena shall comply with the following instructions:

1.  You should conduct Your searches for responsive documents in a manner sufficient to identify the source and location where each responsive document is found.

2.  All documents produced in response to this Subpoena shall be segregated and labeled to show the document request to which the documents are responsive and the source and location where the documents were found.

3.  To the extent that documents are found in file folders and other similar containers that have labels or other identifying information, the documents shall be produced with such file folder and label information intact.

4.  To the extent that documents are found attached to other documents, by means of paper clips, staples, or other means of attachment, such documents shall be produced together in their condition when found.

5.  All documents provided in response to this Subpoena are to include the notes written in a margin and post-its, as well as any attachment referred to or incorporated by the documents.

6.  In the event that there are no documents responsive to a particular request, please specify that You have no responsive documents.

7.  If documents relied upon or required to respond to any of this Subpoena, or requested documents, are no longer in Your possession, custody, or control, You are required to state what disposition was made of such documents, including identification of the person(s) who are believed to be in possession or control of such documents; the date or dates on which such disposition was made, and the reason for such disposition.

8.  If no Claims/requests/appeals are identified pursuant to any part of this Subpoena, please provide copies of the identifiable source documents evidencing Your determination yielding the existence of no results, to include an explanation of how the search was conducted in Your databases, the search parameters, and any screen shots or other dated documents utilized to arrive at Your finding of no results.

L.  <u>Electronic media.</u>  To the extent that the documents that are responsive to this Subpoena may exist on electronic media, those documents should be provided on one of the following media: Compact Disk – Read Only Memory (CD-ROM), Digital Versatile Disc – Read Only Memory (DVD) or USB hard drive.

## DOCUMENTS TO BE PRODUCED

1. Documents sufficient to show Your ownership, legal identity, and organizational structure, including:

   a. State registrations, articles of incorporation, by-laws, and partnership agreements;
   b. Organizational charts, descriptions of Your organizational and supervisory structure, and any documents describing the responsibilities of principals, officers, directors, managers, employees, representatives, and independent contractors;
   c. Documents sufficient to show the names and addresses of all divisions, affiliates, or subsidiaries and their principal lines of business;
   d. Documents sufficient to show the identities and percentage of ownership of all of Your shareholders, limited partners, and/or members, excluding those persons holding only publicly traded shares of a parent organization; and
   e. Documents sufficient to identify the members of Providence's Board of Directors, including their titles, tenures, and addresses.

2. Documents sufficient to identify Providence's officers and employees, including their employment agreements, titles, tenures, and addresses.

3. Documents sufficient to show all entities owned, either in whole or in part, by Providence; for those entities that Providence holds a partial interest, the names and percentages of ownership for all other owners.

4. For all entities identified in response to item 3 above, please provide:

   a. An organizational chart;
   b. Articles of Incorporation or Partnership Agreements;
   c. Most recent state filings (such as anything filed with state insurance agencies); and
   d. List of Board of Directors and entity officers.

5. All of Providence's licenses and certifications with any government entity, including all local, State or Federal entities located in the United States.

6. Documents sufficient to show all Employee Welfare Benefit Plans for which Providence provides Services, including:

   a. The name and address of the Plan Sponsor, including the number of employees and the EIN;
   b. The name and address of the Employee Welfare Benefit Plan, including the number of participants in the plan and the EIN;
   c. Whether the Employee Welfare Benefit plan is self-funded or fully-insured;

  d. Name of associated broker(s), including firm name, person name, and contact information;
  e. Name and address of the Plan's custodian;
  f. The Services Providence provides;
  g. Date Providence was hired; and
  h. Date Providence was terminated, if applicable.

7. All contracts and agreements relating to Services Providence provides to Employee Welfare Benefit Plans.

8. Documents sufficient to show all clients to which Providence provides and/or licenses products, including:

  a. The name and address of the client;
  b. Product(s) Providence provides;
  c. Services Providence provides; and
  d. The states and geographic areas in which such products are sold.

9. All template and prototype documents and forms used to solicit, enroll, administer, maintain, and terminate clients, including all template versions of contract and service agreements, fee schedules, amendments and riders, enrollment packages, disclosures, disclaimers, and waiver and releases of liability.

10. Documents showing the name, address, and phone number of each entity and person that marketed Services or products provided by Providence to potential Clients, including all brokers, promoters, producers, agents, or aggregators.

11. For all products and/or Services that Providence markets through the entities and people identified in item 10 above, please provide all marketing materials they use, including:

  a. Brochures;
  b. Product eligibility sheets; and
  c. All other marketing materials.

12. Prototype documents prepared on behalf of Employee Welfare Benefit Plans to whom Providence provides Services, including:

  a. Benefit booklets or brochures;
  b. Summaries of benefits and coverage (SBC);
  c. Plan documents;
  d. Summary plan descriptions (SPD);
  e. Evidence(s) of coverage (EOC); and
  f. Any other document relating to the Employee Welfare Benefit Plan's benefits or Claims procedures.

13. Documents showing compensation or monies charged to and collected from each Plan on a quarterly (or other periodic) basis for Providence's Services, including fees, expenses, premiums, funding contributions, premium equivalents, and who is responsible for paying such fees.

14. Documents relating to all bank accounts maintained by You for the benefit of any Employee Welfare Benefit plan for which you hold the assets, including checking accounts, savings accounts, certificates of deposit, money market accounts, etc. For each account identified, include documents sufficient to show:

    a. Name of the custodian;
    b. Account number;
    c. Contact information for account representatives;
    d. Purpose of the account; and
    e. Authorized persons with deposit and/or withdrawal authority.

15. Documents sufficient to show the procedures used by You with respect to the billing of all Employee Welfare Benefit Plans to whom You provide Services, to include invoices, evidence of payment, and any reconciliations.

16. All Fee schedules and all other documents provided to clients regarding the clients' payment of Fees to Providence.

17. Documents sufficient to show internal policies and procedures, manuals, policy changes or performance measurements used by You relating to Services You provide to Employee Welfare Benefit Plans.

18. Documents sufficient to show all of the network providers used by the Employee Welfare Benefit Plans to whom You provide Services, including:

    a. Your ownership interest in any network provider(s);
    b. The manner in which the network(s) was selected;
    c. The identity of the person who was responsible for selecting the network(s);
    d. The manner in which the fees for the network(s) are determined;
    e. Whether You earn additional compensation directly or indirectly through Your ownership interest in the network(s); and
    f. The procedures used by You to furnish network(s) services.

19. Documents and communications reflecting complaints made to Providence with respect to the Services You provide to clients, including letters and documents memorializing telephone calls received from Participants, Health Care Professionals, Employers, or state or federal regulatory agencies.

20. Fidelity bond(s) currently in effect for any Employee Welfare Benefit Plans to whom You provide Services.

21. Documents relating to Fiduciary liability insurance, stop loss insurance, reinsurance, excess loss insurance, and captive insurance purchased, established, or negotiated for or on behalf of any Client, including contracts and documents demonstrating the establishment of rates, claims underwriting, history of premiums and recoverables, and attachment points and deductibles.

22. Providence's audited financial statements for 2016, 2017, and 2018, and any quarterly and/or monthly statements for 2019.

23. Providence's General Ledger and chart of accounts.

**U.S. Department of Labor**     Employee Benefits Security Administration
230 South Dearborn Street, Suite 2160
Chicago, Illinois 60604
Phone:   (312) 353-0900



OCT 2 1 2019

<u>CERTIFIED MAIL -</u>
<u>RETURN RECEIPT REQUESTED</u>

My Home Group Data Partnership, LP
Custodian of Records
ATTN: Jonathan Crumly, Registered Agent
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339

                Re:     Anjo, LLC
                       Case Number: 99-000016(50)

Dear Custodian of Records:

This office is conducting an investigation of the above-referenced matter pursuant to § 504(a)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1134(a)(1), to determine whether any person has violated or is about to violate any provision of Title I of ERISA. Enclosed is a subpoena which requires you to produce certain documents and records in connection with that investigation.

Your personal appearance pursuant to this subpoena will not be required at this time provided the documents are produced on or before the date noted in the subpoena.  You will be informed at a later date if your personal appearance to testify is required.  Even though your appearance is not now being required, please provide a cover letter with your response which identifies the documents being produced.  Your cover letter should also state whether a diligent search has been made for the subpoenaed documents and that the documents transmitted constitute all documents called for by the subpoena.

The subpoena requests that you produce documents maintained in electronic form, Electronically Stored Information (ESI), in electronic form.  The formats in which EBSA can accept ESI are listed in the subpoena.  When producing ESI, you should produce the materials as maintained on your computer system, i.e., you should produce ESI with all files, folders and sub-folders intact, and you should produce emails with all attachments intact.

If any documents called for are not produced, please list such documents and indicate their location and the reason for their non-production.

If you have any questions concerning your rights and duties, you may wish to consult counsel. If you have any questions concerning the subpoena or the documents required to be produced, including the production of ESI and the appropriate format and media, please call Senior Investigator Thomas C. Gewin at (404) 302-3917 or Investigator Devon King at (415) 625-2491.

Sincerely,

Jeffrey A. Monhart
Regional Director
Chicago Regional Office
Employee Benefits Security Administration

Enclosure

**SUBPOENA**

99-002116

# UNITED STATES OF AMERICA
## DEPARTMENT OF LABOR
### Employee Benefits Security Administration

To:    *My Home Group Data Partnership, LP*
*Custodian of Records*
*ATTN: Jonathan Crumly, Registered Agent*
*1600 Parkwood Circle*
*Suite 200*
*Atlanta, GA 30339*


*You are hereby required to appear before*

*Senior Investigator Thomas C. Gewin*

*of the Employee Benefits Security Administration,*

*U.S. Department of Labor, at*

*61 Forsyth Street SW, Suite 7B54,*

*in the City of Atlanta, Georgia, 30303, on the 8th day of November 2019, at 10:00 a.m. of that day, to testify in*

*the matter of an investigation of*

**Anjo, LLC**

*being conducted pursuant to Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29*

*U.S.C. Section 1134, in order to determine whether any person has violated or is about to violate any provision*

*of Title I of ERISA or any regulation or order thereunder;*

*And you are hereby required to bring with you and produce at said time and place the following books, papers,*
*and documents:*

    *SEE ATTACHMENT*

*Fail not at your peril.*



**In testimony whereof** *I have hereunto affixed my signature*
*and the seal of the* **United States Department of Labor**
*at Chicago, Illinois on this* 21st *day of October 2019.*

Jeffrey A Monhart

**Jeffrey A. Monhart, Regional Director**

## ATTACHMENT TO SUBPOENA
## My Home Group Data Partnership, LP

### DEFINITIONS

A.     "MHGDP," "You," or "Your" shall mean My Home Group Data Partnership, LP, including any predecessors, successors, affiliates or parent companies, its officers and directors, employees or anyone acting on behalf of My Home Group Data Partnership, LP.

B.     "Plan" shall mean any welfare benefit plan sponsored by MHGDP.

C.     "And" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

D.     "Beneficiary" means a person as defined by ERISA Section 3(8), 29 U.S.C., § 1002(8).

E.     "Claim(s)" means an itemized statement of Services and costs made by Health Providers (as defined herein) to any Employee Welfare Benefit Plan clients for any health care Services, including pre-Service Claims, post-Service Claims, concurrent care Claims and urgent care Claims as defined by 29 C.F.R. § 2560.503-1.

F.     "Communication" means any oral, written, electronic or other exchange or transmission of information (in the form of facts, ideas, inquiries, opinions, analysis or otherwise), including correspondence, memorandum, reports, electronic mail, electronic documents, facsimiles, communications sent or received by computer systems or applications, telephone conversations, telephone or voicemail messages, face-to-face meetings or conversations, and Internet postings and discussions.

G.     "Describe" including its various forms such as "describing," means to fully identify, narrate, present, recite, recount, or otherwise set forth in detail.

H.     "Discuss" including its various forms such as "discussing," means to review, report, summarize, evaluate, examine, explain, or consider, as well as discuss.

I.     "Document(s)" means, including but not limited to, all writings, recordings or electronic data consisting of letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, word processing, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, still photographs, X-ray films, video tapes, motion pictures, electronic mail messages (email), voice mail messages, electronic instant messages (IM) messages of any type disseminated through a computer network, spreadsheets, databases, electronic calendars and contact managers, back-up data, and/or other form of data compilation, stored in any medium from which information can be obtained (including but not limited to magnetic tape, magnetic disk, CD-ROM, DVD, optical disk, flash drive or other electronic or mechanical storage device), however produced, reproduced or stored, of every kind of description within Your possession, custody or control, or the possession, custody or control of any agent,

1

employee, representative or other persons acting or purporting to act for or on behalf of You or the Plan, including but not limited to notes; memoranda; records; reports; correspondence; telexes and faxes; agreements; contracts; accounting or financial records or worksheets; account books; journals; ledgers; bills; receipts; vouchers; transcripts or notes of conversations or meetings; minutes of meetings; statements; directives in any form from general partners or other representatives; diary entries; studies; summaries and/or records of telephone conversations; interviews, meetings and/or conferences; tabulations; and shall include the original and all non-identical copies; all drafts even if not published, disseminated, or used for any purpose; all notes, schedules, footnotes, attachments, enclosures, and documents attached or referred to in any document to be produced pursuant to this Subpoena.

J.    "Email" or "electronic mail" means any electronic communication made using computer communications software, whether through a local computer network or through the Internet, and whether maintained in electronic form and/or paper form. Email maintained in electronic form must be produced in electronic form.

K.    "Employee Benefit Plan" means an employee benefit plan as defined in Section 3(3) of ERISA, 29 U.S.C., § 1002(3).

L.    "Employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an Employee Welfare Benefit Plan; includes a group or association of employers acting for an employer in such capacity, as defined in Section 3(5) of ERISA, 29 U.S.C. § 1002(5).

M.    "ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, et. seq., as amended.

N.    "Fee" means any charge, including administration Fees, Service Fees, per capita Fees, management Fees, and participating Provider Fees.

O.    "Fiduciary" shall have the same meaning as such term has under Section 3(21) of ERISA, 29 U.S.C., § 1002(21), and sections and regulations related thereto.

P.    "Health Coverage" shall include any medical, surgical, mental health and substance use disorder benefits or Services, and all the variations within these Services under each option available to Plan Participants and Beneficiaries, including but not limited to, high, mid and low options offered under Fee for Service or indemnity arrangements, health maintenance organizations, preferred provider organizations and point of service plans.

Q.    "Including" shall be construed to mean "without limitation."

R.    "Issuer" means an insurance company, insurance service, or insurance organization (including a health maintenance organization) which is licensed to engage in the business of insurance in a State and which is subject to State law which regulates insurance (within the meaning of Section 514(b)(2) of ERISA, 29 U.S.C. § 1144(b)(2)).

S.    "Participant" means a person as defined by ERISA Section 3(7), 29 U.S.C. § 1002(7).

2

T.  "Party in Interest" means a person or entity defined in Section 3(14) of ERISA, 29 U.S.C. § 1002(14).

U.  "Plan Document" means a document or instrument governing any term of the Plan, including any document or instrument that describes plan operations and administration, eligibility rules, the provision of Health Coverage, and Claims and appeals procedures.

V.  "Relating to" or "reflecting" means constituting, referring to, pertaining to, responding to, regarding, evidencing, explaining, discussing, depicting, analyzing, or containing any information which in any way concerns, affects, or describes the terms or conditions, or identifies facts, with respect to the subject of the inquiry.

W.  "Service Agreement" means a document setting forth specific Services to be rendered by the person providing the Services and the compensation to be paid for those Services in connection to the Plan.

X.  "Service Provider" shall mean any person or entity that performed, or continues to perform, any services to or for the Plan, including any billing agent, marketing agent, recordkeeper, plan administrator, third party administrator, call center service, insurer, underwriter, claims administrator, broker, consultant, adviser, custodian, subadviser, transition manager, or investment manager (as defined by ERISA Section 3(38), 29 U.S.C. §1002(38)).

Y.  "Service(s)" means any kind of product or Service offered to the Plan, including but not limited to medical or health Services, insurance coverage, Claims processing, recordkeeping, call center Services, enrollee education, group insurance products, and third-party administration products or Services. Medical and health Services shall be broadly construed to include dental, vision, physical therapy, speech therapy, occupational therapy, psychotherapy, therapy for drug and alcohol addiction, treatment for eating disorders, and drugs or devices.

Z.  "Summary Plan Description" shall mean a summary document or documents as defined in ERISA Section 102, 29 USC §1022, and related sections.

## INSTRUCTIONS

A.  <u>Scope of search</u>. This Subpoena calls for all documents in Your possession, custody, control, to the extent not already produced by You. You are required to search for, obtain and produce all responsive documents, including without limitation documents that are in Your custody or control, even if not in Your immediate possession, for every level of Health Coverage available under the Plan. This includes any responsive documents in the possession, custody or control of any person acting on Your behalf or under Your direction or control, such as Your employees, accountants, agents, representatives, attorneys or advisors.

B.  <u>Relevant time period</u>. Unless otherwise specified, the time period covered by this Subpoena is from <u>January 1, 2016</u> to the date of production. Documents created prior to <u>January 1, 2016,</u> which have been used or relied on since <u>January 1, 2016,</u> or which

3

describe legal duties which remain in effect after January 1, 2016 (such as contracts and trust agreements), shall be considered as included within the time period covered by this Subpoena.

C.    Privileges and Protections. If You do not produce documents because You object to part of or an aspect of a request, please provide a written response stating the precise basis for the objection and produce all documents responsive to the remaining part or aspect of the requests.

If any documents responsive to this Subpoena are withheld because of a claim of privilege, please identify the documents You claim are privileged in a written response, and please indicate for each such document: 1) the nature of the privilege or protection claimed; 2) the factual basis for claiming the privilege or protection asserted; 3) the subject matter of the document; 4) the type, length and date of the document; 5) the author of and/or signatory on the document; 6) the identity of each person to whom the document was directed or distributed; and 7) the nature of the document, e.g., letter, memorandum.

D.    Proprietary and Confidential. If you contend documents responsive to this Subpoena are proprietary or confidential, you should mark those documents as such and produce the documents. The Department of Labor follows procedures in accordance with the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and Executive Order 12600, which allows for the withholding of certain proprietary and confidential documents pursuant to the requirements of Exemption 4 of FOIA.

E.    Electronically stored information. If any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, then You are directed to produce the document in computerized form in one of the following formats: Microsoft Word (doc), WordPerfect (wpd), Rich Text (rtf), Microsoft Outlook (pst), Microsoft Outlook Express (msg), Microsoft Excel (xls), Microsoft Access (mdb), Adobe Acrobat (PDF), TIFF, comma separated values (CSV), ASCII, TXT, Concordance, or Quickbooks. It is preferable to receive electronic information stored in databased or tabular format (e.g. CSV or other delimited, XLS, XLSX, etc.). Files of the preceding types can be submitted in a ZIP compressed format. Sufficient information including sufficient identification of the applicable software program and passwords, if any, and data structure (if applicable) should be provided to permit access to and use of the documents. Images created through a scanning process should have a minimum resolution of 300 dots per inch (dpi).

Where available, Claims data should be provided in Microsoft Excel (xls) or delimited flat file (e.g. text, comma-separated values (CSV), etc.), which allows for the sorting and filtering of data. A sample format of the Claims data to be provided may be made available upon request.

To the extent that any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, and it is not in one of the previously identified formats, please identify the document and the corresponding format.

4

Regardless of the format in which a document may exist, You are requested to preserve the integrity of the original electronic document and its contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

F.   Tenses.  Verbs used in the past tense should be read also to include the present tense, and verbs used in the present tense should be read also to include the past tense.

G.   Singular/Plural.  The singular number of a noun, pronoun, or verb should be read also to include the plural, and the plural number of a noun, pronoun, or verb should be read also to include the singular.

H.   Word Neutrality.  All words and phrases shall be construed as masculine, feminine or gender neutral as necessary to bring within the scope of this Subpoena documents that might otherwise be construed to be outside its scope.

I.   Sufficient to Show.  Where a request seeks documents "sufficient" to show specified information, in lieu of producing documents, you may submit a sworn affidavit attested to by an authorized representative that provides the requested information.

J.   Manner of production.  All documents produced in response to this Subpoena shall comply with the following instructions:

   a.  You should conduct Your searches for responsive documents in a manner sufficient to identify the source and location where each responsive document is found.

   b.  All documents produced in response to this Subpoena shall be segregated and labeled to show the document request to which the documents are responsive and the source and location where the documents were found.

   c.  To the extent that documents are found in file folders and other similar containers that have labels or other identifying information, the documents shall be produced with such file folder and label information intact.

   d.  To the extent that documents are found attached to other documents, by means of paper clips, staples, or other means of attachment, such documents shall be produced together in their condition when found.

   e.  All documents provided in response to this Subpoena are to include the notes written in a margin and post-its, as well as any attachment referred to or incorporated by the documents.

   f.  In the event that there are no documents responsive to a particular request, please specify that You have no responsive documents.

   g.  If documents relied upon or required to respond to any of this Subpoena, or requested documents, are no longer in Your possession, custody, or control, You

5

are required to state what disposition was made of such documents, including identification of the person(s) who are believed to be in possession or control of such documents; the date or dates on which such disposition was made, and the reason for such disposition.

h.  If no Claims/requests/appeals are identified pursuant to any part of this Subpoena, please provide copies of the identifiable source documents evidencing Your determination yielding the existence of no results, to include an explanation of how the search was conducted in Your databases, the search parameters, and any screen shots or other dated documents utilized to arrive at Your finding of no results.

K.  Electronic media:

To the extent that the documents that are responsive to this Subpoena may exist on electronic media, those documents should be provided on one of the following media: Compact Disk – Read Only Memory (CD-ROM), Digital Versatile Disc – Read Only Memory (DVD) or USB hard drive.

6

## DOCUMENTS TO BE PRODUCED

1.  Documents relating to MHGDP's organizational and management structure and ownership, including, but not limited to:

    a.  Articles of incorporation, corporate bylaws, and partnership agreements;
    b.  Organizational charts, descriptions of Your organizational and supervisory structure, and any documents describing the responsibilities of principals, officers, directors, managers, employees, representatives, and independent contractors;
    c.  Documents sufficient to show the names and address of all divisions, affiliates, or subsidiaries and their principal lines of business;
    d.  Documents sufficient to show the identities and percentage of ownership of all of Your shareholders, limited partners, and/or members, excluding those persons holding only publicly traded shares of a parent organization; and
    e.  Documents sufficient to show the name and contact information for each of Your managerial employees and corporate officers.

2.  Plan document(s), including the following:

    a.  Amendments and resolutions, with signatures;
    b.  Summary Plan Description (SPD);
    c.  Wrap document;
    d.  Trust Agreement;
    e.  Benefits booklets;
    f.  Employee handbooks which discuss employee benefits;
    g.  Evidences of Coverage (EOCs) and Certificates of Coverage for each medical option;
    h.  Enrollment package provided to Participants at open enrollment and new hire, including front and back of all enrollment forms;
    i.  Documents describing plan coverages, rules, costs, or changes to any of the above documents, including any Notices of Material Modifications; and
    j.  Documents describing and governing any supplemental benefits offered in connection to the Plan.

3.  Summary of Benefits and Coverage (SBC) and Uniform Glossary for the Plan.

4.  Documents describing the cost of coverage for each option under the Plan, including premiums by type of coverage (e.g. single, family), employee vs. employer share of cost of coverage, and the cost of COBRA coverage.

5.  Contracts, including amendments thereto, between MHGDP or the Plan and Service Providers, including brokers, consultants, third party administrators, record-keepers, actuaries, Claim processors, issuers, and agents. Contracts should include any performance agreements and Fee schedules reflecting compensation as well as engagement and other letters defining the scope of work.

6.  Communications between MHGDP or the Plan and Service Providers, including brokers, consultants, third party administrators, record-keepers, actuaries, Claim processors, and agents.

7.  Current fidelity bond policy, including all endorsements and riders, if applicable.

8.  Current fiduciary insurance policy, including all endorsements and riders, if applicable.

9.  The Plan's latest Form 5500 Annual Report filing and any associated financial statements/schedules and accountant's opinion, if applicable.

10. Form M-1 filings.

11. Documents sufficient to identify all individuals (name, position, contact information) directly or indirectly responsible for the operation, administration, and/or oversight of the Plan. This includes trustees, administrative or oversight committee members, and accounting or human resources personnel who process plan paperwork, such as enrollment, Claims, Participant inquiries, and premium payments.

12. Meeting minutes related to the Plan, including meetings by the Board of Trustees, as well as minutes of Trustee committees, subcommittees, or other administrative groups.

13. Communications between MHGDP or the Plan and Employers, Plan Participants, or potential Plan Participants in connection to:

    a.  The benefits provided by the Plan;
    b.  The transfer of Participants from any other plan or arrangement to the Plan;
    c.  The adjudication of specific Claims; and
    d.  The appeal of denied Claims.

14. Marketing materials related to the Plan, including Power Point slides, brochures, emails, and other communications provided by MHGDP or the Plan or in consultation with MHGDP or the Plan, including communications and materials provided to Participants and to brokers, agents, or promoters.

15. Documents sufficient to identify the following with respect to all current and former Plan Participants:

    a.  Name;
    b.  Contact information;
    c.  Basis for eligibility to participate in the Plan, including employment contracts, payroll reports, W-2s, 1099s, or other records sufficient to demonstrate the nature of any employment relationship;
    d.  Enrollment date;
    e.  Coverage option(s) and type of coverage (e.g. single, family);
    f.  Termination date and reason for termination; and
    g.  Total premiums or contributions paid through the date of production.

8

16. All summary pages of payroll registers showing the total amount of employee health plan contributions withheld for each pay date within the applicable time frame.

17. Documents sufficient to identify all bank accounts maintained by MHGDP relating to the Plan, including:

   a. Name of the custodian;
   b. Account number;
   c. Contact information for account representatives;
   d. Purpose of the account; and
   e. Authorized persons with deposit and/or withdrawal authority.

18. Documents sufficient to show the Plan's income, expenses, assets, and liabilities on a monthly basis for the period under review, including:

   a. Invoices;
   b. Bank or investment account statements;
   c. Canceled checks, deposit slips, and electronic transfer records;
   d. Internal and external ledgers and journals; and
   e. Audited and unaudited financial statements.

19. For all rebates, including medical loss ratio rebates, experience-rated contract rebates, and any other rebate from an insurer, received by the Plan, plan sponsor, or any affiliated or related entity, in relation to the Plan:

   a. Documents detailing the amount, receipt date, source, and handling of each rebate;
   b. Sample of notice to Participants about rebates, if applicable;
   c. Documents demonstrating the allocation of rebated amounts to employer and/or employees; and
   d. Correspondence regarding how rebates are to be used or allocated.

20. Claims lag reports or other reports detailing the amount of time from Claim filing to Claim payments.

21. All Claims aging or experience reports.

22. List of all unpaid and pended claims detailing date of claim, service type, billed amount, and reason for pending.

23. External or internal auditor's reports related to the Plan's operations, including Claims audits completed by a Service Provider or consulting firm.

24. Documents utilized or relied upon to determine contribution amounts, including:

   a. External or internal actuarial reports;

9

    b.  Rate sheets;

    c.  Communications;

    d.  Underwriting and rating guidelines, methodologies, and assumptions;

    e.  Source data; and

    f.  Contracts for reinsurance, stop loss, or other form of excess loss insurance.

25.    Documents sufficient to show any Fees, commissions, or other compensation received directly or indirectly by MHGDP or its principals, officers, directors, managers, employees, or representatives in connection with the Plan.

26.    Documents sufficient to show any commissions, Fees, or other compensation paid in connection with the marketing of the Plan to employers or individuals, including contracts, agreements, invoices, cancelled checks or electronic transfer records, account statements, and financial statements.

27.    Documents related to gifts, gratuities, favors, expense reimbursements, and personal Services provided among or between the Plan, the Plan's Service Providers, and MHGDP or its General Partner, principals, officers, directors, managers, employees, or representatives.

28.    Documents and communications relating to pending or past litigation between the Plan or MHGDP and any current or former Participants or members.

29.    Documents and communications relating to complaints, investigations, findings, fines, or penalties by state and federal agencies.

30.    MHGDP's Federal Income Tax Returns.

**U.S. Department of Labor**

61 Forsyth Street SW
Atlanta, Georgia 30303    Ste 7B54

Official Business
Penalty for Private Use, $300

354



**CERTIFIED MAIL®**

9414 8169 0116 9213 8464 36

MY HOME GROUP DATA PARTNERSHIP
CUSTODIAN OF RECORDS
1600 PARKWOOD CIRCLE SE Ste 200
ATLANTA GA 30339-2119

Custodian of Records
Attn: Jonathan Crumly
1600 Parkwood Circle
Suite 200
Atlanta, Georgia  30339

$6.40⁰
US POSTAGE
FIRST-CLASS
FROM 30303
OCT 23 2019
stamps
endicia

**U.S. Department of Labor**     Employee Benefits Security Administration
230 South Dearborn Street, Suite 2160
Chicago, Illinois 60604
Phone:   (312) 353-0900



December 13, 2019

<u>CERTIFIED MAIL -</u>
<u>RETURN RECEIPT REQUESTED</u>

LP Management Services, LLC.
Custodian of Records
ATTN: Jonathan Crumly, Registered Agent
1600 Parwood Circle, Suite 200
Atlanta, GA 30339

                        Re:     Anjo, LLC
                                  Case Number: 99-000016(50)

Dear Custodian of Records:

This office is conducting an investigation of the above-referenced matter pursuant to § 504(a)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1134(a)(1), to determine whether any person has violated or is about to violate any provision of Title I of ERISA. Enclosed is a subpoena which requires you to produce certain documents and records in connection with that investigation.

Your personal appearance pursuant to this subpoena will not be required at this time provided the documents are produced on or before the date noted in the subpoena. You will be informed at a later date if your personal appearance to testify is required. Even though your appearance is not now being required, please provide a cover letter with your response which identifies the documents being produced. Your cover letter should also state whether a diligent search has been made for the subpoenaed documents and that the documents transmitted constitute all documents called for by the subpoena.

The subpoena requests that you produce documents maintained in electronic form, Electronically Stored Information (ESI), in electronic form. The formats in which EBSA can accept ESI are listed in the subpoena. When producing ESI, you should produce the materials as maintained on your computer system, i.e., you should produce ESI with all files, folders and sub-folders intact, and you should produce emails with all attachments intact.

If any documents called for are not produced, please list such documents and indicate their location and the reason for their non-production.

If you have any questions concerning your rights and duties, you may wish to consult counsel. If you have any questions concerning the subpoena or the documents required to be produced, including the production of ESI and the appropriate format and media, please call Senior Investigator Thomas C. Gewin at (404) 302-3917 or Investigator Tim Blas at (312) 789-3637.


Sincerely,


Jeffrey A. Monhart
Regional Director
Chicago Regional Office
Employee Benefits Security Administration


Enclosure

2

**SUBPOENA**

**99-002132**

# UNITED STATES OF AMERICA
## DEPARTMENT OF LABOR
### Employee Benefits Security Administration

To:   *LP Management Services, LLC.*
      *Custodian of Records*
      *ATTN: Jonathan Crumly, Registered Agent*
      *1600 Parwood Circle, Suite 200*
      *Atlanta, GA 30339*

*You are hereby required to appear before*

*Senior Investigator Thomas C. Gewin*

*of the Employee Benefits Security Administration,*

*U.S. Department of Labor, at*

*61 Forsyth Street SW, Suite 7B54,*

*in the City of Atlanta, Georgia, 30303, on the 2nd day of January 2020, at 10:00 a.m. of that day, to testify in the matter of an investigation of*

**Anjo, LLC**

*being conducted pursuant to Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1134, in order to determine whether any person has violated or is about to violate any provision of Title I of ERISA or any regulation or order thereunder;*

*And you are hereby required to bring with you and produce at said time and place the following books, papers, and documents:*

      *SEE ATTACHMENT*

*Fail not at your peril.*



**In testimony whereof** *I have hereunto affixed my signature and the seal of the* **United States Department of Labor** *at Chicago, Illinois on this* __12th__ *day of December 2019.*

**Jeffrey A. Monhart, Regional Director**

## ATTACHMENT TO SUBPOENA
## LP Management Services, LLC

## DEFINITIONS

A.    "LPMS," "You," or "Your" shall mean LP Management Services LLC, including any predecessors, successors, affiliates or parent companies, its officers and directors, employees or anyone acting on behalf of LP Management Services, LLC.

B.    "Plan" shall mean any welfare benefit plan.

C.    "And" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

D.    "Beneficiary" means a person as defined by ERISA Section 3(8), 29 U.S.C., § 1002(8).

E.    "Claim(s)" means an itemized statement of Services and costs made by Health Providers (as defined herein) to any Employee Welfare Benefit Plan clients for any health care Services, including pre-Service Claims, post-Service Claims, concurrent care Claims and urgent care Claims as defined by 29 C.F.R. § 2560.503-1.

F.    "Communication" means any oral, written, electronic or other exchange or transmission of information (in the form of facts, ideas, inquiries, opinions, analysis or otherwise), including correspondence, memorandum, reports, electronic mail, electronic documents, facsimiles, communications sent or received by computer systems or applications, telephone conversations, telephone or voicemail messages, face-to-face meetings or conversations, and Internet postings and discussions.

G.    "Describe" including its various forms such as "describing," means to fully identify, narrate, present, recite, recount, or otherwise set forth in detail.

H.    "Discuss" including its various forms such as "discussing," means to review, report, summarize, evaluate, examine, explain, or consider, as well as discuss.

I.    "Document(s)" means, including but not limited to, all writings, recordings or electronic data consisting of letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, word processing, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, still photographs, X-ray films, video tapes, motion pictures, electronic mail messages (email), voice mail messages, electronic instant messages (IM) messages of any type disseminated through a computer network, spreadsheets, databases, electronic calendars and contact managers, back-up data, and/or other form of data compilation, stored in any medium from which information can be obtained (including but not limited to magnetic tape, magnetic disk, CD-ROM, DVD, optical disk, flash drive or other electronic or mechanical storage device), however produced, reproduced or stored, of every kind of description within Your possession, custody or control, or the possession, custody or control of any agent, employee, representative or other persons acting or purporting to act for or on behalf of

1

You or the Plan, including but not limited to notes; memoranda; records; reports; correspondence; telexes and faxes; agreements; contracts; accounting or financial records or worksheets; account books; journals; ledgers; bills; receipts; vouchers; transcripts or notes of conversations or meetings; minutes of meetings; statements; directives in any form from general partners or other representatives; diary entries; studies; summaries and/or records of telephone conversations; interviews, meetings and/or conferences; tabulations; and shall include the original and all non-identical copies; all drafts even if not published, disseminated, or used for any purpose; all notes, schedules, footnotes, attachments, enclosures, and documents attached or referred to in any document to be produced pursuant to this Subpoena.

J.      "Email" or "electronic mail" means any electronic communication made using computer communications software, whether through a local computer network or through the Internet, and whether maintained in electronic form and/or paper form. Email maintained in electronic form must be produced in electronic form.

K.      "Employee Benefit Plan" means an employee benefit plan as defined in Section 3(3) of ERISA, 29 U.S.C., § 1002(3).

L.      "Employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an Employee Welfare Benefit Plan; includes a group or association of employers acting for an employer in such capacity, as defined in Section 3(5) of ERISA, 29 U.S.C. § 1002(5).

M.      "ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, et. seq., as amended.

N.      "Fee" means any charge, including administration Fees, Service Fees, per capita Fees, management Fees, and participating Provider Fees.

O.      "Fiduciary" shall have the same meaning as such term has under Section 3(21) of ERISA, 29 U.S.C., § 1002(21), and sections and regulations related thereto.

P.      "Health Coverage" shall include any medical, surgical, mental health and substance use disorder benefits or Services, and all the variations within these Services under each option available to Plan Participants and Beneficiaries, including but not limited to, high, mid and low options offered under Fee for Service or indemnity arrangements, health maintenance organizations, preferred provider organizations and point of service plans.

Q.      "Including" shall be construed to mean "without limitation."

R.      "Issuer" means an insurance company, insurance service, or insurance organization (including a health maintenance organization) which is licensed to engage in the business of insurance in a State and which is subject to State law which regulates insurance (within the meaning of Section 514(b)(2) of ERISA, 29 U.S.C. § 1144(b)(2)).

S.       "Participant" means a person as defined by ERISA Section 3(7), 29 U.S.C. § 1002(7).

2

T.    "Party in Interest" means a person or entity defined in Section 3(14) of ERISA, 29 U.S.C. § 1002(14).

U.    "Plan Document" means a document or instrument governing any term of the Plan, including any document or instrument that describes plan operations and administration, eligibility rules, the provision of Health Coverage, and Claims and appeals procedures.

V.    "Relating to" or "reflecting" means constituting, referring to, pertaining to, responding to, regarding, evidencing, explaining, discussing, depicting, analyzing, or containing any information which in any way concerns, affects, or describes the terms or conditions, or identifies facts, with respect to the subject of the inquiry.

W.    "Service Agreement" means a document setting forth specific Services to be rendered by the person providing the Services and the compensation to be paid for those Services in connection to the Plan.

X.    "Service Provider" shall mean any person or entity that performed, or continues to perform, any services to or for the Plan, including any billing agent, marketing agent, recordkeeper, plan administrator, third party administrator, call center service, insurer, underwriter, claims administrator, broker, consultant, advisor, custodian, subadvisor, transition manager, or investment manager (as defined by ERISA Section 3(38), 29 U.S.C. § 1002(38)).

Y.    "Service(s)" means any kind of product or Service offered to the Plan, including but not limited to medical or health Services, insurance coverage, Claims processing, recordkeeping, call center Services, enrollee education, group insurance products, and third-party administration products or Services. Medical and health Services shall be broadly construed to include dental, vision, physical therapy, speech therapy, occupational therapy, psychotherapy, therapy for drug and alcohol addiction, treatment for eating disorders, and drugs or devices.

Z.    "Summary Plan Description" shall mean a summary document or documents as defined in ERISA Section 102, 29 U.S.C. § 1022, and related sections.

## INSTRUCTIONS

A.    Scope of search. This Subpoena calls for all documents in Your possession, custody, or control, to the extent not already produced by You. You are required to search for, obtain and produce all responsive documents, including without limitation documents that are in Your custody or control, even if not in Your immediate possession, for every level of Health Coverage available under the Plan. This includes any responsive documents in the possession, custody or control of any person acting on Your behalf or under Your direction or control, such as Your employees, accountants, agents, representatives, attorneys or advisors.

B.    Relevant time period. Unless otherwise specified, the time period covered by this Subpoena is from January 1, 2016 to the date of production. Documents created prior to January 1, 2016, which have been used or relied on since January 1, 2016, or which

describe legal duties which remain in effect after January 1, 2016 (such as contracts and trust agreements), shall be considered as included within the time period covered by this Subpoena.

C.     Privileges and Protections.  If You do not produce documents because You object to part of or an aspect of a request, please provide a written response stating the precise basis for the objection and produce all documents responsive to the remaining part or aspect of the requests.

If any documents responsive to this Subpoena are withheld because of a claim of privilege, please identify the documents You claim are privileged in a written response, and please indicate for each such document: 1) the nature of the privilege or protection claimed; 2) the factual basis for claiming the privilege or protection asserted; 3) the subject matter of the document; 4) the type, length and date of the document; 5) the author of and/or signatory on the document; 6) the identity of each person to whom the document was directed or distributed; and 7) the nature of the document, e.g., letter, memorandum.

D.     Proprietary and Confidential.  If you contend documents responsive to this Subpoena are proprietary or confidential, you should mark those documents as such and produce the documents.  The Department of Labor follows procedures in accordance with the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and Executive Order 12600, which allows for the withholding of certain proprietary and confidential documents pursuant to the requirements of Exemption 4 of FOIA.

E.     Electronically stored information.  If any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, then You are directed to produce the document in computerized form in one of the following formats: Microsoft Word (doc), WordPerfect (wpd), Rich Text (rtf), Microsoft Outlook (pst), Microsoft Outlook Express (msg), Microsoft Excel (xls), Microsoft Access (mdb), Adobe Acrobat (PDF), TIFF, comma separated values (CSV), ASCII, TXT, Concordance, or Quickbooks.  It is preferable to receive electronic information stored in databased or tabular format (e.g. CSV or other delimited, XLS, XLSX, etc.). Files of the preceding types can be submitted in a ZIP compressed format. Sufficient information including sufficient identification of the applicable software program and passwords, if any, and data structure (if applicable) should be provided to permit access to and use of the documents.  Images created through a scanning process should have a minimum resolution of 300 dots per inch (dpi).

Where available, Claims data should be provided in Microsoft Excel (xls) or delimited flat file (e.g., text, comma-separated values (CSV), etc.), which allows for the sorting and filtering of data.  A sample format of the Claims data to be provided may be made available upon request.

To the extent that any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, and it is not in one of the previously identified formats, please identify the document and the corresponding format.

Regardless of the format in which a document may exist, You are requested to preserve the integrity of the original electronic document and its contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

F.   Tenses.  Verbs used in the past tense should be read also to include the present tense, and verbs used in the present tense should be read also to include the past tense.

G.   Singular/Plural.  The singular number of a noun, pronoun, or verb should be read also to include the plural, and the plural number of a noun, pronoun, or verb should be read also to include the singular.

H.   Word Neutrality. All words and phrases shall be construed as masculine, feminine or gender neutral as necessary to bring within the scope of this Subpoena documents that might otherwise be construed to be outside its scope.

I.   Sufficient to Show.  Where a request seeks documents "sufficient" to show specified information, in lieu of producing documents, you may submit a sworn affidavit attested to by an authorized representative that provides the requested information.

J.   Manner of production.  All documents produced in response to this Subpoena shall comply with the following instructions:

   a.   You should conduct Your searches for responsive documents in a manner sufficient to identify the source and location where each responsive document is found.

   b.   All documents produced in response to this Subpoena shall be segregated and labeled to show the document request to which the documents are responsive and the source and location where the documents were found.

   c.   To the extent that documents are found in file folders and other similar containers that have labels or other identifying information, the documents shall be produced with such file folder and label information intact.

   d.   To the extent that documents are found attached to other documents, by means of paper clips, staples, or other means of attachment, such documents shall be produced together in their condition when found.

   e.   All documents provided in response to this Subpoena are to include the notes written in a margin and post-its, as well as any attachment referred to or incorporated by the documents.

   f.   In the event that there are no documents responsive to a particular request, please specify that You have no responsive documents.

   g.   If documents relied upon or required to respond to any of this Subpoena, or requested documents, are no longer in Your possession, custody, or control, You

5

are required to state what disposition was made of such documents, including identification of the person(s) who are believed to be in possession or control of such documents, the date or dates on which such disposition was made, and the reason for such disposition.

h.  If no Claims/requests/appeals are identified pursuant to any part of this Subpoena, please provide copies of the identifiable source documents evidencing Your determination yielding the existence of no results, to include an explanation of how the search was conducted in Your databases, the search parameters, and any screen shots or other dated documents utilized to arrive at Your finding of no results.

K.  <u>Electronic media</u>:

To the extent that the documents that are responsive to this Subpoena may exist on electronic media, those documents should be provided on one of the following media: Compact Disk – Read Only Memory (CD-ROM), Digital Versatile Disc – Read Only Memory (DVD) or USB hard drive.

## **DOCUMENTS TO BE PRODUCED**

1.  Documents relating to LPMS's organizational and management structure and ownership, including, but not limited to:

    a.  Articles of incorporation, corporate bylaws, and partnership agreements;
    b.  Organizational charts, descriptions of Your organizational and supervisory structure, and any documents describing the responsibilities of principals, officers, directors, managers, employees, representatives, and independent contractors;
    c.  Documents sufficient to show the names and address of all divisions, affiliates, or subsidiaries and their principal lines of business;
    d.  Documents sufficient to show the identities and percentage of ownership of all of Your shareholders, limited partners, and/or members, excluding those persons holding only publicly traded shares of a parent organization; and
    e.  Documents sufficient to show the name and contact information for each of Your managerial employees and corporate officers.

2.  Documents sufficient to identify all partnerships or other entities for which LPMS is a General Partner.

3.  Contracts, including amendments thereto, between LPMS and any other entity or individual in connection with the management of any partnership or entity identified in response to Paragraph 2 above.

4.  Documents sufficient to identify all entities or individuals that recruit, solicit, market, advertise, or offer membership in any partnership identified in paragraph 2.

5.  Meeting minutes related to any partnerships or entities identified in response to Paragraph 2 above.

6.  Documents sufficient to identify all Plans for which You or any of the partnerships or other entities identified in response to Paragraph 2 above are the Plan Sponsor, Plan Administrator, or Named Fiduciary.

7.  Current fiduciary liability, errors and omissions, or other professional liability insurance policies, including all endorsements and riders, if applicable, held by LPMS.

8.  Current fidelity bond policies, including all endorsements and riders, if applicable, held by LPMS for all Plans identified in Paragraph 7 above.

9.  Documents sufficient to identify all bank accounts maintained by LPMS, including:

    a.  Name of the custodian;
    b.  Account number;
    c.  Contact information for account representatives;
    d.  Purpose of the account; and
    e.  Authorized persons with deposit and/or withdrawal authority.

10.  Documents sufficient to show LPMS's income, expenses, assets, and liabilities on a monthly basis for the period under review, including:

    a.  Invoices;
    b.  Bank or investment account statements;
    c.  Canceled checks, deposit slips, and electronic transfer records;
    d.  Monetary distributions to members of any partnership identified in paragraph 2;
    e.  Payroll or compensation information to any employees of LPMS;
    f.  Internal and external ledgers and journals; and
    g.  Audited and unaudited financial statements.

11.  Documents and communications related to the collection, aggregation, or sale of data; the direct sale of goods; or affiliate referrals in connection with any of the partnerships or entities listed in Paragraph 2 above, including:

    a.  Contracts;
    b.  Invoices generated for third parties;
    c.  Payment records;
    d.  Instructions provided to any members of any partnership;
    e.  Computer files, including executable, html, and other files;
    f.  Uniform Resource Locators (URL) used in any of these efforts;
    g.  Software code or scripts developed for or used by LPMS or any of the partnerships;
    h.  Logs of data collection, sales, or affiliate referral efforts made by any members of any partnership;
    i.  Records of any data collected, sales, or affiliate referrals made by LPMS or any partnership or the members or any partnership.

12.  Documents sufficient to show any Fees, commissions, or other compensation received directly or indirectly by LPMS or its principals, officers, directors, managers, employees, or representatives in connection with any Plan.

13.  Documents related to gifts, gratuities, favors, expense reimbursements, and personal Services provided among or between any Plan, Plan Service Provider, and LPMS or any of its owners, principals, officers, directors, managers, employees, or representatives.

14.  Documents and communications relating to pending or past litigation between LPMS and any current or former Plan Participants or members of any partnership or entity identified in Paragraph 2 above.

15.  All filings submitted to the Internal Revenue Service for LPMS, including tax returns and information returns.

**For any Plan for which LPMS itself is the Plan Sponsor, Plan Administrator, or Named Fiduciary, provide the following:**

16.     Plan document(s), including the following:

    a.  Amendments and resolutions, with signatures;
    b.  Summary Plan Description (SPD);
    c.  Wrap document;
    d.  Trust Agreement, with signatures;
    e.  Benefits booklets;
    f.  Employee handbooks which discuss employee benefits;
    g.  Evidences of Coverage (EOCs) and Certificates of Coverage for each medical option;
    h.  Enrollment package provided to Participants at open enrollment and new hire, including front and back of all enrollment forms;
    i.  Documents describing plan coverages, rules, costs, or changes to any of the above documents, including any Notices of Material Modifications; and
    j.  Documents describing and governing any supplemental benefits offered in connection to the Plan.

17.     Summary of Benefits and Coverage (SBC) and Uniform Glossary for the Plan.

18.     Documents describing the cost of coverage for each option under the Plan, including premiums by type of coverage (e.g., single, family), employee vs. employer share of cost of coverage, and the cost of COBRA coverage.

19.     Contracts, including amendments thereto, between LPMS or the Plan and Service Providers, including brokers, consultants, third party administrators, record-keepers, actuaries, Claim processors, issuers, and agents. Contracts should include any performance agreements and Fee schedules reflecting compensation as well as engagement and other letters defining the scope of work.

20.     Communications between LPMS or the Plan and Service Providers, including brokers, consultants, third party administrators, recordkeepers, actuaries, Claim processors, and agents.

21.     Current fidelity bond policy, including all endorsements and riders, if applicable.

22.     The Plan's latest Form 5500 Annual Report filing and any associated financial statements/schedules and accountant's opinion, if applicable.

23.     Form M-1 filings.

24.     Documents sufficient to identify all individuals (name, position, contact information) directly or indirectly responsible for the operation, administration, and/or oversight of the Plan. This includes trustees, administrative or oversight committee members, and accounting or human resources personnel who process plan paperwork, such as enrollment, Claims, Participant inquiries, and premium payments.

25.     Meeting minutes related to the Plan, including meetings by the Board of Trustees, as well as minutes of Trustee committees, subcommittees, or other administrative groups.

26. Communications between LPMS or the Plan and Employers, partnerships identified in paragraph 2, Plan Participants, or potential Plan Participants in connection to:

    a. The benefits provided by the Plan;
    b. The transfer of Participants from any other plan or arrangement to the Plan;
    c. The adjudication of specific Claims; and
    d. The appeal of denied Claims.

27. Marketing materials related to the Plan, including Power Point slides, brochures, emails, and other communications provided by LPMS or the Plan or in consultation with LPMS or the Plan, including communications and materials provided to Participants and to brokers, agents, or promoters.

28. Documents sufficient to identify the following with respect to all current and former Plan Participants:

    a. Name;
    b. Contact information;
    c. Basis for eligibility to participate in the Plan, including employment contracts, payroll reports, W-2s, 1099s, or other records sufficient to demonstrate the nature of any employment relationship;
    d. Enrollment date;
    e. Coverage option(s) and type of coverage (e.g., single, family);
    f. Termination date and reason for termination; and
    g. Total premiums or contributions paid through the date of production.

29. All summary pages of payroll registers showing the total amount of employee health plan contributions withheld for each pay date within the applicable time frame.

30. Documents sufficient to show the Plan's income, expenses, assets, and liabilities on a monthly basis for the period under review, including:

    a. Invoices;
    b. Bank or investment account statements;
    c. Canceled checks, deposit slips, and electronic transfer records;
    d. Internal and external ledgers and journals;
    e. Charts of accounts; and
    f. Audited and unaudited financial statements.

31. For all rebates, including medical loss ratio rebates, experience-rated contract rebates, and any other rebate from an insurer, received by the Plan, Plan Sponsor, or any affiliated or related entity, in relation to the Plan:

    a. Documents detailing the amount, receipt date, source, and handling of each rebate;
    b. Sample of notice to Participants about rebates, if applicable;

      c.  Documents demonstrating the allocation of rebated amounts to employer and/or employees; and

      d.  Correspondence regarding how rebates are to be used or allocated.

32.    Claims lag reports or other reports detailing the amount of time from Claim filing to Claim payments.

33.    All Claims aging or experience reports.

34.    List of all unpaid and pended claims detailing date of claim, service type, billed amount, and reason for pending.

35.    External or internal auditor's reports related to the Plan's operations, including Claims audits completed by a Service Provider or consulting firm.

36.    Documents utilized or relied upon to determine contribution amounts, including:

      a.  External or internal actuarial reports;
      b.  Rate sheets;
      c.  Communications;
      d.  Underwriting and rating guidelines, methodologies, and assumptions;
      e.  Source data; and
      f.  Contracts for reinsurance, stop loss, or other form of excess loss insurance.

37.    Documents sufficient to show any commissions, Fees, or other compensation paid in connection with the marketing of the Plan to employers or individuals, including contracts, agreements, invoices, cancelled checks or electronic transfer records, account statements, and financial statements.

38.    Documents sufficient to show instructions to the Plans' service providers related to payments for claims, service providers, or other entities or persons.

39.    Documents and communications relating to pending or past litigation between the Plan or LPMS, in its capacity as Plan Sponsor, Plan Administrator, or Named Fiduciary, and any current or former Participants or members.

40.    Documents and communications related to software programs that Plan participants use in connection with the Plan or as a requirement of their eligibility to participate in the Plan.

**U.S. Department of Labor**

Employee Benefits Security Administration
230 South Dearborn Street, Suite 2160
Chicago, Illinois 60604
Phone:   (312) 353-0900



OCT 2 1 2019

<u>CERTIFIED MAIL</u> -
<u>RETURN RECEIPT REQUESTED</u>

Global Data Group, LP
Custodian of Records
ATTN: Ryan Owens, Registered Agent
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339

Re:    Anjo, LLC
Case Number: 99-000016(50)

Dear Custodian of Records:

This office is conducting an investigation of the above-referenced matter pursuant to § 504(a)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1134(a)(1), to determine whether any person has violated or is about to violate any provision of Title I of ERISA. Enclosed is a subpoena which requires you to produce certain documents and records in connection with that investigation.

Your personal appearance pursuant to this subpoena will not be required at this time provided the documents are produced on or before the date noted in the subpoena.  You will be informed at a later date if your personal appearance to testify is required.  Even though your appearance is not now being required, please provide a cover letter with your response which identifies the documents being produced.  Your cover letter should also state whether a diligent search has been made for the subpoenaed documents and that the documents transmitted constitute all documents called for by the subpoena.

The subpoena requests that you produce documents maintained in electronic form, Electronically Stored Information (ESI), in electronic form.  The formats in which EBSA can accept ESI are listed in the subpoena.  When producing ESI, you should produce the materials as maintained on your computer system, i.e., you should produce ESI with all files, folders and sub-folders intact, and you should produce emails with all attachments intact.

If any documents called for are not produced, please list such documents and indicate their location and the reason for their non-production.

If you have any questions concerning your rights and duties, you may wish to consult counsel. If you have any questions concerning the subpoena or the documents required to be produced, including the production of ESI and the appropriate format and media, please call Senior Investigator Thomas C. Gewin at (404) 302-3917 or Investigator Devon King at (415) 625-2491.

Sincerely,

Jeffrey A. Monhart
Regional Director
Chicago Regional Office
Employee Benefits Security Administration

Enclosure

<u>SUBPOENA</u>

99-002110

# UNITED STATES OF AMERICA
## DEPARTMENT OF LABOR
### Employee Benefits Security Administration

To:    *Global Data Group, LP*
       *Custodian of Records*
       *ATTN: Ryan Owens, Registered Agent*
       *1600 Parkwood Circle*
       *Suite 200*
       *Atlanta, GA 30339*

*You are hereby required to appear before*

*Senior Investigator Thomas C. Gewin*

*of the Employee Benefits Security Administration,*

*U.S. Department of Labor, at*

*61 Forsyth Street SW, Suite 7B54,*

*in the City of Atlanta, Georgia, 30303, on the 8th day of November 2019, at 10:00 a.m. of that day, to testify in the matter of an investigation of*

**Anjo, LLC**

*being conducted pursuant to Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1134, in order to determine whether any person has violated or is about to violate any provision of Title I of ERISA or any regulation or order thereunder;*

*And you are hereby required to bring with you and produce at said time and place the following books, papers, and documents:*

   *SEE ATTACHMENT*

*Fail not at your peril.*



**In testimony whereof** *I have hereunto affixed my signature and the seal of the* **United States Department of Labor** *at Chicago, Illinois on this* 21st *day of October 2019.*

**Jeffrey A. Monhart, Regional Director**

## ATTACHMENT TO SUBPOENA
## Global Data Group, LP

### DEFINITIONS

A.   "Global Data Group," "You," or "Your" shall mean Global Data Group, LP, including any predecessors, successors, affiliates or parent companies, its officers and directors, employees or anyone acting on behalf of Global Data Group, LP. This entity may also have used the name Global Data Partnership LP.

B.   "Plan" shall mean any welfare benefit plan sponsored by Global Data Group.

C.   "And" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

D.   "Beneficiary" means a person as defined by ERISA Section 3(8), 29 U.S.C., § 1002(8).

E.   "Claim(s)" means an itemized statement of Services and costs made by Health Providers (as defined herein) to any Employee Welfare Benefit Plan clients for any health care Services, including pre-Service Claims, post-Service Claims, concurrent care Claims and urgent care Claims as defined by 29 C.F.R. § 2560.503-1.

F.   "Communication" means any oral, written, electronic or other exchange or transmission of information (in the form of facts, ideas, inquiries, opinions, analysis or otherwise), including correspondence, memorandum, reports, electronic mail, electronic documents, facsimiles, communications sent or received by computer systems or applications, telephone conversations, telephone or voicemail messages, face-to-face meetings or conversations, and Internet postings and discussions.

G.   "Describe" including its various forms such as "describing," means to fully identify, narrate, present, recite, recount, or otherwise set forth in detail.

H.   "Discuss" including its various forms such as "discussing," means to review, report, summarize, evaluate, examine, explain, or consider, as well as discuss.

I.   "Document(s)" means, including but not limited to, all writings, recordings or electronic data consisting of letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, word processing, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, still photographs, X-ray films, video tapes, motion pictures, electronic mail messages (email), voice mail messages, electronic instant messages (IM) messages of any type disseminated through a computer network, spreadsheets, databases, electronic calendars and contact managers, back-up data, and/or other form of data compilation, stored in any medium from which information can be obtained (including but not limited to magnetic tape, magnetic disk, CD-ROM, DVD, optical disk, flash drive or other electronic or mechanical storage device), however produced, reproduced or stored, of every kind of description within Your possession, custody or control, or the possession, custody or control of any agent,

1

employee, representative or other persons acting or purporting to act for or on behalf of You or the Plan, including but not limited to notes; memoranda; records; reports; correspondence; telexes and faxes; agreements; contracts; accounting or financial records or worksheets; account books; journals; ledgers; bills; receipts; vouchers; transcripts or notes of conversations or meetings; minutes of meetings; statements; directives in any form from general partners or other representatives; diary entries; studies; summaries and/or records of telephone conversations; interviews, meetings and/or conferences; tabulations; and shall include the original and all non-identical copies; all drafts even if not published, disseminated, or used for any purpose; all notes, schedules, footnotes, attachments, enclosures, and documents attached or referred to in any document to be produced pursuant to this Subpoena.

J.  "Email" or "electronic mail" means any electronic communication made using computer communications software, whether through a local computer network or through the Internet, and whether maintained in electronic form and/or paper form. Email maintained in electronic form must be produced in electronic form.

K.  "Employee Benefit Plan" means an employee benefit plan as defined in Section 3(3) of ERISA, 29 U.S.C., § 1002(3).

L.  "Employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an Employee Welfare Benefit Plan; includes a group or association of employers acting for an employer in such capacity, as defined in Section 3(5) of ERISA, 29 U.S.C. § 1002(5).

M.  "ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, et. seq., as amended.

N.  "Fee" means any charge, including administration Fees, Service Fees, per capita Fees, management Fees, and participating Provider Fees.

O.  "Fiduciary" shall have the same meaning as such term has under Section 3(21) of ERISA, 29 U.S.C., § 1002(21), and sections and regulations related thereto.

P.  "Health Coverage" shall include any medical, surgical, mental health and substance use disorder benefits or Services, and all the variations within these Services under each option available to Plan Participants and Beneficiaries, including but not limited to, high, mid and low options offered under Fee for Service or indemnity arrangements, health maintenance organizations, preferred provider organizations and point of service plans.

Q.  "Including" shall be construed to mean "without limitation."

R.  "Issuer" means an insurance company, insurance service, or insurance organization (including a health maintenance organization) which is licensed to engage in the business of insurance in a State and which is subject to State law which regulates insurance (within the meaning of Section 514(b)(2) of ERISA, 29 U.S.C. § 1144(b)(2)).

S.   "Participant" means a person as defined by ERISA Section 3(7), 29 U.S.C. § 1002(7).

2

T.   "Party in Interest" means a person or entity defined in Section 3(14) of ERISA, 29 U.S.C. § 1002(14).

U.   "Plan Document" means a document or instrument governing any term of the Plan, including any document or instrument that describes plan operations and administration, eligibility rules, the provision of Health Coverage, and Claims and appeals procedures.

V.   "Relating to" or "reflecting" means constituting, referring to, pertaining to, responding to, regarding, evidencing, explaining, discussing, depicting, analyzing, or containing any information which in any way concerns, affects, or describes the terms or conditions, or identifies facts, with respect to the subject of the inquiry.

W.   "Service Agreement" means a document setting forth specific Services to be rendered by the person providing the Services and the compensation to be paid for those Services in connection to the Plan.

X.   "Service Provider" shall mean any person or entity that performed, or continues to perform, any services to or for the Plan, including any billing agent, marketing agent, recordkeeper, plan administrator, third party administrator, call center service, insurer, underwriter, claims administrator, broker, consultant, adviser, custodian, subadviser, transition manager, or investment manager (as defined by ERISA Section 3(38), 29 U.S.C. §1002(38)).

Y.   "Service(s)" means any kind of product or Service offered to the Plan, including but not limited to medical or health Services, insurance coverage, Claims processing, recordkeeping, call center Services, enrollee education, group insurance products, and third-party administration products or Services. Medical and health Services shall be broadly construed to include dental, vision, physical therapy, speech therapy, occupational therapy, psychotherapy, therapy for drug and alcohol addiction, treatment for eating disorders, and drugs or devices.

Z.   "Summary Plan Description" shall mean a summary document or documents as defined in ERISA Section 102, 29 USC §1022, and related sections.

## INSTRUCTIONS

A.   <u>Scope of search</u>. This Subpoena calls for all documents in Your possession, custody, control, to the extent not already produced by You. You are required to search for, obtain and produce all responsive documents, including without limitation documents that are in Your custody or control, even if not in Your immediate possession, for every level of Health Coverage available under the Plan. This includes any responsive documents in the possession, custody or control of any person acting on Your behalf or under Your direction or control, such as Your employees, accountants, agents, representatives, attorneys or advisors.

B.   <u>Relevant time period</u>. Unless otherwise specified, the time period covered by this Subpoena is from <u>January 1, 2016</u> to the date of production. Documents created prior to <u>January 1, 2016,</u> which have been used or relied on since <u>January 1, 2016,</u> or which

3

describe legal duties which remain in effect after January 1, 2016 (such as contracts and trust agreements), shall be considered as included within the time period covered by this Subpoena.

C.   Privileges and Protections.  If You do not produce documents because You object to part of or an aspect of a request, please provide a written response stating the precise basis for the objection and produce all documents responsive to the remaining part or aspect of the requests.

If any documents responsive to this Subpoena are withheld because of a claim of privilege, please identify the documents You claim are privileged in a written response, and please indicate for each such document: 1) the nature of the privilege or protection claimed; 2) the factual basis for claiming the privilege or protection asserted; 3) the subject matter of the document; 4) the type, length and date of the document; 5) the author of and/or signatory on the document; 6) the identity of each person to whom the document was directed or distributed; and 7) the nature of the document, e.g., letter, memorandum.

D.   Proprietary and Confidential.  If you contend documents responsive to this Subpoena are proprietary or confidential, you should mark those documents as such and produce the documents.  The Department of Labor follows procedures in accordance with the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and Executive Order 12600, which allows for the withholding of certain proprietary and confidential documents pursuant to the requirements of Exemption 4 of FOIA.

E.   Electronically stored information.  If any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, then You are directed to produce the document in computerized form in one of the following formats: Microsoft Word (doc), WordPerfect (wpd), Rich Text (rtf), Microsoft Outlook (pst), Microsoft Outlook Express (msg), Microsoft Excel (xls), Microsoft Access (mdb), Adobe Acrobat (PDF), TIFF, comma separated values (CSV), ASCII, TXT, Concordance, or Quickbooks.  It is preferable to receive electronic information stored in databased or tabular format (e.g. CSV or other delimited, XLS, XLSX, etc.).  Files of the preceding types can be submitted in a ZIP compressed format. Sufficient information including sufficient identification of the applicable software program and passwords, if any, and data structure (if applicable) should be provided to permit access to and use of the documents.  Images created through a scanning process should have a minimum resolution of 300 dots per inch (dpi).

Where available, Claims data should be provided in Microsoft Excel (xls) or delimited flat file (e.g. text, comma-separated values (CSV), etc.), which allows for the sorting and filtering of data.  A sample format of the Claims data to be provided may be made available upon request.

To the extent that any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, and it is not in one of the previously identified formats, please identify the document and the corresponding format.

4

Regardless of the format in which a document may exist, You are requested to preserve the integrity of the original electronic document and its contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

F.    Tenses.  Verbs used in the past tense should be read also to include the present tense, and verbs used in the present tense should be read also to include the past tense.

G.    Singular/Plural.  The singular number of a noun, pronoun, or verb should be read also to include the plural, and the plural number of a noun, pronoun, or verb should be read also to include the singular.

H.    Word Neutrality. All words and phrases shall be construed as masculine, feminine or gender neutral as necessary to bring within the scope of this Subpoena documents that might otherwise be construed to be outside its scope.

I.    Sufficient to Show.  Where a request seeks documents "sufficient" to show specified information, in lieu of producing documents, you may submit a sworn affidavit attested to by an authorized representative that provides the requested information.

J.    Manner of production.  All documents produced in response to this Subpoena shall comply with the following instructions:

   a.    You should conduct Your searches for responsive documents in a manner sufficient to identify the source and location where each responsive document is found.

   b.    All documents produced in response to this Subpoena shall be segregated and labeled to show the document request to which the documents are responsive and the source and location where the documents were found.

   c.    To the extent that documents are found in file folders and other similar containers that have labels or other identifying information, the documents shall be produced with such file folder and label information intact.

   d.    To the extent that documents are found attached to other documents, by means of paper clips, staples, or other means of attachment, such documents shall be produced together in their condition when found.

   e.    All documents provided in response to this Subpoena are to include the notes written in a margin and post-its, as well as any attachment referred to or incorporated by the documents.

   f.    In the event that there are no documents responsive to a particular request, please specify that You have no responsive documents.

   g.    If documents relied upon or required to respond to any of this Subpoena, or requested documents, are no longer in Your possession, custody, or control, You

5

are required to state what disposition was made of such documents, including identification of the person(s) who are believed to be in possession or control of such documents; the date or dates on which such disposition was made, and the reason for such disposition.

h.  If no Claims/requests/appeals are identified pursuant to any part of this Subpoena, please provide copies of the identifiable source documents evidencing Your determination yielding the existence of no results, to include an explanation of how the search was conducted in Your databases, the search parameters, and any screen shots or other dated documents utilized to arrive at Your finding of no results.

K.    Electronic media:

To the extent that the documents that are responsive to this Subpoena may exist on electronic media, those documents should be provided on one of the following media: Compact Disk – Read Only Memory (CD-ROM), Digital Versatile Disc – Read Only Memory (DVD) or USB hard drive.

6

## DOCUMENTS TO BE PRODUCED

1. Documents relating to Global Data Group's organizational and management structure and ownership, including, but not limited to:

   a. Articles of incorporation, corporate bylaws, and partnership agreements;
   b. Organizational charts, descriptions of Your organizational and supervisory structure, and any documents describing the responsibilities of principals, officers, directors, managers, employees, representatives, and independent contractors;
   c. Documents sufficient to show the names and address of all divisions, affiliates, or subsidiaries and their principal lines of business;
   d. Documents sufficient to show the identities and percentage of ownership of all of Your shareholders, limited partners, and/or members, excluding those persons holding only publicly traded shares of a parent organization; and
   e. Documents sufficient to show the name and contact information for each of Your managerial employees and corporate officers.

2. Plan document(s), including the following:

   a. Amendments and resolutions, with signatures;
   b. Summary Plan Description (SPD);
   c. Wrap document;
   d. Trust Agreement;
   e. Benefits booklets;
   f. Employee handbooks which discuss employee benefits;
   g. Evidences of Coverage (EOCs) and Certificates of Coverage for each medical option;
   h. Enrollment package provided to Participants at open enrollment and new hire, including front and back of all enrollment forms;
   i. Documents describing plan coverages, rules, costs, or changes to any of the above documents, including any Notices of Material Modifications; and
   j. Documents describing and governing any supplemental benefits offered in connection to the Plan.

3. Summary of Benefits and Coverage (SBC) and Uniform Glossary for the Plan.

4. Documents describing the cost of coverage for each option under the Plan, including premiums by type of coverage (e.g. single, family), employee vs. employer share of cost of coverage, and the cost of COBRA coverage.

5. Contracts, including amendments thereto, between Global Data Group or the Plan and Service Providers, including brokers, consultants, third party administrators, record-keepers, actuaries, Claim processors, issuers, and agents. Contracts should include any performance agreements and Fee schedules reflecting compensation as well as engagement and other letters defining the scope of work.

6.      Communications between Global Data Group or the Plan and Service Providers, including brokers, consultants, third party administrators, record-keepers, actuaries, Claim processors, and agents.

7.      Current fidelity bond policy, including all endorsements and riders, if applicable.

8.      Current fiduciary insurance policy, including all endorsements and riders, if applicable.

9.      The Plan's latest Form 5500 Annual Report filing and any associated financial statements/schedules and accountant's opinion, if applicable.

10.    Form M-1 filings.

11.    Documents sufficient to identify all individuals (name, position, contact information) directly or indirectly responsible for the operation, administration, and/or oversight of the Plan. This includes trustees, administrative or oversight committee members, and accounting or human resources personnel who process plan paperwork, such as enrollment, Claims, Participant inquiries, and premium payments.

12.    Meeting minutes related to the Plan, including meetings by the Board of Trustees, as well as minutes of Trustee committees, subcommittees, or other administrative groups.

13.    Communications between Global Data Group or the Plan and Employers, Plan Participants, or potential Plan Participants in connection to:

        a.  The benefits provided by the Plan;
        b.  The transfer of Participants from any other plan or arrangement to the Plan;
        c.  The adjudication of specific Claims; and
        d.  The appeal of denied Claims.

14.    Marketing materials related to the Plan, including Power Point slides, brochures, emails, and other communications provided by Global Data Group or the Plan or in consultation with Global Data Group or the Plan, including communications and materials provided to Participants and to brokers, agents, or promoters.

15.    Documents sufficient to identify the following with respect to all current and former Plan Participants:

        a.  Name;
        b.  Contact information;
        c.  Basis for eligibility to participate in the Plan, including employment contracts, payroll reports, W-2s, 1099s, or other records sufficient to demonstrate the nature of any employment relationship;
        d.  Enrollment date;
        e.  Coverage option(s) and type of coverage (e.g. single, family);
        f.  Termination date and reason for termination; and
        g.  Total premiums or contributions paid through the date of production.

16.    All summary pages of payroll registers showing the total amount of employee health plan contributions withheld for each pay date within the applicable time frame.

17.    Documents sufficient to identify all bank accounts maintained by Global Data Group relating to the Plan, including:

    a.    Name of the custodian;
    b.    Account number;
    c.    Contact information for account representatives;
    d.    Purpose of the account; and
    e.    Authorized persons with deposit and/or withdrawal authority.

18.    Documents sufficient to show the Plan's income, expenses, assets, and liabilities on a monthly basis for the period under review, including:

    a.    Invoices;
    b.    Bank or investment account statements;
    c.    Canceled checks, deposit slips, and electronic transfer records;
    d.    Internal and external ledgers and journals; and
    e.    Audited and unaudited financial statements.

19.    For all rebates, including medical loss ratio rebates, experience-rated contract rebates, and any other rebate from an insurer, received by the Plan, plan sponsor, or any affiliated or related entity, in relation to the Plan:

    a.    Documents detailing the amount, receipt date, source, and handling of each rebate;
    b.    Sample of notice to Participants about rebates, if applicable;
    c.    Documents demonstrating the allocation of rebated amounts to employer and/or employees; and
    d.    Correspondence regarding how rebates are to be used or allocated.

20.    Claims lag reports or other reports detailing the amount of time from Claim filing to Claim payments.

21.    All Claims aging or experience reports.

22.    List of all unpaid and pended claims detailing date of claim, service type, billed amount, and reason for pending.

23.    External or internal auditor's reports related to the Plan's operations, including Claims audits completed by a Service Provider or consulting firm.

24.    Documents utilized or relied upon to determine contribution amounts, including:

    a.    External or internal actuarial reports;

      b.  Rate sheets;
      c.  Communications;
      d.  Underwriting and rating guidelines, methodologies, and assumptions;
      e.  Source data; and
      f.  Contracts for reinsurance, stop loss, or other form of excess loss insurance.

25.    Documents sufficient to show any Fees, commissions, or other compensation received directly or indirectly by Global Data Group or its principals, officers, directors, managers, employees, or representatives in connection with the Plan.

26.    Documents sufficient to show any commissions, Fees, or other compensation paid in connection with the marketing of the Plan to employers or individuals, including contracts, agreements, invoices, cancelled checks or electronic transfer records, account statements, and financial statements.

27.    Documents related to gifts, gratuities, favors, expense reimbursements, and personal Services provided among or between the Plan, the Plan's Service Providers, and Global Data Group or its General Partner, principals, officers, directors, managers, employees, or representatives.

28.    Documents and communications relating to pending or past litigation between the Plan or Global Data Group and any current or former Participants or members.

29.    Documents and communications relating to complaints, investigations, findings, fines, or penalties by state and federal agencies.

30.    Global Data Group's Federal Income Tax Returns.

**U.S. Department of Labor**

61 Forsyth Street SW
Atlanta, Georgia 30303    Ste 7854

Official Business
Penalty for Private Use, $300

3541

**CERTIFIED MAIL®**



9414 8169 0116 9213 8464 74

$6.40
US POSTAGE
FIRST-CLASS
FROM 30303
OCT 23 2019
stamps
endicia

GLOBAL DATA GROUP, LP
CUSTODIAN OF RECORDS SUITE 200
1600 PARKWOOD CIRCLE SE
ATLANTA GA 30339-2119

**Global Data Group, LP
Custodian of Records
Attn: Ryan Owens
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339**

**U.S. Department of Labor**

Employee Benefits Security Administration
230 South Dearborn Street, Suite 2160
Chicago, Illinois 60604
Phone:    (312) 353-0900

OCT 2 1 2019

<u>CERTIFIED MAIL</u> -
<u>RETURN RECEIPT REQUESTED</u>

Elite Data Group, LP
Custodian of Records
ATTN: Jonathan Crumly, Registered Agent
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339

                Re:    Anjo, LLC
                         Case Number: 99-000016(50)

Dear Custodian of Records:

This office is conducting an investigation of the above-referenced matter pursuant to § 504(a)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1134(a)(1), to determine whether any person has violated or is about to violate any provision of Title I of ERISA. Enclosed is a subpoena which requires you to produce certain documents and records in connection with that investigation.

Your personal appearance pursuant to this subpoena will not be required at this time provided the documents are produced on or before the date noted in the subpoena. You will be informed at a later date if your personal appearance to testify is required. Even though your appearance is not now being required, please provide a cover letter with your response which identifies the documents being produced. Your cover letter should also state whether a diligent search has been made for the subpoenaed documents and that the documents transmitted constitute all documents called for by the subpoena.

The subpoena requests that you produce documents maintained in electronic form, Electronically Stored Information (ESI), in electronic form. The formats in which EBSA can accept ESI are listed in the subpoena. When producing ESI, you should produce the materials as maintained on your computer system, i.e., you should produce ESI with all files, folders and sub-folders intact, and you should produce emails with all attachments intact.

If any documents called for are not produced, please list such documents and indicate their location and the reason for their non-production.

If you have any questions concerning your rights and duties, you may wish to consult counsel. If you have any questions concerning the subpoena or the documents required to be produced, including the production of ESI and the appropriate format and media, please call Senior Investigator Thomas C. Gewin at (404) 302-3917 or Investigator Devon King at (415) 625-2491.

Sincerely,

Jeffrey A. Monhart
Regional Director
Chicago Regional Office
Employee Benefits Security Administration

Enclosure

SUBPOENA

99-002109

# UNITED STATES OF AMERICA
## DEPARTMENT OF LABOR
### Employee Benefits Security Administration

To:   *Elite Data Group, LP*
*Custodian of Records*
*ATTN: Jonathan Crumly, Registered Agent*
*1600 Parkwood Circle*
*Suite 200*
*Atlanta, GA 30339*

*You are hereby required to appear before*

*Senior Investigator Thomas C. Gewin*

*of the Employee Benefits Security Administration,*

*U.S. Department of Labor, at*

*61 Forsyth Street SW, Suite 7B54,*

*in the City of Atlanta, Georgia, 30303, on the 8th day of November 2019, at 10:00 a.m. of that day, to testify in*
*the matter of an investigation of*

**Anjo, LLC**

*being conducted pursuant to Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29*
*U.S.C. Section 1134, in order to determine whether any person has violated or is about to violate any provision*
*of Title I of ERISA or any regulation or order thereunder;*

*And you are hereby required to bring with you and produce at said time and place the following books, papers,*
*and documents:*

   *SEE ATTACHMENT*

*Fail not at your peril.*



**In testimony whereof** *I have hereunto affixed my signature*
*and the seal of the* **United States Department of Labor**
*at Chicago, Illinois on this* ___21 st___ *day of October 2019.*

**Jeffrey A. Monhart, Regional Director**

## ATTACHMENT TO SUBPOENA
### Elite Data Group, LP

### DEFINITIONS

A.   "Elite Data Group," "You," or "Your" shall mean Elite Data Group, LP, including any predecessors, successors, affiliates or parent companies, its officers and directors, employees or anyone acting on behalf of Elite Data Group, LP.

B.   "Plan" shall mean any welfare benefit plan sponsored by Elite Data Group.

C.   "And" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

D.   "Beneficiary" means a person as defined by ERISA Section 3(8), 29 U.S.C., § 1002(8).

E.   "Claim(s)" means an itemized statement of Services and costs made by Health Providers (as defined herein) to any Employee Welfare Benefit Plan clients for any health care Services, including pre-Service Claims, post-Service Claims, concurrent care Claims and urgent care Claims as defined by 29 C.F.R. § 2560.503-1.

F.   "Communication" means any oral, written, electronic or other exchange or transmission of information (in the form of facts, ideas, inquiries, opinions, analysis or otherwise), including correspondence, memorandum, reports, electronic mail, electronic documents, facsimiles, communications sent or received by computer systems or applications, telephone conversations, telephone or voicemail messages, face-to-face meetings or conversations, and Internet postings and discussions."

G.   "Describe" including its various forms such as "describing," means to fully identify, narrate, present, recite, recount, or otherwise set forth in detail.

H.   "Discuss" including its various forms such as "discussing," means to review, report, summarize, evaluate, examine, explain, or consider, as well as discuss.

I.   "Document(s)" means, including but not limited to, all writings, recordings or electronic data consisting of letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, word processing, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, still photographs, X-ray films, video tapes, motion pictures, electronic mail messages (email), voice mail messages, electronic instant messages (IM) messages of any type disseminated through a computer network, spreadsheets, databases, electronic calendars and contact managers, back-up data, and/or other form of data compilation, stored in any medium from which information can be obtained (including but not limited to magnetic tape, magnetic disk, CD-ROM, DVD, optical disk, flash drive or other electronic or mechanical storage device), however produced, reproduced or stored, of every kind of description within Your possession, custody or control, or the possession, custody or control of any agent, employee, representative or other persons acting or purporting to act for or on behalf of

1

You or the Plan, including but not limited to notes; memoranda; records; reports; correspondence; telexes and faxes; agreements; contracts; accounting or financial records or worksheets; account books; journals; ledgers; bills; receipts; vouchers; transcripts or notes of conversations or meetings; minutes of meetings; statements; directives in any form from general partners or other representatives; diary entries; studies; summaries and/or records of telephone conversations; interviews, meetings and/or conferences; tabulations; and shall include the original and all non-identical copies; all drafts even if not published, disseminated, or used for any purpose; all notes, schedules, footnotes, attachments, enclosures, and documents attached or referred to in any document to be produced pursuant to this Subpoena.

J.      "Email" or "electronic mail" means any electronic communication made using computer communications software, whether through a local computer network or through the Internet, and whether maintained in electronic form and/or paper form.  Email maintained in electronic form must be produced in electronic form.

K.      "Employee Benefit Plan" means an employee benefit plan as defined in Section 3(3) of ERISA, 29 U.S.C., § 1002(3).

L.      "Employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an Employee Welfare Benefit Plan; includes a group or association of employers acting for an employer in such capacity, as defined in Section 3(5) of ERISA, 29 U.S.C. § 1002(5).

M.      "ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, et. seq., as amended.

N.      "Fee" means any charge, including administration Fees, Service Fees, per capita Fees, management Fees, and participating Provider Fees.

O.      "Fiduciary" shall have the same meaning as such term has under Section 3(21) of ERISA, 29 U.S.C., § 1002(21), and sections and regulations related thereto.

P.      "Health Coverage" shall include any medical, surgical, mental health and substance use disorder benefits or Services, and all the variations within these Services under each option available to Plan Participants and Beneficiaries, including but not limited to, high, mid and low options offered under Fee for Service or indemnity arrangements, health maintenance organizations, preferred provider organizations and point of service plans.

Q.      "Including" shall be construed to mean "without limitation."

R.      "Issuer" means an insurance company, insurance service, or insurance organization (including a health maintenance organization) which is licensed to engage in the business of insurance in a State and which is subject to State law which regulates insurance (within the meaning of Section 514(b)(2) of ERISA, 29 U.S.C. § 1144(b)(2)).

S.      "Participant" means a person as defined by ERISA Section 3(7), 29 U.S.C. § 1002(7).

2

T.   "Party in Interest" means a person or entity defined in Section 3(14) of ERISA, 29 U.S.C. § 1002(14).

U.   "Plan Document" means a document or instrument governing any term of the Plan, including any document or instrument that describes plan operations and administration, eligibility rules, the provision of Health Coverage, and Claims and appeals procedures.

V.   "Relating to" or "reflecting" means constituting, referring to, pertaining to, responding to, regarding, evidencing, explaining, discussing, depicting, analyzing, or containing any information which in any way concerns, affects, or describes the terms or conditions, or identifies facts, with respect to the subject of the inquiry.

W.   "Service Agreement" means a document setting forth specific Services to be rendered by the person providing the Services and the compensation to be paid for those Services in connection to the Plan.

X.   "Service Provider" shall mean any person or entity that performed, or continues to perform, any services to or for the Plan, including any billing agent, marketing agent, recordkeeper, plan administrator, third party administrator, call center service, insurer, underwriter, claims administrator, broker, consultant, adviser, custodian, subadviser, transition manager, or investment manager (as defined by ERISA Section 3(38), 29 U.S.C. §1002(38)).

Y.   "Service(s)" means any kind of product or Service offered to the Plan, including but not limited to medical or health Services, insurance coverage, Claims processing, recordkeeping, call center Services, enrollee education, group insurance products, and third-party administration products or Services. Medical and health Services shall be broadly construed to include dental, vision, physical therapy, speech therapy, occupational therapy, psychotherapy, therapy for drug and alcohol addiction, treatment for eating disorders, and drugs or devices.

Z.   "Summary Plan Description" shall mean a summary document or documents as defined in ERISA Section 102, 29 USC §1022, and related sections.

## INSTRUCTIONS

A.   <u>Scope of search</u>.  This Subpoena calls for all documents in Your possession, custody, control, to the extent not already produced by You.  You are required to search for, obtain and produce all responsive documents, including without limitation documents that are in Your custody or control, even if not in Your immediate possession, for every level of Health Coverage available under the Plan.  This includes any responsive documents in the possession, custody or control of any person acting on Your behalf or under Your direction or control, such as Your employees, accountants, agents, representatives, attorneys or advisors.

B.   <u>Relevant time period</u>.  Unless otherwise specified, the time period covered by this Subpoena is from <u>January 1, 2016</u> to the date of production.  Documents created prior to <u>January 1, 2016</u>, which have been used or relied on since <u>January 1, 2016</u>, or which

3

describe legal duties which remain in effect after January 1, 2016 (such as contracts and trust agreements), shall be considered as included within the time period covered by this Subpoena.

C.    Privileges and Protections. If You do not produce documents because You object to part of or an aspect of a request, please provide a written response stating the precise basis for the objection and produce all documents responsive to the remaining part or aspect of the requests.

If any documents responsive to this Subpoena are withheld because of a claim of privilege, please identify the documents You claim are privileged in a written response, and please indicate for each such document: 1) the nature of the privilege or protection claimed; 2) the factual basis for claiming the privilege or protection asserted; 3) the subject matter of the document; 4) the type, length and date of the document; 5) the author of and/or signatory on the document; 6) the identity of each person to whom the document was directed or distributed; and 7) the nature of the document, e.g., letter, memorandum.

D.    Proprietary and Confidential. If you contend documents responsive to this Subpoena are proprietary or confidential, you should mark those documents as such and produce the documents. The Department of Labor follows procedures in accordance with the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and Executive Order 12600, which allows for the withholding of certain proprietary and confidential documents pursuant to the requirements of Exemption 4 of FOIA.

E.    Electronically stored information. If any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, then You are directed to produce the document in computerized form in one of the following formats: Microsoft Word (doc), WordPerfect (wpd), Rich Text (rtf), Microsoft Outlook (pst), Microsoft Outlook Express (msg), Microsoft Excel (xls), Microsoft Access (mdb), Adobe Acrobat (PDF), TIFF, comma separated values (CSV), ASCII, TXT, Concordance, or Quickbooks. It is preferable to receive electronic information stored in databased or tabular format (e.g. CSV or other delimited, XLS, XLSX, etc.). Files of the preceding types can be submitted in a ZIP compressed format. Sufficient information including sufficient identification of the applicable software program and passwords, if any, and data structure (if applicable) should be provided to permit access to and use of the documents. Images created through a scanning process should have a minimum resolution of 300 dots per inch (dpi).

Where available, Claims data should be provided in Microsoft Excel (xls) or delimited flat file (e.g. text, comma-separated values (CSV), etc.), which allows for the sorting and filtering of data. A sample format of the Claims data to be provided may be made available upon request.

To the extent that any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, and it is not in one of the previously identified formats, please identify the document and the corresponding format.

4

Regardless of the format in which a document may exist, You are requested to preserve the integrity of the original electronic document and its contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

F.  <u>Tenses</u>. Verbs used in the past tense should be read also to include the present tense, and verbs used in the present tense should be read also to include the past tense.

G.  <u>Singular/Plural</u>. The singular number of a noun, pronoun, or verb should be read also to include the plural, and the plural number of a noun, pronoun, or verb should be read also to include the singular.

H.  <u>Word Neutrality</u>. All words and phrases shall be construed as masculine, feminine or gender neutral as necessary to bring within the scope of this Subpoena documents that might otherwise be construed to be outside its scope.

I.  <u>Sufficient to Show</u>. Where a request seeks documents "sufficient" to show specified information, in lieu of producing documents, you may submit a sworn affidavit attested to by an authorized representative that provides the requested information.

J.  <u>Manner of production</u>. All documents produced in response to this Subpoena shall comply with the following instructions:

    a.  You should conduct Your searches for responsive documents in a manner sufficient to identify the source and location where each responsive document is found.

    b.  All documents produced in response to this Subpoena shall be segregated and labeled to show the document request to which the documents are responsive and the source and location where the documents were found.

    c.  To the extent that documents are found in file folders and other similar containers that have labels or other identifying information, the documents shall be produced with such file folder and label information intact.

    d.  To the extent that documents are found attached to other documents, by means of paper clips, staples, or other means of attachment, such documents shall be produced together in their condition when found.

    e.  All documents provided in response to this Subpoena are to include the notes written in a margin and post-its, as well as any attachment referred to or incorporated by the documents.

    f.  In the event that there are no documents responsive to a particular request, please specify that You have no responsive documents.

    g.  If documents relied upon or required to respond to any of this Subpoena, or requested documents, are no longer in Your possession, custody, or control, You

are required to state what disposition was made of such documents, including identification of the person(s) who are believed to be in possession or control of such documents; the date or dates on which such disposition was made, and the reason for such disposition.

h.  If no Claims/requests/appeals are identified pursuant to any part of this Subpoena, please provide copies of the identifiable source documents evidencing Your determination yielding the existence of no results, to include an explanation of how the search was conducted in Your databases, the search parameters, and any screen shots or other dated documents utilized to arrive at Your finding of no results.

K.  <u>Electronic media:</u>

To the extent that the documents that are responsive to this Subpoena may exist on electronic media, those documents should be provided on one of the following media: Compact Disk – Read Only Memory (CD-ROM), Digital Versatile Disc – Read Only Memory (DVD) or USB hard drive.

6

## DOCUMENTS TO BE PRODUCED

1.  Documents relating to Elite Data Group's organizational and management structure and ownership, including, but not limited to:

    a.  Articles of incorporation, corporate bylaws, and partnership agreements;
    b.  Organizational charts, descriptions of Your organizational and supervisory structure, and any documents describing the responsibilities of principals, officers, directors, managers, employees, representatives, and independent contractors;
    c.  Documents sufficient to show the names and address of all divisions, affiliates, or subsidiaries and their principal lines of business;
    d.  Documents sufficient to show the identities and percentage of ownership of all of Your shareholders, limited partners, and/or members, excluding those persons holding only publicly traded shares of a parent organization; and
    e.  Documents sufficient to show the name and contact information for each of Your managerial employees and corporate officers.

2.  Plan document(s), including the following:

    a.  Amendments and resolutions, with signatures;
    b.  Summary Plan Description (SPD);
    c.  Wrap document;
    d.  Trust Agreement;
    e.  Benefits booklets;
    f.  Employee handbooks which discuss employee benefits;
    g.  Evidences of Coverage (EOCs) and Certificates of Coverage for each medical option;
    h.  Enrollment package provided to Participants at open enrollment and new hire, including front and back of all enrollment forms;
    i.  Documents describing plan coverages, rules, costs, or changes to any of the above documents, including any Notices of Material Modifications; and
    j.  Documents describing and governing any supplemental benefits offered in connection to the Plan.

3.  Summary of Benefits and Coverage (SBC) and Uniform Glossary for the Plan.

4.  Documents describing the cost of coverage for each option under the Plan, including premiums by type of coverage (e.g. single, family), employee vs. employer share of cost of coverage, and the cost of COBRA coverage.

5.  Contracts, including amendments thereto, between Elite Data Group or the Plan and Service Providers, including brokers, consultants, third party administrators, record-keepers, actuaries, Claim processors, issuers, and agents. Contracts should include any performance agreements and Fee schedules reflecting compensation as well as engagement and other letters defining the scope of work.

6.  Communications between Elite Data Group or the Plan and Service Providers, including brokers, consultants, third party administrators, record-keepers, actuaries, Claim processors, and agents.

7.  Current fidelity bond policy, including all endorsements and riders, if applicable.

8.  Current fiduciary insurance policy, including all endorsements and riders, if applicable.

9.  The Plan's latest Form 5500 Annual Report filing and any associated financial statements/schedules and accountant's opinion, if applicable.

10.  Form M-1 filings.

11.  Documents sufficient to identify all individuals (name, position, contact information) directly or indirectly responsible for the operation, administration, and/or oversight of the Plan. This includes trustees, administrative or oversight committee members, and accounting or human resources personnel who process plan paperwork, such as enrollment, Claims, Participant inquiries, and premium payments.

12.  Meeting minutes related to the Plan, including meetings by the Board of Trustees, as well as minutes of Trustee committees, subcommittees, or other administrative groups.

13.  Communications between Elite Data Group or the Plan and Employers, Plan Participants, or potential Plan Participants in connection to:

    a.  The benefits provided by the Plan;
    b.  The transfer of Participants from any other plan or arrangement to the Plan;
    c.  The adjudication of specific Claims; and
    d.  The appeal of denied Claims.

14.  Marketing materials related to the Plan, including Power Point slides, brochures, emails, and other communications provided by Elite Data Group or the Plan or in consultation with Elite Data Group or the Plan, including communications and materials provided to Participants and to brokers, agents, or promoters.

15.  Documents sufficient to identify the following with respect to all current and former Plan Participants:

    a.  Name;
    b.  Contact information;
    c.  Basis for eligibility to participate in the Plan, including employment contracts, payroll reports, W-2s, 1099s, or other records sufficient to demonstrate the nature of any employment relationship;
    d.  Enrollment date;
    e.  Coverage option(s) and type of coverage (e.g. single, family);
    f.  Termination date and reason for termination; and
    g.  Total premiums or contributions paid through the date of production.

8

16.    All summary pages of payroll registers showing the total amount of employee health plan contributions withheld for each pay date within the applicable time frame.

17.    Documents sufficient to identify all bank accounts maintained by Elite Data Group relating to the Plan, including:

      a.   Name of the custodian;
      b.   Account number;
      c.   Contact information for account representatives;
      d.   Purpose of the account; and
      e.   Authorized persons with deposit and/or withdrawal authority.

18.    Documents sufficient to show the Plan's income, expenses, assets, and liabilities on a monthly basis for the period under review, including:

      a.   Invoices;
      b.   Bank or investment account statements;
      c.   Canceled checks, deposit slips, and electronic transfer records;
      d.   Internal and external ledgers and journals; and
      e.   Audited and unaudited financial statements.

19.    For all rebates, including medical loss ratio rebates, experience-rated contract rebates, and any other rebate from an insurer, received by the Plan, plan sponsor, or any affiliated or related entity, in relation to the Plan:

      a.   Documents detailing the amount, receipt date, source, and handling of each rebate;
      b.   Sample of notice to Participants about rebates, if applicable;
      c.   Documents demonstrating the allocation of rebated amounts to employer and/or employees; and
      d.   Correspondence regarding how rebates are to be used or allocated.

20.    Claims lag reports or other reports detailing the amount of time from Claim filing to Claim payments.

21.    All Claims aging or experience reports.

22.    List of all unpaid and pended claims detailing date of claim, service type, billed amount, and reason for pending.

23.    External or internal auditor's reports related to the Plan's operations, including Claims audits completed by a Service Provider or consulting firm.

24.    Documents utilized or relied upon to determine contribution amounts, including:

      a.   External or internal actuarial reports;

9

b. Rate sheets;

c. Communications;

d. Underwriting and rating guidelines, methodologies, and assumptions;

e. Source data; and

f. Contracts for reinsurance, stop loss, or other form of excess loss insurance.

25. Documents sufficient to show any Fees, commissions, or other compensation received directly or indirectly by Elite Data Group or its principals, officers, directors, managers, employees, or representatives in connection with the Plan.

26. Documents sufficient to show any commissions, Fees, or other compensation paid in connection with the marketing of the Plan to employers or individuals, including contracts, agreements, invoices, cancelled checks or electronic transfer records, account statements, and financial statements.

27. Documents related to gifts, gratuities, favors, expense reimbursements, and personal Services provided among or between the Plan, the Plan's Service Providers, and Elite Data Group or its General Partner, principals, officers, directors, managers, employees, or representatives.

28. Documents and communications relating to pending or past litigation between the Plan or Elite Data Group and any current or former Participants or members.

29. Documents and communications relating to complaints, investigations, findings, fines, or penalties by state and federal agencies.

30. Elite Data Group's Federal Income Tax Returns.

**U.S. Department of Labor**

61 Forsyth Street SW
Atlanta, Georgia 30303    Ste 7354

Official Business
Penalty for Private Use, $300

3541



CERTIFIED MAIL®

9414 8169 0116 9213 8464 43

$6.400
US POSTAGE
FIRST-CLASS
FROM 30303
OCT 23 2019
stamps
endicia

ELITE DATA GROUP, LP
CUSTODIAN OF RECORDS SUITE 200
ATTN: JONATHAN CRUMLY
1600 PARKWOOD CIRCLE SE
ATLANTA GA 30339-2119

**Attn: Jonathan Crumly**
**1600 Parkwood Circle**
**Suite 200**
**Atlanta, Georgia  30339**

**U.S. Department of Labor**

Employee Benefits Security Administration
230 South Dearborn Street, Suite 2160
Chicago, Illinois 60604
Phone:   (312) 353-0900



OCT 2 1 2019

<u>CERTIFIED MAIL</u> -
<u>RETURN RECEIPT REQUESTED</u>

America's Independent Workers DG, LP
Custodian of Records
ATTN: Jonathan Crumly, Registered Agent
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339

                      Re:    Anjo, LLC
                             Case Number: 99-000016(50)

Dear Custodian of Records:

This office is conducting an investigation of the above-referenced matter pursuant to § 504(a)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1134(a)(1), to determine whether any person has violated or is about to violate any provision of Title I of ERISA. Enclosed is a subpoena which requires you to produce certain documents and records in connection with that investigation.

Your personal appearance pursuant to this subpoena will not be required at this time provided the documents are produced on or before the date noted in the subpoena. You will be informed at a later date if your personal appearance to testify is required. Even though your appearance is not now being required, please provide a cover letter with your response which identifies the documents being produced. Your cover letter should also state whether a diligent search has been made for the subpoenaed documents and that the documents transmitted constitute all documents called for by the subpoena.

The subpoena requests that you produce documents maintained in electronic form, Electronically Stored Information (ESI), in electronic form. The formats in which EBSA can accept ESI are listed in the subpoena. When producing ESI, you should produce the materials as maintained on your computer system, i.e., you should produce ESI with all files, folders and sub-folders intact, and you should produce emails with all attachments intact.

If any documents called for are not produced, please list such documents and indicate their location and the reason for their non-production.

If you have any questions concerning your rights and duties, you may wish to consult counsel. If you have any questions concerning the subpoena or the documents required to be produced, including the production of ESI and the appropriate format and media, please call Senior Investigator Thomas C. Gewin at (404) 302-3917 or Investigator Devon King at (415) 625-2491.

Sincerely,

Jeffrey A. Monhart
Regional Director
Chicago Regional Office
Employee Benefits Security Administration

Enclosure

**SUBPOENA**

99-002113

# UNITED STATES OF AMERICA
## DEPARTMENT OF LABOR
### Employee Benefits Security Administration

To:    *America's Independent Workers DG, LP*
       *Custodian of Records*
       *ATTN: Jonathan Crumly, Registered Agent*
       *1600 Parkwood Circle*
       *Suite 200*
       *Atlanta, GA 30339*

*You are hereby required to appear before*

*Senior Investigator Thomas C. Gewin*

*of the Employee Benefits Security Administration,*

*U.S. Department of Labor, at*

*61 Forsyth Street SW, Suite 7B54,*

*in the City of Atlanta, Georgia, 30303, on the 8th day of November 2019, at 10:00 a.m. of that day, to testify in the matter of an investigation of*

**Anjo, LLC**

*being conducted pursuant to Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1134, in order to determine whether any person has violated or is about to violate any provision of Title I of ERISA or any regulation or order thereunder;*

*And you are hereby required to bring with you and produce at said time and place the following books, papers, and documents:*

   *SEE ATTACHMENT*

*Fail not at your peril.*



**In testimony whereof** *I have hereunto affixed my signature and the seal of the* **United States Department of Labor** *at Chicago, Illinois on this* ___21 st___ *day of October 2019.*

*Jeffrey A. Monhart* signature

**Jeffrey A. Monhart, Regional Director**

**ATTACHMENT TO SUBPOENA**
**America's Independent Workers DG, LP**

**DEFINITIONS**

A.  "AIW," "You," or "Your" shall mean America's Independent Workers DG, LP, including any predecessors, successors, affiliates or parent companies, its officers and directors, employees or anyone acting on behalf of America's Independent Workers DG, LP.

B.  "Plan" shall mean any welfare benefit plan sponsored by AIW.

C.  "And" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

D.  "Beneficiary" means a person as defined by ERISA Section 3(8), 29 U.S.C., § 1002(8).

E.  "Claim(s)" means an itemized statement of Services and costs made by Health Providers (as defined herein) to any Employee Welfare Benefit Plan clients for any health care Services, including pre-Service Claims, post-Service Claims, concurrent care Claims and urgent care Claims as defined by 29 C.F.R. § 2560.503-1.

F.  "Communication" means any oral, written, electronic or other exchange or transmission of information (in the form of facts, ideas, inquiries, opinions, analysis or otherwise), including correspondence, memorandum, reports, electronic mail, electronic documents, facsimiles, communications sent or received by computer systems or applications, telephone conversations, telephone or voicemail messages, face-to-face meetings or conversations, and Internet postings and discussions.

G.  "Describe" including its various forms such as "describing," means to fully identify, narrate, present, recite, recount, or otherwise set forth in detail.

H.  "Discuss" including its various forms such as "discussing," means to review, report, summarize, evaluate, examine, explain, or consider, as well as discuss.

I.  "Document(s)" means, including but not limited to, all writings, recordings or electronic data consisting of letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, word processing, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, still photographs, X-ray films, video tapes, motion pictures, electronic mail messages (email), voice mail messages, electronic instant messages (IM) messages of any type disseminated through a computer network, spreadsheets, databases, electronic calendars and contact managers, back-up data, and/or other form of data compilation, stored in any medium from which information can be obtained (including but not limited to magnetic tape, magnetic disk, CD-ROM, DVD, optical disk, flash drive or other electronic or mechanical storage device), however produced, reproduced or stored, of every kind of description within Your possession, custody or control, or the possession, custody or control of any agent,

1

employee, representative or other persons acting or purporting to act for or on behalf of You or the Plan, including but not limited to notes; memoranda; records; reports; correspondence; telexes and faxes; agreements; contracts; accounting or financial records or worksheets; account books; journals; ledgers; bills; receipts; vouchers; transcripts or notes of conversations or meetings; minutes of meetings; statements; directives in any form from general partners or other representatives; diary entries; studies; summaries and/or records of telephone conversations; interviews, meetings and/or conferences; tabulations; and shall include the original and all non-identical copies; all drafts even if not published, disseminated, or used for any purpose; all notes, schedules, footnotes, attachments, enclosures, and documents attached or referred to in any document to be produced pursuant to this Subpoena.

J.      "Email" or "electronic mail" means any electronic communication made using computer communications software, whether through a local computer network or through the Internet, and whether maintained in electronic form and/or paper form. Email maintained in electronic form must be produced in electronic form.

K.      "Employee Benefit Plan" means an employee benefit plan as defined in Section 3(3) of ERISA, 29 U.S.C., § 1002(3).

L.      "Employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an Employee Welfare Benefit Plan; includes a group or association of employers acting for an employer in such capacity, as defined in Section 3(5) of ERISA, 29 U.S.C. § 1002(5).

M.      "ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, et. seq., as amended.

N.      "Fee" means any charge, including administration Fees, Service Fees, per capita Fees, management Fees, and participating Provider Fees.

O.      "Fiduciary" shall have the same meaning as such term has under Section 3(21) of ERISA, 29 U.S.C., § 1002(21), and sections and regulations related thereto.

P.      "Health Coverage" shall include any medical, surgical, mental health and substance use disorder benefits or Services, and all the variations within these Services under each option available to Plan Participants and Beneficiaries, including but not limited to, high, mid and low options offered under Fee for Service or indemnity arrangements, health maintenance organizations, preferred provider organizations and point of service plans.

Q.      "Including" shall be construed to mean "without limitation."

R.      "Issuer" means an insurance company, insurance service, or insurance organization (including a health maintenance organization) which is licensed to engage in the business of insurance in a State and which is subject to State law which regulates insurance (within the meaning of Section 514(b)(2) of ERISA, 29 U.S.C. § 1144(b)(2)).

S.       "Participant" means a person as defined by ERISA Section 3(7), 29 U.S.C. § 1002(7).

2

T.      "Party in Interest" means a person or entity defined in Section 3(14) of ERISA, 29 U.S.C.
        § 1002(14).

U.      "Plan Document" means a document or instrument governing any term of the Plan,
        including any document or instrument that describes plan operations and administration,
        eligibility rules, the provision of Health Coverage, and Claims and appeals procedures.

V.      "Relating to" or "reflecting" means constituting, referring to, pertaining to, responding to,
        regarding, evidencing, explaining, discussing, depicting, analyzing, or containing any
        information which in any way concerns, affects, or describes the terms or conditions, or
        identifies facts, with respect to the subject of the inquiry.

W.      "Service Agreement" means a document setting forth specific Services to be rendered by
        the person providing the Services and the compensation to be paid for those Services in
        connection to the Plan.

X.      "Service Provider" shall mean any person or entity that performed, or continues to
        perform, any services to or for the Plan, including any billing agent, marketing agent,
        recordkeeper, plan administrator, third party administrator, call center service, insurer,
        underwriter, claims administrator, broker, consultant, adviser, custodian, subadviser,
        transition manager, or investment manager (as defined by ERISA Section 3(38), 29
        U.S.C. §1002(38)).

Y.      "Service(s)" means any kind of product or Service offered to the Plan, including but not
        limited to medical or health Services, insurance coverage, Claims processing,
        recordkeeping, call center Services, enrollee education, group insurance products, and
        third-party administration products or Services. Medical and health Services shall be
        broadly construed to include dental, vision, physical therapy, speech therapy,
        occupational therapy, psychotherapy, therapy for drug and alcohol addiction, treatment
        for eating disorders, and drugs or devices.

Z.      "Summary Plan Description" shall mean a summary document or documents as defined
        in ERISA Section 102, 29 USC §1022, and related sections.

## INSTRUCTIONS

A.      Scope of search. This Subpoena calls for all documents in Your possession, custody,
        control, to the extent not already produced by You. You are required to search for, obtain
        and produce all responsive documents, including without limitation documents that are in
        Your custody or control, even if not in Your immediate possession, for every level of
        Health Coverage available under the Plan. This includes any responsive documents in
        the possession, custody or control of any person acting on Your behalf or under Your
        direction or control, such as Your employees, accountants, agents, representatives,
        attorneys or advisors.

B.      Relevant time period. Unless otherwise specified, the time period covered by this
        Subpoena is from January 1, 2016 to the date of production. Documents created prior to
        January 1, 2016, which have been used or relied on since January 1, 2016, or which

3

describe legal duties which remain in effect after <u>January 1, 2016</u> (such as contracts and trust agreements), shall be considered as included within the time period covered by this Subpoena.

C.   <u>Privileges and Protections</u>.  If You do not produce documents because You object to part of or an aspect of a request, please provide a written response stating the precise basis for the objection and produce all documents responsive to the remaining part or aspect of the requests.

If any documents responsive to this Subpoena are withheld because of a claim of privilege, please identify the documents You claim are privileged in a written response, and please indicate for each such document: 1) the nature of the privilege or protection claimed; 2) the factual basis for claiming the privilege or protection asserted; 3) the subject matter of the document; 4) the type, length and date of the document; 5) the author of and/or signatory on the document; 6) the identity of each person to whom the document was directed or distributed; and 7) the nature of the document, e.g., letter, memorandum.

D.   <u>Proprietary and Confidential</u>.  If you contend documents responsive to this Subpoena are proprietary or confidential, you should mark those documents as such and produce the documents.  The Department of Labor follows procedures in accordance with the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and Executive Order 12600, which allows for the withholding of certain proprietary and confidential documents pursuant to the requirements of Exemption 4 of FOIA.

E.   <u>Electronically stored information</u>.  If any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, then You are directed to produce the document in computerized form in one of the following formats: Microsoft Word (doc), WordPerfect (wpd), Rich Text (rtf), Microsoft Outlook (pst), Microsoft Outlook Express (msg), Microsoft Excel (xls), Microsoft Access (mdb), Adobe Acrobat (PDF), TIFF, comma separated values (CSV), ASCII, TXT, Concordance, or Quickbooks.  It is preferable to receive electronic information stored in databased or tabular format (e.g. CSV or other delimited, XLS, XLSX, etc.).  Files of the preceding types can be submitted in a ZIP compressed format. Sufficient information including sufficient identification of the applicable software program and passwords, if any, and data structure (if applicable) should be provided to permit access to and use of the documents.  Images created through a scanning process should have a minimum resolution of 300 dots per inch (dpi).

Where available, Claims data should be provided in Microsoft Excel (xls) or delimited flat file (e.g. text, comma-separated values (CSV), etc.), which allows for the sorting and filtering of data.  A sample format of the Claims data to be provided may be made available upon request.

To the extent that any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, and it is not in one of the previously identified formats, please identify the document and the corresponding format.

Regardless of the format in which a document may exist, You are requested to preserve the integrity of the original electronic document and its contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

F.   <u>Tenses</u>.  Verbs used in the past tense should be read also to include the present tense, and verbs used in the present tense should be read also to include the past tense.

G.   <u>Singular/Plural</u>.  The singular number of a noun, pronoun, or verb should be read also to include the plural, and the plural number of a noun, pronoun, or verb should be read also to include the singular.

H.   <u>Word Neutrality</u>.  All words and phrases shall be construed as masculine, feminine or gender neutral as necessary to bring within the scope of this Subpoena documents that might otherwise be construed to be outside its scope.

I.   <u>Sufficient to Show.</u>  Where a request seeks documents "sufficient" to show specified information, in lieu of producing documents, you may submit a sworn affidavit attested to by an authorized representative that provides the requested information.

J.   <u>Manner of production</u>.  All documents produced in response to this Subpoena shall comply with the following instructions:

   a.   You should conduct Your searches for responsive documents in a manner sufficient to identify the source and location where each responsive document is found.

   b.   All documents produced in response to this Subpoena shall be segregated and labeled to show the document request to which the documents are responsive and the source and location where the documents were found.

   c.   To the extent that documents are found in file folders and other similar containers that have labels or other identifying information, the documents shall be produced with such file folder and label information intact.

   d.   To the extent that documents are found attached to other documents, by means of paper clips, staples, or other means of attachment, such documents shall be produced together in their condition when found.

   e.   All documents provided in response to this Subpoena are to include the notes written in a margin and post-its, as well as any attachment referred to or incorporated by the documents.

   f.   In the event that there are no documents responsive to a particular request, please specify that You have no responsive documents.

   g.   If documents relied upon or required to respond to any of this Subpoena, or requested documents, are no longer in Your possession, custody, or control, You

are required to state what disposition was made of such documents, including identification of the person(s) who are believed to be in possession or control of such documents; the date or dates on which such disposition was made, and the reason for such disposition.

h. If no Claims/requests/appeals are identified pursuant to any part of this Subpoena, please provide copies of the identifiable source documents evidencing Your determination yielding the existence of no results, to include an explanation of how the search was conducted in Your databases, the search parameters, and any screen shots or other dated documents utilized to arrive at Your finding of no results.

K.    <u>Electronic media</u>:

To the extent that the documents that are responsive to this Subpoena may exist on electronic media, those documents should be provided on one of the following media: Compact Disk – Read Only Memory (CD-ROM), Digital Versatile Disc – Read Only Memory (DVD) or USB hard drive.

## DOCUMENTS TO BE PRODUCED

1.  Documents relating to AIW's organizational and management structure and ownership, including, but not limited to:

    a.  Articles of incorporation, corporate bylaws, and partnership agreements;
    b.  Organizational charts, descriptions of Your organizational and supervisory structure, and any documents describing the responsibilities of principals, officers, directors, managers, employees, representatives, and independent contractors;
    c.  Documents sufficient to show the names and address of all divisions, affiliates, or subsidiaries and their principal lines of business;
    d.  Documents sufficient to show the identities and percentage of ownership of all of Your shareholders, limited partners, and/or members, excluding those persons holding only publicly traded shares of a parent organization; and
    e.  Documents sufficient to show the name and contact information for each of Your managerial employees and corporate officers.

2.  Plan document(s), including the following:

    a.  Amendments and resolutions, with signatures;
    b.  Summary Plan Description (SPD);
    c.  Wrap document;
    d.  Trust Agreement;
    e.  Benefits booklets;
    f.  Employee handbooks which discuss employee benefits;
    g.  Evidences of Coverage (EOCs) and Certificates of Coverage for each medical option;
    h.  Enrollment package provided to Participants at open enrollment and new hire, including front and back of all enrollment forms;
    i.  Documents describing plan coverages, rules, costs, or changes to any of the above documents, including any Notices of Material Modifications; and
    j.  Documents describing and governing any supplemental benefits offered in connection to the Plan.

3.  Summary of Benefits and Coverage (SBC) and Uniform Glossary for the Plan.

4.  Documents describing the cost of coverage for each option under the Plan, including premiums by type of coverage (e.g. single, family), employee vs. employer share of cost of coverage, and the cost of COBRA coverage.

5.  Contracts, including amendments thereto, between AIW or the Plan and Service Providers, including brokers, consultants, third party administrators, record-keepers, actuaries, Claim processors, issuers, and agents. Contracts should include any performance agreements and Fee schedules reflecting compensation as well as engagement and other letters defining the scope of work.

7

6.  Communications between AIW or the Plan and Service Providers, including brokers, consultants, third party administrators, record-keepers, actuaries, Claim processors, and agents.

7.  Current fidelity bond policy, including all endorsements and riders, if applicable.

8.  Current fiduciary insurance policy, including all endorsements and riders, if applicable.

9.  The Plan's latest Form 5500 Annual Report filing and any associated financial statements/schedules and accountant's opinion, if applicable.

10. Form M-1 filings.

11. Documents sufficient to identify all individuals (name, position, contact information) directly or indirectly responsible for the operation, administration, and/or oversight of the Plan. This includes trustees, administrative or oversight committee members, and accounting or human resources personnel who process plan paperwork, such as enrollment, Claims, Participant inquiries, and premium payments.

12. Meeting minutes related to the Plan, including meetings by the Board of Trustees, as well as minutes of Trustee committees, subcommittees, or other administrative groups.

13. Communications between AIW or the Plan and Employers, Plan Participants, or potential Plan Participants in connection to:

    a.  The benefits provided by the Plan;
    b.  The transfer of Participants from any other plan or arrangement to the Plan;
    c.  The adjudication of specific Claims; and
    d.  The appeal of denied Claims.

14. Marketing materials related to the Plan, including Power Point slides, brochures, emails, and other communications provided by AIW or the Plan or in consultation with AIW or the Plan, including communications and materials provided to Participants and to brokers, agents, or promoters.

15. Documents sufficient to identify the following with respect to all current and former Plan Participants:

    a.  Name;
    b.  Contact information;
    c.  Basis for eligibility to participate in the Plan, including employment contracts, payroll reports, W-2s, 1099s, or other records sufficient to demonstrate the nature of any employment relationship;
    d.  Enrollment date;
    e.  Coverage option(s) and type of coverage (e.g. single, family);
    f.  Termination date and reason for termination; and
    g.  Total premiums or contributions paid through the date of production.

16.   All summary pages of payroll registers showing the total amount of employee health plan contributions withheld for each pay date within the applicable time frame.

17.   Documents sufficient to identify all bank accounts maintained by AIW relating to the Plan, including:

    a.   Name of the custodian;
    b.   Account number;
    c.   Contact information for account representatives;
    d.   Purpose of the account; and
    e.   Authorized persons with deposit and/or withdrawal authority.

18.   Documents sufficient to show the Plan's income, expenses, assets, and liabilities on a monthly basis for the period under review, including:

    a.   Invoices;
    b.   Bank or investment account statements;
    c.   Canceled checks, deposit slips, and electronic transfer records;
    d.   Internal and external ledgers and journals; and
    e.   Audited and unaudited financial statements.

19.   For all rebates, including medical loss ratio rebates, experience-rated contract rebates, and any other rebate from an insurer, received by the Plan, plan sponsor, or any affiliated or related entity, in relation to the Plan:

    a.   Documents detailing the amount, receipt date, source, and handling of each rebate;
    b.   Sample of notice to Participants about rebates, if applicable;
    c.   Documents demonstrating the allocation of rebated amounts to employer and/or employees; and
    d.   Correspondence regarding how rebates are to be used or allocated.

20.   Claims lag reports or other reports detailing the amount of time from Claim filing to Claim payments.

21.   All Claims aging or experience reports.

22.   List of all unpaid and pended claims detailing date of claim, service type, billed amount, and reason for pending.

23.   External or internal auditor's reports related to the Plan's operations, including Claims audits completed by a Service Provider or consulting firm.

24.   Documents utilized or relied upon to determine contribution amounts, including:

    a.   External or internal actuarial reports;

      b.  Rate sheets;
      c.  Communications;
      d.  Underwriting and rating guidelines, methodologies, and assumptions;
      e.  Source data; and
      f.  Contracts for reinsurance, stop loss, or other form of excess loss insurance.

25. Documents sufficient to show any Fees, commissions, or other compensation received directly or indirectly by AIW or its principals, officers, directors, managers, employees, or representatives in connection with the Plan.

26. Documents sufficient to show any commissions, Fees, or other compensation paid in connection with the marketing of the Plan to employers or individuals, including contracts, agreements, invoices, cancelled checks or electronic transfer records, account statements, and financial statements.

27. Documents related to gifts, gratuities, favors, expense reimbursements, and personal Services provided among or between the Plan, the Plan's Service Providers, and AIW or its General Partner, principals, officers, directors, managers, employees, or representatives.

28. Documents and communications relating to pending or past litigation between the Plan or AIW and any current or former Participants or members.

29. Documents and communications relating to complaints, investigations, findings, fines, or penalties by state and federal agencies.

30. AIW's Federal Income Tax Returns.

10

**U.S. Department of Labor**

61 Forsyth Street SW
Atlanta, Georgia 30303    Ste 1B54

Official Business
Penalty for Private Use, $300

3541

**CERTIFIED MAIL®**

9414 8169 0116 9213 8464 98

$6.40⁰
US POSTAGE
FIRST-CLASS
FROM 30303
OCT 23 2019
stamps
endicia



AMERICA'S INDEPENDENT WORKERS
CUSTODIAN OF RECORDS
1600 PARKWOOD CIRCLE SE Ste 200
ATLANTA GA 30339-2119

**America's Independent Workers**
**Custodian of Records**
**Attn: Jonathan Crumly**
**1600 Parkwood Circle**
**Suite 200**
**Atlanta, Georgia  30339**

**U.S. Department of Labor**    Employee Benefits Security Administration
230 South Dearborn Street, Suite 2160
Chicago, Illinois 60604
Phone:   (312) 353-0900



OCT 2 1 2019

<u>CERTIFIED MAIL</u> -
<u>RETURN RECEIPT REQUESTED</u>

America's Consumers & Affiliates LP
Custodian of Records
ATTN: Jonathan Crumly, Registered Agent
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339

Re:    Anjo, LLC
Case Number: 99-000016(50)

Dear Custodian of Records:

This office is conducting an investigation of the above-referenced matter pursuant to § 504(a)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1134(a)(1), to determine whether any person has violated or is about to violate any provision of Title I of ERISA. Enclosed is a subpoena which requires you to produce certain documents and records in connection with that investigation.

Your personal appearance pursuant to this subpoena will not be required at this time provided the documents are produced on or before the date noted in the subpoena. You will be informed at a later date if your personal appearance to testify is required. Even though your appearance is not now being required, please provide a cover letter with your response which identifies the documents being produced. Your cover letter should also state whether a diligent search has been made for the subpoenaed documents and that the documents transmitted constitute all documents called for by the subpoena.

The subpoena requests that you produce documents maintained in electronic form, Electronically Stored Information (ESI), in electronic form. The formats in which EBSA can accept ESI are listed in the subpoena. When producing ESI, you should produce the materials as maintained on your computer system, i.e., you should produce ESI with all files, folders and sub-folders intact, and you should produce emails with all attachments intact.

If any documents called for are not produced, please list such documents and indicate their location and the reason for their non-production.

If you have any questions concerning your rights and duties, you may wish to consult counsel. If you have any questions concerning the subpoena or the documents required to be produced, including the production of ESI and the appropriate format and media, please call Senior Investigator Thomas C. Gewin at (404) 302-3917 or Investigator Devon King at (415) 625-2491.

Sincerely,

Jeffrey A. Monhart
Regional Director
Chicago Regional Office
Employee Benefits Security Administration

Enclosure

2

**SUBPOENA**

99-002112

# UNITED STATES OF AMERICA
## DEPARTMENT OF LABOR
### Employee Benefits Security Administration

To:    *America's Consumers & Affiliates LP*
*Custodian of Records*
*ATTN: Jonathan Crumly, Registered Agent*
*1600 Parkwood Circle*
*Suite 200*
*Atlanta, GA 30339*

*You are hereby required to appear before*

*Senior Investigator Thomas C. Gewin*

*of the Employee Benefits Security Administration,*

*U.S. Department of Labor, at*

*61 Forsyth Street SW, Suite 7B54,*

*in the City of Atlanta, Georgia, 30303, on the 8th day of November 2019, at 10:00 a.m. of that day, to testify in the matter of an investigation of*

**Anjo, LLC**

*being conducted pursuant to Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1134, in order to determine whether any person has violated or is about to violate any provision of Title I of ERISA or any regulation or order thereunder;*

*And you are hereby required to bring with you and produce at said time and place the following books, papers, and documents:*

*SEE ATTACHMENT*

*Fail not at your peril.*



**In testimony whereof** *I have hereunto affixed my signature and the seal of the* **United States Department of Labor** *at Chicago, Illinois on this* ___21st___ *day of October 2019.*

**Jeffrey A. Monhart, Regional Director**

## ATTACHMENT TO SUBPOENA
## America's Consumers & Affiliates LP

### DEFINITIONS

A.    "AC&A," "You," or "Your" shall mean America's Consumers & Affiliates LP, including any predecessors, successors, affiliates or parent companies, its officers and directors, employees or anyone acting on behalf of America's Consumers & Affiliates LP.

B.    "Plan" shall mean any welfare benefit plan sponsored by AC&A.

C.    "And" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

D.    "Beneficiary" means a person as defined by ERISA Section 3(8), 29 U.S.C., § 1002(8).

E.    "Claim(s)" means an itemized statement of Services and costs made by Health Providers (as defined herein) to any Employee Welfare Benefit Plan clients for any health care Services, including pre-Service Claims, post-Service Claims, concurrent care Claims and urgent care Claims as defined by 29 C.F.R. § 2560.503-1.

F.    "Communication" means any oral, written, electronic or other exchange or transmission of information (in the form of facts, ideas, inquiries, opinions, analysis or otherwise), including correspondence, memorandum, reports, electronic mail, electronic documents, facsimiles, communications sent or received by computer systems or applications, telephone conversations, telephone or voicemail messages, face-to-face meetings or conversations, and Internet postings and discussions.

G.    "Describe" including its various forms such as "describing," means to fully identify, narrate, present, recite, recount, or otherwise set forth in detail.

H.    "Discuss" including its various forms such as "discussing," means to review, report, summarize, evaluate, examine, explain, or consider, as well as discuss.

I.    "Document(s)" means, including but not limited to, all writings, recordings or electronic data consisting of letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, word processing, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, still photographs, X-ray films, video tapes, motion pictures, electronic mail messages (email), voice mail messages, electronic instant messages (IM) messages of any type disseminated through a computer network, spreadsheets, databases, electronic calendars and contact managers, back-up data, and/or other form of data compilation, stored in any medium from which information can be obtained (including but not limited to magnetic tape, magnetic disk, CD-ROM, DVD, optical disk, flash drive or other electronic or mechanical storage device), however produced, reproduced or stored, of every kind of description within Your possession, custody or control, or the possession, custody or control of any agent, employee, representative or other persons acting or purporting to act for or on behalf of

1

You or the Plan, including but not limited to notes; memoranda; records; reports; correspondence; telexes and faxes; agreements; contracts; accounting or financial records or worksheets; account books; journals; ledgers; bills; receipts; vouchers; transcripts or notes of conversations or meetings; minutes of meetings; statements; directives in any form from general partners or other representatives; diary entries; studies; summaries and/or records of telephone conversations; interviews, meetings and/or conferences; tabulations; and shall include the original and all non-identical copies; all drafts even if not published, disseminated, or used for any purpose; all notes, schedules, footnotes, attachments, enclosures, and documents attached or referred to in any document to be produced pursuant to this Subpoena.

J.    "Email" or "electronic mail" means any electronic communication made using computer communications software, whether through a local computer network or through the Internet, and whether maintained in electronic form and/or paper form. Email maintained in electronic form must be produced in electronic form.

K.    "Employee Benefit Plan" means an employee benefit plan as defined in Section 3(3) of ERISA, 29 U.S.C., § 1002(3).

L.    "Employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an Employee Welfare Benefit Plan; includes a group or association of employers acting for an employer in such capacity, as defined in Section 3(5) of ERISA, 29 U.S.C. § 1002(5).

M.    "ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, et. seq., as amended.

N.    "Fee" means any charge, including administration Fees, Service Fees, per capita Fees, management Fees, and participating Provider Fees.

O.    "Fiduciary" shall have the same meaning as such term has under Section 3(21) of ERISA, 29 U.S.C., § 1002(21), and sections and regulations related thereto.

P.    "Health Coverage" shall include any medical, surgical, mental health and substance use disorder benefits or Services, and all the variations within these Services under each option available to Plan Participants and Beneficiaries, including but not limited to, high, mid and low options offered under Fee for Service or indemnity arrangements, health maintenance organizations, preferred provider organizations and point of service plans.

Q.    "Including" shall be construed to mean "without limitation."

R.    "Issuer" means an insurance company, insurance service, or insurance organization (including a health maintenance organization) which is licensed to engage in the business of insurance in a State and which is subject to State law which regulates insurance (within the meaning of Section 514(b)(2) of ERISA, 29 U.S.C. § 1144(b)(2)).

S.    "Participant" means a person as defined by ERISA Section 3(7), 29 U.S.C. § 1002(7).

2

T.    "Party in Interest" means a person or entity defined in Section 3(14) of ERISA, 29 U.S.C. § 1002(14).

U.    "Plan Document" means a document or instrument governing any term of the Plan, including any document or instrument that describes plan operations and administration, eligibility rules, the provision of Health Coverage, and Claims and appeals procedures.

V.    "Relating to" or "reflecting" means constituting, referring to, pertaining to, responding to, regarding, evidencing, explaining, discussing, depicting, analyzing, or containing any information which in any way concerns, affects, or describes the terms or conditions, or identifies facts, with respect to the subject of the inquiry.

W.    "Service Agreement" means a document setting forth specific Services to be rendered by the person providing the Services and the compensation to be paid for those Services in connection to the Plan.

X.    "Service Provider" shall mean any person or entity that performed, or continues to perform, any services to or for the Plan, including any billing agent, marketing agent, recordkeeper, plan administrator, third party administrator, call center service, insurer, underwriter, claims administrator, broker, consultant, adviser, custodian, subadviser, transition manager, or investment manager (as defined by ERISA Section 3(38), 29 U.S.C. §1002(38)).

Y.    "Service(s)" means any kind of product or Service offered to the Plan, including but not limited to medical or health Services, insurance coverage, Claims processing, recordkeeping, call center Services, enrollee education, group insurance products, and third-party administration products or Services. Medical and health Services shall be broadly construed to include dental, vision, physical therapy, speech therapy, occupational therapy, psychotherapy, therapy for drug and alcohol addiction, treatment for eating disorders, and drugs or devices.

Z.    "Summary Plan Description" shall mean a summary document or documents as defined in ERISA Section 102, 29 USC §1022, and related sections.

## INSTRUCTIONS

A.    <u>Scope of search</u>.  This Subpoena calls for all documents in Your possession, custody, control, to the extent not already produced by You.  You are required to search for, obtain and produce all responsive documents, including without limitation documents that are in Your custody or control, even if not in Your immediate possession, for every level of Health Coverage available under the Plan.  This includes any responsive documents in the possession, custody or control of any person acting on Your behalf or under Your direction or control, such as Your employees, accountants, agents, representatives, attorneys or advisors.

B.    <u>Relevant time period</u>.  Unless otherwise specified, the time period covered by this Subpoena is from <u>January 1, 2016</u> to the date of production.  Documents created prior to <u>January 1, 2016,</u> which have been used or relied on since <u>January 1, 2016,</u> or which

3

describe legal duties which remain in effect after January 1, 2016 (such as contracts and trust agreements), shall be considered as included within the time period covered by this Subpoena.

C.    Privileges and Protections. If You do not produce documents because You object to part of or an aspect of a request, please provide a written response stating the precise basis for the objection and produce all documents responsive to the remaining part or aspect of the requests.

If any documents responsive to this Subpoena are withheld because of a claim of privilege, please identify the documents You claim are privileged in a written response, and please indicate for each such document: 1) the nature of the privilege or protection claimed; 2) the factual basis for claiming the privilege or protection asserted; 3) the subject matter of the document; 4) the type, length and date of the document; 5) the author of and/or signatory on the document; 6) the identity of each person to whom the document was directed or distributed; and 7) the nature of the document, e.g., letter, memorandum.

D.    Proprietary and Confidential. If you contend documents responsive to this Subpoena are proprietary or confidential, you should mark those documents as such and produce the documents. The Department of Labor follows procedures in accordance with the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and Executive Order 12600, which allows for the withholding of certain proprietary and confidential documents pursuant to the requirements of Exemption 4 of FOIA.

E.    Electronically stored information. If any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, then You are directed to produce the document in computerized form in one of the following formats: Microsoft Word (doc), WordPerfect (wpd), Rich Text (rtf), Microsoft Outlook (pst), Microsoft Outlook Express (msg), Microsoft Excel (xls), Microsoft Access (mdb), Adobe Acrobat (PDF), TIFF, comma separated values (CSV), ASCII, TXT, Concordance, or Quickbooks. It is preferable to receive electronic information stored in databased or tabular format (e.g. CSV or other delimited, XLS, XLSX, etc.). Files of the preceding types can be submitted in a ZIP compressed format. Sufficient information including sufficient identification of the applicable software program and passwords, if any, and data structure (if applicable) should be provided to permit access to and use of the documents. Images created through a scanning process should have a minimum resolution of 300 dots per inch (dpi).

Where available, Claims data should be provided in Microsoft Excel (xls) or delimited flat file (e.g. text, comma-separated values (CSV), etc.), which allows for the sorting and filtering of data. A sample format of the Claims data to be provided may be made available upon request.

To the extent that any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, and it is not in one of the previously identified formats, please identify the document and the corresponding format.

Regardless of the format in which a document may exist, You are requested to preserve the integrity of the original electronic document and its contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

F.   <u>Tenses</u>.  Verbs used in the past tense should be read also to include the present tense, and verbs used in the present tense should be read also to include the past tense.

G.   <u>Singular/Plural</u>.  The singular number of a noun, pronoun, or verb should be read also to include the plural, and the plural number of a noun, pronoun, or verb should be read also to include the singular.

H.   <u>Word Neutrality</u>. All words and phrases shall be construed as masculine, feminine or gender neutral as necessary to bring within the scope of this Subpoena documents that might otherwise be construed to be outside its scope.

I.   <u>Sufficient to Show</u>.  Where a request seeks documents "sufficient" to show specified information, in lieu of producing documents, you may submit a sworn affidavit attested to by an authorized representative that provides the requested information.

J.   <u>Manner of production</u>.  All documents produced in response to this Subpoena shall comply with the following instructions:

   a.   You should conduct Your searches for responsive documents in a manner sufficient to identify the source and location where each responsive document is found.

   b.   All documents produced in response to this Subpoena shall be segregated and labeled to show the document request to which the documents are responsive and the source and location where the documents were found.

   c.   To the extent that documents are found in file folders and other similar containers that have labels or other identifying information, the documents shall be produced with such file folder and label information intact.

   d.   To the extent that documents are found attached to other documents, by means of paper clips, staples, or other means of attachment, such documents shall be produced together in their condition when found.

   e.   All documents provided in response to this Subpoena are to include the notes written in a margin and post-its, as well as any attachment referred to or incorporated by the documents.

   f.   In the event that there are no documents responsive to a particular request, please specify that You have no responsive documents.

   g.   If documents relied upon or required to respond to any of this Subpoena, or requested documents, are no longer in Your possession, custody, or control, You

5

are required to state what disposition was made of such documents, including identification of the person(s) who are believed to be in possession or control of such documents; the date or dates on which such disposition was made, and the reason for such disposition.

h.  If no Claims/requests/appeals are identified pursuant to any part of this Subpoena, please provide copies of the identifiable source documents evidencing Your determination yielding the existence of no results, to include an explanation of how the search was conducted in Your databases, the search parameters, and any screen shots or other dated documents utilized to arrive at Your finding of no results.

K.  <u>Electronic media:</u>

To the extent that the documents that are responsive to this Subpoena may exist on electronic media, those documents should be provided on one of the following media: Compact Disk – Read Only Memory (CD-ROM), Digital Versatile Disc – Read Only Memory (DVD) or USB hard drive.

6

## DOCUMENTS TO BE PRODUCED

1. Documents relating to AC&A's organizational and management structure and ownership, including, but not limited to:

    a. Articles of incorporation, corporate bylaws, and partnership agreements;
    b. Organizational charts, descriptions of Your organizational and supervisory structure, and any documents describing the responsibilities of principals, officers, directors, managers, employees, representatives, and independent contractors;
    c. Documents sufficient to show the names and address of all divisions, affiliates, or subsidiaries and their principal lines of business;
    d. Documents sufficient to show the identities and percentage of ownership of all of Your shareholders, limited partners, and/or members, excluding those persons holding only publicly traded shares of a parent organization; and
    e. Documents sufficient to show the name and contact information for each of Your managerial employees and corporate officers.

2. Plan document(s), including the following:

    a. Amendments and resolutions, with signatures;
    b. Summary Plan Description (SPD);
    c. Wrap document;
    d. Trust Agreement;
    e. Benefits booklets;
    f. Employee handbooks which discuss employee benefits;
    g. Evidences of Coverage (EOCs) and Certificates of Coverage for each medical option;
    h. Enrollment package provided to Participants at open enrollment and new hire, including front and back of all enrollment forms;
    i. Documents describing plan coverages, rules, costs, or changes to any of the above documents, including any Notices of Material Modifications; and
    j. Documents describing and governing any supplemental benefits offered in connection to the Plan.

3. Summary of Benefits and Coverage (SBC) and Uniform Glossary for the Plan.

4. Documents describing the cost of coverage for each option under the Plan, including premiums by type of coverage (e.g. single, family), employee vs. employer share of cost of coverage, and the cost of COBRA coverage.

5. Contracts, including amendments thereto, between AC&A or the Plan and Service Providers, including brokers, consultants, third party administrators, record-keepers, actuaries, Claim processors, issuers, and agents. Contracts should include any performance agreements and Fee schedules reflecting compensation as well as engagement and other letters defining the scope of work.

6.  Communications between AC&A or the Plan and Service Providers, including brokers, consultants, third party administrators, record-keepers, actuaries, Claim processors, and agents.

7.  Current fidelity bond policy, including all endorsements and riders, if applicable.

8.  Current fiduciary insurance policy, including all endorsements and riders, if applicable.

9.  The Plan's latest Form 5500 Annual Report filing and any associated financial statements/schedules and accountant's opinion, if applicable.

10. Form M-1 filings.

11. Documents sufficient to identify all individuals (name, position, contact information) directly or indirectly responsible for the operation, administration, and/or oversight of the Plan. This includes trustees, administrative or oversight committee members, and accounting or human resources personnel who process plan paperwork, such as enrollment, Claims, Participant inquiries, and premium payments.

12. Meeting minutes related to the Plan, including meetings by the Board of Trustees, as well as minutes of Trustee committees, subcommittees, or other administrative groups.

13. Communications between AC&A or the Plan and Employers, Plan Participants, or potential Plan Participants in connection to:

    a. The benefits provided by the Plan;
    b. The transfer of Participants from any other plan or arrangement to the Plan;
    c. The adjudication of specific Claims; and
    d. The appeal of denied Claims.

14. Marketing materials related to the Plan, including Power Point slides, brochures, emails, and other communications provided by AC&A or the Plan or in consultation with AC&A or the Plan, including communications and materials provided to Participants and to brokers, agents, or promoters.

15. Documents sufficient to identify the following with respect to all current and former Plan Participants:

    a. Name;
    b. Contact information;
    c. Basis for eligibility to participate in the Plan, including employment contracts, payroll reports, W-2s, 1099s, or other records sufficient to demonstrate the nature of any employment relationship;
    d. Enrollment date;
    e. Coverage option(s) and type of coverage (e.g. single, family);
    f. Termination date and reason for termination; and
    g. Total premiums or contributions paid through the date of production.

8

16. All summary pages of payroll registers showing the total amount of employee health plan contributions withheld for each pay date within the applicable time frame.

17. Documents sufficient to identify all bank accounts maintained by AC&A relating to the Plan, including:

    a. Name of the custodian;
    b. Account number;
    c. Contact information for account representatives;
    d. Purpose of the account; and
    e. Authorized persons with deposit and/or withdrawal authority.

18. Documents sufficient to show the Plan's income, expenses, assets, and liabilities on a monthly basis for the period under review, including:

    a. Invoices;
    b. Bank or investment account statements;
    c. Canceled checks, deposit slips, and electronic transfer records;
    d. Internal and external ledgers and journals; and
    e. Audited and unaudited financial statements.

19. For all rebates, including medical loss ratio rebates, experience-rated contract rebates, and any other rebate from an insurer, received by the Plan, plan sponsor, or any affiliated or related entity, in relation to the Plan:

    a. Documents detailing the amount, receipt date, source, and handling of each rebate;
    b. Sample of notice to Participants about rebates, if applicable;
    c. Documents demonstrating the allocation of rebated amounts to employer and/or employees; and
    d. Correspondence regarding how rebates are to be used or allocated.

20. Claims lag reports or other reports detailing the amount of time from Claim filing to Claim payments.

21. All Claims aging or experience reports.

22. List of all unpaid and pended claims detailing date of claim, service type, billed amount, and reason for pending.

23. External or internal auditor's reports related to the Plan's operations, including Claims audits completed by a Service Provider or consulting firm.

24. Documents utilized or relied upon to determine contribution amounts, including:

    a. External or internal actuarial reports;

       b.  Rate sheets;
       c.  Communications;
       d.  Underwriting and rating guidelines, methodologies, and assumptions;
       e.  Source data; and
       f.  Contracts for reinsurance, stop loss, or other form of excess loss insurance.

25.    Documents sufficient to show any Fees, commissions, or other compensation received directly or indirectly by AC&A or its principals, officers, directors, managers, employees, or representatives in connection with the Plan.

26.    Documents sufficient to show any commissions, Fees, or other compensation paid in connection with the marketing of the Plan to employers or individuals, including contracts, agreements, invoices, cancelled checks or electronic transfer records, account statements, and financial statements.

27.    Documents related to gifts, gratuities, favors, expense reimbursements, and personal Services provided among or between the Plan, the Plan's Service Providers, and AC&A or its General Partner, principals, officers, directors, managers, employees, or representatives.

28.    Documents and communications relating to pending or past litigation between the Plan or AC&A and any current or former Participants or members.

29.    Documents and communications relating to complaints, investigations, findings, fines, or penalties by state and federal agencies.

30.    AC&A's Federal Income Tax Returns.

CERTIFIED MAIL®

CERTIFIED MAIL®

**U.S. Department of Labor**

61 Forsyth Street SW
Atlanta, Georgia 30303    Ste 7854

Official Business
Penalty for Private Use, $300

3541

$6.40°°
US POSTAGE
FIRST-CLASS
FROM 30303
OCT 23 2019
stamps
endicia

9414 8169 0116 9213 8461 84

AMERICA'S CONSUMERS AND AFFILIATES, LP
CUSTODIAN OF RECORDS, SUITE 200
ATTN: JONATHAN CRUMLY
1600 PARKWOOD CIRCLE SE
ATLANTA GA 30339-2119

A...
C...
A...
**1600 Parkwood Circle
Suite 200
Atlanta, Georgia  30339**



**U.S. Department of Labor**

Employee Benefits Security Administration
230 South Dearborn Street, Suite 2160
Chicago, Illinois 60604
Phone:   (312) 353-0900



OCT 2 1 2019

<u>CERTIFIED MAIL</u> -
<u>RETURN RECEIPT REQUESTED</u>

Agridata Partnership Group, LP
Custodian of Records
ATTN: Jonathan Crumly, Registered Agent
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339

>                    Re:     Anjo, LLC
>                            Case Number: 99-000016(50)

Dear Custodian of Records:

This office is conducting an investigation of the above-referenced matter pursuant to § 504(a)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1134(a)(1), to determine whether any person has violated or is about to violate any provision of Title I of ERISA. Enclosed is a subpoena which requires you to produce certain documents and records in connection with that investigation.

Your personal appearance pursuant to this subpoena will not be required at this time provided the documents are produced on or before the date noted in the subpoena. You will be informed at a later date if your personal appearance to testify is required. Even though your appearance is not now being required, please provide a cover letter with your response which identifies the documents being produced. Your cover letter should also state whether a diligent search has been made for the subpoenaed documents and that the documents transmitted constitute all documents called for by the subpoena.

The subpoena requests that you produce documents maintained in electronic form, Electronically Stored Information (ESI), be produced in electronic form. The formats in which EBSA can accept ESI are listed in the subpoena. When producing ESI, you should produce the materials as maintained on your computer system, i.e., you should produce ESI with all files, folders and sub-folders intact, and you should produce emails with all attachments intact.

If any documents called for are not produced, please list such documents and indicate their location and the reason for their non-production.

If you have any questions concerning your rights and duties, you may wish to consult counsel. If you have any questions concerning the subpoena or the documents required to be produced, including the production of ESI and the appropriate format and media, please call Senior Investigator Thomas C. Gewin at (404) 302-3917 or Investigator Devon King at (415) 625-2491.

Sincerely,

Jeffrey A. Monhart
Regional Director
Chicago Regional Office
Employee Benefits Security Administration

Enclosure

SUBPOENA

99-002114

# UNITED STATES OF AMERICA
## DEPARTMENT OF LABOR
### Employee Benefits Security Administration

To:   *Agridata Partnership Group, LP*
      *Custodian of Records*
      *ATTN: Jonathan Crumly, Registered Agent*
      *1600 Parkwood Circle*
      *Suite 200*
      *Atlanta, GA 30339*

*You are hereby required to appear before*

*Senior Investigator Thomas C. Gewin*

*of the Employee Benefits Security Administration,*

*U.S. Department of Labor, at*

*61 Forsyth Street SW, Suite 7B54,*

*in the City of Atlanta, Georgia, 30303, on the 8th day of November 2019, at 10:00 a.m. of that day, to testify in the matter of an investigation of*

**Anjo, LLC**

*being conducted pursuant to Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1134, in order to determine whether any person has violated or is about to violate any provision of Title I of ERISA or any regulation or order thereunder;*

*And you are hereby required to bring with you and produce at said time and place the following books, papers, and documents:*

    *SEE ATTACHMENT*

*Fail not at your peril.*



**In testimony whereof** *I have hereunto affixed my signature and the seal of the* **United States Department of Labor** *at Chicago, Illinois on this* __21st__ *day of October 2019.*

*Jeffrey A. Monhart*

**Jeffrey A. Monhart, Regional Director**

**ATTACHMENT TO SUBPOENA**
**Agridata Partnership Group, LP**

**DEFINITIONS**

A.    "Agridata," "You," or "Your" shall mean Agridata Partnership Group, LP, including any predecessors, successors, affiliates or parent companies, its officers and directors, employees or anyone acting on behalf of Agridata Partnership Group, LP.

B.    "Plan" shall mean any welfare benefit plan sponsored by Agridata.

C.    "And" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

D.    "Beneficiary" means a person as defined by ERISA Section 3(8), 29 U.S.C., § 1002(8).

E.    "Claim(s)" means an itemized statement of Services and costs made by Health Providers (as defined herein) to any Employee Welfare Benefit Plan clients for any health care Services, including pre-Service Claims, post-Service Claims, concurrent care Claims and urgent care Claims as defined by 29 C.F.R. § 2560.503-1.

F.    "Communication" means any oral, written, electronic or other exchange or transmission of information (in the form of facts, ideas, inquiries, opinions, analysis or otherwise), including correspondence, memorandum, reports, electronic mail, electronic documents, facsimiles, communications sent or received by computer systems or applications, telephone conversations, telephone or voicemail messages, face-to-face meetings or conversations, and Internet postings and discussions.

G.    "Describe" including its various forms such as "describing," means to fully identify, narrate, present, recite, recount, or otherwise set forth in detail.

H.    "Discuss" including its various forms such as "discussing," means to review, report, summarize, evaluate, examine, explain, or consider, as well as discuss.

I.    "Document(s)" means, including but not limited to, all writings, recordings or electronic data consisting of letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, word processing, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, still photographs, X-ray films, video tapes, motion pictures, electronic mail messages (email), voice mail messages, electronic instant messages (IM) messages of any type disseminated through a computer network, spreadsheets, databases, electronic calendars and contact managers, back-up data, and/or other form of data compilation, stored in any medium from which information can be obtained (including but not limited to magnetic tape, magnetic disk, CD-ROM, DVD, optical disk, flash drive or other electronic or mechanical storage device), however produced, reproduced or stored, of every kind of description within Your possession, custody or control, or the possession, custody or control of any agent, employee, representative or other persons acting or purporting to act for or on behalf of

1

You or the Plan, including but not limited to notes; memoranda; records; reports; correspondence; telexes and faxes; agreements; contracts; accounting or financial records or worksheets; account books; journals; ledgers; bills; receipts; vouchers; transcripts or notes of conversations or meetings; minutes of meetings; statements; directives in any form from general partners or other representatives; diary entries; studies; summaries and/or records of telephone conversations; interviews, meetings and/or conferences; tabulations; and shall include the original and all non-identical copies; all drafts even if not published, disseminated, or used for any purpose; all notes, schedules, footnotes, attachments, enclosures, and documents attached or referred to in any document to be produced pursuant to this Subpoena.

J.   "Email" or "electronic mail" means any electronic communication made using computer communications software, whether through a local computer network or through the Internet, and whether maintained in electronic form and/or paper form. Email maintained in electronic form must be produced in electronic form.

K.   "Employee Benefit Plan" means an employee benefit plan as defined in Section 3(3) of ERISA, 29 U.S.C., § 1002(3).

L.   "Employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an Employee Welfare Benefit Plan; includes a group or association of employers acting for an employer in such capacity, as defined in Section 3(5) of ERISA, 29 U.S.C. § 1002(5).

M.   "ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, et. seq., as amended.

N.   "Fee" means any charge, including administration Fees, Service Fees, per capita Fees, management Fees, and participating Provider Fees.

O.   "Fiduciary" shall have the same meaning as such term has under Section 3(21) of ERISA, 29 U.S.C., § 1002(21), and sections and regulations related thereto.

P.   "Health Coverage" shall include any medical, surgical, mental health and substance use disorder benefits or Services, and all the variations within these Services under each option available to Plan Participants and Beneficiaries, including but not limited to, high, mid and low options offered under Fee for Service or indemnity arrangements, health maintenance organizations, preferred provider organizations and point of service plans.

Q.   "Including" shall be construed to mean "without limitation."

R.   "Issuer" means an insurance company, insurance service, or insurance organization (including a health maintenance organization) which is licensed to engage in the business of insurance in a State and which is subject to State law which regulates insurance (within the meaning of Section 514(b)(2) of ERISA, 29 U.S.C. § 1144(b)(2)).

S.    "Participant" means a person as defined by ERISA Section 3(7), 29 U.S.C. § 1002(7).

2

T.    "Party in Interest" means a person or entity defined in Section 3(14) of ERISA, 29 U.S.C. § 1002(14).

U.    "Plan Document" means a document or instrument governing any term of the Plan, including any document or instrument that describes plan operations and administration, eligibility rules, the provision of Health Coverage, and Claims and appeals procedures.

V.    "Relating to" or "reflecting" means constituting, referring to, pertaining to, responding to, regarding, evidencing, explaining, discussing, depicting, analyzing, or containing any information which in any way concerns, affects, or describes the terms or conditions, or identifies facts, with respect to the subject of the inquiry.

W.    "Service Agreement" means a document setting forth specific Services to be rendered by the person providing the Services and the compensation to be paid for those Services in connection to the Plan.

X.    "Service Provider" shall mean any person or entity that performed, or continues to perform, any services to or for the Plan, including any billing agent, marketing agent, recordkeeper, plan administrator, third party administrator, call center service, insurer, underwriter, claims administrator, broker, consultant, adviser, custodian, subadviser, transition manager, or investment manager (as defined by ERISA Section 3(38), 29 U.S.C. §1002(38)).

Y.    "Service(s)" means any kind of product or Service offered to the Plan, including but not limited to medical or health Services, insurance coverage, Claims processing, recordkeeping, call center Services, enrollee education, group insurance products, and third-party administration products or Services. Medical and health Services shall be broadly construed to include dental, vision, physical therapy, speech therapy, occupational therapy, psychotherapy, therapy for drug and alcohol addiction, treatment for eating disorders, and drugs or devices.

Z.    "Summary Plan Description" shall mean a summary document or documents as defined in ERISA Section 102, 29 USC §1022, and related sections.

## INSTRUCTIONS

A.    <u>Scope of search</u>.  This Subpoena calls for all documents in Your possession, custody, control, to the extent not already produced by You.  You are required to search for, obtain and produce all responsive documents, including without limitation documents that are in Your custody or control, even if not in Your immediate possession, for every level of Health Coverage available under the Plan.  This includes any responsive documents in the possession, custody or control of any person acting on Your behalf or under Your direction or control, such as Your employees, accountants, agents, representatives, attorneys or advisors.

B.    <u>Relevant time period</u>.  Unless otherwise specified, the time period covered by this Subpoena is from <u>January 1, 2016</u> to the date of production.  Documents created prior to <u>January 1, 2016,</u> which have been used or relied on since <u>January 1, 2016,</u> or which

3

describe legal duties which remain in effect after January 1, 2016 (such as contracts and trust agreements), shall be considered as included within the time period covered by this Subpoena.

C.    Privileges and Protections. If You do not produce documents because You object to part of or an aspect of a request, please provide a written response stating the precise basis for the objection and produce all documents responsive to the remaining part or aspect of the requests.

If any documents responsive to this Subpoena are withheld because of a claim of privilege, please identify the documents You claim are privileged in a written response, and please indicate for each such document: 1) the nature of the privilege or protection claimed; 2) the factual basis for claiming the privilege or protection asserted; 3) the subject matter of the document; 4) the type, length and date of the document; 5) the author of and/or signatory on the document; 6) the identity of each person to whom the document was directed or distributed; and 7) the nature of the document, e.g., letter, memorandum.

D.    Proprietary and Confidential. If you contend documents responsive to this Subpoena are proprietary or confidential, you should mark those documents as such and produce the documents. The Department of Labor follows procedures in accordance with the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and Executive Order 12600, which allows for the withholding of certain proprietary and confidential documents pursuant to the requirements of Exemption 4 of FOIA.

E.    Electronically stored information. If any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, then You are directed to produce the document in computerized form in one of the following formats: Microsoft Word (doc), WordPerfect (wpd), Rich Text (rtf), Microsoft Outlook (pst), Microsoft Outlook Express (msg), Microsoft Excel (xls), Microsoft Access (mdb), Adobe Acrobat (PDF), TIFF, comma separated values (CSV), ASCII, TXT, Concordance, or Quickbooks. It is preferable to receive electronic information stored in databased or tabular format (e.g. CSV or other delimited, XLS, XLSX, etc.). Files of the preceding types can be submitted in a ZIP compressed format. Sufficient information including sufficient identification of the applicable software program and passwords, if any, and data structure (if applicable) should be provided to permit access to and use of the documents. Images created through a scanning process should have a minimum resolution of 300 dots per inch (dpi).

Where available, Claims data should be provided in Microsoft Excel (xls) or delimited flat file (e.g. text, comma-separated values (CSV), etc.), which allows for the sorting and filtering of data. A sample format of the Claims data to be provided may be made available upon request.

To the extent that any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, and it is not in one of the previously identified formats, please identify the document and the corresponding format.

4

Regardless of the format in which a document may exist, You are requested to preserve the integrity of the original electronic document and its contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

F.    <u>Tenses</u>.  Verbs used in the past tense should be read also to include the present tense, and verbs used in the present tense should be read also to include the past tense.

G.    <u>Singular/Plural</u>.  The singular number of a noun, pronoun, or verb should be read also to include the plural, and the plural number of a noun, pronoun, or verb should be read also to include the singular.

H.    <u>Word Neutrality</u>.  All words and phrases shall be construed as masculine, feminine or gender neutral as necessary to bring within the scope of this Subpoena documents that might otherwise be construed to be outside its scope.

I.    <u>Sufficient to Show.</u>  Where a request seeks documents "sufficient" to show specified information, in lieu of producing documents, you may submit a sworn affidavit attested to by an authorized representative that provides the requested information.

J.    <u>Manner of production</u>.  All documents produced in response to this Subpoena shall comply with the following instructions:

    a.    You should conduct Your searches for responsive documents in a manner sufficient to identify the source and location where each responsive document is found.

    b.    All documents produced in response to this Subpoena shall be segregated and labeled to show the document request to which the documents are responsive and the source and location where the documents were found.

    c.    To the extent that documents are found in file folders and other similar containers that have labels or other identifying information, the documents shall be produced with such file folder and label information intact.

    d.    To the extent that documents are found attached to other documents, by means of paper clips, staples, or other means of attachment, such documents shall be produced together in their condition when found.

    e.    All documents provided in response to this Subpoena are to include the notes written in a margin and post-its, as well as any attachment referred to or incorporated by the documents.

    f.    In the event that there are no documents responsive to a particular request, please specify that You have no responsive documents.

    g.    If documents relied upon or required to respond to any of this Subpoena, or requested documents, are no longer in Your possession, custody, or control, You

are required to state what disposition was made of such documents, including identification of the person(s) who are believed to be in possession or control of such documents; the date or dates on which such disposition was made, and the reason for such disposition.

h.  If no Claims/requests/appeals are identified pursuant to any part of this Subpoena, please provide copies of the identifiable source documents evidencing Your determination yielding the existence of no results, to include an explanation of how the search was conducted in Your databases, the search parameters, and any screen shots or other dated documents utilized to arrive at Your finding of no results.

K.    <u>Electronic media</u>:

To the extent that the documents that are responsive to this Subpoena may exist on electronic media, those documents should be provided on one of the following media: Compact Disk – Read Only Memory (CD-ROM), Digital Versatile Disc – Read Only Memory (DVD) or USB hard drive.

6

## DOCUMENTS TO BE PRODUCED

1.  Documents relating to Agridata's organizational and management structure and ownership, including, but not limited to:

    a.  Articles of incorporation, corporate bylaws, and partnership agreements;
    b.  Organizational charts, descriptions of Your organizational and supervisory structure, and any documents describing the responsibilities of principals, officers, directors, managers, employees, representatives, and independent contractors;
    c.  Documents sufficient to show the names and address of all divisions, affiliates, or subsidiaries and their principal lines of business;
    d.  Documents sufficient to show the identities and percentage of ownership of all of Your shareholders, limited partners, and/or members, excluding those persons holding only publicly traded shares of a parent organization; and
    e.  Documents sufficient to show the name and contact information for each of Your managerial employees and corporate officers.

2.  Plan document(s), including the following:

    a.  Amendments and resolutions, with signatures;
    b.  Summary Plan Description (SPD);
    c.  Wrap document;
    d.  Trust Agreement;
    e.  Benefits booklets;
    f.  Employee handbooks which discuss employee benefits;
    g.  Evidences of Coverage (EOCs) and Certificates of Coverage for each medical option;
    h.  Enrollment package provided to Participants at open enrollment and new hire, including front and back of all enrollment forms;
    i.  Documents describing plan coverages, rules, costs, or changes to any of the above documents, including any Notices of Material Modifications; and
    j.  Documents describing and governing any supplemental benefits offered in connection to the Plan.

3.  Summary of Benefits and Coverage (SBC) and Uniform Glossary for the Plan.

4.  Documents describing the cost of coverage for each option under the Plan, including premiums by type of coverage (e.g. single, family), employee vs. employer share of cost of coverage, and the cost of COBRA coverage.

5.  Contracts, including amendments thereto, between Agridata or the Plan and Service Providers, including brokers, consultants, third party administrators, record-keepers, actuaries, Claim processors, issuers, and agents. Contracts should include any performance agreements and Fee schedules reflecting compensation as well as engagement and other letters defining the scope of work.

6.    Communications between Agridata or the Plan and Service Providers, including brokers, consultants, third party administrators, record-keepers, actuaries, Claim processors, and agents.

7.    Current fidelity bond policy, including all endorsements and riders, if applicable.

8.    Current fiduciary insurance policy, including all endorsements and riders, if applicable.

9.    The Plan's latest Form 5500 Annual Report filing and any associated financial statements/schedules and accountant's opinion, if applicable.

10.   Form M-1 filings.

11.   Documents sufficient to identify all individuals (name, position, contact information) directly or indirectly responsible for the operation, administration, and/or oversight of the Plan. This includes trustees, administrative or oversight committee members, and accounting or human resources personnel who process plan paperwork, such as enrollment, Claims, Participant inquiries, and premium payments.

12.   Meeting minutes related to the Plan, including meetings by the Board of Trustees, as well as minutes of Trustee committees, subcommittees, or other administrative groups.

13.   Communications between Agridata or the Plan and Employers, Plan Participants, or potential Plan Participants in connection to:

     a.  The benefits provided by the Plan;
     b.  The transfer of Participants from any other plan or arrangement to the Plan;
     c.  The adjudication of specific Claims; and
     d.  The appeal of denied Claims.

14.   Marketing materials related to the Plan, including Power Point slides, brochures, emails, and other communications provided by Agridata or the Plan or in consultation with Agridata or the Plan, including communications and materials provided to Participants and to brokers, agents, or promoters.

15.   Documents sufficient to identify the following with respect to all current and former Plan Participants:

     a.  Name;
     b.  Contact information;
     c.  Basis for eligibility to participate in the Plan, including employment contracts, payroll reports, W-2s, 1099s, or other records sufficient to demonstrate the nature of any employment relationship;
     d.  Enrollment date;
     e.  Coverage option(s) and type of coverage (e.g. single, family);
     f.  Termination date and reason for termination; and
     g.  Total premiums or contributions paid through the date of production.

8

16.    All summary pages of payroll registers showing the total amount of employee health plan contributions withheld for each pay date within the applicable time frame.

17.    Documents sufficient to identify all bank accounts maintained by Agridata relating to the Plan, including:

       a.  Name of the custodian;
       b.  Account number;
       c.  Contact information for account representatives;
       d.  Purpose of the account; and
       e.  Authorized persons with deposit and/or withdrawal authority.

18.    Documents sufficient to show the Plan's income, expenses, assets, and liabilities on a monthly basis for the period under review, including:

       a.  Invoices;
       b.  Bank or investment account statements;
       c.  Canceled checks, deposit slips, and electronic transfer records;
       d.  Internal and external ledgers and journals; and
       e.  Audited and unaudited financial statements.

19.    For all rebates, including medical loss ratio rebates, experience-rated contract rebates, and any other rebate from an insurer, received by the Plan, plan sponsor, or any affiliated or related entity, in relation to the Plan:

       a.  Documents detailing the amount, receipt date, source, and handling of each rebate;
       b.  Sample of notice to Participants about rebates, if applicable;
       c.  Documents demonstrating the allocation of rebated amounts to employer and/or employees; and
       d.  Correspondence regarding how rebates are to be used or allocated.

20.    Claims lag reports or other reports detailing the amount of time from Claim filing to Claim payments.

21.    All Claims aging or experience reports.

22.    List of all unpaid and pended claims detailing date of claim, service type, billed amount, and reason for pending.

23.    External or internal auditor's reports related to the Plan's operations, including Claims audits completed by a Service Provider or consulting firm.

24.    Documents utilized or relied upon to determine contribution amounts, including:

       a.  External or internal actuarial reports;

9

     b.  Rate sheets;

     c.  Communications;

     d.  Underwriting and rating guidelines, methodologies, and assumptions;

     e.  Source data; and

     f.  Contracts for reinsurance, stop loss, or other form of excess loss insurance.

25.     Documents sufficient to show any Fees, commissions, or other compensation received directly or indirectly by Agridata or its principals, officers, directors, managers, employees, or representatives in connection with the Plan.

26.     Documents sufficient to show any commissions, Fees, or other compensation paid in connection with the marketing of the Plan to employers or individuals, including contracts, agreements, invoices, cancelled checks or electronic transfer records, account statements, and financial statements.

27.     Documents related to gifts, gratuities, favors, expense reimbursements, and personal Services provided among or between the Plan, the Plan's Service Providers, and Agridata or its General Partner, principals, officers, directors, managers, employees, or representatives.

28.     Documents and communications relating to pending or past litigation between the Plan or Agridata and any current or former Participants or members.

29.     Documents and communications relating to complaints, investigations, findings, fines, or penalties by state and federal agencies.

30.     Agridata's Federal Income Tax Returns.

**CERTIFIED MAIL®**

**U.S. Department of Labor**

61 Forsyth Street SW
Atlanta, Georgia 30303    *ste 7054*

Official Business
Penalty for Private Use, $300

*3541*



9414 8169 0116 9213 8464 12

AGRIDATE PARTNERSHIP GROUP, LP
CUSTODIAN OF RECORDS SUITE 200
ATTN: JONATHAN CRUMLY
1600 PARKWOOD CIRCLE SE
ATLANTA GA 30339-2119

**Attn: Jonathan Crumly**
**1600 Parkwood Circle**
**Suite 200**
**Atlanta, Georgia  30339**

$6.400
US POSTAGE
FIRST-CLASS
FROM 30303
OCT 23 2019
stamps
endicia

062S00104B0502

**U.S. Department of Labor**

Employee Benefits Security Administration
230 South Dearborn Street, Suite 2160
Chicago, Illinois 60604
Phone:   (312) 353-0900



OCT 2 1 2019

<u>CERTIFIED MAIL -</u>
<u>RETURN RECEIPT REQUESTED</u>

United Data Group, LP
Custodian of Records
ATTN: Jonathan Crumly, Registered Agent
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339

Re:    Anjo, LLC
Case Number: 99-000016(50)

Dear Custodian of Records:

This office is conducting an investigation of the above-referenced matter pursuant to § 504(a)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1134(a)(1), to determine whether any person has violated or is about to violate any provision of Title I of ERISA. Enclosed is a subpoena which requires you to produce certain documents and records in connection with that investigation.

Your personal appearance pursuant to this subpoena will not be required at this time provided the documents are produced on or before the date noted in the subpoena. You will be informed at a later date if your personal appearance to testify is required. Even though your appearance is not now being required, please provide a cover letter with your response which identifies the documents being produced. Your cover letter should also state whether a diligent search has been made for the subpoenaed documents and that the documents transmitted constitute all documents called for by the subpoena.

The subpoena requests that you produce documents maintained in electronic form, Electronically Stored Information (ESI), in electronic form. The formats in which EBSA can accept ESI are listed in the subpoena. When producing ESI, you should produce the materials as maintained on your computer system, i.e., you should produce ESI with all files, folders and sub-folders intact, and you should produce emails with all attachments intact.

If any documents called for are not produced, please list such documents and indicate their location and the reason for their non-production.

If you have any questions concerning your rights and duties, you may wish to consult counsel.  If you have any questions concerning the subpoena or the documents required to be produced, including the production of ESI and the appropriate format and media, please call Senior Investigator Thomas C. Gewin at (404) 302-3917 or Investigator Devon King at (415) 625-2491.

Sincerely,

Jeffrey A. Monhart
Regional Director
Chicago Regional Office
Employee Benefits Security Administration

Enclosure

<u>**SUBPOENA**</u>

# UNITED STATES OF AMERICA
## DEPARTMENT OF LABOR
### Employee Benefits Security Administration

*To:    United Data Group, LP*
*Custodian of Records*
*ATTN: Jonathan Crumly, Registered Agent*
*1600 Parkwood Circle*
*Suite 200*
*Atlanta, GA 30339*

*You are hereby required to appear before*

*Senior Investigator Thomas C. Gewin*

*of the Employee Benefits Security Administration,*

*U.S. Department of Labor, at*

*61 Forsyth Street SW, Suite 7B54,*

*in the City of Atlanta, Georgia, 30303, on the 8th day of November 2019, at 10:00 a.m. of that day, to testify in*
*the matter of an investigation of*

**Anjo, LLC**

*being conducted pursuant to Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29*
*U.S.C. Section 1134, in order to determine whether any person has violated or is about to violate any provision*
*of Title I of ERISA or any regulation or order thereunder;*

*And you are hereby required to bring with you and produce at said time and place the following books, papers,*
*and documents:*

*SEE ATTACHMENT*

*Fail not at your peril.*



**In testimony whereof** *I have hereunto affixed my signature*
*and the seal of the* **United States Department of Labor**
*at Chicago, Illinois on this* 21st *day of October 2019.*

**Jeffrey A. Monhart, Regional Director**

## ATTACHMENT TO SUBPOENA
### United Data Group, LP

### DEFINITIONS

A.    "United Data Group," "You," or "Your" shall mean United Data Group, LP, including any predecessors, successors, affiliates or parent companies, its officers and directors, employees or anyone acting on behalf of United Data Group, LP.

B.    "Plan" shall mean any welfare benefit plan sponsored by United Data Group.

C.    "And" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

D.    "Beneficiary" means a person as defined by ERISA Section 3(8), 29 U.S.C., § 1002(8).

E.    "Claim(s)" means an itemized statement of Services and costs made by Health Providers (as defined herein) to any Employee Welfare Benefit Plan clients for any health care Services, including pre-Service Claims, post-Service Claims, concurrent care Claims and urgent care Claims as defined by 29 C.F.R. § 2560.503-1.

F.    "Communication" means any oral, written, electronic or other exchange or transmission of information (in the form of facts, ideas, inquiries, opinions, analysis or otherwise), including correspondence, memorandum, reports, electronic mail, electronic documents, facsimiles, communications sent or received by computer systems or applications, telephone conversations, telephone or voicemail messages, face-to-face meetings or conversations, and Internet postings and discussions.

G.    "Describe" including its various forms such as "describing," means to fully identify, narrate, present, recite, recount, or otherwise set forth in detail.

H.    "Discuss" including its various forms such as "discussing," means to review, report, summarize, evaluate, examine, explain, or consider, as well as discuss.

I.    "Document(s)" means, including but not limited to, all writings, recordings or electronic data consisting of letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, word processing, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, still photographs, X-ray films, video tapes, motion pictures, electronic mail messages (email), voice mail messages, electronic instant messages (IM) messages of any type disseminated through a computer network, spreadsheets, databases, electronic calendars and contact managers, back-up data, and/or other form of data compilation, stored in any medium from which information can be obtained (including but not limited to magnetic tape, magnetic disk, CD-ROM, DVD, optical disk, flash drive or other electronic or mechanical storage device), however produced, reproduced or stored, of every kind of description within Your possession, custody or control, or the possession, custody or control of any agent, employee, representative or other persons acting or purporting to act for or on behalf of

1

You or the Plan, including but not limited to notes; memoranda; records; reports; correspondence; telexes and faxes; agreements; contracts; accounting or financial records or worksheets; account books; journals; ledgers; bills; receipts; vouchers; transcripts or notes of conversations or meetings; minutes of meetings; statements; directives in any form from general partners or other representatives; diary entries; studies; summaries and/or records of telephone conversations; interviews, meetings and/or conferences; tabulations; and shall include the original and all non-identical copies; all drafts even if not published, disseminated, or used for any purpose; all notes, schedules, footnotes, attachments, enclosures, and documents attached or referred to in any document to be produced pursuant to this Subpoena.

J.    "Email" or "electronic mail" means any electronic communication made using computer communications software, whether through a local computer network or through the Internet, and whether maintained in electronic form and/or paper form. Email maintained in electronic form must be produced in electronic form.

K.    "Employee Benefit Plan" means an employee benefit plan as defined in Section 3(3) of ERISA, 29 U.S.C., § 1002(3).

L.    "Employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an Employee Welfare Benefit Plan; includes a group or association of employers acting for an employer in such capacity, as defined in Section 3(5) of ERISA, 29 U.S.C. § 1002(5).

M.    "ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, et. seq., as amended.

N.    "Fee" means any charge, including administration Fees, Service Fees, per capita Fees, management Fees, and participating Provider Fees.

O.    "Fiduciary" shall have the same meaning as such term has under Section 3(21) of ERISA, 29 U.S.C., § 1002(21), and sections and regulations related thereto.

P.    "Health Coverage" shall include any medical, surgical, mental health and substance use disorder benefits or Services, and all the variations within these Services under each option available to Plan Participants and Beneficiaries, including but not limited to, high, mid and low options offered under Fee for Service or indemnity arrangements, health maintenance organizations, preferred provider organizations and point of service plans.

Q.    "Including" shall be construed to mean "without limitation."

R.    "Issuer" means an insurance company, insurance service, or insurance organization (including a health maintenance organization) which is licensed to engage in the business of insurance in a State and which is subject to State law which regulates insurance (within the meaning of Section 514(b)(2) of ERISA, 29 U.S.C. § 1144(b)(2)).

S.    "Participant" means a person as defined by ERISA Section 3(7), 29 U.S.C. § 1002(7).

2

T.    "Party in Interest" means a person or entity defined in Section 3(14) of ERISA, 29 U.S.C. § 1002(14).

U.    "Plan Document" means a document or instrument governing any term of the Plan, including any document or instrument that describes plan operations and administration, eligibility rules, the provision of Health Coverage, and Claims and appeals procedures.

V.    "Relating to" or "reflecting" means constituting, referring to, pertaining to, responding to, regarding, evidencing, explaining, discussing, depicting, analyzing, or containing any information which in any way concerns, affects, or describes the terms or conditions, or identifies facts, with respect to the subject of the inquiry.

W.    "Service Agreement" means a document setting forth specific Services to be rendered by the person providing the Services and the compensation to be paid for those Services in connection to the Plan.

X.    "Service Provider" shall mean any person or entity that performed, or continues to perform, any services to or for the Plan, including any billing agent, marketing agent, recordkeeper, plan administrator, third party administrator, call center service, insurer, underwriter, claims administrator, broker, consultant, adviser, custodian, subadviser, transition manager, or investment manager (as defined by ERISA Section 3(38), 29 U.S.C. §1002(38)).

Y.    "Service(s)" means any kind of product or Service offered to the Plan, including but not limited to medical or health Services, insurance coverage, Claims processing, recordkeeping, call center Services, enrollee education, group insurance products, and third-party administration products or Services. Medical and health Services shall be broadly construed to include dental, vision, physical therapy, speech therapy, occupational therapy, psychotherapy, therapy for drug and alcohol addiction, treatment for eating disorders, and drugs or devices.

Z.    "Summary Plan Description" shall mean a summary document or documents as defined in ERISA Section 102, 29 USC §1022, and related sections.

## INSTRUCTIONS

A.    Scope of search. This Subpoena calls for all documents in Your possession, custody, control, to the extent not already produced by You. You are required to search for, obtain and produce all responsive documents, including without limitation documents that are in Your custody or control, even if not in Your immediate possession, for every level of Health Coverage available under the Plan. This includes any responsive documents in the possession, custody or control of any person acting on Your behalf or under Your direction or control, such as Your employees, accountants, agents, representatives, attorneys or advisors.

B.    Relevant time period. Unless otherwise specified, the time period covered by this Subpoena is from January 1, 2016 to the date of production. Documents created prior to January 1, 2016, which have been used or relied on since January 1, 2016, or which

3

describe legal duties which remain in effect after <u>January 1, 2016</u> (such as contracts and trust agreements), shall be considered as included within the time period covered by this Subpoena.

C.  <u>Privileges and Protections.</u> If You do not produce documents because You object to part of or an aspect of a request, please provide a written response stating the precise basis for the objection and produce all documents responsive to the remaining part or aspect of the requests.

   If any documents responsive to this Subpoena are withheld because of a claim of privilege, please identify the documents You claim are privileged in a written response, and please indicate for each such document: 1) the nature of the privilege or protection claimed; 2) the factual basis for claiming the privilege or protection asserted; 3) the subject matter of the document; 4) the type, length and date of the document; 5) the author of and/or signatory on the document; 6) the identity of each person to whom the document was directed or distributed; and 7) the nature of the document, e.g., letter, memorandum.

D.  <u>Proprietary and Confidential.</u> If you contend documents responsive to this Subpoena are proprietary or confidential, you should mark those documents as such and produce the documents. The Department of Labor follows procedures in accordance with the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and Executive Order 12600, which allows for the withholding of certain proprietary and confidential documents pursuant to the requirements of Exemption 4 of FOIA.

E.  <u>Electronically stored information.</u> If any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, then You are directed to produce the document in computerized form in one of the following formats: Microsoft Word (doc), WordPerfect (wpd), Rich Text (rtf), Microsoft Outlook (pst), Microsoft Outlook Express (msg), Microsoft Excel (xls), Microsoft Access (mdb), Adobe Acrobat (PDF), TIFF, comma separated values (CSV), ASCII, TXT, Concordance, or Quickbooks. It is preferable to receive electronic information stored in databased or tabular format (e.g. CSV or other delimited, XLS, XLSX, etc.). Files of the preceding types can be submitted in a ZIP compressed format. Sufficient information including sufficient identification of the applicable software program and passwords, if any, and data structure (if applicable) should be provided to permit access to and use of the documents. Images created through a scanning process should have a minimum resolution of 300 dots per inch (dpi).

   Where available, Claims data should be provided in Microsoft Excel (xls) or delimited flat file (e.g. text, comma-separated values (CSV), etc.), which allows for the sorting and filtering of data. A sample format of the Claims data to be provided may be made available upon request.

   To the extent that any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, and it is not in one of the previously identified formats, please identify the document and the corresponding format.

Regardless of the format in which a document may exist, You are requested to preserve the integrity of the original electronic document and its contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

F.  <u>Tenses</u>. Verbs used in the past tense should be read also to include the present tense, and verbs used in the present tense should be read also to include the past tense.

G.  <u>Singular/Plural</u>. The singular number of a noun, pronoun, or verb should be read also to include the plural, and the plural number of a noun, pronoun, or verb should be read also to include the singular.

H.  <u>Word Neutrality</u>. All words and phrases shall be construed as masculine, feminine or gender neutral as necessary to bring within the scope of this Subpoena documents that might otherwise be construed to be outside its scope.

I.  <u>Sufficient to Show</u>. Where a request seeks documents "sufficient" to show specified information, in lieu of producing documents, you may submit a sworn affidavit attested to by an authorized representative that provides the requested information.

J.  <u>Manner of production</u>. All documents produced in response to this Subpoena shall comply with the following instructions:

    a.  You should conduct Your searches for responsive documents in a manner sufficient to identify the source and location where each responsive document is found.

    b.  All documents produced in response to this Subpoena shall be segregated and labeled to show the document request to which the documents are responsive and the source and location where the documents were found.

    c.  To the extent that documents are found in file folders and other similar containers that have labels or other identifying information, the documents shall be produced with such file folder and label information intact.

    d.  To the extent that documents are found attached to other documents, by means of paper clips, staples, or other means of attachment, such documents shall be produced together in their condition when found.

    e.  All documents provided in response to this Subpoena are to include the notes written in a margin and post-its, as well as any attachment referred to or incorporated by the documents.

    f.  In the event that there are no documents responsive to a particular request, please specify that You have no responsive documents.

    g.  If documents relied upon or required to respond to any of this Subpoena, or requested documents, are no longer in Your possession, custody, or control, You

are required to state what disposition was made of such documents, including identification of the person(s) who are believed to be in possession or control of such documents; the date or dates on which such disposition was made, and the reason for such disposition.

h. If no Claims/requests/appeals are identified pursuant to any part of this Subpoena, please provide copies of the identifiable source documents evidencing Your determination yielding the existence of no results, to include an explanation of how the search was conducted in Your databases, the search parameters, and any screen shots or other dated documents utilized to arrive at Your finding of no results.

K.    <u>Electronic media:</u>

To the extent that the documents that are responsive to this Subpoena may exist on electronic media, those documents should be provided on one of the following media: Compact Disk – Read Only Memory (CD-ROM), Digital Versatile Disc – Read Only Memory (DVD) or USB hard drive.

6

## DOCUMENTS TO BE PRODUCED

1.   Documents relating to United Data Group's organizational and management structure and ownership, including, but not limited to:

   a.   Articles of incorporation, corporate bylaws, and partnership agreements;
   b.   Organizational charts, descriptions of Your organizational and supervisory structure, and any documents describing the responsibilities of principals, officers, directors, managers, employees, representatives, and independent contractors;
   c.   Documents sufficient to show the names and address of all divisions, affiliates, or subsidiaries and their principal lines of business;
   d.   Documents sufficient to show the identities and percentage of ownership of all of Your shareholders, limited partners, and/or members, excluding those persons holding only publicly traded shares of a parent organization; and
   e.   Documents sufficient to show the name and contact information for each of Your managerial employees and corporate officers.

2.   Plan document(s), including the following:

   a.   Amendments and resolutions, with signatures;
   b.   Summary Plan Description (SPD);
   c.   Wrap document;
   d.   Trust Agreement;
   e.   Benefits booklets;
   f.   Employee handbooks which discuss employee benefits;
   g.   Evidences of Coverage (EOCs) and Certificates of Coverage for each medical option;
   h.   Enrollment package provided to Participants at open enrollment and new hire, including front and back of all enrollment forms;
   i.   Documents describing plan coverages, rules, costs, or changes to any of the above documents, including any Notices of Material Modifications; and
   j.   Documents describing and governing any supplemental benefits offered in connection to the Plan.

3.   Summary of Benefits and Coverage (SBC) and Uniform Glossary for the Plan.

4.   Documents describing the cost of coverage for each option under the Plan, including premiums by type of coverage (e.g. single, family), employee vs. employer share of cost of coverage, and the cost of COBRA coverage.

5.   Contracts, including amendments thereto, between United Data Group or the Plan and Service Providers, including brokers, consultants, third party administrators, record-keepers, actuaries, Claim processors, issuers, and agents. Contracts should include any performance agreements and Fee schedules reflecting compensation as well as engagement and other letters defining the scope of work.

6.  Communications between United Data Group or the Plan and Service Providers, including brokers, consultants, third party administrators, record-keepers, actuaries, Claim processors, and agents.

7.  Current fidelity bond policy, including all endorsements and riders, if applicable.

8.  Current fiduciary insurance policy, including all endorsements and riders, if applicable.

9.  The Plan's latest Form 5500 Annual Report filing and any associated financial statements/schedules and accountant's opinion, if applicable.

10. Form M-1 filings.

11. Documents sufficient to identify all individuals (name, position, contact information) directly or indirectly responsible for the operation, administration, and/or oversight of the Plan. This includes trustees, administrative or oversight committee members, and accounting or human resources personnel who process plan paperwork, such as enrollment, Claims, Participant inquiries, and premium payments.

12. Meeting minutes related to the Plan, including meetings by the Board of Trustees, as well as minutes of Trustee committees, subcommittees, or other administrative groups.

13. Communications between United Data Group or the Plan and Employers, Plan Participants, or potential Plan Participants in connection to:

    a.  The benefits provided by the Plan;
    b.  The transfer of Participants from any other plan or arrangement to the Plan;
    c.  The adjudication of specific Claims; and
    d.  The appeal of denied Claims.

14. Marketing materials related to the Plan, including Power Point slides, brochures, emails, and other communications provided by United Data Group or the Plan or in consultation with United Data Group or the Plan, including communications and materials provided to Participants and to brokers, agents, or promoters.

15. Documents sufficient to identify the following with respect to all current and former Plan Participants:

    a.  Name;
    b.  Contact information;
    c.  Basis for eligibility to participate in the Plan, including employment contracts, payroll reports, W-2s, 1099s, or other records sufficient to demonstrate the nature of any employment relationship;
    d.  Enrollment date;
    e.  Coverage option(s) and type of coverage (e.g. single, family);
    f.  Termination date and reason for termination; and
    g.  Total premiums or contributions paid through the date of production.

16.   All summary pages of payroll registers showing the total amount of employee health plan contributions withheld for each pay date within the applicable time frame.

17.   Documents sufficient to identify all bank accounts maintained by United Data Group relating to the Plan, including:

    a.   Name of the custodian;
    b.   Account number;
    c.   Contact information for account representatives;
    d.   Purpose of the account; and
    e.   Authorized persons with deposit and/or withdrawal authority.

18.   Documents sufficient to show the Plan's income, expenses, assets, and liabilities on a monthly basis for the period under review, including:

    a.   Invoices;
    b.   Bank or investment account statements;
    c.   Canceled checks, deposit slips, and electronic transfer records;
    d.   Internal and external ledgers and journals; and
    e.   Audited and unaudited financial statements.

19.   For all rebates, including medical loss ratio rebates, experience-rated contract rebates, and any other rebate from an insurer, received by the Plan, plan sponsor, or any affiliated or related entity, in relation to the Plan:

    a.   Documents detailing the amount, receipt date, source, and handling of each rebate;
    b.   Sample of notice to Participants about rebates, if applicable;
    c.   Documents demonstrating the allocation of rebated amounts to employer and/or employees; and
    d.   Correspondence regarding how rebates are to be used or allocated.

20.   Claims lag reports or other reports detailing the amount of time from Claim filing to Claim payments.

21.   All Claims aging or experience reports.

22.   List of all unpaid and pended claims detailing date of claim, service type, billed amount, and reason for pending.

23.   External or internal auditor's reports related to the Plan's operations, including Claims audits completed by a Service Provider or consulting firm.

24.   Documents utilized or relied upon to determine contribution amounts, including:

    a.   External or internal actuarial reports;

9

      b.  Rate sheets;
      c.  Communications;
      d.  Underwriting and rating guidelines, methodologies, and assumptions;
      e.  Source data; and
      f.  Contracts for reinsurance, stop loss, or other form of excess loss insurance.

25.    Documents sufficient to show any Fees, commissions, or other compensation received directly or indirectly by United Data Group or its principals, officers, directors, managers, employees, or representatives in connection with the Plan.

26.    Documents sufficient to show any commissions, Fees, or other compensation paid in connection with the marketing of the Plan to employers or individuals, including contracts, agreements, invoices, cancelled checks or electronic transfer records, account statements, and financial statements.

27.    Documents related to gifts, gratuities, favors, expense reimbursements, and personal Services provided among or between the Plan, the Plan's Service Providers, and United Data Group or its General Partner, principals, officers, directors, managers, employees, or representatives.

28.    Documents and communications relating to pending or past litigation between the Plan or United Data Group and any current or former Participants or members.

29.    Documents and communications relating to complaints, investigations, findings, fines, or penalties by state and federal agencies.

30.    United Data Group's Federal Income Tax Returns.

**U.S. Department of Labor**

Employee Benefits Security Administration
230 South Dearborn Street, Suite 2160
Chicago, Illinois 60604
Phone: (312) 353-0900



JUL 1 9 2019

<u>CERTIFIED MAIL -</u>
<u>RETURN RECEIPT REQUESTED</u>

American Partnership Group, LP
Custodian of Records
ATTN: Jonathan Crumly, Registered Agent
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339

       Re:  Anjo, LLC
          Case Number: 99-000016(50)

Dear Custodian of Records:

This office is conducting an investigation of the above-referenced matter pursuant to § 504(a)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1134(a)(1), to determine whether any person has violated or is about to violate any provision of Title I of ERISA. Enclosed is a subpoena which requires you to produce certain documents and records in connection with that investigation.

Your personal appearance pursuant to this subpoena will not be required at this time provided the documents are produced on or before the date noted in the subpoena. You will be informed at a later date if your personal appearance to testify is required. Even though your appearance is not now being required, please provide a cover letter with your response which identifies the documents being produced. Your cover letter should also state whether a diligent search has been made for the subpoenaed documents and that the documents transmitted constitute all documents called for by the subpoena.

The subpoena requests that you produce documents maintained in electronic form, Electronically Stored Information ("ESI"), be produced in electronic form. The formats in which EBSA can accept ESI are listed in the subpoena. When producing ESI, you should produce the materials as maintained on your computer system, i.e., you should produce ESI with all files, folders and sub-folders intact, and you should produce emails with all attachments intact.

If any documents called for are not produced, please list such documents and indicate their location and the reason for their non-production.

If you have any questions concerning your rights and duties, you may wish to consult counsel. If you have any questions concerning the subpoena or the documents required to be produced, including the production of ESI and the appropriate format and media, please call Senior Investigator Thomas C. Gewin at (404) 302-3917.

Sincerely,

*Jeffrey Monhart*

Jeffrey A. Monhart
Regional Director
Chicago Regional Office
Employee Benefits Security Administration

Enclosure

<u>**SUBPOENA**</u>                         **99-002083**

# UNITED STATES OF AMERICA
## DEPARTMENT OF LABOR
### Employee Benefits Security Administration

To:     *American Partnership Group, LP*
        *Custodian of Records*
        *ATTN: Jonathan Crumly, Registered Agent*
        *1600 Parkwood Circle*
        *Suite 200*
        *Atlanta, GA 30339*

*You are hereby required to appear before*

*Senior Investigator Thomas C. Gewin*

*of the Employee Benefits Security Administration,*

*U.S. Department of Labor, at*

*61 Forsyth Street SW, Suite 7B54,*

*in the City of Atlanta, Georgia, 30303, on the 2nd day of August 2019, at 10:00 a.m. of that day, to testify in the*

*matter of an investigation of*

**Anjo, LLC**

*being conducted pursuant to Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29*

*U.S.C. Section 1134, in order to determine whether any person has violated or is about to violate any provision*

*of Title I of ERISA or any regulation or order thereunder;*

*And you are hereby required to bring with you and produce at said time and place the following books, papers,*

*and documents:*

   *SEE ATTACHMENT*

*Fail not at your peril.*



**In testimony whereof** *I have hereunto affixed my signature*
*and the seal of the* **United States Department of Labor**
*at Chicago, Illinois on this* 18th *day of July 2019.*

**Jeffrey A. Monhart, Regional Director**

## ATTACHMENT TO SUBPOENA
### American Partnership Group, LP

### DEFINITIONS

A.    "APG," "You," or "Your" shall mean American Partnership Group, LP, including any predecessors, successors, affiliates or parent companies, its officers and directors, employees or anyone acting on behalf of American Partnership Group, LP.

B.    "Plan" shall mean any welfare benefit plan sponsored by APG.

C.    "And" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

D.    "Beneficiary" means a person as defined by ERISA Section 3(8), 29 U.S.C., § 1002(8).

E.    "Claim(s)" means an itemized statement of Services and costs made by Health Providers (as defined herein) to any Employee Welfare Benefit Plan clients for any health care Services, including pre-Service Claims, post-Service Claims, concurrent care Claims and urgent care Claims as defined by 29 C.F.R. § 2560.503-1.

F.    "Communication" means any oral, written, electronic or other exchange or transmission of information (in the form of facts, ideas, inquiries, opinions, analysis or otherwise), including correspondence, memorandum, reports, electronic mail, electronic documents, facsimiles, communications sent or received by computer systems or applications, telephone conversations, telephone or voicemail messages, face-to-face meetings or conversations, and Internet postings and discussions.

G.    "Describe" including its various forms such as "describing," means to fully identify, narrate, present, recite, recount, or otherwise set forth in detail.

H.    "Discuss" including its various forms such as "discussing," means to review, report, summarize, evaluate, examine, explain, or consider, as well as discuss.

I.    "Document(s)" means, including but not limited to, all writings, recordings or electronic data consisting of letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, word processing, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, still photographs, X-ray films, video tapes, motion pictures, electronic mail messages (email), voice mail messages, electronic instant messages (IM) of any type disseminated through a computer network, spreadsheets, databases, electronic calendars and contact managers, back-up data, and/or other form of data compilation, stored in any medium from which information can be obtained (including but not limited to magnetic tape, magnetic disk, CD-ROM, DVD, optical disk, flash drive or other electronic or mechanical storage device), however produced, reproduced or stored, of every kind of description within Your possession, custody or control, or the possession, custody or control of any agent, employee, representative or other persons acting or purporting to act for or on behalf of You or the

1

Plan, including but not limited to notes; memoranda; records; reports; correspondence; telexes and faxes; agreements; contracts; accounting or financial records or worksheets; account books; journals; ledgers; bills; receipts; vouchers; transcripts or notes of conversations or meetings; minutes of meetings; statements; directives in any form from general partners or other representatives; diary entries; studies; summaries and/or records of telephone conversations; interviews, meetings and/or conferences; tabulations; and shall include the original and all non-identical copies; all drafts even if not published, disseminated, or used for any purpose; all notes, schedules, footnotes, attachments, enclosures, and documents attached or referred to in any document to be produced pursuant to this Subpoena.

J.    "Email" or "electronic mail" means any electronic communication made using computer communications software, whether through a local computer network or through the Internet, and whether maintained in electronic form and/or paper form. Email maintained in electronic form must be produced in electronic form.

K.    "Employee Benefit Plan" means an employee benefit plan as defined in Section 3(3) of ERISA, 29 U.S.C., § 1002(3).

L.    "Employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an Employee Welfare Benefit Plan; includes a group or association of employers acting for an employer in such capacity, as defined in Section 3(5) of ERISA, 29 U.S.C. § 1002(5).

M.    "ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, et. seq., as amended.

N.    "Fee" means any charge, including administration Fees, Service Fees, per capita Fees, management Fees, and participating Provider Fees.

O.    "Fiduciary" shall have the same meaning as such term has under Section 3(21) of ERISA, 29 U.S.C., § 1002(21), and sections and regulations related thereto.

P.    "Health Coverage" shall include any medical, surgical, mental health and substance use disorder benefits or Services, and all the variations within these Services under each option available to Plan Participants and Beneficiaries, including but not limited to, high, mid and low options offered under Fee for Service or indemnity arrangements, health maintenance organizations, preferred provider organizations and point of service plans.

Q.    "Including" shall be construed to mean "without limitation."

R.    "Issuer" means an insurance company, insurance service, or insurance organization (including a health maintenance organization) which is licensed to engage in the business of insurance in a State and which is subject to State law which regulates insurance (within the meaning of Section 514(b)(2) of ERISA, 29 U.S.C. § 1144(b)(2)).

S.    "Participant" means a person as defined by ERISA Section 3(7), 29 U.S.C. § 1002(7).

T.    "Party in Interest" means a person or entity defined in Section 3(14) of ERISA, 29 U.S.C. § 1002(14).

U.    "Plan Document" means a document or instrument governing any term of the Plan, including any document or instrument that describes plan operations and administration, eligibility rules, the provision of Health Coverage, and Claims and appeals procedures.

V.    "Relating to" or "reflecting" means constituting, referring to, pertaining to, responding to, regarding, evidencing, explaining, discussing, depicting, analyzing, or containing any information which in any way concerns, affects, or describes the terms or conditions, or identifies facts, with respect to the subject of the inquiry.

W.    "Service Agreement" means a document setting forth specific Services to be rendered by the person providing the Services and the compensation to be paid for those Services in connection with the Plan.

X.    "Service Provider" shall mean any person or entity that performed, or continues to perform, any services to or for the Plan, including any billing agent, marketing agent, recordkeeper, plan administrator, third party administrator, call center service, insurer, underwriter, claims administrator, broker, consultant, adviser, custodian, subadviser, transition manager, or investment manager (as defined by ERISA Section 3(38), 29 U.S.C. §1002(38)).

Y.    "Service(s)" means any kind of product or Service offered to the Plan, including but not limited to medical or health Services, insurance coverage, Claims processing, recordkeeping, call center Services, enrollee education, group insurance products, and third-party administration products or Services. Medical and health Services shall be broadly construed to include dental, vision, physical therapy, speech therapy, occupational therapy, psychotherapy, therapy for drug and alcohol addiction, treatment for eating disorders, and drugs or devices.

Z.    "Summary Plan Description" shall mean a summary document or documents as defined in ERISA Section 102, 29 USC §1022, and related sections.

## INSTRUCTIONS

A.    <u>Scope of search</u>.  This Subpoena calls for all documents in Your possession, custody, control, to the extent not already produced by You.  You are required to search for, obtain and produce all responsive documents, including without limitation documents that are in Your custody or control, even if not in Your immediate possession, for every level of Health Coverage available under the Plan.  This includes any responsive documents in the possession, custody or control of any person acting on Your behalf or under Your direction or control, such as Your employees, accountants, agents, representatives, attorneys or advisors.

B.    <u>Relevant time period</u>.  Unless otherwise specified, the time period covered by this Subpoena is from <u>January 1, 2016</u> to the date of production.  Documents created prior to <u>January 1, 2016,</u> which have been used or relied on since <u>January 1, 2016,</u> or which

3

describe legal duties which remain in effect after <u>January 1, 2016</u> (such as contracts and trust agreements), shall be considered as included within the time period covered by this Subpoena.

C.      <u>Privileges and Protections</u>.  If You do not produce documents because You object to part of or an aspect of a request, please provide a written response stating the precise basis for the objection and produce all documents responsive to the remaining part or aspect of the requests.

If any documents responsive to this Subpoena are withheld because of a claim of privilege, please identify the documents You claim are privileged in a written response, and please indicate for each such document: 1) the nature of the privilege or protection claimed; 2) the factual basis for claiming the privilege or protection asserted; 3) the subject matter of the document; 4) the type, length and date of the document; 5) the author of and/or signatory on the document; 6) the identity of each person to whom the document was directed or distributed; and 7) the nature of the document, e.g., letter, memorandum.

D.      <u>Proprietary and Confidential.</u>  If you contend documents responsive to this Subpoena are proprietary or confidential, you should mark those documents as such and produce the documents.  The Department of Labor follows procedures in accordance with the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and Executive Order 12600, which allows for the withholding of certain proprietary and confidential documents pursuant to the requirements of Exemption 4 of FOIA.

E.      <u>Electronically stored information</u>.  If any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, then You are directed to produce the document in computerized form in one of the following formats: Microsoft Word (doc), WordPerfect (wpd), Rich Text (rtf), Microsoft Outlook (pst), Microsoft Outlook Express (msg), Microsoft Excel (xls), Microsoft Access (mdb), Adobe Acrobat (PDF), TIFF, comma separated values (CSV), ASCII, TXT, Concordance, or Quickbooks.  It is preferable to receive electronic information stored in databased or tabular format (e.g., CSV or other delimited, XLS, XLSX, etc.). Files of the preceding types can be submitted in a ZIP compressed format. Sufficient information including sufficient identification of the applicable software program and passwords, if any, and data structure (if applicable) should be provided to permit access to and use of the documents.  Images created through a scanning process should have a minimum resolution of 300 dots per inch (dpi).

Where available, Claims data should be provided in Microsoft Excel (xls) or delimited flat file (e.g., text, comma-separated values (CSV), etc.), which allows for the sorting and filtering of data.  A sample format of the Claims data to be provided may be made available upon request.

To the extent that any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, and it is not in one of the previously identified formats, please identify the document and the corresponding format.

4

Regardless of the format in which a document may exist, You are requested to preserve the integrity of the original electronic document and its contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

F.   <u>Tenses</u>.  Verbs used in the past tense should be read also to include the present tense, and verbs used in the present tense should be read also to include the past tense.

G.   <u>Singular/Plural</u>.  The singular number of a noun, pronoun, or verb should be read also to include the plural, and the plural number of a noun, pronoun, or verb should be read also to include the singular.

H.   <u>Word Neutrality</u>. All words and phrases shall be construed as masculine, feminine or gender neutral as necessary to bring within the scope of this Subpoena documents that might otherwise be construed to be outside its scope.

I.   <u>Sufficient to Show.</u>  Where a request seeks documents "sufficient" to show specified information, in lieu of producing documents, you may submit a sworn affidavit attested to by an authorized representative that provides the requested information.

J.   <u>Manner of production</u>.  All documents produced in response to this Subpoena shall comply with the following instructions:

   a.   You should conduct Your searches for responsive documents in a manner sufficient to identify the source and location where each responsive document is found.

   b.   All documents produced in response to this Subpoena shall be segregated and labeled to show the document request to which the documents are responsive and the source and location where the documents were found.

   c.   To the extent that documents are found in file folders and other similar containers that have labels or other identifying information, the documents shall be produced with such file folder and label information intact.

   d.   To the extent that documents are found attached to other documents, by means of paper clips, staples, or other means of attachment, such documents shall be produced together in their condition when found.

   e.   All documents provided in response to this Subpoena are to include the notes written in a margin and post-its, as well as any attachment referred to or incorporated by the documents.

   f.   In the event that there are no documents responsive to a particular request, please specify that You have no responsive documents.

   g.   If documents relied upon or required to respond to any of this Subpoena, or requested documents, are no longer in Your possession, custody, or control, You

are required to state what disposition was made of such documents, including identification of the person(s) who are believed to be in possession or control of such documents; the date or dates on which such disposition was made, and the reason for such disposition.

h. If no Claims/requests/appeals are identified pursuant to any part of this Subpoena, please provide copies of the identifiable source documents evidencing Your determination yielding the existence of no results, to include an explanation of how the search was conducted in Your databases, the search parameters, and any screen shots or other dated documents utilized to arrive at Your finding of no results.

K.   <u>Electronic media</u>:

To the extent that the documents that are responsive to this Subpoena may exist on electronic media, those documents should be provided on one of the following media: Compact Disk – Read Only Memory (CD-ROM), Digital Versatile Disc – Read Only Memory (DVD) or USB hard drive.

## DOCUMENTS TO BE PRODUCED

1.    Documents relating to APG's organizational and management structure and ownership, including, but not limited to:

   a.    Articles of incorporation, corporate bylaws, and partnership agreements;
   b.    Organizational charts, descriptions of Your organizational and supervisory structure, and any documents describing the responsibilities of principals, officers, directors, managers, employees, representatives, and independent contractors;
   c.    Documents sufficient to show the names and address of all divisions, affiliates, or subsidiaries and their principal lines of business;
   d.    Documents sufficient to show the identities and percentage of ownership of all of Your shareholders, limited partners, and/or members, excluding those persons holding only publicly traded shares of a parent organization; and
   e.    Documents sufficient to show the name and contact information for each of Your managerial employees and corporate officers.

2.    Plan document(s), including the following:

   a.    Amendments and resolutions, with signatures;
   b.    Summary Plan Description (SPD);
   c.    Wrap document;
   d.    Trust Agreement;
   e.    Benefits booklets;
   f.    Employee handbooks which discuss employee benefits;
   g.    Evidences of Coverage (EOCs) and Certificates of Coverage for each medical option;
   h.    Enrollment package provided to Participants at open enrollment and new hire, including front and back of all enrollment forms;
   i.    Documents describing plan coverages, rules, costs, or changes to any of the above documents, including any Notices of Material Modifications; and
   j.    Documents describing and governing any supplemental benefits offered in connection to the Plan.

3.    Summary of Benefits and Coverage (SBC) and Uniform Glossary for the Plan.

4.    Documents describing the cost of coverage for each option under the Plan, including premiums by type of coverage (e.g., single, family), employee vs. employer share of cost of coverage, and the cost of COBRA coverage.

5.    Contracts, including amendments thereto, between APG or the Plan and Service Providers, including brokers, consultants, third party administrators, record-keepers, actuaries, Claim processors, issuers, and agents. Contracts should include any performance agreements and Fee schedules reflecting compensation as well as engagement and other letters defining the scope of work.

7

6.    Communications between APG or the Plan and Service Providers, including brokers, consultants, third party administrators, record-keepers, actuaries, Claim processors, and agents.

7.    Current fidelity bond policy, including all endorsements and riders, if applicable.

8.    Current fiduciary insurance policy, including all endorsements and riders, if applicable.

9.    The Plan's latest Form 5500 Annual Report filing and any associated financial statements/schedules and accountant's opinion, if applicable.

10.    Form M-1 filings.

11.    Documents sufficient to identify all individuals (name, position, contact information) directly or indirectly responsible for the operation, administration, and/or oversight of the Plan. This includes trustees, administrative or oversight committee members, and accounting or human resources personnel who process plan paperwork, such as enrollment, Claims, Participant inquiries, and premium payments.

12.    Meeting minutes related to the Plan, including meetings by the Board of Trustees, as well as minutes of Trustee committees, subcommittees, or other administrative groups.

13.    Communications between APG or the Plan and Employers, Plan Participants, or potential Plan Participants in connection to:

    a.  The benefits provided by the Plan;
    b.  The transfer of Participants from any other plan or arrangement to the Plan;
    c.  The adjudication of specific Claims; and
    d.  The appeal of denied Claims.

14.    Marketing materials related to the Plan, including Power Point slides, brochures, emails, and other communications provided by APG or the Plan or in consultation with APG or the Plan, including communications and materials provided to Participants and to brokers, agents, or promoters.

15.    Documents sufficient to identify the following with respect to all current and former Plan Participants:

    a.  Name;
    b.  Contact information;
    c.  Basis for eligibility to participate in the Plan, including employment contracts, payroll reports, W-2s, 1099s, or other records sufficient to demonstrate the nature of any employment relationship;
    d.  Enrollment date;
    e.  Coverage option(s) and type of coverage (e.g., single, family);
    f.  Termination date and reason for termination; and
    g.  Total premiums or contributions paid through the date of production.

16. All summary pages of payroll registers showing the total amount of employee health plan contributions withheld for each pay date within the applicable time frame.

17. Documents sufficient to identify all bank accounts maintained by APG relating to the Plan, including:

    a. Name of the custodian;
    b. Account number;
    c. Contact information for account representatives;
    d. Purpose of the account; and
    e. Authorized persons with deposit and/or withdrawal authority.

18. Documents sufficient to show the Plan's income, expenses, assets, and liabilities on a monthly basis for the period under review, including:

    a. Invoices;
    b. Bank or investment account statements;
    c. Canceled checks, deposit slips, and electronic transfer records;
    d. Internal and external ledgers and journals; and
    e. Audited and unaudited financial statements.

19. For all rebates, including medical loss ratio rebates, experience-rated contract rebates, and any other rebate from an insurer, received by the Plan, plan sponsor, or any affiliated or related entity, in relation to the Plan:

    a. Documents detailing the amount, receipt date, source, and handling of each rebate;
    b. Sample of notice to Participants about rebates, if applicable;
    c. Documents demonstrating the allocation of rebated amounts to employer and/or employees; and
    d. Correspondence regarding how rebates are to be used or allocated.

20. Claims lag reports or other reports detailing the amount of time from Claim filing to Claim payments.

21. All Claims aging or experience reports.

22. List of all unpaid and pended claims detailing date of claim, service type, billed amount, and reason for pending.

23. External or internal auditor's reports related to the Plan's operations, including Claims audits completed by a Service Provider or consulting firm.

24. Documents utilized or relied upon to determine contribution amounts, including:

    a. External or internal actuarial reports;

9

      b.  Rate sheets;
      c.  Communications;
      d.  Underwriting and rating guidelines, methodologies, and assumptions;
      e.  Source data; and
      f.  Contracts for reinsurance, stop loss, or other form of excess loss insurance.

25. Documents sufficient to show any Fees, commissions, or other compensation received directly or indirectly by APG or its principals, officers, directors, managers, employees, or representatives in connection with the Plan.

26. Documents sufficient to show any commissions, Fees, or other compensation paid in connection with the marketing of the Plan to employers or individuals, including contracts, agreements, invoices, cancelled checks or electronic transfer records, account statements, and financial statements.

27. Documents related to gifts, gratuities, favors, expense reimbursements, and personal Services provided among or between the Plan, the Plan's Service Providers, and APG or its General Partner, principals, officers, directors, managers, employees, or representatives.

28. Documents and communications relating to pending or past litigation between the Plan or APG and any current or former Participants or members.

29. Documents and communications relating to complaints, investigations, findings, fines, or penalties by state and federal agencies.

30. APG's Federal Income Tax Returns.

10



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

American Partnership Group
Custodian of Records
Attn: Jonathan Crumley
1600 Parkwood Circle
Suite 200
Atlanta GA 30339

2. Article Number (Transfer from service label)
7017 0530 0000 2055 8449

9590 9402 3270 7196 1744 74

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ (Registered Agent)
☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

**U.S. Department of Labor**     Employee Benefits Security Administration
230 South Dearborn Street, Suite 2160
Chicago, Illinois 60604
Phone:    (312) 353-0900

JUL 1 9 2019

<u>CERTIFIED MAIL</u> -
<u>RETURN RECEIPT REQUESTED</u>

Data Partnership Group, Limited Partnership
Custodian of Records
ATTN: Jonathan Crumly, Registered Agent
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339

                        Re:    Anjo, LLC
                               Case Number: 99-000016(50)

Dear Custodian of Records:

This office is conducting an investigation of the above-referenced matter pursuant to § 504(a)(1)
of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1134(a)(1), to
determine whether any person has violated or is about to violate any provision of Title I of ERISA.
Enclosed is a subpoena which requires you to produce certain documents and records in connection
with that investigation.

Your personal appearance pursuant to this subpoena will not be required at this time provided the
documents are produced on or before the date noted in the subpoena.  You will be informed at a
later date if your personal appearance to testify is required.  Even though your appearance is not
now being required, please provide a cover letter with your response which identifies the
documents being produced.  Your cover letter should also state whether a diligent search has been
made for the subpoenaed documents and that the documents transmitted constitute all documents
called for by the subpoena.

The subpoena requests that you produce documents maintained in electronic form, Electronically
Stored Information (ESI), be produced in electronic form.  The formats in which EBSA can accept
ESI are listed in the subpoena.  When producing ESI, you should produce the materials as
maintained on your computer system, i.e., you should produce ESI with all files, folders and sub-
folders intact, and you should produce emails with all attachments intact.

If any documents called for are not produced, please list such documents and indicate their location
and the reason for their non-production.

If you have any questions concerning your rights and duties, you may wish to consult counsel. If you have any questions concerning the subpoena or the documents required to be produced, including the production of ESI and the appropriate format and media, please call Senior Investigator Thomas C. Gewin at (404) 302-3917.

Sincerely,

Jeffrey A. Monhart
Regional Director
Chicago Regional Office
Employee Benefits Security Administration

Enclosure

<u>**SUBPOENA**</u>          **99-002085**

# UNITED STATES OF AMERICA
## DEPARTMENT OF LABOR
### Employee Benefits Security Administration

*To:    Data Partnership Group, Limited Partnership*
*Custodian of Records*
*ATTN: Jonathan Crumly, Registered Agent*
*1600 Parkwood Circle*
*Suite 200*
*Atlanta, GA 30339*

*You are hereby required to appear before*

*Senior Investigator Thomas C. Gewin*

*of the Employee Benefits Security Administration,*

*U.S. Department of Labor, at*

*61 Forsyth Street SW, Suite 7B54,*

*in the City of Atlanta, Georgia, 30303, on the 2ⁿᵈ day of August 2019, at 10:00 a.m. of that day, to testify in the matter of an investigation of*

**Anjo, LLC**

*being conducted pursuant to Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1134, in order to determine whether any person has violated or is about to violate any provision of Title I of ERISA or any regulation or order thereunder;*

*And you are hereby required to bring with you and produce at said time and place the following books, papers, and documents:*

*SEE ATTACHMENT*

*Fail not at your peril.*



*In testimony whereof I have hereunto affixed my signature*
*and the seal of the* **United States Department of Labor**
*at Chicago, Illinois on this* 18th *day of July 2019.*

**Jeffrey A. Monhart, Regional Director**

## ATTACHMENT TO SUBPOENA
### Data Partnership Group, Limited Partnership

### DEFINITIONS

A. &ldquo;DPG,&rdquo; &ldquo;You,&rdquo; or &ldquo;Your&rdquo; shall mean Data Partnership Group, Limited Partnership, including any predecessors, successors, affiliates or parent companies, its officers and directors, employees or anyone acting on behalf of Data Partnership Group, Limited Partnership.

B. &ldquo;Plan&rdquo; shall mean the Data Partnership Group, LP Employee Benefit Plan.

C. &ldquo;And&rdquo; and &ldquo;or&rdquo; shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

D. &ldquo;Beneficiary&rdquo; means a person as defined by ERISA Section 3(8), 29 U.S.C., § 1002(8).

E. &ldquo;Claim(s)&rdquo; means an itemized statement of Services and costs made by Health Providers (as defined herein) to any Employee Welfare Benefit Plan clients for any health care Services, including pre-Service Claims, post-Service Claims, concurrent care Claims and urgent care Claims as defined by 29 C.F.R. § 2560.503-1.

F. &ldquo;Communication&rdquo; means any oral, written, electronic or other exchange or transmission of information (in the form of facts, ideas, inquiries, opinions, analysis or otherwise), including correspondence, memorandum, reports, electronic mail, electronic documents, facsimiles, communications sent or received by computer systems or applications, telephone conversations, telephone or voicemail messages, face-to-face meetings or conversations, and Internet postings and discussions.

G. &ldquo;Describe&rdquo; including its various forms such as &ldquo;describing,&rdquo; means to fully identify, narrate, present, recite, recount, or otherwise set forth in detail.

H. &ldquo;Discuss&rdquo; including its various forms such as &ldquo;discussing,&rdquo; means to review, report, summarize, evaluate, examine, explain, or consider, as well as discuss.

I. &ldquo;Document(s)&rdquo; means, including but not limited to, all writings, recordings or electronic data consisting of letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, word processing, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, still photographs, X-ray films, video tapes, motion pictures, electronic mail messages (email), voice mail messages, electronic instant messages (IM) of any type disseminated through a computer network, spreadsheets, databases, electronic calendars and contact managers, back-up data, and/or other form of data compilation, stored in any medium from which information can be obtained (including but not limited to magnetic tape, magnetic disk, CD-ROM, DVD, optical disk, flash drive or other electronic or mechanical storage device), however produced, reproduced or stored, of every kind of description within Your possession, custody or control, or the possession, custody or control of any agent, employee,

1

representative or other persons acting or purporting to act for or on behalf of You or the Plan, including but not limited to notes; memoranda; records; reports; correspondence; telexes and faxes; agreements; contracts; accounting or financial records or worksheets; account books; journals; ledgers; bills; receipts; vouchers; transcripts or notes of conversations or meetings; minutes of meetings; statements; directives in any form from general partners or other representatives; diary entries; studies; summaries and/or records of telephone conversations; interviews, meetings and/or conferences; tabulations; and shall include the original and all non-identical copies; all drafts even if not published, disseminated, or used for any purpose; all notes, schedules, footnotes, attachments, enclosures, and documents attached or referred to in any document to be produced pursuant to this Subpoena.

J.    "Email" or "electronic mail" means any electronic communication made using computer communications software, whether through a local computer network or through the Internet, and whether maintained in electronic form and/or paper form. Email maintained in electronic form must be produced in electronic form.

K.    "Employee Benefit Plan" means an employee benefit plan as defined in Section 3(3) of ERISA, 29 U.S.C., § 1002(3).

L.    "Employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an Employee Welfare Benefit Plan; includes a group or association of employers acting for an employer in such capacity, as defined in Section 3(5) of ERISA, 29 U.S.C. § 1002(5).

M.    "ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, et. seq., as amended.

N.    "Fee" means any charge, including administration Fees, Service Fees, per capita Fees, management Fees, and participating Provider Fees.

O.    "Fiduciary" shall have the same meaning as such term has under Section 3(21) of ERISA, 29 U.S.C., § 1002(21), and sections and regulations related thereto.

P.    "Health Coverage" shall include any medical, surgical, mental health and substance use disorder benefits or Services, and all the variations within these Services under each option available to Plan Participants and Beneficiaries, including but not limited to, high, mid and low options offered under Fee for Service or indemnity arrangements, health maintenance organizations, preferred provider organizations and point of service plans.

Q.    "Including" shall be construed to mean "without limitation."

R.    "Issuer" means an insurance company, insurance service, or insurance organization (including a health maintenance organization) which is licensed to engage in the business of insurance in a State and which is subject to State law which regulates insurance (within the meaning of Section 514(b)(2) of ERISA, 29 U.S.C. § 1144(b)(2)).

S.    "Participant" means a person as defined by ERISA Section 3(7), 29 U.S.C. § 1002(7).

T.    "Party in Interest" means a person or entity defined in Section 3(14) of ERISA, 29 U.S.C. § 1002(14).

U.    "Plan Document" means a document or instrument governing any term of the Plan, including any document or instrument that describes plan operations and administration, eligibility rules, the provision of Health Coverage, and Claims and appeals procedures.

V.    "Relating to" or "reflecting" means constituting, referring to, pertaining to, responding to, regarding, evidencing, explaining, discussing, depicting, analyzing, or containing any information which in any way concerns, affects, or describes the terms or conditions, or identifies facts, with respect to the subject of the inquiry.

W.    "Service Agreement" means a document setting forth specific Services to be rendered by the person providing the Services and the compensation to be paid for those Services in connection to the Plan.

X.    "Service Provider" shall mean any person or entity that performed, or continues to perform, any services to or for the Plan, including any billing agent, marketing agent, recordkeeper, plan administrator, third party administrator, call center service, insurer, underwriter, claims administrator, broker, consultant, adviser, custodian, subadviser, transition manager, or investment manager (as defined by ERISA Section 3(38), 29 U.S.C. §1002(38)).

Y.    "Service(s)" means any kind of product or Service offered to the Plan, including but not limited to medical or health Services, insurance coverage, Claims processing, recordkeeping, call center Services, enrollee education, group insurance products, and third-party administration products or Services. Medical and health Services shall be broadly construed to include dental, vision, physical therapy, speech therapy, occupational therapy, psychotherapy, therapy for drug and alcohol addiction, treatment for eating disorders, and drugs or devices.

Z.    "Summary Plan Description" shall mean a summary document or documents as defined in ERISA Section 102, 29 USC §1022, and related sections.

## INSTRUCTIONS

A.    <u>Scope of search</u>. This Subpoena calls for all documents in Your possession, custody, control, to the extent not already produced by You. You are required to search for, obtain and produce all responsive documents, including without limitation documents that are in Your custody or control, even if not in Your immediate possession, for every level of Health Coverage available under the Plan. This includes any responsive documents in the possession, custody or control of any person acting on Your behalf or under Your direction or control, such as Your employees, accountants, agents, representatives, attorneys or advisors.

B.    <u>Relevant time period</u>. Unless otherwise specified, the time period covered by this Subpoena is from <u>January 1, 2016</u> to the date of production. Documents created prior to <u>January 1, 2016</u>, which have been used or relied on since <u>January 1, 2016</u>, or which

3

describe legal duties which remain in effect after <u>January 1, 2016</u> (such as contracts and trust agreements), shall be considered as included within the time period covered by this Subpoena.

C.    <u>Privileges and Protections</u>.  If You do not produce documents because You object to part of or an aspect of a request, please provide a written response stating the precise basis for the objection and produce all documents responsive to the remaining part or aspect of the requests.

If any documents responsive to this Subpoena are withheld because of a claim of privilege, please identify the documents You claim are privileged in a written response, and please indicate for each such document: 1) the nature of the privilege or protection claimed; 2) the factual basis for claiming the privilege or protection asserted; 3) the subject matter of the document; 4) the type, length and date of the document; 5) the author of and/or signatory on the document; 6) the identity of each person to whom the document was directed or distributed; and 7) the nature of the document, e.g., letter, memorandum.

D.    <u>Proprietary and Confidential</u>.  If you contend documents responsive to this Subpoena are proprietary or confidential, you should mark those documents as such and produce the documents.  The Department of Labor follows procedures in accordance with the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and Executive Order 12600, which allows for the withholding of certain proprietary and confidential documents pursuant to the requirements of Exemption 4 of FOIA.

E.    <u>Electronically stored information</u>.  If any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, then You are directed to produce the document in computerized form in one of the following formats: Microsoft Word (doc), WordPerfect (wpd), Rich Text (rtf), Microsoft Outlook (pst), Microsoft Outlook Express (msg), Microsoft Excel (xls), Microsoft Access (mdb), Adobe Acrobat (PDF), TIFF, comma separated values (CSV), ASCII, TXT, Concordance, or Quickbooks.  It is preferable to receive electronic information stored in databased or tabular format (e.g., CSV or other delimited, XLS, XLSX, etc.). Files of the preceding types can be submitted in a ZIP compressed format. Sufficient information including sufficient identification of the applicable software program and passwords, if any, and data structure (if applicable) should be provided to permit access to and use of the documents.  Images created through a scanning process should have a minimum resolution of 300 dots per inch (dpi).

Where available, Claims data should be provided in Microsoft Excel (xls) or delimited flat file (e.g., text, comma-separated values (CSV), etc.), which allows for the sorting and filtering of data.  A sample format of the Claims data to be provided may be made available upon request.

To the extent that any document called for by this Subpoena exists as, or can be retrieved from, information stored in electronic or computerized form, and it is not in one of the previously identified formats, please identify the document and the corresponding format.

Regardless of the format in which a document may exist, You are requested to preserve the integrity of the original electronic document and its contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

F.     <u>Tenses</u>.  Verbs used in the past tense should be read also to include the present tense, and verbs used in the present tense should be read also to include the past tense.

G.     <u>Singular/Plural</u>.  The singular number of a noun, pronoun, or verb should be read also to include the plural, and the plural number of a noun, pronoun, or verb should be read also to include the singular.

H.     <u>Word Neutrality</u>. All words and phrases shall be construed as masculine, feminine or gender neutral as necessary to bring within the scope of this Subpoena documents that might otherwise be construed to be outside its scope.

I.     <u>Sufficient to Show.</u> Where a request seeks documents "sufficient" to show specified information, in lieu of producing documents, you may submit a sworn affidavit attested to by an authorized representative that provides the requested information.

J.     <u>Manner of production</u>.  All documents produced in response to this Subpoena shall comply with the following instructions:

    a.  You should conduct Your searches for responsive documents in a manner sufficient to identify the source and location where each responsive document is found.

    b.  All documents produced in response to this Subpoena shall be segregated and labeled to show the document request to which the documents are responsive and the source and location where the documents were found.

    c.  To the extent that documents are found in file folders and other similar containers that have labels or other identifying information, the documents shall be produced with such file folder and label information intact.

    d.  To the extent that documents are found attached to other documents, by means of paper clips, staples, or other means of attachment, such documents shall be produced together in their condition when found.

    e.  All documents provided in response to this Subpoena are to include the notes written in a margin and post-its, as well as any attachment referred to or incorporated by the documents.

    f.  In the event that there are no documents responsive to a particular request, please specify that You have no responsive documents.

    g.  If documents relied upon or required to respond to any of this Subpoena, or requested documents, are no longer in Your possession, custody, or control, You

are required to state what disposition was made of such documents, including identification of the person(s) who are believed to be in possession or control of such documents; the date or dates on which such disposition was made, and the reason for such disposition.

h. If no Claims/requests/appeals are identified pursuant to any part of this Subpoena, please provide copies of the identifiable source documents evidencing Your determination yielding the existence of no results, to include an explanation of how the search was conducted in Your databases, the search parameters, and any screen shots or other dated documents utilized to arrive at Your finding of no results.

K.    <u>Electronic media</u>:

To the extent that the documents that are responsive to this Subpoena may exist on electronic media, those documents should be provided on one of the following media: Compact Disk – Read Only Memory (CD-ROM), Digital Versatile Disc – Read Only Memory (DVD) or USB hard drive.

## **DOCUMENTS TO BE PRODUCED**

1. Documents relating to DPG's organizational and management structure and ownership, including, but not limited to:

   a. Articles of incorporation, corporate bylaws, and partnership agreements;
   b. Organizational charts, descriptions of Your organizational and supervisory structure, and any documents describing the responsibilities of principals, officers, directors, managers, employees, representatives, and independent contractors;
   c. Documents sufficient to show the names and address of all divisions, affiliates, or subsidiaries and their principal lines of business;
   d. Documents sufficient to show the identities and percentage of ownership of all of Your shareholders, limited partners, and/or members, excluding those persons holding only publicly traded shares of a parent organization; and
   e. Documents sufficient to show the name and contact information for each of Your managerial employees and corporate officers.

2. Plan document(s), including the following:

   a. Amendments and resolutions, with signatures;
   b. Summary Plan Description (SPD);
   c. Wrap document;
   d. Trust Agreement;
   e. Benefits booklets;
   f. Employee handbooks which discuss employee benefits;
   g. Evidences of Coverage (EOCs) and Certificates of Coverage for each medical option;
   h. Enrollment package provided to Participants at open enrollment and new hire, including front and back of all enrollment forms;
   i. Documents describing plan coverages, rules, costs, or changes to any of the above documents, including any Notices of Material Modifications; and
   j. Documents describing and governing any supplemental benefits offered in connection to the Plan.

3. Summary of Benefits and Coverage (SBC) and Uniform Glossary for the Plan.

4. Documents describing the cost of coverage for each option under the Plan, including premiums by type of coverage (e.g., single, family), employee vs. employer share of cost of coverage, and the cost of COBRA coverage.

5. Contracts, including amendments thereto, between DPG or the Plan and Service Providers, including brokers, consultants, third party administrators, record-keepers, actuaries, Claim processors, issuers, and agents. Contracts should include any performance agreements and Fee schedules reflecting compensation as well as engagement and other letters defining the scope of work.

6.  Communications between DPG or the Plan and Service Providers, including brokers, consultants, third party administrators, record-keepers, actuaries, Claim processors, and agents.

7.  Current fidelity bond policy, including all endorsements and riders, if applicable.

8.  Current fiduciary insurance policy, including all endorsements and riders, if applicable.

9.  The Plan's latest Form 5500 Annual Report filing and any associated financial statements/schedules and accountant's opinion, if applicable.

10. Form M-1 filings.

11. Documents sufficient to identify all individuals (name, position, contact information) directly or indirectly responsible for the operation, administration, and/or oversight of the Plan. This includes trustees, administrative or oversight committee members, and accounting or human resources personnel who process plan paperwork, such as enrollment, Claims, Participant inquiries, and premium payments.

12. Meeting minutes related to the Plan, including meetings by the Board of Trustees, as well as minutes of Trustee committees, subcommittees, or other administrative groups.

13. Communications between DPG or the Plan and Employers, Plan Participants, or potential Plan Participants in connection to:

    a.  The benefits provided by the Plan;
    b.  The transfer of Participants from any other plan or arrangement to the Plan;
    c.  The adjudication of specific Claims; and
    d.  The appeal of denied Claims.

14. Marketing materials related to the Plan, including Power Point slides, brochures, emails, and other communications provided by DPG or the Plan or in consultation with DPG or the Plan, including communications and materials provided to Participants, Employers, and to brokers, agents, or promoters.

15. Documents sufficient to identify the following with respect to all current and former Plan Participants:

    a.  Name;
    b.  Contact information;
    c.  Basis for eligibility to participate in the Plan, including employment contracts, payroll reports, W-2s, 1099s, or other records sufficient to demonstrate the nature of any employment relationship;
    d.  Enrollment date;
    e.  Coverage option(s) and type of coverage (e.g., single, family);
    f.  Termination date and reason for termination; and
    g.  Total premiums or contributions paid through the date of production.

8

16. All summary pages of payroll registers showing the total amount of employee health plan contributions withheld for each pay date within the applicable time frame.

17. Documents sufficient to identify all bank accounts maintained by DPG relating to the Plan, including:

    a. Name of the custodian;
    b. Account number;
    c. Contact information for account representatives;
    d. Purpose of the account; and
    e. Authorized persons with deposit and/or withdrawal authority.

18. Documents sufficient to show the Plan's income, expenses, assets, and liabilities on a monthly basis for the period under review, including:

    a. Invoices;
    b. Bank or investment account statements;
    c. Canceled checks, deposit slips, and electronic transfer records;
    d. Internal and external ledgers and journals; and
    e. Audited and unaudited financial statements.

19. For all rebates, including medical loss ratio rebates, experience-rated contract rebates, and any other rebate from an insurer, received by the Plan, plan sponsor, or any affiliated or related entity, in relation to the Plan:

    a. Documents detailing the amount, receipt date, source, and handling of each rebate;
    b. Sample of notice to Participants about rebates, if applicable;
    c. Documents demonstrating the allocation of rebated amounts to employer and/or employees; and
    d. Correspondence regarding how rebates are to be used or allocated.

20. Claims lag reports or other reports detailing the amount of time from Claim filing to Claim payments.

21. All Claims aging or experience reports.

22. List of all unpaid and pended claims detailing date of claim, service type, billed amount, and reason for pending.

23. External or internal auditor's reports related to the Plan's operations, including Claims audits completed by a Service Provider or consulting firm.

24. Documents utilized or relied upon to determine contribution amounts, including:

    a. External or internal actuarial reports;

    b.  Rate sheets;
    c.  Communications;
    d.  Underwriting and rating guidelines, methodologies, and assumptions;
    e.  Source data; and
    f.  Contracts for reinsurance, stop loss, or other form of excess loss insurance.

25.    Documents sufficient to show any Fees, commissions, or other compensation received directly or indirectly by DPG or its principals, officers, directors, managers, employees, or representatives in connection with the Plan.

26.    Documents sufficient to show any commissions, Fees, or other compensation paid in connection with the marketing of the Plan to employers or individuals, including contracts, agreements, invoices, cancelled checks or electronic transfer records, account statements, and financial statements.

27.    Documents related to gifts, gratuities, favors, expense reimbursements, and personal Services provided among or between the Plan, the Plan's Service Providers, and DPG or its General Partner, principals, officers, directors, managers, employees, or representatives.

28.    Documents and communications relating to pending or past litigation between the Plan or DPG and any current or former Participants or members.

29.    Documents and communications relating to complaints, investigations, findings, fines, or penalties by state and federal agencies.

30.    DPG's Federal Income Tax Returns.

**EXHIBIT D**

taylor | english

Taylor English Duma LLP 1600 Parkwood Circle, Suite 200, Atlanta, Georgia 30339
Main: 770.434.6868  Fax: 770.434.7376  taylorenglish.com

JONATHAN D. CRUMLY
DIRECT DIAL: (678) 426-6959
JCRUMLY@TAYLORENGLISH.COM

November 6, 2020

*Via email and US Mail*
**Gewin.Thomas@dol.gov**
Thomas Gewin, Senior Investigator
U.S. Department of Labor
62 Forsyth Street, S.W., Room 7B54
Atlanta, Georgia  30303

**Bogle.Edward@dol.gov**
Edward H. Bogle, Senior Investigator
U.S. Department of Labor
230 S. Dearborn Street, Suite 2160
Chicago, Illinois 60604

**Liu.Katrina.T@dol.gov**
Katrina Liu
U.S. Department of Labor
200 Constitution Ave. N.W.
Suite N-4611
Washington, D.C. 20210

**Daiess.Jamidi@dol.gov**
Jamidi Daiess
U.S. Department of Labor
200 Constitution Ave. N.W.
Suite N-4611
Washington, D.C. 20210

**Quinn.Jeff@dol.gov**
Jeff Quinn
U.S. Department of Labor
200 Constitution Ave. N.W.
Suite N-4611
Washington, D.C. 20210

**Evans.Alanna@dol.gov**
Alanna Evans
U.S. Department of Labor
200 Constitution Ave. N.W.
Suite N-4611
Washington, D.C. 20210

  Re: **Anjo, LLC; DOL Case Number: 99-000016(50) (the "Anjo Investigation")**

Dear Sirs and Madams:

  As you know, this law firm represents several entities that have been served subpoenas in the Anjo Investigation. These entities include Suffolk Administrative Services, LLC ("SAS"), Providence Insurance Partners, LLC ("PIP"), and Providence Insurance Company, I.I. ("PIC").

  It is our understanding that in addition to the 3 subpoenas served on our clients noted above, DOL has served at least 11 subpoenas on entities implementing Partnership Plans (defined below), and at least 5 subpoenas on other businesses engaged in providing services to the self-insured group plans offered by various Limited Partnerships (each an "LP" and, collectively, "the LPs"). All of these nearly 20 subpoenas are expansive in scope, both as to subject matter and relevant time period. To our knowledge, every entity receiving subpoenas in the Anjo Investigation has cooperated to the best of their ability and resource levels.

  At least as to the subpoenas served on our clients, each of them includes a cover letter indicating "This office is conducting an investigation of the above-referenced matter pursuant to § 504(a)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1134(a)(l), to determine whether any person has violated or is about to violate any provision of Title I of ERISA." Each subpoena itself repeats this extremely vague, broad description of the scope of the Anjo Investigation as being pursued "in order to determine whether any person has violated or is about to violate any

01875089-1

U.S. Department of Labor
November 6, 2020
Page 2

provision of Title I of ERISA or any regulation or order thereunder." In the fifteen months since DOL began issuing subpoenas, no further explanation has been provided as to the purpose, scope, or alleged violation of ERISA, its regulations or orders "thereunder" which have been committed by Anjo or any person or entity receiving any of the subpoenas.

Our clients have all cooperated with DOL in the Anjo Investigation at great cost in legal fees and lost productivity. As we have informed you several times, each of these entities is a small business with limited personnel resources available to respond to these various subpoenas. Despite these limited resources, our clients and associated entities implementing the Partnership Plans have produced nearly 20,000 documents comprising over 200,000 pages in response to the various DOL subpoenas issued in furtherance of the Anjo Investigation.

Our clients' constitutionally protected interactions with DOL officials provides a framework for understanding their current posture in seeking clarity and conclusion to the Anjo Investigation. We believe the history of these interactions is worthy of recapping in this letter.

In October 2018 (the "October 2018 Meeting"), representatives of LP Management Services LLC ("LPMS"), SAS, and PIP met with DOL in an effort to be transparent with the relevant regulatory agencies that would interact with the proposed plan, its participants, and its sponsors. In attendance at the October 2018 Meeting and representing the interests of LPMS, SAS, and PIP was attorney Alexander Renfro, among others. Attending and representing the interests of DOL were Preston Rutledge, Assistant Secretary of DOL and head of Employee Benefits Security Administration division of DOL, and others. By all accounts, the October 2018 Meeting was collegial and constructive. LPMS, SAS, and PIP representatives explained the partnership plan structure to DOL representatives, and provided high-level detail of the goals of the plans and the business structure. Assistant Secretary Rutledge told representatives from LPMS, SAS, and PIP that the best route to ensure approval of the partnership plan structure by DOL was to submit a formal Advisory Opinion Request. The parties agreed to continue discussions so that DOL could be comfortable evaluating the proposed health benefits plan to determine if it was ERISA compliant. Clearly, our clients walked through the front door of DOL in good faith seeking open, honest dialogue about the proposed novel structure.

On November 8, 2018, LPMS filed a formal Advisory Opinion Request (the "2018 Request") with DOL, seeking guidance on whether its proposed health insurance plans (the "Partnership Plans") were lawful single-employer health plans under ERISA. The structure was developed by Mr. Renfro, the Chief Legal Officer of PIP and a principal in SAS and PIC. Mr. Renfro, as attorney for LPMS, was the principal author and sole signatory of the 2018 Request. The 2018 Request detailed the legal and factual basis for application of ERISA to the Partnership Plans building upon the previously recognized concept under ERISA of "working owners."

Given the novel nature of the structure, LPMS sought guidance from DOL with respect to four issues: that (i) a single-employer self-insured group health plan sponsored by a limited partnership is an "employee welfare benefit plan" within the meaning of ERISA § 3(1); (ii) a single-employer self-insured group health plan sponsored by a limited partner is a "group health plan" within the meaning of Part 7 of Subtitle B of Title I of ERISA ("Part 7"); (iii) the limited partners participating in the limited Partnership's single-employer self-insured group health plan are "participants" within the meaning of ERISA Section 3(7); and, (iv) the single-employer self-insured group health plan sponsored by the limited partnership is governed by Title I of ERISA. In response to questions posed verbally by DOL officials, LPMS made two revisions to its initial request. On January 15, 2019, and on February 27, 2019, LPMS submitted revised versions of the 2018 Request, culminating in a final revised request ("Revised Request") to include additional factors and legal arguments for consideration by DOL. All

01875089-1

U.S. Department of Labor
November 6, 2020
Page 3

of these interactions were initiated by our clients in good faith, seeking collaborative interactions with DOL as the regulatory authority over ERISA.

In the weeks and months that followed, DOL gave several indications that it would not oppose the use of Partnership Plans. Assistant Secretary Rutledge verbally expressed to Christopher Condeluci, a paid advisor to SAS, that he did not see why DOL needed to issue an Advisory Opinion, because ERISA already allows partners to be treated as employees for purposes of plan eligibility. During this conversation, Mr. Rutledge told Mr. Condeluci that LPMS should "just do it," meaning implement the Partnership Plans. Acting in reliance on such statements, LPMS formed several Partnership Plans, and the sponsors of those plans began accepting limited partners as participants in their health plans. At or around this time, seven sitting state Attorneys General sent a letter to Secretary Acosta, stressing the urgency of the public health problem that the LPMS structure addressed, and requesting expedited consideration of the Revised Request (the "AG Letter"). DOL made no formal response whatsoever to any of these submissions.

Instead, during a meeting on March 6, 2019, then DOL Chief of Staff Nicholas Geale told a group of representatives from LPMS, SAS, PIP, and interested states, including Mr. Renfro, Mr. Condeluci, and Louisiana Attorney General Jeff Landry that although the Partnership Plan structure was "ingenious" and that he "wished he'd thought of it," DOL could not respond to the Revised Request due to a perceived conflict with litigation around DOL's new Association Health Plan (AHP) rule. At one point during the meeting, representatives from DOL became agitated and stated that if the LPMS group disagreed about DOL's priorities, they should "take it up with the White House."

In a subsequent meeting between Mr. Condeluci and Mr. Geale, DOL proposed that if LPMS would withdraw the Revised Request (and/or cease pressing for an answer to it), Geale would "look [LPMS representatives] in the eye" and promise that DOL would not investigate or otherwise interfere with any LPMS-managed Partnership Plans. Mr. Geale's offer may have been sincere, but it was of little value to our clients, because even assuming DOL refrained from investigating or hampering the partnerships implementing the Partnership Plans, the fifty separate state insurance regulators could pose significant and indefinite regulatory burdens on the partnerships through investigations and rulings of their own. It simply was not practical or advisable to rely on handshake promises with the threat of adverse actions by individual states in the absence of ERISA guidance from DOL. Several other members of DOL were present for portions of this meeting, including, upon information and belief, Secretary Acosta, Assistant Secretary Rutledge, members of the enforcement division of DOL, and Joseph Canary, who is the Director of the Office of Regulations of Interpretations and the author of the subsequent adverse Response (described below).

The first subpoenas known to our clients related to the Anjo Investigation were issued by DOL on July 19, 2019, shortly after the aforementioned meeting between Mr. Condeluci and numerous DOL officials, thus beginning the Anjo Investigation with DOL having never posed a single written question or other formal response to the Revised Request, or the AG letter. DOL issued subpoenas to every entity doing business with our clients, including some businesses that have nothing whatsoever to do with any Partnership Plans. Such actions leave our clients with little options other than to assume that the intent of the Anjo Investigation and the subpoenas is to intimidate our clients and their business partners, despite the Partnership Plans compliance with ERISA. Our clients have complied in good faith with all requests, and encouraged their business partners to do the same. Nevertheless, such compliance efforts come at a price, having collectively cost tens of thousands of dollars in legal fees plus costs and uncountable time and energy of limited staff required to date for compliance (which could have been much better spent serving clients and improving all aspects of their businesses).

01875089-1

U.S. Department of Labor
November 6, 2020
Page 4

Immediately before the initiation of the Anjo Investigation and since that time, DOL inexplicably and rapidly changed course in its dealings with our clients regarding the propriety of the Partnership Plans. As the Anjo Investigation got under way, a long-scheduled June 2019 meeting between LPMS, SAS, PIP, and DOL was abruptly pushed back to July. When it finally occurred, it lasted only ten minutes and the representatives from DOL demonstrated little interest in continuing discussions with LPMS, SAS, and PIP about the Partnership Plans or the Revised Request.

As you are also aware, DOL's failure to respond to the Revised Request or the AG Letter eventually led LPMS and Data Marketing Partnership LP (one of the LPMS-managed limited partnerships utilizing the Partnership Plan model) to file suit against DOL in the United States District Court for the Northern District of Texas. *See, Data Marketing Partnership LP and LP Management Services, LLC v. Department of Labor*, Civil Case 4:19–cv–00800–O (the "AO Case"). On January 24, 2020, less than one week before its answer was due in the AO Case, DOL finally issued an adverse action response to the Advisory Opinion request ("Response") to the AO Request. After amending the complaint and seeking a preliminary injunction within a week of receiving the Response, DOL contacted counsel for LPMS and DMP, in accordance with the District Court's directive to discuss the case. Shortly after this initial conference, DOL, LPMS and DMP agreed that no discovery would be required and that the parties would submit cross-motions for summary judgment on an expedited basis. While DOL agreed that the AO Case should be decided without discovery on an expedited summary judgment briefing basis, DOL continued to issue subpoenas to our clients and their business associates in the Anjo Investigation.

The AO Case culminated in a decisive ruling by the District Court granting summary judgment to LPMS and DMP, while denying summary judgment to DOL. That order determined as a matter of law that the Partnership Plans, as implemented by LPMS and DMP, were single-employer benefits plans subject to ERISA. The Court also enjoined DOL from acting on the Response.

Following receipt of the AO Case order on summary judgment, our office contacted Senior Investigator Gewin and made a good faith offer to organize an interview with Mr. Renfro concerning the Partnership Plans and the various components of the operation of those Partnership Plans. In response, Senior Investigator Gewin declined the offer. Presumably, this rejection was after consultation with all or most recipients of this letter.

Following commencement of the Anjo Investigation and its plodding progress, President Trump signed Executive Order 13924, Executive Order on Regulatory Relief to Support Economic Recovery on May 19, 2020 (the "EO"). Paul J. Ray, Administrator for the Office of Information and Regulatory Affairs, issued a Memo implementing Section 6 of the EO, at the direction of the Director of the Office of Management and Budget, Russel T. Vaught ("Memo"). Section 6 of the EO directs heads of all agencies to "consider principles of fairness in administrative enforcement and adjudication." To effect this policy, the Office of Information and Regulatory Affairs suggested implementation of a number of practices and procedures. The EO and Memo provide relevant instruction as to numerous problems with the Anjo Investigation.

For example, the Memo states, "[a]dministrative enforcement should be prompt and fair." It further instructs agencies that, "[a]dministrative enforcement should be free of improper Government coercion." Importantly, it emphasizes, ***"[r]etaliatory or punitive motives, or the desire to compel capitulation***, should not form the basis for an agency's selection of targets or investigations ..." (emphasis added). It is obvious from the timing, duration, scope, and other factors that DOL is not complying with these basic tenants of fairness, justice, and equal protection highlighted by the Memo.

U.S. Department of Labor
November 6, 2020
Page 5

Moreover, the Memo suggests certain practices in the actual conduct of otherwise appropriate investigations. The Memo instructs agencies to "ensure that members of the regulated public are not required to prove a negative to prevent liability," and to "consider applying the rule of lenity in administrative investigations…" Further, "regulations should require investigating staff to either recommend or bring an enforcement action, or instead cease the investigation…" Finally, the Memo provides that "[a]dministrative adjudicators should operate independently of enforcement staff on matters within their areas of adjudication." To date, DOL's Anjo Investigation has failed to implement all of these fundamental considerations of due process.

With the above history in mind, our clients seek clarification from DOL concerning the Anjo Investigation. Specifically, our clients would like DOL to inform them:

1. Based on the information provided to date in the Anjo Investigation, have any of our clients violated or, in your informed opinion, are they about to violate any provision of Title I of ERISA or any regulation or order thereunder?

    a. If so, which clients?

    b. If so, which specific provision of Title I of ERISA or any regulation or order thereunder are they suspected of violating or being "about to violate"?

2. Given that the Anjo Investigation has now continued for over fifteen months, what is the period within which DOL intends to either recommend or bring an enforcement action for any such alleged violation?

    a. If DOL cannot provide this period, why not?

    b. If DOL can provide this period, when will it provide this information to our clients?

Regardless of the responses to the above, our clients have authorized us to engage in constructive dialogue with DOL to resolve any issues it perceives with the Partnership Plans, their operation, and any open but undisclosed issues raised in the Anjo Investigation. This offer demonstrates our clients continuing good faith efforts to cooperate with DOL, dating back to the October 2018 Meeting. Despite the continuing strain on our clients' resources required by its responses to the Anjo Investigation, our clients continue to desire good faith dialogue with DOL. We understand from prior comments by some recipients of this letter that DOL is also facing strained resources in pursuing the Anjo Investigation. Considering the AO Case order and these burdens on the resources of both sides, we believe it is in the best interests of DOL, our clients, and the limited partners enrolled in Partnership Plans to develop a framework allowing for each side to be assured that our clients' Partnership Plans are operating in full compliance with all ERISA statutes, regulations, and orders.

With that in mind, our clients are willing to offer the following for DOL's consideration as a path to reach conclusion to the Anjo Investigation:

- The scope and concerns of the Anjo Investigation will be explicitly defined by DOL.

- The Anjo Investigation will hereafter be limited to SAS, PIP, PIC, other vendors to the Partnership Plans, and entities sponsoring the Partnership Plans, and all other entities will receive formal notice that they are not targets of the Anjo Investigation.[1]

---

[1] Please note that if DOL has lingering, separate issues with Agentra LLC and/or American Worker's Insurance Services, Inc. aka "AWIS", our clients do not object to DOL continuing to pursue those as matters outside the

U.S. Department of Labor
November 6, 2020
Page 6

- A target date for formal conclusion of the Anjo Investigation will be established and agreed to by the Parties.

- Our clients will voluntarily provide annual reporting on the claims history and average claims trust account balances for any Partnership Plans to DOL every March, beginning March 2021, for 3 years.

- If any of the Partnership Plans modify their plan documents, trust documents, or summaries of benefits and coverage, and SAS, PIP, or PIC are still servicing said organization(s), then copies of these modifications will be provided to the DOL within thirty (30) days of their effective date.

- Mr. Renfro will sit down with EBSA and DOL Solicitor's Office at their convenience to describe the model of the Partnership Plans and application of applicable ERISA treatment, including any consumer protection enhancements implemented by the LPs at the recommendation of SAS, PIP, and PIC.

We appreciate your attention in this regard. Our clients certainly hope you receive this letter and the above offer in good faith as that is the motivation for issuing it. Should you have any questions, please do not hesitate to contact us.

Sincerely,

Jonathan D. Crumly

cc: Clients (via email only)

---

Partnership Plans. As of the date of this letter, neither Agentra nor AWIS provide vendor services of any kind to any Partnership Plans sponsored by the LPs.

01875089-1

**EXHIBIT E**

December 14, 2020

**VIA ELECTRONIC MAIL**
Jonathan D. Crumly
Taylor English Duma LLP
1600 Parkwood Circle, Suite 200
Atlanta, Georgia 30339
(678) 426-6952
jcrumly@taylorenglish.com

      Re:    Anjo, LLC
              EBSA Case Number: 99-000016(50)

Dear Mr. Crumly,

      This letter responds to your letter dated November 6, 2020, concerning the above-captioned investigation being conducted by the Secretary of Labor, U.S. Department of Labor, Employee Benefits Security Administration (Secretary).  Your firm represents Suffolk Administrative Services, LLC, Providence Insurance Partners, LLC, and Providence Insurance Company, I.I. (PIC), which have been subpoenaed for information in connection with the investigation.  You described the scope of the Secretary's investigation as being "extremely vague," the subpoenas issued by EBSA as being "expansive in scope," and how responding to these subpoenas has caused your clients to incur legal costs and lost productivity.  Your letter also provided a narrative of events related to the request for and issuance of EBSA's Advisory Opinion 2020-01A, including the district court case brought by your clients against the Secretary of Labor in *Data Marketing Partnership LP v. Department of Labor*, Case No. 4:19-cv-00800-O (N.D. Texas), which concluded with a judgment that Data Marketing Partnership's health plan is subject to ERISA.  Your letter ends with a request for information on whether your clients have or are about to violate any provision of Title I of ERISA, and a request for EBSA to provide a time period in which it intends to either recommend or bring an enforcement action.  You also propose, among other things, that EBSA explicitly define "the scope and concerns of the Anjo Investigation," that EBSA and your clients agree to a "target date for formal conclusion of the Anjo Investigation," and that the investigation be limited only to your clients, other vendors to the Partnership Plans, and entities sponsoring the Partnership Plans.

      The Secretary of Labor has broad authority under Section 504 of ERISA, 29 U.S.C. § 1134, to conduct investigations to determine whether any violations of ERISA have occurred and in connection therewith, to require the submission of records relevant to those investigations.  An administrative subpoena is proper if it is within the agency's statutory authority and it seeks information reasonably relevant to the investigation.  *See United States v. Bisceglia*, 420 U.S.

1

141, 146-47 (1975); *United States v. Zadeh*, 820 F.3d 746, 755-56 (5th Cir. 2016); *Sandsend Fin. Consultants, Ltd. v. Fed. Home Loan Bank Bd.*, 878 F.2d 875, 878 (5th Cir. 1989). "For purposes of an administrative subpoena, the notion of relevancy is a broad one." *Sandsend Fin. Consultants, Ltd.*, 878 F.2d at 882. Indeed, the purpose of a statutory grant of investigative authority "is not to accuse, but to inquire." *Bisceglia*, 420 U.S. at 146.

Under ERISA and the relevant case law, the Secretary has ample authority to conduct its investigation in order to determine whether ERISA violations have or are about to occur. As your letter recognizes, the investigation involves review of tens of thousands of documents, which were obtained over the course of several months, including months of extensions granted by the Secretary for subpoena responses from your clients as well as other entities. For example, subpoena responses from PIC were due on July 31, 2020, but, as of the writing of this letter, several responses remain outstanding, including contracts and documents relating to clients that are employee benefit plans, but not "Partnership Plans" (defined in your letter as LPMS's "proposed health insurance plans"). Indeed, the Secretary's investigative authority applies to all employee benefit plans, and your client's attempt to limit the investigation only to "Partnership Plans" is unavailing. *See* 29 U.S.C. §§ 1003(a), 1134(a). While the Secretary understands that a party's compliance with subpoenas requires an expenditure of resources, this does not curb the Secretary's authority to conduct his investigation in full. *See Pennington v. Donovan*, 574 F. Supp. 708, 709-10 (S.D. Tex. 1983) (enforcing the Secretary's subpoena for records related to plan assets, over the plaintiff's arguments that compliance "interfered with his work and put him to great expense").

While we appreciate your clients' cooperation thus far, at this time we are not in a position to provide the specific information you seek regarding the timing and scope of the Secretary's investigation. Finally, we appreciate your offer to make Mr. Renfro available for an interview with the Department. However, as we indicated previously, we believe an interview with Mr. Renfro will be more productive and efficient after we have had an opportunity to review all of the documents required to be produced in response to the subpoenas issued.

Sincerely,
s/ Katrina Liu
Katrina Liu
Trial Attorney
Office of the Solicitor
U.S. Department of Labor

Cc:    Thomas Gewin, EBSA
       Jamidi Daiess, EBSA
       Jeff Quinn, EBSA
       Alanna Evans, EBSA

taylor | english

**Taylor English Duma LLP** 2000 Parkwood Circle, Suite 200, Atlanta, Georgia 30339
Main: 770.434.6868 Fax: 770.434.7376 taylorenglish.com

EXHIBIT
F

JONATHAN D. CRUMLY
DIRECT DIAL: (678) 426-4659
JCRUMLY@TAYLORENGLISH.COM

December 30, 2020

**_Via e-mail only to Liu.Katrina.Ti@dol.gov_**
Katrina Liu
Office of the Solicitor
US Department of Labor
200 Constitution Ave. N.W.
Suite N-4611
Washington, DC 20210

> Re:   Anjo, LLC; DOL Case Number: 99-000016(50) (the "Anjo
> Investigation")

Dear Ms. Liu:

Thank you for your letter of December 14, 2020. My clients are disappointed that DOL seems unwilling to cooperate with them in a process to allow faster resolution to whatever undisclosed concerns DOL may, or may not, have concerning ERISA compliance. Given the global pandemic and economic pressure that places on all small businesses, my clients and I had hoped DOL would prefer to have a structure in place allowing it to do a reasonable analysis of current ERISA compliance as well as parameters on self-reporting by my clients to keep DOL informed without unduly taxing the resources of these small businesses.

We understand that it is DOL's position that the scope of its investigatory authority is broad, perhaps even unlimited. We have never argued with the position that DOL's investigatory authority is broad. However, as the cases even you cited indicate, the scope of that authority is not unlimited. *US v. Bisceglia,* 420 U.S. 141, 146–147 (1975) (summons will be scrutinized "to determine whether it seeks information relevant to the legitimate investigative purpose" rather than any improper purpose); and *US v. Morton Salt Co.,* 338 U.S. 632, 652 (1950) ("a governmental investigation . . . may not be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power" and "shall not be unreasonable"). The reasonable relevance standard will be met only where 1) the subpoena is within the statutory authority of the agency; 2) the information sought is "reasonably relevant" to the inquiry; 3) information sought is not already in the possession of the agency; and 4) the demand is not "unreasonably broad or burdensome." *US v. Zadeh,* 820 F.3d 746, 755 (5th Cir. 2016) (reasonably relevant standard met after subpoena was narrowed to those patients known to the DEA and was "specific and limited in scope").

When the conduct under investigation or what the "inquiry actually is" is not identified, courts, and those responding to DOL's subpoenas, cannot evaluate whether the inquiry is reasonably relevant or is "unreasonably broad or burdensome". *Consumer Fin. Prot. Bureau v. Source for Pub. Data, LP,* 903 F.3d 456, 460 (5th Cir. 2018) (an agency does not have "unfettered authority to cast about for potential wrongdoing"). The courts are simply not required to "rubber-

stamp actions of an administrative agency" and will not allow an agency "to bootstrap itself when justifying an investigation into every record and document a plaintiff possesses." *Sunshine Gas Co. v. United States Dep't of Energy*, 524 F. Supp. 834, 841 (N.D. Tex. 1981). "A legitimate, proper purpose and relevancy are required." *Id.*

> Straw men are easy to knock down; it is far more difficult to provide a purpose to the eminently sensible proposition that some refinement of purpose is needed if this Court is to have any role in considering the rights of all … parties who stand before it in a subpoena enforcement proceeding.

*Id.* (citation omitted). Our difference of opinion arises from your refusal to define, well over a year after DOL's exhaustive inquiry began, what said inquiry actually is. Consequently, we are left assuming DOL is simply asserting unfettered authority to cast about for potential wrongdoing without any indication of actual wrongdoing by any of my clients.

You assert that the Anjo Investigation is being conducted pursuant to DOL's investigative authority under Section 504 of ERISA to "determine whether [Anjo] has violated or is about to violate any provision" of ERISA. 29 U.S.C. § 1134. You then refuse to provide any additional details or parameters of any actually suspected wrongdoing by any of my clients. To the extent that the scope of the investigation may not necessarily be confined to Anjo, LLC, and arguably includes information pertaining to the business operations of PIC and its business partners and customers, namely, SAS, PIP and LPMS, these entities have produced thousands of documents responsive to DOL's subpoenas directed to them. Yet, despite the request that DOL specify some parameters for its investigation, you state that DOL "is not in a position to provide the specific information . . . regarding the timing and scope of [DOL's] investigation." This refusal to articulate any scope defies the mandate under the Regulatory Relief to Support Economic Recovery Executive Order 13924, (May 19, 2020) and the case law sited above.

My clients are confused and disturbed by DOL's refusal to simply inform them of what conduct of theirs is suspected to violate ERISA. At all times, they have sought to comply faithfully with all ERISA requirements, whether statutory or regulatory. My clients have always sought a positive, cooperative relationship with DOL in every interaction. As my colleague, Diane Festin LaRoss, communicated to you earlier this month, PIC continued in those efforts by agreeing to produce voluminous documents over the next few weeks despite those documents being entirely unrelated to the partnership plans addressed in the Fort Worth litigation.

In the midst of the harsh economic impacts of this pandemic on all small businesses in America, I would hope DOL would reconsider the position taken in your letter. If it does, I am available to discuss these issues at your convenience.

Sincerely,

Jonathan D. Crumly

cc: Clients

01920499-3

**U.S. Department of Labor**        **Office of the Solicitor**
                                    **Washington, D.C. 20210**

July 21, 2022

**VIA ELECTRONIC MAIL**
Jonathan D. Crumly
Taylor English Duma LLP
1600 Parkwood Circle, Suite 200
Atlanta, Georgia 30339
(678) 426-6959
jcrumly@taylorenglish.com

**<u>Inadmissible Settlement Communication pursuant to Fed. R. of Evid. 408</u>**

      Re:    Prospective DOL Litigation Against Suffolk Administrative Services et al.

Dear Counsel:

      The investigation by the Employee Benefits Security Administration of the U.S. Department of Labor involving Anjo, LLC and its affiliates has been referred to our office for possible litigation. We have determined that Suffolk Administrative Services, LLC (SAS), Providence Insurance Company, I.I. (PIC), Providence Insurance Partners, LLC (PIP), Alexander Renfro, William Bryan, and Arjan Zieger, are operating a multiple employer welfare arrangement (the Providence MEWA) that includes employee welfare benefit plans (the Participating Plans) governed by the Employee Retirement Income Security Act (ERISA). *See* 29 U.S.C. §§ 1002(1) & (40)(A), 1003. We have further determined that SAS, PIP, Renfro, Bryan, and Zieger, have violated their ERISA fiduciary duties to the Participating Plans and engaged in prohibited transactions by (1) authorizing the payment of excessive and unreasonable fees to SAS from plan assets, (2) authorizing the payment of excessive and unreasonable premiums to PIC from plan assets, and (3) authorizing the payment of excessive and unreasonable fees to other service providers, including enrollers or "distribution partners," from plan assets. We have determined that PIC knowingly participated in the fiduciary breaches and prohibited transactions involving its receipt of payments from Participating Plans.

      We have also determined that SAS breached its fiduciary duties by failing to monitor Hawaii Mainland Administrators (HMA), a third-party administrator for the Providence MEWA, that has improperly denied or imposed cost-sharing on benefit claims for preventive services in violation of the Patient Protection and Affordable Care Act (ACA), 42 U.S.C. § 300gg-13, as incorporated in ERISA section 715, 29 U.S.C. § 1185d. SAS has engaged in additional ERISA violations, including (i) designing plans that improperly impose pre-existing condition exclusions and annual dollar limits, in violation of 29 U.S.C. § 1185d; 42 U.S.C. § 300gg-3(a); (ii) providing deficient Summary Plan Documents to Participating Plans that lack certain information required by ERISA section 102 and its implementing regulations, 29 U.S.C. § 1022,

29 C.F.R. §§ 2520.102-2, 102-3; and (iii) failing to file a "Form M-1 Report for Multiple Employer Welfare Arrangements (MEWAs) and Certain Entities Claiming Exception (ECEs)" (Form M-1) with the U.S. Department of Labor for the Providence MEWA as required under ERISA section 101(g), 29 U.S.C. § 1021(g).

The main (though non-exclusive) bases for our findings of violations are below.  **We intend to file suit to remedy these violations on or about August 19, 2022.**  Should your clients wish to explore settlement, we are amenable to entering an agreement to toll any applicable statute of limitations.

### I.    SAS, PIP, Renfro, Bryan, and Zieger Breached Their Fiduciary Duties and Engaged in Prohibited Transactions by Authorizing and Directing the Payment of Excessive Fees from Plan Contributions to Compensate MEWA Service Providers

We have determined that the Providence MEWA is a non-plan MEWA as defined in ERISA that maintains and administers ERISA-governed health benefit plans for at least 170 employer-sponsors and approximately 9,000 employee-participants. 29 U.S.C. § 1002(40(A).[1] At the center of the MEWA are SAS, PIP, PIC, Renfro, Bryan, and Zieger who make decisions about the MEWA's operations, including its marketing, enrollment services, selection and retention of service providers, and use of Plan contributions.  Based on their involvement, SAS, PIP, PIC, Renfro, Bryan, and Zieger all serve as fiduciaries to the plans that subscribe to the MEWA. 29 U.S.C. § 1002(21)(A).

ERISA section 404 imposes on fiduciaries of employee benefit plans the duties of prudence and loyalty. 29 U.S.C. §§ 1104(a)(1)(A) & (B). Both duties mandate that a fiduciary take into account costs imposed on participants, such as fees charged to participants for administering the plan. "[C]ost-conscious management is fundamental to prudence[.]" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016).

Separately, ERISA section 406, categorically bars certain transactions that Congress deemed "likely to injure the […] plan." *Harris Tr. & Saving Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241-42 (2000) (quotation omitted); 29 U.S.C. § 1106.  ERISA prohibits fiduciaries from causing a plan to enter into transactions for the "furnishing of goods, services, or facilities between the plan and a party in interest," or for the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. §§ 1106(a)(1)(C) and (D).  A "party in interest" under ERISA includes service providers to ERISA plans. 29 U.S.C. § 1002(14)(B).  A transaction between a plan and service provider is permissible only if the services are necessary to the plan's operation and the plan pays "reasonable compensation" for the services. 29 U.S.C. § 1108(b)(2). Fiduciaries also must not "deal with the assets of the plan in his own interest or for

---

[1] We do not include in our analysis health plans sponsored by limited partnerships such as the ones at issue in *Data Marketing Partnership, et al. v. Walsh*, No. 20-11179 (5th Cir.), which are part of the Providence MEWA alongside traditional employer-sponsored health plans.

his own account," nor "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries."  *Id.* § 1106(b)(1) and (2).

We have concluded that SAS, through its executives Renfro, Bryan, and Zieger, breached its fiduciary duties and engaged in prohibited transactions by authorizing the payment of exorbitant fees from contributions made by Participating Plans.  First, the contributions made to SAS by the Participating Plans are plan assets, as the underlying plan documents unambiguously indicate that those contributions are to be used to pay claims and plan administrative expenses. SAS then unilaterally directs how Plan contributions earmarked as "Administrative Costs" are distributed among the MEWA's service providers.  Specifically, SAS instructs third party administrators (TPAs) how to allocate contributions as compensation to the Plans' service providers (selected by SAS) using Confidential Payment Instructions (CPIs). As much as 84% of a Plan's total contribution is parceled out as administrative fees, with only 16% available to pay for the medical claims of participants and beneficiaries.  The service providers for the MEWA include SAS itself, enrollers such as Crystal Bay, Enrollment First, and Enroll Prime, and TPAs such as HMA or Boon Administrative Services (Boon).  The largest fee—larger even than the amount used to pay claims—is the fee that SAS takes for itself, which is split up as multiple fees to various business units within SAS (e.g., "Incela," "ABC," "ABC Legal," and "ouTPAce."). When aggregated, the fees that SAS directs to itself make up as much as 39% of total contributions, depending on the Plan.  Such fees are excessive, unreasonable, and redundant.

We have also concluded that SAS and its executives engaged in fiduciary breaches and prohibited transactions by hiring PIC as the "reinsurer" for Participating Plans in the MEWA. Pursuant to Contractual Liability Insurance Policies (CLIPs) between PIC and the employer-sponsor, PIC insures benefits provided by the MEWA.  SAS assigns PIC a portion of the Plan contributions earmarked as "Risk Assessment," which are used to replenish accounts held by the TPAs for paying claims.  Once those accounts are replenished to a minimum balance as required by SAS, the TPA sends all remaining funds to PIC.  The majority of the Participating Plans, however, cover only claims for preventive services (which is much less costly than major medical coverage), so the amounts in the TPA's claims accounts have always been sufficient to cover claims. The Participating Plans have not needed to use the insurance provided by PIC, yet SAS has nevertheless paid PIC millions of dollars to reinsure the Plans from 2018 to the present. Further, SAS's retention of PIC as a service provider to the MEWA is a prohibited transaction because SAS, Renfro, Bryan, and Zieger stand on both sides of the transaction.  Through a series of holding companies and trusts, Renfro, Bryan, and Zieger own and manage both SAS and PIC, such that they were acting in their own interest when using SAS to grow PIC's business, which is impermissible self-dealing and a violation of their fiduciary duty to act exclusively for the benefit of the Plans' participants and beneficiaries.

II.    **The Providence MEWA Has Violated ACA Provisions Incorporated in ERISA By Denying or Imposing Cost-Sharing on Claims for Preventive Services, Imposing Pre-Existing Condition Exclusions, and Imposing Annual Dollar Limits in Certain Plans**

Our investigative findings also support a determination that SAS failed to monitor HMA's claims administration for the Participating Plans, which enabled HMA's improper denial and imposition of cost-sharing on claims for preventive services. The ACA requires that preventive services be covered by a health plan at no cost to the participant. 42 U.S.C. § 300gg-13. A review of HMA's claims data from 2020 showed that HMA denied up to 10% of preventive services claims and applied participant cost-sharing to nearly 35% of preventive services claims. As the fiduciary who appointed HMA as the TPA for some of the Participating Plans, SAS was responsible for monitoring HMA's performance. SAS, however, has neither audited nor systematically reviewed the claims administration performed by HMA or any of the TPAs for the Providence MEWA.

We have also determined that certain products offered by SAS contain pre-existing condition exclusions and annual dollar limits that are prohibited by the ACA. 42 U.S.C. §§ 300gg-3(a), 300gg-11. Several of the plan designs include a supplemental hospital benefit (*e.g.*, EASE Essential Supplemental, EASE Premium Supplemental, MEC HP3, HSP3 Supplement, HSP6 Supplement, and HSP9 Supplement), and at least two "add-on" options are available that provide limited inpatient hospital benefits and can be purchased along with another plan (*e.g.*, CAT50, CAT100). These plans expressly exclude from coverage any claims resulting from a pre-existing condition existing within the 12 months preceding the day of the plan's purchase. The MEC HP3 Supplement has a similar pre-existing condition exclusion, except that it is for conditions in the 24 months preceding the coverage date. These plans also contain illegal annual dollar limits. For example, the supplemental hospital benefit is limited to $1,000 per day and a maximum number of days covered per plan year within 5-15 days (for a maximum yearly benefit between $5,000 to $15,000). The CAT50 and CAT100 options also have annual dollar limits of $50,000 and $100,000, respectively.

III.    **The Providence MEWA Failed to Meet Its Disclosure and Reporting Obligations**

Finally, we have determined that SAS and PIP have failed to meet their disclosure and reporting obligations under ERISA. For example, SAS and PIP have failed to provide Summary Plan Documents (SPDs) to the Participating Plans that comply with all the requirements of ERISA and its implementing regulations. 29 U.S.C. § 1022; 29 C.F.R. §§ 2520.102-2, 102-3. The SPDs created by SAS and PIP, which contain similar language across the Participating Plans, exclude several categories of required information:

1. The agent for legal process including their name, address, and telephone number
2. The plan administrator, including their name, address and telephone number
3. The address of the Plan Sponsor

4.  The trustees, including their name, address and telephone number
5.  Information regarding participant ineligibility or disqualification
6.  The plan administration type
7.  The date of the end of the plan year
8.  Information about plan premiums, deductibles, and copayment information

SAS, as administrator of the Providence MEWA, has also failed to file a Form M-1 with the U.S. Department of Labor on behalf of the MEWA. 29 C.F.R. § 2520.101-2(c)(1)(i).

The foregoing does not represent the full scope of the problems with the Providence MEWA that we intend to prove in litigation.  We plan to file a lawsuit against SAS, PIP, PIC, Renfro, Bryan, and Zieger to restore all losses to the Participating Plans and to reverse all prohibited transactions with restitution by the fiduciaries for all losses (including lost opportunity costs) resulting from their fiduciary breaches.  We also plan to seek equitable relief, including an injunction against your clients removing them from their roles with the Providence MEWA and Participating Plans as well as permanent fiduciary and service provider bars against Renfro, Bryan, and Zieger.

We are available to further discuss our concerns with you.

Regards,

s/ Katrina Liu

Katrina Liu
Jeff Hahn
Jamie Bowers

U.S. Department of Labor
Office of the Solicitor
Plan Benefits Security Division
liu.katrina.t@dol.gov
hahn.jeffrey.m@dol.gov
bowers.jamie.l@dol.gov

5

**EXHIBIT H**

**U.S. Department of Labor**   Office of the Solicitor
Washington, D.C. 20210

June 8, 2023

**VIA ELECTRONIC MAIL**
Jonathan D. Crumly
Freeman Mathis & Gary LLP
100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339
(678) 996-9137
jonathan.crumly@fmglaw.com

Roberta C. Watson
The Wagner Law Group
101 E. Kennedy Blvd.
Suite 2140
Tampa, FL 33602
(813) 603-2960
rcwatson@wagnerlawgroup.com

**Inadmissible Settlement Communication pursuant to Fed. R. of Evid. 408**

   Re:  Providence MEWA - Settlement Demand from the Department of Labor

Counsel:

  As you know, EBSA's investigation of Anjo, LLC, its directors, and affiliates regarding their operation of a multiple employer welfare arrangement ("MEWA" or "Providence MEWA") in violation of ERISA has been referred to our office for possible litigation. To explore potential settlement, the Department has entered into multiple tolling agreements with your clients Suffolk Administrative Services, LLC ("SAS"), Providence Insurance Company, I.I. ("PIC"), Providence Insurance Partners, LLC ("PIP"), Alexander Renfro, William Bryan, and Arjan Zieger (together, the "Providence Parties"). In order to make a good-faith settlement proposal, we have also requested documents from your clients so that the Employee Benefit Security Administration ("EBSA") can calculate the monetary liability of the Providence Parties to the traditional employer plans participating in the MEWA ("Participating Plans").[1] Because your responses and production were incomplete at best, the loss amounts in this letter are approximations based on the limited information received, and we reserve the right to alter our proposal based on more complete information.

  As described more fully in the Department's July 21, 2022 letter, the Providence Parties have violated ERISA in multiple ways, including by (i) paying fees to SAS from plan assets in

---

[1] The Participating Plans are ones sponsored by traditional employers, and do not include any limited partnership plans.

acts of self-dealing without review or approval by fiduciaries of the Participating Plans; (ii) paying fees to PIC from plan assets in acts of self-dealing without review or approval by fiduciaries of the Participating Plans; and (iii) paying fees to other service providers, including to enrollers or "distribution partners," for unnecessary services.[2] The aforementioned fees authorized by the Providence Parties were also excessive relative to the services provided to the MEWA. Through these actions, the Providence Parties violated ERISA's fiduciary standards and prohibited-transaction rules in sections 404 and 406, 29 U.S.C. §§ 1104, 1106.

The Providence Parties face significant monetary liability as a result of their violations. EBSA has determined that the Providence MEWA received, at a minimum, $93.2 million in fees between 2016 and 2022 from employer and employee contributions, the majority of which—$60.3 million—was paid to SAS and PIC. Specifically, EBSA calculated a total of $19 million paid to SAS, and a total of $41.3 million paid to PIC between 2016 and 2022. Because SAS and PIC received these amounts via self-dealing in violation of ERISA section 406(b), your clients would thus be liable for the entire $60.3 million in any litigation. In addition, EBSA has determined that between 2016 and 2022, the Providence Parties authorized roughly $16 million in payments to the enrollers out of the Plans' contributions despite the enrollers providing no discernible ongoing service to the Plans.

Nevertheless, EBSA is prepared to accept a total monetary settlement of **$40 million** from the Providence Parties.[3] This amount is not only a reasonable compromise of the Providence Parties' self-dealing liability (to say nothing of their liability for paying enrollers for unnecessary services), but serves as a rough approximation of the amount by which the Providence Parties caused the Plans to overpay for administrative expenses, based on a comparison of the Providence MEWA's loss ratio to a more reasonable loss ratio. The Providence MEWA targeted a loss ratio between 27% and 48% from 2016 to 2022, meaning that the MEWA aimed to devote only 27% to 48% of Plan contributions toward benefit claims and/or health care improvements, with the remaining 52% to 73% of contributions earmarked for administrative fees, marketing, and other overhead costs.[4] Had the MEWA used a more reasonable loss ratio of 80%, EBSA calculated that the Plans would have saved $42.9 million in administrative fees between 2016 to 2022.[5]

---

[2] This is not a full list of the Providence Parties' ERISA violations but it accounts for the majority of the monetary losses. The calculations of fees does not include any fees received from the various limited partnerships participating in the MEWA.

[3] The Department would also require the Providence Parties to pay an additional 20% of that amount as a penalty pursuant to ERISA § 502(l), along with reimbursement of any plan assets used by the Providence Parties to fund attorneys' fees in connection with this investigation.

[4] The Department lacks full sets of claims data and so cannot currently determine the actual loss ratio of the Providence MEWA. Based on the partial data EBSA received, it believes that the actual loss ratio is *even less* than the MEWA's target loss ratios that ranged from 27-48%.

[5] While not directly applicable to the Providence MEWA, we note that the Affordable Care Act established an 80% loss-ratio requirement for insurers in the small group market.

Along with monetary relief, EBSA would require the following injunctive relief from the Providence Parties: (i) the immediate and permanent removal of SAS, PIC, Alexander Renfro, William Bryan, and Arjan Zieger as fiduciaries, service providers, and administrators of the Participating Plans in the Providence MEWA; (ii) the appointment of an Independent Fiduciary to the Participating Plans and Providence MEWA, which would take control of all plan assets and would have authority to terminate the Providence MEWA and to dissolve the relationship between the Participating Plans and SAS, PIP, and PIC (if it determines that is in the best interest of the plan participants and beneficiaries); and (iii) if the Independent Fiduciary decides to terminate the Providence MEWA, the timely adjudication of any outstanding claims and return of any assets of the Providence MEWA to the Participating Plans, including settlement payments by the Providence Parties.

The Providence Parties must also sign a consent order (i) containing the terms of settlement, including the amount to be paid by the Providence Parties in settlement of the Secretary's prospective claims; (ii) barring the Providence Parties from serving as fiduciaries to the Providence MEWA, any of the Participating Plans, or any other employer plans governed by ERISA; and (iii) barring the Providence Parties from acting as a service provider to the Providence MEWA, any of the Participating Plans, or any other employer plans governed by ERISA.

As stated above, based on the limited information the Department has in its possession, this is EBSA's initial demand to resolve its claims related to the Anjo Investigation. EBSA reserves the right to change its demand upon receiving additional information.

Regards,

s/ Jamie Bowers

Jamie Bowers
Katrina Liu
Jeff Hahn

U.S. Department of Labor
Office of the Solicitor
Plan Benefits Security Division
bowers.jamie.l@dol.gov
liu.katrina.t@dol.gov
hahn.jeffrey.m@dol.gov

3





**U.S. Department of Labor**       Employee Benefits Security Administration
                                   Washington, D.C.  20210

January 24, 2020

Alexander T. Renfro, JD, LLM                          2020-01A
The Law Office of Alexander Renfro                    ERISA SEC.
3200 West End Avenue, Suite 500                       3(1)
Nashville, TN 37204                                   29 CFR 2510.3-3

Dear Mr. Renfro:

This is in response to your request on behalf of LP Management Services, LLC (LP
Management), for the Department's views on the regulatory status under the Employee
Retirement Income Security Act of 1974 (ERISA) of health benefit programs that the LP
Management limited partnerships may choose to offer to their "limited partners."  In particular,
you ask whether the Department would consider LP Management's limited partnership programs
to be employee welfare benefit plans within the meaning of section 3(1) of ERISA, and, if so,
whether the arrangements constitute single-employer group health plans sponsored by the limited
partnerships as an "employer."

After submitting your request, you filed a complaint for declaratory and injunctive relief against
the Department in *Data Marketing Partnership, LP v. United States Department of Labor,* Civil
Case No.4:19-cv-00800-O United States District Court for Northern District of Texas (filed
October 4, 2019).  The complaint included allegations regarding a currently operating limited
partnership program.  The summary of facts and representations in this letter is based on the
materials you submitted in support of your request as well as the information alleged in the
complaint.[1]

As discussed in more detail below, ERISA does not sweep so broadly as to regulate the
commercial sale of insurance in the manner proposed by LP Management.  ERISA regulates the
provision of *employee* benefits by employers and employee organizations, not the commercial
sale of insurance outside the context of employment-based relationships.  Based on your
representations, in the Department's view, the limited partners as described in your request are
not employees or bona fide partners of the limited partnerships; they do not work for or through
the partnership; and they do not receive income for performing services for or as partners of the
partnership.  In sum, you have provided no facts that would support a conclusion that the limited

---

[1] The summary does not include representations you provided about the financial and reinsurance safeguards
adopted by the limited partnership, *e.g.*, use of a licensed and bonded third party administrator, reinsurance
supported by retrocessionary coverage, and a trust to hold plan assets, because those representations and allegations
were not relevant to the Department's decision on the foundational question you posed about the status of the
limited partnership health coverage program under the definition of "employee welfare benefit plan" in section 3(1)
of ERISA.

partners are meaningfully employed by the partnership or perform any services on its behalf. The purported and sole "service" that the limited partners would appear to perform for or through the partnership would be to install specific software on their personal electronic devices that capture data as they browse the Internet or use those devices for their own purposes. If LP Management's arguments were accepted, marketers could sell any health insurance package as a single ERISA-covered plan, as long as their buyers had smartphones, the contract papers included "limited partnership" provisions, and the customers assented to the installation of tracking software (much as numerous firms, such as internet browsers and social media companies, already track consumers' activities on the Internet without claiming that the tracked consumers work for them). Accordingly, in the Department's view the limited partners are not participants in a single-employer group health plan or in an ERISA plan at all.[2]

According to the information you submitted and the representations you made in support of your request, LP Management proposes to serve as general partner of various limited partnerships and manage the day-to-day affairs of these partnerships. The limited partnerships' business would be to capture, segregate, aggregate, and sell to third-party marketing firms, electronic data generated by individuals who become limited partners and install on their personal electronic devices specific software which, among other things, captures the data tracking of other companies as the individual partners use their devices and surf the Internet. LP Management represents that individuals would obtain a limited partnership interest by executing a joinder agreement with LP Management, which would serve as the general partner. You assert that limited partners would participate in global management issues through periodic votes of all partners, but you provided no information on such votes. You assert that each limited partner agrees to contribute more than five hundred (500) hours of "work" per year through the generation, transmission, and sharing of their data, but you provide no information on how that "work" differs in any meaningful way from the personal activities individual limited partners would otherwise engage in while using their personal devices. Neither you nor LP Management representatives have suggested that individual limited partners will have any meaningful equity interest in the limited partnership or that they can expect any appreciable financial benefit for their participation in the partnership, except for the health coverage for which the limited partners pay separate premiums.

Apart from permitting LP Management to track the use of their personal electronic devices, it does not appear that the limited partners perform any work for or through the partnership. According to the representations you have provided in support of your request, limited partners do not appear to report to any assigned "work" location or otherwise notify the partnership that they are commencing their work; and they are not required to possess any particular work-related skills. In fact, the limited partnership agreement does not appear to require that a limited partner perform any service for or through the partnership apart from permitting tracking of the limited partner's use of the Internet on a personal device, as the limited partner sees fit. It appears that the limited partners would generate economic value for the partnership in much the same way that visitors to websites generate value for the entities that track consumer traffic every day for marketing and advertising purposes. In our view, there is no employer-employee relationship between the partnership and the limited partners, and as a matter of economic reality, it does not

---

[2] Requestors of advisory opinions may withdraw requests only "prior to receipt of notice that the Department intends to issue an adverse opinion[.]" ERISA Procedure 76-1, §9, 41 Fed. Reg. 36281, 36283 (Aug. 27, 1976). Because you received such notice, the request may not be withdrawn.

appear that the limited partners depend on the limited partnership as a source of business revenue. Indeed, it appears from your representations that the revenue that a limited partner could reasonably expect from the limited partnership will typically be approximately zero. Based on the representations and materials that you have provided, in operation, the primary reason for an individual or employer to participate as a "limited partner" in the arrangement appears to be to acquire health coverage.

Notwithstanding the absence of factual representations supporting an actual employment or working owner relationship between the individuals participating in the arrangement as limited partners and the limited partnerships, you argue that the limited partnership health benefit programs should be deemed to be single-employer plans because the partnership itself would have a small number of common law employees (possibly only one, as compared to thousands or tens of thousands of non-employee limited partners who could potentially acquire coverage through the arrangement). You argue that the presence of a single employee participant is sufficient to extend ERISA coverage to all the limited partners, without any stated limit.

This position cannot be squared with ERISA's text. The term "employee welfare benefit plan" is defined in section 3(1) of ERISA, in relevant part, as "any plan, fund, or program … established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise … medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment …." In addition to providing the types of benefits described in section 3(1) of ERISA, a benefit program must, among other criteria, be established or maintained by an employer, an employee organization, or both, to provide the specified benefits to participants or their beneficiaries to be treated as an "employee welfare benefit plan" within the meaning of ERISA.[3] Section 3(7) of Title I of ERISA, in turn, provides, in relevant part, that a "participant" is any employee or former employee of an employer who is or may become eligible to receive a benefit of any type from an employee benefit plan that covers employees of such employer.

These provisions, like the title of the law itself — the *Employee* Retirement Income Security Act (emphasis added) — are replete with references to the employment relationship, and ERISA's coverage expressly turns on the provision of benefits in the employment context. As the above quoted language demonstrates, ERISA covers *employee* welfare benefit plans sponsored by an *employer* or *employee* organization for the benefit of plan participants who are themselves *employees* or former *employees.* The arrangements proposed by LP Management meet none of these criteria, inasmuch as the partnership is not the limited partners' employer, and the partners are neither employees nor employers with respect to the partnership.

---

[3] There is no indication that an employee organization within the meaning of section 3(4) of ERISA is involved in the limited partnerships or their health benefit programs. Section 3(4) of ERISA defines "employee organization" as "any labor union or any organization of any kind, or any agency or employee representation committee, association, group, or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employment relationships; or any employees' beneficiary association organized for the purpose in whole or in part, of establishing such a plan."

Nevertheless, LP Management points to ERISA regulation at 29 CFR § 2510.3-3(b), which, in relevant part, states:

> **(b) Plans without employees.** For purposes of title I of the Act and this chapter, the term "employee benefit plan" shall not include any plan, fund or program, other than an apprenticeship or other training program, under which no employees are participants covered under the plan, as defined in paragraph (d) of this section. For example, a so-called "Keogh" or "H.R. 10" plan under which only partners or only a sole proprietor are participants covered under the plan will not be covered under title I. However, a Keogh plan under which one or more common law employees, in addition to the self-employed individuals, are participants covered under the plan, will be covered under title I.

You argue, by implication, that the limited partnership benefit program can be treated as a single ERISA-covered plan because it would cover at least one common law employee of the partnership itself, and therefore, fall outside the exclusion for "plans without employees," even if its predominant purpose is to provide health benefits to individuals who are not employees of the partnership, do not look to the partnership for work-based earnings, and are classified by the sponsor as "limited partners"—and even if the single common law employee is outnumbered by thousands or tens of thousands of "limited partners" who obtain health coverage through the arrangement.

The text of the regulation will not support your expansive claim of ERISA coverage. As discussed above, ERISA regulates employment-based benefit programs and 29 CFR 2510.3-3(b) must be read in that context. The fact that one common law employee participates in a purported partnership program does not mean that everyone covered by the arrangement is participating in an ERISA plan. Rather, the regulation must be read in light of the Department's authority under ERISA to regulate the provision of employee benefits offered in the context of a genuine employment relationship. *See*, for example, ERISA sections 3(1) and 3(4) (limiting coverage to plans maintained by employers or employee organizations), section 3(7) (defining participant in terms of an employment relationship), and section 2 (declaring ERISA's purpose as "in the interests of employees and their beneficiaries"). Consistent with these statutory limitations, limited partners must participate in the plan as "working owners" to be covered as plan participants within the meaning of Title I of ERISA. The limited partners here are neither employed nor self-employed with respect to the partnership, but rather are merely consumers purchasing health coverage in exchange for premiums and an agreement that the partnership can track their personal activities on their electronic devices.

You additionally argue that ERISA section 732(d) supports LP Management's position, but this argument too is unpersuasive. Section 732(d) provides "for purposes of this part," [*i.e.*, Part 7 of ERISA] that "[a]ny plan, fund, or program which would not be (but for this subsection) an employee welfare benefit plan and which is established or maintained by a partnership, to the extent that such plan, fund, or program provides medical care (including items and services paid for as medical care) to present or former partners in the partnership or to their dependents (as defined under the terms of the plan, fund, or program), directly or through insurance, reimbursement, or otherwise, shall be treated (subject to paragraph (2)) as an employee welfare

4

benefit plan which is a group health plan."[4]  Paragraphs (2) and (3) provide that, in the case of a group health plan, the term "employer" also includes the partnership in relation to any partner and the term "participant" also includes, in connection with a group health plan maintained by a partnership, an individual who is a partner in relation to the partnership.

The regulations emphasize the need for an employment or self-employment services-based relationship with respect to the partners participating in a group health plan maintained by a partnership.  Specifically, the regulations clarify that, for purposes of Part 7 of ERISA, a partner must be a "bona fide partner" in order to be considered an employee, and the partnership is considered the employer of a partner only if the partner is a "bona fide partner."  29 CFR 2590.732(d)(2), (d)(3).  The regulation also states that whether an individual is a bona fide partner is determined based on all the relevant facts and circumstances, including whether the individual performs services on behalf of the partnership.  *Id.*

The limited partners here are not "bona fide partners" within the meaning of ERISA section 732 because they do not work or perform services for the partnership; they have only a nominal (at best) ownership interest in the partnership; and they do not earn income based on work performed for or through the partnership that is a material income-producing factor for the partnership.  If the limited partners worked for or through the partnership, had a material ownership interest in the partnership, and earned income for work that generated material income for the partnership, it would be plausible to treat them as employed by the partnership in the relevant sense.  In such circumstances, the partners could have dual status, like self-employed individuals who earn  income from their self-employment with respect to a group health plan (*i.e.*, the partner could be both an "employer" for purposes of the partnership's sponsoring the group health plan and an "employee" for purposes of participating in the partnership's group health plan).

As discussed above, however, the limited partners in the arrangement merely obtain health benefits through the partnership and permit it to capture data based on their personal use of their personal devices.  Their nominal ownership interests do not appear to have economic or operational substance; they do not appear to perform labor for the partnership in any meaningful sense; there is no basis to conclude the limited partners will derive any income from the partnership for the performance of services; and the limited partners neither give nor take directions in a work context from the partnership.  They are simply purchasers of health coverage who, like other purchasers of individual health insurance, are responsible for paying all of the health care premiums for their coverage under the limited partnership arrangement.  To treat them as employee participants in an ERISA-covered plan would effectively read the employment-based limitations on ERISA coverage out of the statute.  As noted at the beginning of this letter, any marketer could claim coverage of any arrangement as a single ERISA-covered plan, as long as the buyer had a smartphone, signed a "limited partnership" agreement, and was willing to permit the marketer to track the buyer's activities on the phone (just as numerous firms already track a buyer's activities on the Internet, without claiming any employment relationship).

---

[4] The Department's regulation at 29 CFR 2590.732 expressly states that its provisions on the treatment of partnerships are "[f]or purposes of this part."  The parallel Department of Health and Human Services regulation at 45 CFR 146.145(c) and the Department of the Treasury regulation at 26 CFR 54.9831–1 similarly limit the application of those provisions for purposes of certain requirements applicable to group health plans.

Such a reading and result is insupportable under the clear employment-based language of the statute.

For the foregoing reasons, and based on your representations, information in the complaint you filed against the Department, and the materials we reviewed, it is the Department's view that the proposed LP Management health benefit programs would not be single-employer group health plans or ERISA plans at all.[5] To the contrary, treating the limited partnership program as a single ERISA plan would effectively eliminate ERISA's important statutory distinction between offering and maintaining employment-based ERISA covered plans, on the one hand, and the mere marketing of insurance and benefits to individuals outside the employment context, on the other.[6] We have consulted with the Departments of Health and Human Services and the Treasury. They have advised the Department that other than to the extent that the LP Management has established a separate welfare plan for the partnership's common law employees, the limited partnership programs described by LP Management would not be a group health plan within the meaning of 45 CFR 146.145(a) or 26 CFR 54.9831–1, and thus, the limited partnership programs would generally be subject to regulations applicable to the individual market, and not the small or large group markets.

This letter constitutes an advisory opinion under ERISA Procedure 76-1. Accordingly, it is issued subject to the provisions of that procedure, including section 10 thereof, relating to the effect of advisory opinions. This opinion relates solely to the application of the provisions of Title I of ERISA addressed in this letter. Further, this letter is not determinative of any particular tax treatment under the Internal Revenue Code and does not address any issues arising under any other federal or state laws.

Sincerely,


John J. Canary
Director, Office of Regulations and Interpretations

---

[5] To the extent the limited partnership program covers common law employees of the partnership, the Department would consider the limited partnership to have established a separate welfare benefit plan for those employees. That plan would be subject to ERISA, and the persons responsible for operating the plan would be subject to the reporting, disclosure, fiduciary, group health, and enforcement provisions in Parts 1, 4, 5, 6, and 7 of ERISA.
[6] You did not ask and this letter does not address the status of the limited partnership programs as multiple employer welfare arrangements (MEWAs) within the meaning of ERISA section 3(40). In light of our conclusion that the programs are not ERISA-covered plans, the programs would be subject to broad state insurance regulation regardless of whether they were multiple employer welfare arrangements (MEWAs) within the meaning of ERISA section 3(40) and ERISA section 514(b)(6).

EXHIBIT

J

**FMG LAW**  **Freeman Mathis & Gary** LLP

100 Galleria Parkway
Suite 1600
Atlanta, GA 30339-5948

Jonathan Crumly, Esq.

D:678.996.9137
C:770.883.6344

Tel: 770.818.0000

Jonathan.Crumly@fmglaw.com

**www.fmglaw.com**

January 11, 2024

*Via Email:* galen.thorp@usdoj.gov
Galen N. Thorp
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20530

<u>**I**NADMISSIBLE **S**ETTLEMENT **C**OMMUNICATION PURSUANT TO **F**ED. **R.** OF **E**VID. **408**</u>

Re:  *Data Marketing Partnership LP, et al. v. US Department of Labor, et al.*, USDC
    Northern District of Texas, Fort Worth Division, CAFN 4:19-cv-00800-O

Dear Galen:

I hope the holidays treated you well, and that your 2024 is off to a good start. The filing deadline for the Plaintiffs' Motion for Summary Judgment is approaching, and it will be filed timely, on or before January 15. While you likely disagree, we believe that our arguments are compelling, and that the facts as well as the history of the case make a permanent injunction against the Department of Labor – upheld by the Fifth Circuit, should the Department choose to appeal again – the most likely outcome.

With the permission of my clients, I am writing to explore the possibility of settlement discussions, prior to the Court's ruling as to imposition of an injunction. My clients' interest in a negotiated resolution is driven not by fears of an adverse decision – to the contrary, it stems from concerns about potential unintended consequences of prevailing. A broad, permanent, nationwide injunction against the Department was never their goal – nor was litigation itself.

This matter began with a very positive meeting at the Department in October 2018. A spirit of professional cooperation between our respective clients extended for several months thereafter, including submission of the Advisory Opinion (AO) request and constructive follow-up dialog that led to several revisions to the AO request. In another meeting in March 2019 (at which I was present), the then-Chief of Staff to the Secretary described the proposed structure as "ingenious" and "something we wish we'd thought of." The Department nonetheless indicated that a favorable AO would not be forthcoming, but that the Department would take no enforcement action against our clients, should they choose to implement the business model described in the AO request.

Galen N. Thorp
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
January 11, 2024
Page 2

_____

We thanked the Chief of Staff and others for their kind words, but explained that even if the Department took no adverse steps, that would not prevent state regulators – who properly look to the Department as the authority on all ERISA matters – from initiating their own investigations and enforcement proceedings, in the absence of Department guidance to the contrary. We therefore urged the Department to reconsider its position on the Advisory Opinion request. As you know, that did not happen. We were forced to file suit, which led to the issuing of the Department's negative AO and the court decisions which followed – as well as the one that is pending.

During the pre-litigation interactions that took place in late 2018 and early 2019, the Department expressed certain misgivings, which may be paraphrased as "We think you are well-intended, but we are concerned about possible abuse of your proposed structure by Bad Actors." Setting aside the question of whether the Department continues to believe that my clients are ethical people seeking to provide valuable services (if indeed it ever did so believe), my clients are themselves concerned about abuses of the partnership plan structure. We are aware of several entities entirely unrelated to my clients, selling what they claim are "data partnership health plans." Although the District Court's injunction, even before it was provisionally vacated by the 5th Circuit, applied only to the Plaintiffs, we assume that if and when they are challenged, the promoters of these "copycat" plans will make a facts-and-circumstances argument that they should receive the same protection from the court decisions.

Relying on verbal advice from the then-Assistant Secretary for EBSA, offered during the initial October 2018 meeting, my clients believed that they would have the opportunity to work with the Department to develop safeguards which would simultaneously provide broader access to ERISA-subject benefit plans, while also protecting participants from the fraud, abuse, and financial instability that occur all too frequently in the "ACA alternative" sector.[1] Ideally, this joint effort would have created standards to align the Department's interest and views, and invested the Department with proper oversight over all ERISA plan sponsors and parties in interest, including my clients. The fact that a great deal of ink and other resources have been spilled since has not lessened the Bad Actor concerns of my clients, nor would we expect that it would have assuaged those of the Department.

If imposed, a permanent injunction will act as a blunt instrument that will complicate–and ultimately hamper–the Department's ERISA regulatory and enforcement functions. The Department's autonomy to interpret certain regulations would be supplanted by the Courts, and more "data partnership copycats" with no interest in the aforementioned safeguards will seek to capitalize. While your clients and mine may differ on approaches and opinions on these issues, they share a strong belief in the rule of law, and the need for its consistent application. It may not be possible to arrive at a mutually satisfactory settlement, but we believe it would be a serious mistake by all concerned not to try.

_____

[1] We realize that eliminating ACA alternatives altogether is a policy goal of many, but a debate as to the merits, practicality, and timing of such an initiative is beyond the scope of this case.

**INADMISSIBLE SETTLEMENT COMMUNICATION PURSUANT TO FED. R. OF EVID. 408**

Galen N. Thorp
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
January 11, 2024
Page 3

_____

     In order for settlement discussions to be fruitful, we believe that they should take place in person, and that they should include principals authorized to make decisions for each side. We are willing to travel to Washington D.C. at any date and time which is convenient to the Department, and to provide a list of proposed attendees in advance. We would ask that the Department also provide such a list. As to urgency, although we in theory have until March 18 – the deadline for filing of the Plaintiffs' Reply in Support of Motion for Summary Judgment – to reach settlement, if it is possible to make better use of the resources we will each otherwise expend, we respectfully suggest that we should meet sooner rather than later.

     Please feel free to reach out by telephone, should you prefer to have an informal, off-the-record discussion. Thank you in advance for your consideration of this proposal.

                 Sincerely,

                 Jonathan D. Crumly, Sr.

cc:     Clients (by email only)

EXHIBIT
K

**From:** Thorp, Galen (CIV) <Galen.Thorp@usdoj.gov>
**Sent:** Thursday, February 8, 2024 9:47 AM
**To:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>
**Cc:** Bob Chadwick <Bob.Chadwick@fmglaw.com>; Hahn, Jeffrey M - SOL
<Hahn.Jeffrey.M@dol.gov>
**Subject:** RE: Data Marketing Partnership LP, et al. v. US Department of Labor, et al., CAFN
4:19-cv-00800-O - FRE 408 Settlement Communication

> **Caution:** This email originated from outside of the FMG organization. **Do not click links** or **open attachments** unless you recognize the sender and know the content is safe.

Mr. Crumly,

Thank you for your letter last month.  We would like to schedule a phone call on Monday or Tuesday next week to informally explore the possibility of settlement.  We understand that you have also put a settlement offer on the table for your other DOL matter, so it would make sense to have a broader conversation that includes Mr. Hahn.  On Monday we are available between 10am and 4pm.  On Tuesday, we are available from 10-12 or 1-4 EST.

In order to make room for this discussion, we would also ask for your consent to a 30 day extension of the briefing deadlines in this case.  An additional reason for our extension request is that we are currently scheduled to submit our next brief on February 26, but Katrina Liu, agency counsel for this matter, is still in a trial that has been extended through at least February 21.

Sincerely,
Galen

_____

**Galen Thorp** | Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
(202) 514-4781 | Galen.Thorp@usdoj.gov



**EXHIBIT L**

U.S. Department of Labor    Office of the Solicitor
Washington, D.C. 20210

April 26, 2024

**VIA ELECTRONIC MAIL**
Jonathan D. Crumly
Freeman Mathis & Gary LLP
100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339
(678) 996-9137
jonathan.crumly@fmglaw.com

Roberta C. Watson
The Wagner Law Group
101 E. Kennedy Blvd.
Suite 2140
Tampa, FL 33602
(813) 603-2960
rcwatson@wagnerlawgroup.com

<u>**Inadmissible Settlement Communication pursuant to Fed. R. of Evid. 408**</u>

  Re: Providence MEWA and Data Marketing Partnership Matters – Global Settlement
     Proposal

Jonathan and Roberta:

  Thank you for your April 4, 2024, response to our March 11, 2024, letter proposing a
global settlement that would resolve both Data Marketing Partnership's ("DMP") claims against
the Department of Labor and the Department's prospective ERISA claims relating to the
Providence MEWA. The Department's counterproposal is outlined below. We are available to
schedule a call to discuss.

<u>**Global Settlement Proposal**</u>

**A.**  <u>**Providence MEWA – Injunctive Relief**</u>

  1. <u>Reasonableness of Fees</u>

    •  **Providence Proposal:** Providence parties agree to retain the services of mutually
     agreeable, well-respected benefits firms and legal counsel as prospective
     consultants to review and determine the reasonableness of all vendor fees (both
     Providence parties and other vendors), including the status of each agreement as
     an arm's length transaction.

     o   **Department's Response:** The Department is amenable to Providence retaining a third party, unbiased consultant to review fees and affiliation status. However, the law firms listed in your proposal are not acceptable to the Department. At this juncture, the Department seeks agreement that Providence will retain an independent entity qualified to evaluate the reasonableness of health plan fees. The identity of the consultant can be determined by the parties at a later date.  The Department also seeks agreement that the Providence Parties: (a) will retain the consultant to conduct an initial review of fees as well as recurring reviews at regular intervals thereafter, (b) will follow the consultant's recommendations regarding fee arrangements, (c) will bear all costs of retaining the consultant and implementing its recommendations, and (d) will share the consultant's findings, recommendations, and/or any reports with the Participating Plans. The consultant must also share its preliminary findings and recommendations with the Department for review and feedback, prior to Providence implementing the recommendations.

2.   <u>Disclosure of Fees</u>

- **Providence Proposal:** All the fees requested to be disclosed by the Department ((i) fees SAS receives by plan design and tier; (ii) fees other service providers receive for each plan design and tier; and (iii) affiliations between SAS and any service providers) are disclosed through SAS's corrective form of agreement. Alternatively, SAS is willing to include a paragraph in the agreement that list related companies as a form of disclosure.

     o   **Department's Response:** The new SAS form agreement (including Appendix A to that agreement) does not appear to satisfy the Department's fee disclosure request. It is unclear if Appendix A's column for "Company Fees" is meant to capture the total contribution payment by the Participating Plans, or just the portion earmarked for SAS's fee. In either case, the disclosure is insufficient because it does not separately list fees received by each and every service provider to the Participating Plans, including PIC, nor does it list affiliations between SAS and other service providers to the Participating Plans. Meanwhile, the agreement elsewhere appears to treat vendor cost information as confidential. *See* Sec. 3(e). Please let us know what actions the Providence Parties would take to fully disclose *all* fees by Plan for SAS, PIC, and other service providers, along with any affiliations among those groups.

2

3. <u>Segregation of Plan Funds</u>

- **Providence Proposal:** Providence Parties will eliminate the imprest accounts funded with plan contributions; instead, PIC will fulfill TPA and/or Plan Sponsor claims on the applicable stop loss policy for the Plan. Plan contributions are collected by the TPA, and service provider fees are paid from those contributions. The remainder owed under the stop loss policy is then transferred to PIC. Any remaining funds are the responsibility of the TPA to segregate.

  - **Department's Response:** It is not clear from the Providence Parties' proposal that plan contributions will be segregated by Plan. Please confirm.

4. <u>Trust Accounts</u>

- **Providence Proposal:** Providence Parties are willing to coordinate with all Plan TPAs to ensure trust accounts are established by each Plan.

  - **Department's Response:** The Department takes this to mean that the Providence Parties agree to establish (through the TPAs) trust accounts for each of the Participating Plans. If this is the case, the Department is amenable to this term. Please clarify if that is not the case.

5. <u>Fiduciary Bar</u>

- **Providence Proposal:** Mr. Renfro would sign a bar against serving as a fiduciary or service provider to ERISA plans or to any of the Participating Plans, subject to the caveat that the bar would not hinder Mr. Renfro from practicing law in the benefits space.

  - **Department's Response:** The Department is amenable to working out the details of the fiduciary and service provider bar while protecting Mr. Renfro's ability to practice employee benefits law.

6. <u>Fiduciary Training</u>

- **Providence Proposal:** Mr. Zieger and Mr. Bryan are willing to engage in fiduciary training but would like additional details on the type of training.

  - **Department's Response:** The Department suggests a training course focused on health plan compliance sponsored by the International Foundation of Employee Benefit Plans. *See* Self-Funded Health Plans Plan Administration (ifebp.org)

## B. **Providence MEWA – Monetary Relief**

- **Providence Proposal**: $2.4 million, inclusive of the 20% penalty under ERISA section 502(l), paid over three years.

    **Department's Response:** The Department is willing to lower its monetary demand to $5.5 million (inclusive of the mandatory 20% penalty under ERISA section 502(l)) but cannot agree to a three-year payment plan. The Department seeks that the monetary payment (except for the portion attributed to the Section 502(*l*) penalty) be paid by the Providence Parties to benefit the Participating Plans in a manner to be determined by the Department.

## C. **Providence MEWA – New Terms Proposed by the Providence Parties**

- **Providence Proposal:** You request that the Department "not continue its aggressive investigatory approach (i.e. the new Socios Buenos LP (SB) subpoena) without independent, just cause[.]"

  - **Department's Response**: The Department agrees to close the Socios Buenos investigation as part of the global settlement. To the extent, however, the Providence Parties are seeking assurances that the Department will not investigate them in the future, the Department cannot (and does not) agree to place constraints on its future investigatory authority. The Department can agree, however, to issue a letter to Socios Buenos formally closing the investigation.

- **Providence Proposal:** Finally, you request that the Department issue a press release indicating that the Anjo Investigation has been concluded to its satisfaction and that no adverse action is being taken against PIC, Suffolk, Mr. Bryan, or Mr. Zieger.

  - **Department's Response**: The Department does not negotiate over press. The Department can agree, however, to issue a letter to the Providence Parties formally closing the investigation.

## D. **DMP Matter**

The Department appreciates that DMP and LPMS are amenable to dismissing the *DMP* action. Your letter did not explicitly respond to the Department's request that LP Management Services LLC ("LPMS") also withdraw its advisory opinion request and the Department restates that request here. Regarding the various conditions of DMP and LPMS's dismissal of *DMP*, the Department provides the following responses:

- **LPMS Proposal:** Neither side issues press releases or makes public or private statements regarding the working owner and bona fide partner theory.

  - **Department Response:** The Department does not negotiate over press and cannot agree to place constraints on its future speech. The Department is not requesting that DMP or LPMS be restrained from making public or private statements regarding "the working owner and bona fide partner theory."

- **LPMS Proposal:** The Department will withdraw the Socios Buenos subpoena and acknowledge that Socios Buenos has complied with its obligations under the subpoena.

  - **Department Response:** As noted above, the Department agrees to withdraw the Socios Buenos subpoena and close that investigation as part of a global settlement. The Department cannot provide any public or private statements that Socios Buenos has complied with its obligations under the subpoena. The Department can agree, however, to issue to Socios Buenos a letter formally closing the investigation.

- **LPMS Proposal:** The Department will not initiate further investigatory efforts into LPMS or limited partnerships absent independent, just cause.

  - **Department Response:** The Department cannot (and does not) agree to place constraints on its future investigatory authority.

- **LPMS Proposal:** The Department will issue a letter to LPMS stating that the Department finds its practices and policies regarding the management of benefit plans consistent with ERISA rules and regulations regarding single-employer benefit plans.

  - **Department Response:** The Department cannot agree to this proposal.

- **LPMS Proposal:** LPMS and other limited partnerships will not disclose anything regarding its settlement with the Department.

  - **Department Response:** The Department is not seeking to restrain LPMS from disclosure about its settlement with the Department. As a matter of policy, the Department does not deem its settlement agreements to be confidential.

We are happy to have a call to discuss any aspects of this proposal; please let us know if you would like to speak this week or next. Thank you.

Regards,

s/ *Katrina Liu*

Katrina Liu
Jeff Hahn
Jamie Bowers
Sarah Holz

U.S. Department of Labor
Office of the Solicitor
Plan Benefits Security Division
liu.katrina.t@dol.gov
hahn.jeffrey.m@dol.gov
bowers.jamie.l@dol.gov
holz.sarah.d@dol.gov

Galen Thorp
U.S. Department of Justice
Civil Division
Federal Programs Branch
galen.thorp@usdoj.gov

EXHIBIT
**M**

## Jonathan Crumly

| | |
|---|---|
| **From:** | Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov> |
| **Sent:** | Monday, May 27, 2024 9:54 AM |
| **To:** | Jonathan Crumly; Roberta Watson |
| **Cc:** | Stephen Rosenberg |
| **Subject:** | RE: Followup to Our Call Last Week |

> **Caution:** This email originated from outside of the FMG organization. **Do not click links** or **open attachments** unless you recognize the sender and know the content is safe.

Thank you for this and I'll be in touch.  In the meantime, Jonathan, do you have anything to add on the DMP side?  As we discussed, my client is willing to issue closing letters for the Anjo and Socios Buenos investigations, but is unwilling to provide anything further in writing.

Katrina Liu (she/her)
Plan Benefits Security Division
Office of the Solicitor
202-693-5520

---

**From:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>
**Sent:** Friday, May 24, 2024 7:21 PM
**To:** Roberta Watson <rcwatson@wagnerlawgroup.com>; Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Cc:** Stephen Rosenberg <SRosenberg@wagnerlawgroup.com>
**Subject:** Re: Followup to Our Call Last Week

> **CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

Katrina,

PIC, Mr. Zieger, and Mr. Bryan are in agreement with these terms.

**Jonathan Crumly**
Senior Counsel
**Freeman Mathis & Gary, LLP**
**100 Galleria Parkway** | **Suite 1600** | **Atlanta, GA 30339-5948**
**D: 678-996-9137** | **C: 770-883-6344**
Jonathan.Crumly@fmglaw.com | LinkedIn | Bio
www.fmglaw.com | Instagram | Twitter | Facebook

CA | CT | FL | GA | IL | IN | KY | MA | NJ | NY | OH | PA | RI | TN | TX
Please read this important notice and confidentiality statement

---

**From:** Roberta Watson <rcwatson@wagnerlawgroup.com>
**Sent:** Friday, May 24, 2024 5:24:24 PM

**To:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Cc:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>; Stephen Rosenberg <SRosenberg@wagnerlawgroup.com>
**Subject:** Followup to Our Call Last Week

> **Caution:** This email originated from outside of the FMG organization. **Do not click links** or **open attachments** unless you recognize the sender and know the content is safe.

CONFIDENTIAL TO FACILITATE SETTLEMENT OF LITIGATION

Katrina –

This is a followup to our call last week.  Please pass it on to others in the Department, as appropriate.

As I told you then, I was surprised that some of the things I was hearing from you in that call (or thought I was hearing) were not things I had deduced from the prior correspondence.  I am concerned that the parties are very close to settlement but may not realize how close they are because they don't fully understand the other side's position.  This email is one last attempt to bridge that gap.  I am writing solely on behalf of Suffolk and Mr. Renfro, my only clients in the Anjo investigation.

First, I think the DOL misunderstands what the DMP folks are requesting for the DOL to put in writing regarding that matter.  But I'm not involved in that matter, so I'm hoping that they can clarify that for you in a way you will find acceptable.

Second, as to the disclosure and reasonableness of future fees, I believe that we are already there in that it appears to me that the DOL's position and Mr. Renfro's align.  We only need to agree on how to articulate it in a settlement agreement.

You said that the Department wants Suffolk to disclose all fees to the employer, and for the fees to be reasonable.  Suffolk and Mr. Renfro are fully agreeable to that to the extent that Suffolk can possibly do that or assist with that.  Suffolk does not currently select the providers or control the fees, and it will commit not to do so in the future.  Rather, the employer selects its own providers.  Suffolk does get informed of the fees, and it makes sure that the employers are aware each month as to how much money goes where, to facilitate plan administration.  Suffolk will commit to making sure that employers are clearly informed of the fees in the future on a provider-by-provider bases.  In terms of a settlement, Suffolk is happy to make sure that all fees of which it is aware or can become aware are fully disclosed to the employer.  (Our only hesitation here is that Suffolk is not always informed of brokerage fees, or of how the brokerage fees are divided, and Suffolk is not certain that it can force disclosure to it of that information.)  This sounds to me like the parties are, essentially, in agreement on the various fees being fully disclosed to the employer.

As to writing up the agreement, we have assumed that the DOL would take the lead in preparing the agreement.  If you need for us to take some action on that, please let us know.

As to making sure that the fees are reasonable, you asked that there be a consultant who would evaluate the reasonableness of all the fees.  Suffolk and Mr. Renfro are totally agreeable to that as well.  You said you wanted agreement on the process for the consultant to follow to determine if the fees are reasonable.  Suffolk and Mr. Renfro are agreeable to whatever process the DOL requires.  As a starting point, we suggest the following process:

- Third-party firm reviews the total expenses of a particular client's plan (or, if the client sponsors multiple designs, each plan design)

- Third-party firm reviews the depth of coverage in each client's plan/plan design, as applicable, as well as the actuarial value of each plan/plan design
- Third-party firm reviews the level of funding for administration of the plan and the level of funding for claims of the plan
- Third-party firm reviews the level of funding by the plan sponsor and the level of funding expected of plan participants
- Third-party firm reviews a list of each vendor providing services to the plan, the services these vendors provide, and the fees these vendors charge the plan
- Third-party firm reviews an assessment of the client's ability to self-administer the services of each vendor
- Third-party firm reviews comparisons to each vendor's service and fee model with one to three comparable market competitors
- With respect to each vendor to the plan, the third-party review firm will perform a valuation of the vendor's services compared to the fees charged to determine whether those fees are excessive in the opinion of the third-party firm
  - This valuation will not be controlled by any other party and will be based on the information provided above, as well as any specific or supplementary guidance provided by the Department

But any process that the DOL finds acceptable will be agreeable to Suffolk and Mr. Renfro.

As we discussed Mr. Renfro has agreed to accept a ban on his being a fiduciary to an ERISA plan in the future. We have agreed that he will be allowed to practice law, including ERISA law. You were going to let me know whether he must avoid any ERISA engagement where he would be paid by a plan. He can live with that answer either way, but he would like to be sure he knows what his limits are. For your information, Mr. Renfro is in the process now of resigning from Suffolk and PIC; he will not wait for the resolution of this matter for that.

In any event, we object to having a settlement of the Anjo investigation be dependent on settling the DMP case.

Please let me know if you would like to discuss anything further.

*Roberta Casper Watson*
*Direct line (813) 603-2960*
*Tampa Fax (813) 603-2961*
*Boston Fax (617) 357-5250*
*iPhone (617) 615-5200*
*rcwatson@wagnerlawgroup.com*

**The Wagner Law Group**

101 East Kennedy Boulevard, Suite 2140
Tampa, FL  33602
Tel: (813) 603-2959

www.wagnerlawgroup.com

***************************************************************************************************

This message contains confidential information, intended only for the person(s) named above, which may also be privileged. Any use, distribution, copying or disclosure by any other person is strictly prohibited. If you have received this message in error, please notify us immediately by telephone (collect), and delete the original message without making a copy.

**Jonathan Crumly**

| | |
|---|---|
| **From:** | Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov> |
| **Sent:** | Tuesday, June 11, 2024 1:37 PM |
| **To:** | Jonathan Crumly; Bob Chadwick; 'Roberta Watson'; 'Stephen Rosenberg' |
| **Cc:** | Holz, Sarah D - SOL; Liu, Katrina T - SOL |
| **Subject:** | RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan |

> **Caution:** This email originated from outside of the FMG organization. **Do not click links** or **open attachments** unless you recognize the sender and know the content is safe.

Jonathan,

Yes, that January 24 demand is still on the table (though of course the other injunctive pieces are still part of that demand). But we'd have to know relatively soon if your clients are interested in that offer, as we're planning on filing the complaint by the end of the week, and I can't promise what our client would be willing to do once we file.

Jeff Hahn
Counsel for Appellate and Special Litigation
U.S. Department of Labor
Office of the Solicitor
Plan Benefits Security Division
202-961-5182

---

**From:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>
**Sent:** Tuesday, June 11, 2024 10:32 AM
**To:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; 'Roberta Watson' <rcwatson@wagnerlawgroup.com>; 'Stephen Rosenberg' <SRosenberg@wagnerlawgroup.com>
**Cc:** Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>; Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

> **CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

Katrina,

We are disappointed to hear that our discussions have failed to produce mutually acceptable settlements of the two matters. I have had several discussions with my clients since our call yesterday afternoon. Jeffrey stated that if the DMP Matter is not dismissed, the monetary demand in the Anjo Investigation would increase substantially. My Anjo Investigation clients have requested that I confirm what that amount would be. In my review of the settlement correspondence in the Anjo Investigation, I noted that on January 24 (prior to Galen Thorp's proposal of global settlement discussions) the Department presented a demand of $12.5 million plus the 20% penalty pursuant to ERISA § 502(1) for a total of $15.0 million. Is that demand still on the table if the DMP Matter is not dismissed?

If the Department files a complaint, I am authorized to accept service on behalf of PIC, Mr. Bryan, and Mr. Zieger. You can email the service materials to me.

**Jonathan Crumly**
Senior Counsel
**Freeman Mathis Decisions**
**100 Galleria Parkway | Suite 1600 | Atlanta, GA 30339-5948**
**D: 678-996-9137 | C: 770-883-6344**
Jonathan.Crumly@fmglaw.com
decisions.fmglaw.com | Instagram | Twitter | Facebook



AZ | CA | CO | CT | DE | FL | GA | IL | IN | KY | MA | NJ | NM | NV | NY | OH | PA | RI | TN | TX | WA
Please read this important notice and confidentiality statement

---

**From:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Sent:** Tuesday, June 11, 2024 11:10 AM
**To:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; 'Roberta Watson' <rcwatson@wagnerlawgroup.com>; 'Stephen Rosenberg' <SRosenberg@wagnerlawgroup.com>
**Cc:** Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>; Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

> **Caution:** This email originated from outside of the FMG organization. **Do not click links** or **open attachments** unless you recognize the sender and know the content is safe.

Counsel,

We are planning to file a complaint by the end of this week.  Please advise whether you are authorized to accept service on behalf of your clients and/or whether your clients will waive service.

Thank you,

Katrina Liu (she/her)
Plan Benefits Security Division
Office of the Solicitor
202-693-5520

---

**From:** Liu, Katrina T - SOL
**Sent:** Thursday, May 30, 2024 10:29 AM
**To:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; Roberta Watson <rcwatson@wagnerlawgroup.com>; Stephen Rosenberg <SRosenberg@wagnerlawgroup.com>
**Cc:** Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>; Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan
**Importance:** High

Counsel,

We haven't received any additional information from your clients since our discussion on Tuesday. We are planning to file the complaint by COB today. Please advise whether you are authorized to accept service on behalf of your clients and/or whether your clients will waive service.

Thank you,

Katrina Liu (she/her)
Plan Benefits Security Division
Office of the Solicitor
202-693-5520

---

**From:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Sent:** Friday, May 24, 2024 3:03 PM
**To:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; Roberta Watson <rcwatson@wagnerlawgroup.com>; Stephen Rosenberg <SRosenberg@wagnerlawgroup.com>
**Cc:** Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>; Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>; Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Subject:** Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

Dear counsel,

Since we have not heard from you since our calls on Thursday, May 16, we are preparing to commence an action next week in the U.S. District Court of Puerto Rico against Suffolk Administrative Services, Providence Insurance Company, Alexander Renfro, Arjan Zieger, and William Bryan for violations of ERISA. The complaint will allege that SAS, PIC, Renfro, Zieger, and Bryan violated their fiduciary duties to self-funded ERISA plans and engaged in prohibited transactions by self-dealing and authorizing excessive and unreasonable fees from plan assets. The complaint will also allege a failure by SAS to file Form M-1s with the Department.

**Please advise whether you are authorized to accept service of the complaint on behalf of your clients and, if so, please confirm your addresses:**

Jonathan Crumly
Bob Chadwick
Freeman, Mathis & Gary LLP
100 Galleria Parkway
Suite 1600
Atlanta, GA 30339-5948

Roberta Watson
Stephen Rosenberg
The Wagner Law Group
101 East Kennedy Boulevard
Suite 2140
Tampa, FL 33602

Thank you,

**Katrina T. Liu | Senior Trial Attorney**
Plan Benefits Security Division | Office of the Solicitor | U.S. Department of Labor
200 Constitution Ave. N.W., Suite N-4611, Washington, D.C. 20210
liu.katrina.t@dol.gov | (202) 693-5520
Pronouns: she, her, hers



## Jonathan Crumly

| | |
|---|---|
| **From:** | Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov> |
| **Sent:** | Thursday, October 31, 2024 10:27 AM |
| **To:** | Jonathan Crumly; Robert G. Chadwick, Jr.; Roberta Watson; Stephen Rosenberg |
| **Cc:** | Hahn, Jeffrey M - SOL; Holz, Sarah D - SOL; Bowers, Jamie L - SOL |
| **Subject:** | RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan |

> **Caution:** This email originated from outside of the FMG organization. **Do not click links** or **open attachments** unless you recognize the sender and know the content is safe.

Jonathan,

We are perplexed by your assertion that the Department represented for the first time on September 3, 2024, that it would not release claims related to the limited partnership plans. The Department has been very clear at every step of the negotiations that our discussions are limited to Participating Plans sponsored by traditional employers and that our settlement discussions do not resolve any potential claims related to the limited partnership plans.  Indeed, we have repeatedly reiterated this position throughout our settlement discussions (see, for example, the Department's demand letters of July 21, 2022 (footnote 1), June 8, 2023 (footnote 1), January 24, 2024 (footnote 1), and March 11, 2024 (footnote 1)).

Moreover, the Department has also made clear that it cannot constrain its ability to conduct future investigations (see the Department's demand letter from April 26, 2024).  Relatedly, the Department is only authorized to release claims it has actually investigated. The claims outlined in our July 21, 2022 demand letter are the claims the Department investigated during the prior five years, which are the only claims we are able to release as part of these negotiations. At one point, when our negotiations encompassed potential settlement of the *DMP* litigation, we offered to drop our investigation of Socios Buenos LP, but we withdrew that offer when settlement of *DMP* fell through. Nevertheless, this offer did not at any point waive the Department's authority to investigate any potential future ERISA violations by your clients.

It appears we have reached an impasse. Accordingly, with the tolling period expiring on November 6, the Department will prepare to file suit before that date. Please advise as soon as possible if anything changes for your clients.  Otherwise, **please let us know if you will accept service of the complaint on behalf of your clients via email**.  I am also including Roberta and Stephen here, as I understand they represent Alex Renfro and SAS.

Thank you,

Katrina Liu (she/her)
Senior Trial Attorney
Plan Benefits Security Division
202-693-5520

---

**From:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>
**Sent:** Tuesday, October 29, 2024 10:10 AM
**To:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

**CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

Katrina,

In our phone call of September 3, you disclosed for the first time throughout our lengthy settlement discussions that the Department was unwilling to consider granting releases for any activities pertaining to our clients' providing services to customers utilizing the Limited Partnership (LP) structure. Further, the Department's revised release language is not even a full release of claims unrelated to our clients' involvement with LP customers. This came as a considerable surprise, and quite frankly, few if any of the other settlement terms would ever have been entertained by our clients, had we understood earlier that it was the intention of the Department to leave open the possibility (which we actually view as a certainty, given the history) of further investigations and other actions by the Department, post "settlement" for conduct the Department has been investigating for five years.

We have nonetheless endeavored over these past weeks to find some language that we could incorporate into a further redline which would be acceptable to all of our clients, as well as to those represented by the Wagner Group. This has proven not to be possible. The Department's latest redline not only removed references to the LP Plans, but it narrowed the release to merely to those claims "outlined in the Department's July 21, 2022 demand letter." That is hardly a full and complete release for an investigation conducted by the Department which began in April 2019. We and our clients believed that we were negotiating with the Department for a complete release of all conduct the Department may or may not consider a violation of ERISA up to the date the settlement agreement is executed, including that pertaining to the LPs. In other words, a full and complete release.

Whether or not the Department will consider a true full and complete release of the Providence Parties in a settlement agreement, I wanted to apprise you of the status of Mr. Renfro's ownership interest in Suffolk and Providence. As counsel for Mr. Renfro and Suffolk alerted you several months ago, Mr. Renfro intended to withdraw from ownership of both Suffolk and Providence as part of the settlement and lifetime ban provision. Despite no settlement agreement having been reached, Mr. Renfro has completed his divestiture of his ownership interest in Suffolk and Providence and no longer maintains an ownership interest in either entity.

I do hope we can reach an agreement given all the hard work put in by both sides to reach settlement terms. Please contact me at your convenience if you wish to discuss any of this.

**Jonathan Crumly**
Senior Counsel
**Freeman Mathis & Gary, LLP**
**100 Galleria Parkway | Suite 1600 | Atlanta, GA 30339-5948**
**D: 678-996-9137 | C: 770-883-6344**
Email: Jonathan.Crumly@fmglaw.com
www.fmglaw.com | Instagram | Twitter | Facebook



AZ | CA | CO | CT | DE | FL | GA | IL | IN | KY | MA | NJ | NM | NV | NY | OH | PA | RI | TN | TX | WA
Please read this important notice and confidentiality statement

**From:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Sent:** Monday, September 30, 2024 1:36 PM
**To:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

**Caution:** This email originated from outside of the FMG organization. **Do not click links** or **open attachments** unless you recognize the sender and know the content is safe.

Let me circle up with my folks, but I think that will be fine. Assuming it is, we will circulate updated agreements.

Katrina Liu (she/her)
Senior Trial Attorney
Plan Benefits Security Division
202-693-5520

---

**From:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>
**Sent:** Monday, September 30, 2024 1:31 PM
**To:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

**CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

I was thinking a 30-day extension for both deadlines. I have meetings scheduled with the clients tomorrow & Wednesday so should have comments back to you no later than Friday.

**Jonathan Crumly**
Senior Counsel
**Freeman Mathis & Gary, LLP**
**100 Galleria Parkway | Suite 1600 | Atlanta, GA 30339-5948**
**D: 678-996-9137 | C: 770-883-6344**
Jonathan.Crumly@fmglaw.com | LinkedIn | Bio
www.fmglaw.com | Instagram | Twitter | Facebook



CA | CT | FL | GA | IL | IN | KY | MA | NJ | NY | OH | PA | RI | TN | TX
Please read this important notice and confidentiality statement

**From:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Sent:** Monday, September 30, 2024 12:14 PM
**To:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

**Caution:** This email originated from outside of the FMG organization. **Do not click links** or **open attachments** unless you recognize the sender and know the content is safe.

Thanks for the update. How long are you thinking?

Katrina Liu (she/her)
Senior Trial Attorney
Plan Benefits Security Division
202-693-5520

**From:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>
**Sent:** Monday, September 30, 2024 12:02 PM
**To:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

> **CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

Katrina,

Unfortunately, between travel schedules and the office closures related to hurricane Helene last week, I was not able to obtain feedback from my clients on the most recent revisions to the term sheet. The current litigation standstill expired last week with the tolling agreement expiring next week. Would the Department be open to one additional extension?

**Jonathan Crumly**
Senior Counsel
**Freeman Mathis & Gary, LLP**
**100 Galleria Parkway | Suite 1600 | Atlanta, GA 30339-5948**
**D: 678-996-9137 | C: 770-883-6344**
Jonathan.Crumly@fmglaw.com | LinkedIn | Bio
www.fmglaw.com | Instagram | Twitter | Facebook



CA | CT | FL | GA | IL | IN | KY | MA | NJ | NY | OH | PA | RI | TN | TX
Please read this important notice and confidentiality statement

**From:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Sent:** Monday, September 23, 2024 4:49 PM
**To:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

> **Caution:** This email originated from outside of the FMG organization. **Do not click links** or **open attachments** unless you recognize the sender and know the content is safe.

Sounds good, thank you.

Katrina Liu (she/her)
Senior Trial Attorney
Plan Benefits Security Division
202-693-5520

**From:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>
**Sent:** Monday, September 23, 2024 4:25 PM
**To:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Cc:** Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>; Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; Stephen Rosenberg <SRosenberg@wagnerlawgroup.com>; Roberta Watson

<[rcwatson@wagnerlawgroup.com](mailto:rcwatson@wagnerlawgroup.com)>; Bowers, Jamie L - SOL <[Bowers.Jamie.L@dol.gov](mailto:Bowers.Jamie.L@dol.gov)>

**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

> **CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

Katrina,

Thank you for this. I was traveling Friday but we have circulated this new draft to our clients. I hope to have any questions/comments back to you by the end of the week.

**Jonathan Crumly**
Senior Counsel
**Freeman Mathis & Gary, LLP**
**100 Galleria Parkway | Suite 1600 | Atlanta, GA 30339-5948**
D: 678-996-9137 | C: 770-883-6344
[Jonathan.Crumly@fmglaw.com](mailto:Jonathan.Crumly@fmglaw.com) | LinkedIn | Bio
[www.fmglaw.com](http://www.fmglaw.com) | Instagram | Twitter | Facebook



CA | CT | FL | GA | IL | IN | KY | MA | NJ | NY | OH | PA | RI | TN | TX
Please read this important notice and confidentiality statement

**From:** Liu, Katrina T - SOL <[Liu.Katrina.T@dol.gov](mailto:Liu.Katrina.T@dol.gov)>
**Sent:** Friday, September 20, 2024 1:49 PM
**To:** Jonathan Crumly <[Jonathan.Crumly@fmglaw.com](mailto:Jonathan.Crumly@fmglaw.com)>
**Cc:** Holz, Sarah D - SOL <[Holz.Sarah.D@dol.gov](mailto:Holz.Sarah.D@dol.gov)>; Hahn, Jeffrey M - SOL <[Hahn.Jeffrey.M@dol.gov](mailto:Hahn.Jeffrey.M@dol.gov)>; Bob Chadwick <[Bob.Chadwick@fmglaw.com](mailto:Bob.Chadwick@fmglaw.com)>; Stephen Rosenberg <[SRosenberg@wagnerlawgroup.com](mailto:SRosenberg@wagnerlawgroup.com)>; Roberta Watson <[rcwatson@wagnerlawgroup.com](mailto:rcwatson@wagnerlawgroup.com)>; Bowers, Jamie L - SOL <[Bowers.Jamie.L@dol.gov](mailto:Bowers.Jamie.L@dol.gov)>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

> **Caution:** This email originated from outside of the FMG organization. **Do not click links** or **open attachments** unless you recognize the sender and know the content is safe.

Counsel,

Thank you for your patience. See attached for our counterproposal, presented as redlines to the version of the term sheet you sent us on July 29, 2024. I am also attaching a clean version.

At our last discussion, I believe I flagged for you how our client will not agree to include the limited partnership plans in this settlement, and will desire a briefer timeline for monetary payments. We also discussed a requirement for SAS to cap all administrative fees for plans, which you represented SAS was unable to do. Taking that into consideration, we now revert to our prior proposal for hiring a consultant to evaluate SAS and PIC's (and any other affiliate's and subcontractor's) fees. Please let us know if you would like to discuss.

Thank you,

Katrina Liu (she/her)

Senior Trial Attorney
Plan Benefits Security Division
202-693-5520

---

**From:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>
**Sent:** Monday, July 29, 2024 5:24 PM
**To:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Cc:** Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>; Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; Stephen Rosenberg <SRosenberg@wagnerlawgroup.com>; Roberta Watson <rcwatson@wagnerlawgroup.com>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

> **CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

Katrina,

Thank you for this. I am back in the office now and have been able to review the proposed term sheet with our clients. Attached are revisions to the original proposed term sheet (a clean & redlined version).

Let me know if you want to discuss these proposed changes.

**Jonathan Crumly**
Senior Counsel
**Freeman Mathis Decisions**
**100 Galleria Parkway | Suite 1600 | Atlanta, GA 30339-5948**
**D: 678-996-9137 | C: 770-883-6344**
Jonathan.Crumly@fmglaw.com
decisions.fmglaw.com | Instagram | Twitter | Facebook



AZ | CA | CO | CT | DE | FL | GA | IL | IN | KY | MA | NJ | NM | NV | NY | OH | PA | RI | TN | TX | WA
Please read this important notice and confidentiality statement

---

**From:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Sent:** Monday, July 22, 2024 4:15 PM
**To:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; Stephen Rosenberg <SRosenberg@wagnerlawgroup.com>; Roberta Watson <rcwatson@wagnerlawgroup.com>
**Cc:** Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>; Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

> **Caution:** This email originated from outside of the FMG organization. **Do not click links** or **open attachments** unless you recognize the sender and know the content is safe.

Jonathan,

We don't plan to put pen to paper until we reach a settlement in principle. But to keep things moving forward, I am attaching a proposed term sheet for your review. Let me know if you have any questions.

Katrina Liu (she/her)
Plan Benefits Security Division
Office of the Solicitor
202-693-5520

---

**From:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>
**Sent:** Friday, July 19, 2024 8:52 AM
**To:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; Stephen Rosenberg <SRosenberg@wagnerlawgroup.com>; Roberta Watson <rcwatson@wagnerlawgroup.com>
**Cc:** Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>; Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>
**Subject:** Re: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

> **CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

Katrina,

Understood. Do you have a draft of the proposed settlement agreement you could share?

Thanks.

**Jonathan Crumly**
Senior Counsel
**Freeman Mathis & Gary, LLP**
**100 Galleria Parkway** | **Suite 1600** | **Atlanta, GA 30339-5948**
**D: 678-996-9137 | C: 770-883-6344**
Jonathan.Crumly@fmglaw.com | LinkedIn | Bio
www.fmglaw.com | Instagram | Twitter | Facebook

CA | CT | FL | GA | IL | IN | KY | MA | NJ | NY | OH | PA | RI | TN | TX
Please read this important notice and confidentiality statement

---

**From:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Sent:** Wednesday, July 17, 2024 5:12:02 PM
**To:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; Stephen Rosenberg <SRosenberg@wagnerlawgroup.com>; Roberta Watson <rcwatson@wagnerlawgroup.com>
**Cc:** Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>; Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

> **Caution:** This email originated from outside of the FMG organization. **Do not click links** or **open attachments** unless you recognize the sender and know the content is safe.

Jonathan,

Thank you for helping to handle during your leave. I am not allowed to share the Complaint document, but I am attaching our initial demand letter, which lays out the various ERISA claims we plan to bring. I'll add that, since we sent this initial demand and as we further analyzed our case based on the productions we received from your clients, we have decided not to bring claims related to coverage for preventive services, pre-existing condition exclusions or annual dollar limits, or the provision of deficient SPDs. The remaining claims described in the demand letter, specifically those related to the handling of plan contributions/fee payments and M-1 reporting, are contained in the Complaint. We have also decided not to name PIP as a defendant.

Thank you and let me know if you have any questions.

Katrina Liu (she/her)
Plan Benefits Security Division
Office of the Solicitor
202-693-5520

---

**From:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>
**Sent:** Tuesday, July 16, 2024 11:39 AM
**To:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>; Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>
**Cc:** Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; 'Stephen Rosenberg' <SRosenberg@wagnerlawgroup.com>; 'Roberta Watson' <rcwatson@wagnerlawgroup.com>
**Subject:** Re: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

> **CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

Katrina,

Thank you for this. We have forwarded it to our clients for review. However, we will be unable to respond substantively unless you can provide the proposed complaint referenced in the first bullet point. As the current stand still agreement within the tolling agreement expires this Friday, the sooner we can review the proposed complaint, the better.

Thanks again.

**Jonathan Crumly**
Senior Counsel
**Freeman Mathis & Gary, LLP**
**100 Galleria Parkway | Suite 1600 | Atlanta, GA 30339-5948**
**D: 678-996-9137 | C: 770-883-6344**
Jonathan.Crumly@fmglaw.com | LinkedIn | Bio
www.fmglaw.com | Instagram | Twitter | Facebook

CA | CT | FL | GA | IL | IN | KY | MA | NJ | NY | OH | PA | RI | TN | TX
Please read this important notice and confidentiality statement

---

**From:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Sent:** Monday, July 15, 2024 1:39 PM

**To:** Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>; Jonathan Crumly <Jonathan.Crumly@fmglaw.com>
**Cc:** Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; 'Stephen Rosenberg' <SRosenberg@wagnerlawgroup.com>; 'Roberta Watson' <rcwatson@wagnerlawgroup.com>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

> **Caution:** This email originated from outside of the FMG organization. **Do not click links** or **open attachments** unless you recognize the sender and know the content is safe.

Counsel,

Thank you for clarifying SAS's agreement to fully disclose all itemized fees to the plan clients. Based on that clarification, the Department's counteroffer is as follows:

- The Department will agree to a payment plan (rather than an immediate, single payment – more below) only if the parties agree that the Department will file the Complaint and an Unopposed Motion for Entry of a Consent Judgment in federal district court. The Consent Judgment will contain the terms of the parties' settlement, including the monetary payment and all injunctive actions detailed in the Department's January 24 letter.

- Your clients will make a monetary payment of $15 million, inclusive of the 502(l) penalty, within 12 months of the court's entry of the consent judgment. The payment schedule is as follows:
  - within one week of entry of the consent judgment, your clients will pay $2 million as a "good faith" payment;
  - within 6 months of entry of the consent judgment, your clients will pay at least half of the remaining balance of the $15 million (at least $6.5 million);
  - within 12 months of the entry of the consent judgment, your clients will pay the remaining balance of the $15 million (at most $6.5 million).

- As a term in the Consent Judgment, the Department will agree to release its claims contained in the Complaint, specifically the alleged ERISA violations by SAS, PIC, and Messrs. Renfro, Bryan, and Zieger that arose prior to the date of the filing of the Complaint.

- Execution of another tolling agreement, which will remain in effect until the filing of the Complaint or two months after the expiration of the current agreement (whichever is later).

Please let me know if you have any questions or would like to discuss.


Katrina Liu (she/her)
Plan Benefits Security Division
Office of the Solicitor
202-693-5520

---

**From:** Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>
**Sent:** Wednesday, June 26, 2024 2:49 PM
**To:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>
**Cc:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>; Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; 'Stephen Rosenberg' <SRosenberg@wagnerlawgroup.com>; 'Roberta Watson' <rcwatson@wagnerlawgroup.com>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

Hi Jonathan,

Thank you for reaching out, and thanks to Roberta for her email last week. Our client is considering your proposal, and we anticipate providing a substance response during the week of July 8.

Thank you,
Sarah

---

**From:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>
**Sent:** Wednesday, June 26, 2024 1:20 PM
**To:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Cc:** Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>; Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; Stephen Rosenberg <SRosenberg@wagnerlawgroup.com>; Roberta Watson <rcwatson@wagnerlawgroup.com>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

> **CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

Katrina,

Can you advise on what you see as next steps & the potential timeline? Thanks.

**Jonathan Crumly**
Senior Counsel
**Freeman Mathis Decisions**
**100 Galleria Parkway | Suite 1600 | Atlanta, GA 30339-5948**
**D: 678-996-9137 | C: 770-883-6344**
Jonathan.Crumly@fmglaw.com
decisions.fmglaw.com | Instagram | Twitter | Facebook



AZ | CA | CO | CT | DE | FL | GA | IL | IN | KY | MA | NJ | NM | NV | NY | OH | PA | RI | TN | TX | WA
Please read this important notice and confidentiality statement

---

**From:** Roberta Watson <rcwatson@wagnerlawgroup.com>
**Sent:** Wednesday, June 19, 2024 2:10 PM
**To:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Cc:** Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>; Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>; Jonathan Crumly <Jonathan.Crumly@fmglaw.com>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; Stephen Rosenberg <SRosenberg@wagnerlawgroup.com>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

> **Caution:** This email originated from outside of the FMG organization. **Do not click links** or **open attachments** unless you recognize the sender and know the content is safe.

Katrina –

My clients have agreed to the following, and I have received assurance from Mr. Crumly that his clients have also agreed:

It is current SAS policy to require written confirmation that all plan sponsors have received and agreed to full itemized fee disclosures, substantially similar to the S&S contract recently provided to the Department.  As part of settlement, SAS will formally agree not to accept fees from any plan or plan sponsor in the absence of such written confirmation (in the form of sponsor signatures) of accurate, transparent, and itemized fee disclosures. We are encouraged if this manner of disclosure meets the Department's standard; that's exactly what we were aiming for.  If the Department has changes to propose, we plan to be receptive.

I believe we are now on the same page as the Department.  Please let us know if you need any further clarification.

**Roberta Casper Watson**
**Direct line (813) 603-2960**
**Tampa Fax (813) 603-2961**
**Boston Fax (617) 357-5250**
**iPhone (617) 615-5200**
**rcwatson@wagnerlawgroup.com**

**The Wagner Law Group**

101 East Kennedy Boulevard, Suite 2140
Tampa, FL  33602
Tel: (813) 603-2959

www.wagnerlawgroup.com

*****************************************************************************************************

This message contains confidential information, intended only for the person(s) named above, which may also be privileged.  Any use, distribution, copying or disclosure by any other person is strictly prohibited.  If you have received this message in error, please notify us immediately by telephone (collect), and delete the original message without making a copy.

**From:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Sent:** Monday, June 17, 2024 3:07 PM
**To:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; Roberta Watson <rcwatson@wagnerlawgroup.com>; Stephen Rosenberg <SRosenberg@wagnerlawgroup.com>
**Cc:** Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>; Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

Counsel

I'm writing with our initial thoughts on your clients' latest offer.  First, it's not clear whether you've agreed that SAS will ensure that the fees of each plan service provider will be disclosed to and approved by the plan sponsor.  Attached is an ASA template included as part of the May 30, 2024, document production. Page 3 includes a list of plan services, providers for each of those services, and a placeholder for fees for each service.  Assuming the fee amounts are filled in for client review and approval at the outset of their enrollment in a SAS plan and upon any change to service provider fee amounts, this is the kind of disclosure that the Department is envisioning that all of SAS's clients receive and sign.  Please confirm whether SAS is able to ensure fee disclosures such as the sample attached for all its Participating Plan sponsor clients.

Second, while the Department acknowledges your clients' significant monetary offer of $15 million, it is not willing to agree to a 5-year payment plan. Though I can't promise anything at this juncture, we may be willing to negotiate the terms of payment, but not unless and until we have agreement that SAS will make all appropriate fee disclosures to the plan sponsors.

Katrina Liu (she/her)
Plan Benefits Security Division
Office of the Solicitor
202-693-5520

---

**From:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>
**Sent:** Thursday, June 13, 2024 11:26 AM
**To:** Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>; Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>; Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>
**Cc:** Bob Chadwick <Bob.Chadwick@fmglaw.com>; 'Roberta Watson' <rcwatson@wagnerlawgroup.com>; 'Stephen Rosenberg' <SRosenberg@wagnerlawgroup.com>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

> **CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

Jeff,

My Anjo Investigation clients (PIC, Mr. Bryan & Mr. Zieger) have just authorized me to offer the following:

- Total monetary relief of $15 million, inclusive of the 20% penalty pursuant to ERISA § 502(1).
- Five years from execution of the final settlement agreement to make the payments.
- Full and complete release of all claims against my clients by the Department, inclusive of any alleged ERISA violations arising from their services to any group health benefits plans or Plan Sponsors, prior to the date of the settlement agreement.
- All injunctive relief items detailed in the January 24 letter (all to be more explicitly spelled out in the final settlement agreement. To be clear – there is no opposition to the injunctive relief requested, just a desire to properly document the details such that my clients can, in fact, perform all of the required actions)
- Tenth Tolling Agreement to provide sufficient time to finalize the settlement agreement. We suggest 4 weeks.

My understanding is that SAS and Mr. Renfro are in agreement with these terms, and I expect you will receive a confirming email from their counsel.

Please advise if the Department is willing to settle on these terms.

**Jonathan Crumly**
Senior Counsel
**Freeman Mathis Decisions**
**100 Galleria Parkway | Suite 1600 | Atlanta, GA 30339-5948**
**D: 678-996-9137 | C: 770-883-6344**
Jonathan.Crumly@fmglaw.com
decisions.fmglaw.com | Instagram | Twitter | Facebook



AZ | CA | CO | CT | DE | FL | GA | IL | IN | KY | MA | NJ | NM | NV | NY | OH | PA | RI | TN | TX | WA
Please read this important notice and confidentiality statement

**From:** Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>
**Sent:** Tuesday, June 11, 2024 1:37 PM
**To:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; 'Roberta Watson' <rcwatson@wagnerlawgroup.com>; 'Stephen Rosenberg' <SRosenberg@wagnerlawgroup.com>
**Cc:** Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>; Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

> **Caution:** This email originated from outside of the FMG organization. **Do not click links** or **open attachments** unless you recognize the sender and know the content is safe.

Jonathan,

Yes, that January 24 demand is still on the table (though of course the other injunctive pieces are still part of that demand). But we'd have to know relatively soon if your clients are interested in that offer, as we're planning on filing the complaint by the end of the week, and I can't promise what our client would be willing to do once we file.

Jeff Hahn
Counsel for Appellate and Special Litigation
U.S. Department of Labor
Office of the Solicitor
Plan Benefits Security Division
202-961-5182

**From:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>
**Sent:** Tuesday, June 11, 2024 10:32 AM
**To:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; 'Roberta Watson' <rcwatson@wagnerlawgroup.com>; 'Stephen Rosenberg' <SRosenberg@wagnerlawgroup.com>
**Cc:** Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>; Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

> **CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

Katrina,

We are disappointed to hear that our discussions have failed to produce mutually acceptable settlements of the two matters. I have had several discussions with my clients since our call yesterday afternoon. Jeffrey stated that if the DMP Matter is not dismissed, the monetary demand in the Anjo Investigation would increase substantially. My Anjo Investigation clients have requested that I confirm what that amount would be. In my review of the settlement

13

correspondence in the Anjo Investigation, I noted that on January 24 (prior to Galen Thorp's proposal of global settlement discussions) the Department presented a demand of $12.5 million plus the 20% penalty pursuant to ERISA § 502(1) for a total of $15.0 million. Is that demand still on the table if the DMP Matter is not dismissed?

If the Department files a complaint, I am authorized to accept service on behalf of PIC, Mr. Bryan, and Mr. Zieger. You can email the service materials to me.

**Jonathan Crumly**
Senior Counsel
**Freeman Mathis Decisions**
**100 Galleria Parkway | Suite 1600 | Atlanta, GA 30339-5948**
**D: 678-996-9137 | C: 770-883-6344**
Jonathan.Crumly@fmglaw.com

decisions.fmglaw.com | Instagram | Twitter | Facebook



AZ | CA | CO | CT | DE | FL | GA | IL | IN | KY | MA | NJ | NM | NV | NY | OH | PA | RI | TN | TX | WA
Please read this important notice and confidentiality statement

---

**From:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Sent:** Tuesday, June 11, 2024 11:10 AM
**To:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; 'Roberta Watson' <rcwatson@wagnerlawgroup.com>; 'Stephen Rosenberg' <SRosenberg@wagnerlawgroup.com>
**Cc:** Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>; Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

> **Caution:** This email originated from outside of the FMG organization. **Do not click links** or **open attachments** unless you recognize the sender and know the content is safe.

Counsel,

We are planning to file a complaint by the end of this week. Please advise whether you are authorized to accept service on behalf of your clients and/or whether your clients will waive service.

Thank you,

Katrina Liu (she/her)
Plan Benefits Security Division
Office of the Solicitor
202-693-5520

---

**From:** Liu, Katrina T - SOL
**Sent:** Thursday, May 30, 2024 10:29 AM
**To:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; Roberta Watson <rcwatson@wagnerlawgroup.com>; Stephen Rosenberg <SRosenberg@wagnerlawgroup.com>
**Cc:** Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>; Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>
**Subject:** RE: Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan
**Importance:** High

Counsel,

We haven't received any additional information from your clients since our discussion on Tuesday. We are planning to file the complaint by COB today. Please advise whether you are authorized to accept service on behalf of your clients and/or whether your clients will waive service.

Thank you,

Katrina Liu (she/her)
Plan Benefits Security Division
Office of the Solicitor
202-693-5520

---

**From:** Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Sent:** Friday, May 24, 2024 3:03 PM
**To:** Jonathan Crumly <Jonathan.Crumly@fmglaw.com>; Bob Chadwick <Bob.Chadwick@fmglaw.com>; Roberta Watson <rcwatson@wagnerlawgroup.com>; Stephen Rosenberg <SRosenberg@wagnerlawgroup.com>
**Cc:** Hahn, Jeffrey M - SOL <Hahn.Jeffrey.M@dol.gov>; Holz, Sarah D - SOL <Holz.Sarah.D@dol.gov>; Liu, Katrina T - SOL <Liu.Katrina.T@dol.gov>
**Subject:** Commencement of action against SAS, PIC, Renfro, Zieger, and Bryan

Dear counsel,

Since we have not heard from you since our calls on Thursday, May 16, we are preparing to commence an action next week in the U.S. District Court of Puerto Rico against Suffolk Administrative Services, Providence Insurance Company, Alexander Renfro, Arjan Zieger, and William Bryan for violations of ERISA. The complaint will allege that SAS, PIC, Renfro, Zieger, and Bryan violated their fiduciary duties to self-funded ERISA plans and engaged in prohibited transactions by self-dealing and authorizing excessive and unreasonable fees from plan assets. The complaint will also allege a failure by SAS to file Form M-1s with the Department.

**Please advise whether you are authorized to accept service of the complaint on behalf of your clients and, if so, please confirm your addresses:**

Jonathan Crumly
Bob Chadwick
Freeman, Mathis & Gary LLP
100 Galleria Parkway
Suite 1600
Atlanta, GA 30339-5948

Roberta Watson
Stephen Rosenberg
The Wagner Law Group
101 East Kennedy Boulevard
Suite 2140
Tampa, FL 33602

Thank you,

**Katrina T. Liu | Senior Trial Attorney**
Plan Benefits Security Division | Office of the Solicitor | U.S. Department of Labor
200 Constitution Ave. N.W., Suite N-4611, Washington, D.C. 20210
liu.katrina.t@dol.gov | (202) 693-5520

Pronouns: she, her, hers